UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EZRA BIRNBAUM, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     v.<br><br>GENERAL ELECTRIC COMPANY and H. LAWRENCE CULP, JR.,<br><br>               Defendants. | 19cv1013 (DLC) |
| SHEET METAL WORKERS LOCAL 17 TRUST FUNDS, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     v.<br><br>GENERAL ELECTRIC COMPANY, JOHN M. FLANNERY, RUSSELL STOKES, and JAMIE S. MILLER,<br><br>               Defendants. | 19cv1244 (DLC) |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
OF EZRA BIRNBAUM FOR NON-CONSOLIDATION OF THE ABOVE-CAPTIONED
ACTIONS, FOR APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF HIS
SELECTION OF LEAD COUNSEL**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT AND PROCEDURAL POSTURE ........................................... 1

SUMMARY OF THE PENDING ACTIONS ................................................................ 6

    A. The *Birnbaum* Action .............................................................................. 6

        1.  GE and its acquisition of Alstom Energy. ................................................ 6

        2.  For GE Power, GE takes a $23 Billion goodwill impairment charge .......................... 7

        3.  GE names Defendant Culp as the Company's new CEO and Chairman and discloses the GE Power Charge ................................................................................ 7

        4.  GE previously announced ongoing SEC investigations into its accounting practices .. 8

        5.  Unbeknownst to the market, the SEC expands its investigation into the GE Power Charge and the DOJ follows suit. ........................................................... 8

        6.  GE delays its 2018 third quarter Earnings Results and fails to disclose the Expanded Investigation, triggering the start of the Class Period. ................................. 8

        7.  GE belatedly discloses the Expanded Investigation into the GE Power Charge. ......... 9

        8.  GE knew of the Expanded Investigation by October 12 and had no justifiable reason for delaying its disclosure. ..................................................................... 10

    B. The *Sheet Metal Workers* Action .................................................................. 11

    C. The *Sheet Metal Workers* Action and the *Birnbaum* Action Are Very Different ............. 15

ARGUMENT ................................................................................................ 15

    A. The *Birnbaum* Action and *Sheet Metal Workers* Action Should Not Be Consolidated. .. 16

    B. If the Actions are Consolidated, Mr. Birnbaum Should Be the Lead Plaintiff for the *Birnbaum* Action Subclass .......................................................................... 20

    C. If the Actions are Not Consolidated, Mr. Birnbaum Should Be Appointed Lead Plaintiff for the *Birnbaum* Action. ............................................................................ 21

        1.  Mr. Birnbaum Has the Largest Financial interest in the relief the *Birnbaum* Class seeks. ............................................................................................ 21

        2.  Mr. Birnbaum otherwise satisfies the requirements of Rule 23 ............................. 22

    D. The Court Should Approve Mr. Birnbaum's Selection of Lead Counsel ....................... 23

CONCLUSION .............................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*Barrios v. Elmore*, No. 3:18-CV-132-DJH-RSE, 2018 WL 3636576 (W.D. Ky. July 31, 2018) 20

*Chilton v. Chiumento Grp.*,
   365 F. App'x 298 (2d Cir. 2010) ........................................................................... 21

*Clark v. Barrick Gold Corp.*,
   No. 13 CIV 3851 RPP, 2013 WL 5300698 (S.D.N.Y. Sept. 20, 2013)................................. 23

*Clark v. Barrick Gold Corp.*,
   No. 13 CIV 3851(RPP), 2013 WL 5300698 (S.D.N.Y. Sept. 20, 2013) ............................... 22

*In re BP, PLC Sec. Litig.*,
   758 F. Supp. 2d 428  (S.D. Tex. 2010) ............................................................. 20, 21

*In re Cent. European Distribution Corp.*,
   No. 11-6247, 2012 U.S. Dist. LEXIS 160248  (D.N.J. Nov. 8, 2012) ............................ 18, 19

*In re Currency Conversion Fee Antitrust Litig.*,
   No. 01 MDL 1409, 2009 WL 1834351 (S.D.N.Y. June 18, 2009)........................................ 17

*In re Datatec Sys, Inc. Sec. Litig.*,
   No. 04-CV-525 GEB, 2006 WL 3095951 (D.N.J. Oct. 30, 2006) ...................................... 16

*In re PHLCORP Sec. Litig.*,
   1989 U.S. Dist. LEXIS 13681 (S.D.N.Y. 1989).................................................... 20

*In re Repetitive Stress Injury Litig.*,
   11 F.3d 368 (2d Cir. 1993), *on reh'g.,* 35 F.3d 637 (2d Cir. 1994)................................ 16, 17

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
   No. 09-CV-01376-LHK, 2010 WL 4117477 (N.D. Cal. Oct. 19, 2009)................................ 17

*Leeds v. Matrixx Initiatives, Inc.*,
   2012 U.S. Dist. LEXIS 47279 (D. Utah Apr. 2, 2012)................................................ 18, 20

*MacAlister v. Guterma*,
   263 F.2d 65 (2d. Cir. 1958)........................................................................ 17

*Malcolm v. Nat'l Gypsum Co.*,
   995 F.2d 346 (2d Cir. 1993)...................................................................... 16, 17

*Marliere v. Vill. of Woodridge*,
   No. 96 C 0816, 1996 WL 464241 (N.D. Ill. Aug. 12, 1996).......................................... 19

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*,
   No. 11 Civ. 5097(JFK), 2011 WL 4831209 (S.D.N.Y. Oct. 12, 2011)................................ 22

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
   589 F. Supp. 2d 388 (S.D.N.Y. 2008)................................................................ 24

*Webb v. Goord*,
   197 F.R.D. 98 (S.D.N.Y. 2000) .................................................................... 16

**Statutes**

15 U.S.C. § 78j(b) ............................................................................................................... 1

15 U.S.C. § 78t(a) ............................................................................................................... 1

15 U.S.C. § 78u-4(a)(3)(A) ............................................................................................... 15

15 U.S.C. § 78u-4(a)(3)(B) ............................................................................................... 21

15 U.S.C. § 78u-4(a)(3)(B)(i) ............................................................................................. 5

15 U.S.C. § 78u-4(a)(3)(B)(iii) .................................................................................... 21, 22

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) ....................................................................................... 5

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc) ............................................................................... 22

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa) .............................................................................. 23

15 U.S.C. § 78u-4(a)(3)(B)(v) ........................................................................................... 23

15 U.S.C. S. 78u-4(a)(3)(B)(ii) .................................................................................... 15, 16

**Rules**

17 C.F.R. § 240.10b-5 ......................................................................................................... 1

Fed. R. Civ. P. 23(a)(4) ..................................................................................................... 23

Fed. R. Civ. P. 23(c)(4)(B) ................................................................................................ 20

Fed. R. Civ. P. 42(a) ......................................................................................................... 16

Ezra Birnbaum respectfully submits this memorandum in support of his motion: (1) in opposition to consolidation of the above-captioned actions (the "Actions"); (2) for appointment as Lead Plaintiff in the earlier-captioned action (19-cv-1013 (DLC)) (the "*Birnbaum* Action") pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); (3) for approval of his selection of Keller Lenkner LLC as Lead Counsel for the Class in the *Birnbaum* Action; and (4) for any such further relief as the Court may deem just and proper.

## PRELIMINARY STATEMENT AND PROCEDURAL POSTURE

On February 1, 2019, movant filed the *Birnbaum* Action, which alleges that General Electric Company ("GE") and its Chief Executive Officer, H. Lawrence Culp, Jr., (collectively, "the *Birnbaum* Defendants") defrauded investors in violation of Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and corresponding Securities and Exchange Commission Rule 10b-5 (17 C.F.R. § 240.10b-5). Specifically, during the time period from October 12 through October 29, 2018, inclusive (the "*Birnbaum* Class Period"), the *Birnbaum* Defendants knew, but misrepresented or concealed from investors, that the SEC had expanded its investigation into the Company's accounting practices, including investigating GE's $23 billion goodwill impairment charge (the "GE Power Charge"). The Company announced the GE Power Charge on October 1, 2018, and the SEC investigation began shortly after.

The Company revealed the truth on October 30, 2018, when GE announced that the SEC had expanded its previous investigation into the Company's accounting practices to now include the GE Power Charge. The Company announced that the Department of Justice was also investigating GE (the "Expanded Investigations"). GE had failed to disclose that material information on October 12, 2018, when defendants announced that GE was delaying the release of the Company's quarterly earnings. Upon disclosure of the Expanded Investigations, GE's

stock price fell sharply from a closing price of $11.16 on October 29, 2018, to a closing price of $10.18 on October 30, 2018—a nearly 10% market decline—on trading of almost 345 million shares. GE shares traded as low as $9.87 on October 30, 2018.

On February 8, 2019, another class action was filed in this Court titled *Sheet Metal Workers Local 17 Trust Funds v. General Electric Company, et al.*, Case No. 1:19-cv-01244 (the "*Sheet Metal Workers* Action"). *The Sheet Metal Workers* Action is on behalf of GE investors who purchased or otherwise acquired GE common stock between December 27, 2017 and October 29, 2018, inclusive (the "*Sheet Metal Workers* Class Period"). The defendants in the *Sheet Metal Workers* Action are GE, John L. Flannery, Russell Stokes, and Jamie S. Miller (the "*Sheet Metal Workers* Defendants").

The *Sheet Metal Workers* Action does not involve allegations of falsity relating to the disclosure of the Expanded Investigations. Instead, the allegations center around a new turbine type at GE Power called the "H-Class," also known as High Efficiency, Air Cooled ("HA"), which purported to deliver improved efficiency and reliability over prior turbines and was expected to drive customer demand. According to the *Sheet Metal Workers* Action, during the *Sheet Metal Workers* Class Period, most of GE Power's revenue came from the sale and servicing of its Gas Power Systems, including its H-Class gas turbines that the Company sold to power utilities across the globe. In 2017, GE Power was the leading manufacturer of gas turbines, with more than 50% of global market share. The *Sheet Metal Workers* Complaint alleges that, throughout the *Sheet Metal Workers* Class Period, Defendants made false and misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, prospects, and financial health. Specifically, Defendants failed to disclose that: (1) the design and technology of GE Power's flagship gas turbines were structurally flawed

2

as they were plagued with an oxidation problem that caused the blades in the H-Class gas turbines to fail; (2) GE Power's goodwill was materially overstated, in large part because of such structural issues; (3) the Company lacked adequate internal and financial controls; and (4) as a result of the foregoing, Defendants' public statements were materially false and misleading and lacked a reasonable basis. Further, the *Sheet Metal Workers* Complaint alleges that the truth about the H-Class gas turbines began to be revealed on September 19, 2018, when the *Sheet Metal Workers* Defendants disclosed negative information about the turbines. In reaction to these disclosures, according to the *Sheet Metal Workers* Complaint, GE's stock plummeted $1.59 per share or 12%, from $12.86 per share on September 19, 2018, to $11.27 per share on September 25, 2018.[1]

On February 13, 2019, the *Sheet Metal Workers* Action was accepted by the Court as related to the *Birnbaum* Action. The date to move for lead plaintiff in the Actions under the PSLRA is April 2, 2019.

The *Birnbaum* and the *Sheet Metal Workers* Actions should not be consolidated because the class periods, the allegations, and the damages and loss causation are materially different. Consolidation would ***frustrate,*** rather than promote, judicial efficiency. **First**, the class periods in the Actions are materially different. The *Birnbaum* Class Period lasts only 17 days—from October 12 through October 29, 2018. In contrast, the *Sheet Metal Workers* Class extends almost

---

[1] It is curious why the Class Period in the *Sheet Metal Workers* Action ends on October 29, 2018, when there are no false statements alleged after July 27, 2018 and the truth began to emerge in September 2018.

10 months—from December 27, 2017 through October 29, 2018.[2] The overlap between the Actions is minute.

   **Second**, just like the class periods in the Actions, the allegations have minimal overlap. The crux of the *Birnbaum* Action is an attack on the statements and omissions relating to the Expanded Investigations, including the GE October 12, 2018 press release, and the failure to update the GE 2017 10-K and 2018 first quarter 10-Q concerning the Expanded Investigations. In contrast, the *Sheet Metal Workers* Complaint does not mention the October 12, 2018 statement challenged in the *Birnbaum* Action, nor the previous statements of the ongoing SEC investigations *Birnbaum* alleges needed to be updated. The *Sheet Metal Workers* Action asserts no falsity whatsoever concerning the disclosure of the Expanded Investigations. Rather, the materially false and misleading statements in the *Sheet Metal Workers Action* relate to statements regarding GE's Pakistan Relationship; GE's Fourth Quarter 2017 Results; GE's First Quarter 2018 Financial Results; GE's June 4, 2018 Business Update Call; and GE's Second Quarter 2018 Financial Results. The attacked statements in *Sheet Metal Workers* have nothing to do with disclosure of the Expanded Investigations. These statements are alleged to be materially false and misleading because defendants allegedly failed to disclose that: (1) the design and technology of GE Power's flagship gas turbines were structurally flawed as they were plagued with an oxidation problem that caused the blades in the H-Class gas turbines to fail; (2) GE Power's goodwill was materially overstated, in large part because of such structural issues; and (3) the Company lacked adequate internal and financial controls. The allegations in the Actions are therefore critically different.

---

[2] Also, importantly, the defendants in each case are materially different. The only common defendant is GE. The *Birnbaum* Action names GE executive Culp, while the *Sheet Metal Workers* Action names former and current GE executives Flannery, Stokes and Miller.

*Third*, the damages and loss causation analyses in the Actions materially differ as well. The *Birnbaum* Action alleges one GE stock drop, on October 30, 2018. And it is readily apparent that the GE stock-drop on October 30, 2018, was due to the disclosure of the Expanded Investigations: the heart of the false and misleading statements in the *Birnbaum* Action. But according to the *Sheet Metal Workers* Action, the truth about defendants' alleged scheme started to be revealed on September 19, 2018. In reaction to those disclosures, according to the *Sheet Metal Workers* Complaint, GE's stock plummeted $1.59 per share or 12%, from $12.86 per share on September 19, 2018, to $11.27 per share on September 25, 2018—allegedly wiping out over $13 billion of the Company's market cap. The existence of a partial disclosure makes loss causation and damages more complicated for the *Sheet Metal Workers* Action.

For these reasons, and those set forth below, the Actions should not be consolidated.

Under the PSLRA, this Court must appoint the "most adequate plaintiff" to serve as Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i). The Court shall determine which movant has the "largest financial interest" in the relief sought by the Class in this litigation, and also whether such movant has made a prima facie showing that it is a typical and adequate class representative under Rule 23 of the Federal Rules of Civil Procedure ("FRCP"). 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). For the reasons set forth below, Mr. Birnbaum is the "most adequate plaintiff" to serve as lead in the *Birnbaum* Action because of the $5925.80 in losses he incurred on his *Birnbaum* Class Period investments in GE common stock. Mr. Birnbaum also satisfies the relevant requirements of Rule 23 because his claims are typical of all members of the Class, and he will fairly and adequately represent the Class.

If the Court consolidates the Actions, Mr. Birnbaum respectfully requests that he be appointed as lead plaintiff for a subclass of GE securities purchasers from October 12 through October 29, 2018, inclusive.

Finally, Mr. Birnbaum has selected Keller Lenkner, a law firm with substantial experience in successfully prosecuting securities class actions, to serve as Lead Counsel for the Class. Accordingly, Mr. Birnbaum respectfully requests that the Court appoint him Lead Plaintiff in the *Birnbaum* Action and otherwise grant his motion.

## SUMMARY OF THE PENDING ACTIONS

**A.   The *Birnbaum* Action**

**1.   GE and its acquisition of Alstom Energy.**

GE is a public company, with shares of its common stock registered with the SEC and listed on the New York Stock Exchange. *Birnbaum* Compl. ¶ 2. "GE Power," GE's largest Industrials segment, provides products and services related to energy production to customers worldwide. *Id.*

In November 2015, GE purchased Alstom Energy for approximately $10.6 billion. *Id.* ¶ 3. At the time GE acquired Alstom, Alstom had a negative book value of approximately $7.2 billion, accounting for minority interests that were left in some of the operations. GE added to its balance sheet as "goodwill" the $17.8 billion difference between Alstom's negative book value of $7.2 billion and the purchase price of $10.6 billion. *Id.* ¶¶ 6-7. Goodwill is the effective equivalent of the amount that was overpaid for an acquisition. *Id.* ¶ 8. The Company justified the $17.8 billion disparity between Alstom's book value and GE's purchase price as reflecting "estimated GE-specific synergies," including anticipated "additional revenue from cross-selling complementary product lines." *Id.* ¶ 9.

GE purports to test its goodwill allocations in the third quarter of every fiscal year. *Id*. ¶ 23. In the third quarter of its 2017 fiscal year, GE concluded that the goodwill allocated to GE Power needed to be adjusted downward by $1.2 billion. GE characterized this adjustment as "minor." *Id*. ¶ 14. The goodwill associated with GE Power was largely attributable to Alstom. *Id*. ¶ 15.

### 2.     For GE Power, GE takes a $23 Billion goodwill impairment charge.

Despite its normal practice of assessing goodwill allocations in the third quarter of each fiscal year, in the second quarter of its 2018 fiscal year, GE effected an "interim revision" of GE Power's goodwill in the amount of $2.1 billion. *Id*. ¶ 16. Notwithstanding this atypical early revision, only three months later, in September 2018, GE further assessed GE Power's goodwill and decided to write-off almost all the remaining $23.2 billion of accrued goodwill. *Id*. ¶ 17. The massive goodwill write-down amounts to an admission that the acquisition of Alstom, which gave rise to the goodwill, was ill-conceived, and the acquired business does not have the earning power initially envisioned for it. *Id*. ¶ 18.

### 3.     GE names Defendant Culp as the Company's new CEO and Chairman and discloses the GE Power Charge.

On October 1, 2018, GE issued a press release announcing that it had appointed Defendant Culp as its new Chairman and Chief Executive Officer. *Id*. ¶ 20. At the same time and for the first time, GE disclosed that it would likely take the $23 billion GE Power Charge, although it indicated that the goodwill impairment "charge is not yet finalized and remains subject to review." *Id*. ¶ 21. The press release stated that: "The Company will provide additional commentary when it reports third quarter results." *Id*. ¶ 22. Most of the GE Power Charge related to GE's 2015 purchase of Alstom's energy business, and worse, the write-down of the amount allocated to goodwill was greater than the cost of the Alstom acquisition ($10.1 billion). *Id*. ¶ 23.

4. **GE previously announced ongoing SEC investigations into its accounting practices.**

Before the October 1, 2018 disclosure of the GE Power Charge, GE had disclosed that it was the subject of an SEC investigation relating to the Company's revenue recognition practices and internal controls over financial reporting related to long-term service agreements. *Id*. ¶ 24. The SEC was also investigating GE's increase in future policy benefit reserves for GE Capital's run-off insurance operations. *Id*. ¶ 25. GE publicly disclosed both of those investigations earlier in 2018. *Id*. ¶ 26.

5. **Unbeknownst to the market, the SEC expands its investigation into the GE Power Charge and the DOJ follows suit.**

After GE's October 1, 2018 announcement of the Power Charge, GE learned that the SEC had expanded its investigation to include the GE Power Charge. *Id*. ¶ 27. In addition to the SEC's investigations, the DOJ opened an investigation into GE's accounting, including the GE Power Charge. *Id*. ¶ 28. At the time, the market was unaware of the Expanded Investigation. *Id*. ¶ 29.

6. **GE delays its 2018 third quarter Earnings Results and fails to disclose the Expanded Investigation, triggering the start of the Class Period.**

On October 12, 2018, the first day of the Class Period in the *Birnbaum* Action, GE issued a press release announcing that it was moving its third quarter 2018 earnings release from October 25 to October 30, 2018. *Id*. ¶ 32. Defendants misleadingly stated that the earnings release was delayed to allow Defendant Culp "to complete initial business reviews and site visits following his appointment on October 1." *Id*. ¶ 31. As of October 12, GE knew that the Expanded Investigation posed a substantial likelihood that the outcome would prove materially detrimental to GE's earnings for past, current, and future periods. *Id*. ¶ 32. Having disclosed a

purported reason for the delay in reporting third quarter earnings, GE was obligated to disclose the Expanded Investigation. *Id*.

Recognizing that GE's purported reason for the delay was suspicious, an October 12, 2018 article in *The Wall Street Journal* noted that "[a]nalysts were surprised by [the] delay, saying there possibly could be an unknown issue or a pending asset sale. The company is telling investors that the delay is related to Mr. Culp's travel schedule as he is reviewing GE businesses." *Id*. ¶ 33. The *Wall Street Journal'*s suspicions turned out to be dead on. *Id*. ¶ 34. The delay was not because the new CEO needed more time, but rather because of the Expanded Investigation. *Id*.

GE's failure to disclose the Expanded Investigation was also improper because, before the Class Period, GE made statements about the status of the SEC's investigations into GE's businesses. *Id*. ¶ 35. GE needed to correct those statements relating to the Expanded Investigation. *Id*.

### 7. GE belatedly discloses the Expanded Investigation into the GE Power Charge.

Before the market opened on October 30, 2018, GE issued a press release announcing its third quarter 2018 financial results. *Id*. ¶ 36. Although the release mentioned the GE Power Charge of $23 billion, it did not disclose the Expanded Investigation relating to the GE Power Charge, nor give any indication that a separate release relating to the Expanded Investigation would be forthcoming that same day. Pre-market trading rose sharply after this initial press release. *Id*. ¶ 37.

Later that morning (at 8am ET), GE held its third quarter 2018 earnings conference call. In prepared remarks at the beginning of the call, GE Chief Financial Officer, Jaimie S. Miller, disclosed the Expanded Investigation. *Id*. ¶ 39. That same day, GE filed its 2018 third quarter

Form 10-Q with the SEC. GE's 10-Q also disclosed the Expanded Investigation. *Id*. ¶ 40.

According to GE's 10-Q, "[f]ollowing our announcement on October 1, 2018 about the expected

non-cash goodwill impairment charge related to GE's Power business … the SEC expanded the

scope of its investigation to include that charge as well." *Id*. GE also announced that "[s]taff

from the DOJ are also investigating these matters." *Id*.

### 8. GE knew of the Expanded Investigation by October 12 and had no justifiable reason for delaying its disclosure.

If a write-down or write-off is sizeable, the quarter in which the company allocates the

write-down or write-off can have a dramatic impact on the market price for a company's

securities. *Id*. ¶ 41. Not only can imprecise procedures produce inaccurate market pricing

decisions, but mistimed write-downs can frequently lead to insider trading or other market

misconduct. *Id*.

Because write-downs or write-offs are material, significant or sizeable write-offs or

write-downs raise questions for SEC staff regarding the integrity of the processes followed, as

well as the timeliness of those processes. *Id*. ¶ 42. The SEC has frequently cautioned public

companies regarding the need to recognize write-downs or write-offs in a timely fashion. *Id*.

If the SEC followed normal processes, SEC staff contacted GE within 24-48 hours of

GE's initial announcement of the GE Power Charge. *Id*. ¶ 43. GE made its initial announcement

on October 1 and was likely aware of the Expanded Investigation by October 3. *Id*. Yet, GE

waited until October 30, 2018 to disclose the Expanded Investigation. *Id*.

Exacerbating the problems GE's need for a write-down caused, GE issued a public

statement on October 12, 2018 about its 2018 third quarter financials yet failed to disclose that

the GE Power Charge had caused the Expanded Investigation. *Id*. ¶ 44. GE's delay in disclosing

the Expanded Investigation until October 30, 2018 also meant that GE's statements made before

October 12, 2018 about the status of the SEC investigations into GE's businesses were the only authoritative disclosure about these events. *Id*. ¶ 45. As soon as GE knew of the Expanded Investigation, those prior statements became false and misleading. *Id*.

Because of GE's delay in making appropriate disclosures, over one billion GE shares traded on materially false and misleading information from October 12 through October 29, 2018. *Id*. ¶ 46. After disclosing the Expanded Investigation, GE's stock price fell sharply from a closing price of $11.16 on October 29, to a closing price of $10.18, on October 30, 2018—a nearly 10% market decline—on trading of almost 345 million shares. *Id*. ¶ 53. GE shares traded as low as $9.87 on October 30, 2018. *Id*. Notably, GE's shares had jumped almost 2% in pre-market trading on October 30, 2018, after GE announced its third quarter 2018 earnings results and dividend cut, but before it disclosed the Expanded Investigation. *Id*. ¶ 54.

**B.    The *Sheet Metal Workers* Action**

The *Sheet Metal Workers Action* is on behalf of purchasers of GE common stock who purchased shares between December 27, 2017 and October 29, 2018, inclusive. *Sheet Metal Workers* Compl. ¶1. The defendants in that case are GE, and former and current GE executives, Flannery, Stokes and Miller. *Id*. ¶¶ 22-26.

*The Sheet Metal Workers* Action centers around a turbine type at GE Power called the H-Class, also known as High Efficiency, Air Cooled (HA), which purported to deliver improved efficiency and reliability over prior turbines, and was expected to drive customer demand. *Id*. ¶ 3. During that Class Period, most of GE Power's revenue came from the sale and servicing of its Gas Power Systems, including its H-Class gas turbines that the Company sold to power utilities across the globe. *Id*. ¶ 2. In 2017, GE Power was the leading manufacturer of gas turbines, with more than 50% of global market share. *Id*. Throughout the *Sheet Metal Workers* Class Period, Defendants made false and misleading statements, as well as failed to disclose

material adverse facts about the Company's business, operations, prospects and financial health. *See id*. ¶¶ 30-41. Specifically, Defendants failed to disclose that: (1) the design and technology of GE Power's flagship gas turbines were structurally flawed as they were plagued with an oxidation problem that caused the blades in the H-Class gas turbines to fail; (2) GE Power's goodwill was materially overstated, in large part because of such structural issues; (3) the Company lacked adequate internal and financial controls; and (4) as a result of the foregoing, Defendant's public statements were materially false and/or misleading and/or lacked a reasonable basis. *Id*.

Indeed, GE had repeatedly publicly claimed that, of its competitors, "none can offer the outstanding performance, reliability, efficiency, and expertise of GE H-class gas turbine." *Id*. ¶ 3. In reality, the H-Class turbine was disastrously defective. *Id*. ¶ 4. Specifically, the coating used to keep the turbines' blades from overheating was ineffective, leading to dangerous oxidation that could cause the turbines to fail after as little as one year of use, in turn causing power outages in the areas serviced by the utilities using GE's turbines, and requiring months-long repairs. *Id*. Indeed, as was later revealed, data from French utilities showed that power plants using GE's H-Class turbines suffered *four times as many outages* as other plants. *Id*.

Early in the Class Period, signs of trouble were emerging with GE's H-Class turbines, but defendants assured the public that the problems were minor, easily fixable, and in no way widespread or systemic. *Id*. ¶ 6. For example, on December 27, 2017, *Reuters* published an article titled, *"In Pakistan, Questions Raised over GE's Flagship Power Turbines*," reporting that GE's "flagship gas turbines ran into problems in Pakistan earlier this year, leading to delays and lengthy outages at three newly built power stations." *Id*. According to the article, the GE H-Class turbines that began running in the beginning of 2017 in Pakistan were "producing at levels well

12

below their capacity and the problem was acute in the crucial summer months, when temperatures in the country frequently exceed 40 degrees Celsius (104 °F)." *Id*. In a statement to *Reuters*, however, GE denied there were any issues with the H-class turbines, assuring the public that "every commercial HA site today is demonstrating exceptional performance levels for both output and efficiency." *Id*. Specific to GE Power's gas turbines running in Pakistan, GE represented, "we've encountered and communicated openly about launch challenges and readily resolved issues during this time." *Id*.

Defendants represented that GE Power "is a fundamentally strong franchise with leading technology" and GE was "proud of the HA gas turbine technology." *Id*. ¶ 7. Further, GE assured investors that the Company's installed turbine units were "performing to specifications and guarantees." *Id*. When GE Power began to experience "softening demand" for its turbines in the first quarter of 2018, GE falsely attributed this reduction entirely to external factors, such as "excess capacity in developed markets," and "continued pressure in oil and gas applications and macroeconomic and geopolitical environments . . . energy efficiency, renewable energy penetration and delays in expected orders," rather than any performance issues with the turbines. *Id*.

In late September 2018, investors began to learn the truth about GE's "flagship" H-Class turbines. *Id*. ¶ 8. On September 19, 2018, defendants disclosed by a LinkedIn post that four H-Class turbines were shut down due to blade problems that were discovered at power plants in Texas owned by Exelon. *Id*. The Company also admitted that a series of delays had impacted "the completion of the three HA-equipped power plants in Pakistan" which GE said "were caused by a mix of factors—some in our control and others that were out of our hands." *Id*. Through the LinkedIn post, defendants revealed that the Company had "identified an issue that

13

we expect to impact our HA units" involving "an oxidation issue that affects the lifespan of a single blade component." *Id*. GE further warned that the same oxidation issue was likely to lead to additional turbine shutdowns at other plants. *Id*. However, defendants again downplayed the issue, assuring investors that "[t]he minor adjustments that we need to make do not make the HA any less of a record setting turbine – they are meeting – and in many cases exceeding – their performance goals at every customer site today." *Id*.

Analysts were incredulous. *Id*. ¶ 9. In a note to investors, JPMorgan analyst Stephen Tusa warned that the issue with some gas-turbine blades threatened to hurt GE Power's earnings and damage its reputation when it was already losing market share. *Id*. Contrary to defendants' prior claims that reduced demand was purely a result of the market, Tusa stated that there could no longer be any doubt that GE Power's turbine issues were "company-specific" and "structural," and not due to the "cyclical nature of the power industry downturn." *Id*. Tusa also explained that the blade issue was not a simple or minor problem to fix, as repairs to the faulty turbines would require "close to perfection [on] a microscopic level." *Id*. Over the next four trading days, in response to fallout from the turbine issues, GE's stock price dropped $1.59 per share or 12%, from $12.86 per share on September 19, 2018 to $11.27 per share on September 25, 2018— wiping out over $13 billon in the Company's market cap. *Id*.

While the Class Period in the *Sheet Metal Workers* Action ends on October 29, 2018, the complaint in that case does not allege any false and misleading statements made after July 27, 2018. In contrast, all the false and misleading statements and omissions of material fact in the

*Birnbaum* Action occur in October 2018, after the truth was allegedly already revealed in the *Sheet Metal Workers* Action.[3]

## C.   The *Sheet Metal Workers* Action and the *Birnbaum* Action Are Very Different.

The *Sheet Metal Workers* Action and the *Birnbaum* Action are very different, and therefore, should not be consolidated. The class periods and defendants in the Actions are materially different. The central allegations in the Actions, especially the false and misleading statements, are markedly different. And the damages and loss causation in the Actions materially differ.

## ARGUMENT

Under the PSLRA, any Class member may move for appointment as Lead Plaintiff within 60 days of the publication of notice that the first action asserting substantially the same claims has been filed. 15 U.S.C. § 78u-4(a)(3)(A). On February 1, 2019, Mr. Birnbaum filed the *Birnbaum* Action against Defendants. On the same day, counsel for Mr. Birnbaum published a notice on *PR Newswire*, which alerted investors to the pendency of the *Birnbaum* Action and apprised investors that they must seek Lead Plaintiff status by April 2, 2019. *See* Ottensoser Decl., Ex. A. Accordingly, Mr. Birnbaum satisfies the PSLRA 60-day requirement through the filing of this motion.

The PSLRA requires that the Court decide a motion to consolidate related securities class actions before addressing motions for appointment of Lead Plaintiff brought by competing plaintiff groups. 15 U.S.C. S. 78u-4(a)(3)(B)(ii).  Because the *Birnbaum* and *Sheet Metal*

---

[3] In fact, GE announced the \$23 billion GE Power Charge on October 1, 2018 (before the start of the *Birnbaum* Class Period). That additional partial disclosure relating to the *Sheet Metal Workers* Complaint and the GE Power Charge would also potentially negate any of false and misleading statements alleged in the *Sheet Metal Workers* Action.

*Workers* Actions deal with materially different class periods, causes of actions, damages and loss causation, and are brought against different defendants, the actions should not be consolidated.

After consolidation of related actions, the Court "shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions . . . ." *Id.* If the Court determines that the cases should be consolidated, it should appoint Mr. Birnbaum as Lead Plaintiff of a subclass for plaintiffs who purchased GE stock from October 12 through October 29 2018. If the Court rejects consolidation, the Court should appoint Mr. Birnbaum as Lead Plaintiff in the *Birnbaum* Action.

**A.    The *Birnbaum* Action and *Sheet Metal Workers* Action Should Not Be Consolidated.**

The Federal Rules provide that "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). But, "the discretion to consolidate is not unfettered." *Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993). The proponents of consolidation bear the burden to demonstrate that consolidation is appropriate. *In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373-74 (2d Cir. 1993), *on reh'g.,* 35 F.3d 637 (2d Cir. 1994) (vacating consolidation). Two or more cases should not be consolidated when the prejudice to a party outweighs the benefits of consolidation—consolidation "cannot be pursued at the sacrifice of fairness to all the parties." *Webb v. Goord*, 197 F.R.D. 98, 101 (S.D.N.Y. 2000). Courts have routinely declined to consolidate cases when they involve different claims, different defendants, or are based on different public statements. *See, e.g.*, *In re Datatec Sys., Inc. Sec. Litig.,* No. 04-CV-525 GEB, 2006 WL 3095951, at *9 (D.N.J. Oct. 30, 2006) (declining to consolidate separate class actions that contained somewhat similar allegations where the cases involved different claims and different, but overlapping, defendants); *In re Wells Fargo Mortg.-Backed Certificates Litig.,* No.

16

09-CV-01376-LHK, 2010 WL 4117477 (N.D. Cal. Oct. 19, 2009) (finding no bases to consolidate two separate claims against a single defendant when the claims were based on different public statements).

It is not enough that consolidation may make the litigation more efficient; instead, the Court must weigh any considerations of "convenience and economy" against the "paramount concern for a fair and impartial" proceeding. *See Malcolm*, 995 F.2d at 350. And, consolidation is inappropriate where potential benefits can be achieved by procedures short of "consolidation." *See MacAlister v. Guterma*, 263 F.2d 65, 70 (2d. Cir. 1958) (consolidation inappropriate where there were "[m]any avenues of relief . . . to forestall the possible confusion and duplication," including coordinated discovery). The standard for consolidation is not met here.

Here, plaintiffs in each case have sued different defendants and asserted materially different class periods. Further, the legal and factual theories of liability and the theories of loss causation and damages all materially differ. Because of the vast factual and legal differences, consolidation in this case would frustrate, rather than promote, judicial efficiency.

The *Birnbaum* Action asserts claims based upon completely different events and circumstances than those at issue in the *Sheet Metal Workers* Action. Proof of materiality, scienter, and damages—the fundamental elements of a Section 10(b) claim—will be vastly different for the *Birnbaum* and the *Sheet Metal Workers* actions. And the *Birnbaum* Class Period is but a small fraction of the *Sheet Metal Workers* Class Period. A proper comparison between these Actions demonstrates that their differences far outweigh their similarities and negate any assumption that consolidation will improve judicial efficiency. *See In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, 2009 WL 1834351, at *2 (S.D.N.Y. June 18, 2009) (denying consolidation when there were overlapping questions of law and fact but consolidation

17

would cause "delay, confusion, or prejudice"). The claims asserted, and concomitant scienter and damages allegations, are wildly different because they are dependent upon unique events, facts, and circumstances.

Even more critically, the evidence required to establish defendants' liability in each of the Actions is utterly distinct. Proving the defendants knowingly made materially false and misleading statements regarding the start of the Expanded Investigations will be a completely different task than proving that defendants knowing issued myriad false statements regarding the GE Power business, and in particular, the H-class turbines. Similarly, proving the damages the *Birnbaum* Class suffered upon the disclosure of the falsity of the statements in October 2018 will be a completely different task than proving the damages the *Sheet Metal Workers* Class suffered when the falsity of those statements was revealed beginning in September 2018. And the existence of a partial disclosure certainly makes loss causation and damages more complicated for the *Sheet Metal Workers* Action. *Cf. Leeds v. Matrixx Initiatives, Inc.*, 2012 U.S. Dist. LEXIS 47279, at *2, *6-8 (D. Utah Apr. 2, 2012) (coordinating discovery but denying consolidation, holding that "while there are common issues between the cases, . . . there are significant case-specific issues with respect to specific causation and damages that weigh against a finding that consolidation would promote judicial economy").

In a similar situation to the one presented here, a court de-consolidated several actions when the pleadings alleged different underlying facts and different class periods and where certain class periods would not be prosecuted at all absent de-consolidation. *See In re Cent. European Distribution Corp.*, No. 11-6247, 2012 U.S. Dist. LEXIS 160248, at *28-29 (D.N.J. Nov. 8, 2012). Indeed, in that case, the court noted that the differences between the cases were "stark," holding that where claims have different class periods, that revolve around different

facts, consolidation is inappropriate. *Id*. at *28-29. The court observed that "if the[] actions remain[ed] consolidated, the Court must either appoint a new lead plaintiff or allow [one party] to neglect [the other party's] claims. Neither option is palatable." *Id.* at *29. A party would be prejudiced "by subjecting them to a lead plaintiff that would neglect their claims." *Id.* In short, "consolidation is unwarranted when prejudice would result." *Id.*

If the cases here are consolidated, unwarranted prejudice would result. The *Sheet Metal Workers* Action does not allege any false and misleading statement after July 27, 2018. Yet, all the false and misleading statements in the *Birnbaum* Action are in October 2018. The complaint in the *Sheet Metal Workers* Action also claims the truth began to be revealed in September 2018, i.e., well before the first materially false statements and omissions alleged in the *Birnbaum* Action.

It is therefore impossible to see how consolidation of these cases will work as a practical matter and how it will enhance efficiency. Proceeding together would result in the two sets of plaintiffs becoming mired in many facts and discovery that do not pertain to their respective actions, while having to ensure that the periods and claims relevant to their action do not conflict. In such circumstances, consolidation is not appropriate. *See Marliere v. Vill. of Woodridge*, No. 96 C 0816, 1996 WL 464241 (N.D. Ill. Aug. 12, 1996) (denying pre-trial consolidation where relevant periods and specific acts of misconduct were different). Consolidation of the Actions is simply unwarranted and unadvisable from the standpoint of judicial efficiency. Also, to the extent that there are overlapping witnesses and evidence in these two Actions, judicial economy

can be served by mandating coordination of discovery in such instances, rather than the

unnecessary—and inefficient—measure of wholesale consolidation.[4]

**B.    If the Actions are Consolidated, Mr. Birnbaum Should Be the Lead Plaintiff for the *Birnbaum* Action Subclass.**

Where conflicts of interests would arise between the Actions, the Court has discretion to

create a separate class, or subclass, with a separate lead plaintiff and lead counsel "when

appropriate." Fed. R. Civ. P. 23(c)(4)(B). In securities cases, subclasses are appropriate when

plaintiffs "have a substantial antagonism towards the positions of others in the class." *In re*

*PHLCORP Sec. Litig.*, 1989 U.S. Dist. LEXIS 13681 (S.D.N.Y. 1989). As here, where the

conflict is substantial and material, the creation of a subclass is warranted.

For example, in *In re BP, PLC Sec. Litig.*, 758 F. Supp. 2d 428  (S.D. Tex. 2010), the

court appointed a subclass of investors with separate lead plaintiff and representation because the

competing lead plaintiff movants' claims rested on different legal theories and those differences

gave rise to a substantial risk of conflict with the interests of other class members. The court

noted that:

> [T]he Court does not believe that the Ludlow Plaintiffs by
> themselves will best represent all of the class members. First, the

---

[4] Mr. Birnbaum would not oppose the coordination of discovery in these separate cases to the extent practicable. Such coordination for discovery purposes has been found to promote judicial economy where substantively separate cases—like these Actions—are inappropriate for consolidation. *E.g., Leeds*, 2012 U.S. Dist. LEXIS 47279, at *2, *6-8; *Barrios v. Elmore*, No. 3:18-CV-132-DJH-RSE, 2018 WL 3636576, at *3 (W.D. Ky. July 31, 2018) ("[D]iscovery effort can be coordinated by the parties whether or not the actions are formally consolidated."). Here, the parties in the *Birnbaum* and *Sheet Metal Workers* Actions can coordinate depositions of overlapping witnesses on successive days, thereby decreasing inefficiencies. And to the extent plaintiffs require identical documents to be produced from defendants, such documents can be shared by lead plaintiffs in both Actions, thereby avoiding the cost and burden to defendants of producing the same documents on multiple occasions. Such practical solutions in favor of judicial economy are far more advisable than lumping two disparate classes and claims together in the hope that the inevitable conflicts and inefficiencies will not detract from the prosecution of each class's cases.

> dual theories of the case cut against reliance on the Ludlow
> Plaintiffs alone to represent those who purchased stock before or
> after the Ludlow Period. As with New York Ohio, the Ludlow
> Plaintiffs might not have an interest in vigorously pursuing claims
> based on conduct outside the Ludlow Period, instead focusing on
> conduct in the thirteen months leading up to the Deepwater
> Horizon explosion. This creates a serious potential conflict of
> interest between the Ludlow Plaintiffs and members of the broader
> class.

*Id*. at 439. Like *BP*, to the extent these Actions are consolidated, Mr. Birnbaum should be lead

counsel for a GE subclass running from October 12 through October 29, 2018.

**C.**     **If the Actions are Not Consolidated, Mr. Birnbaum Should Be Appointed Lead Plaintiff for the *Birnbaum* Action.**

If the Actions are not consolidated, Mr. Birnbaum respectfully submits that he should be

appointed Lead Plaintiff for the *Birnbaum* Action because he is the movant "most capable of

adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B). When

selecting Lead Plaintiff, the PSLRA establishes a presumption that the "most adequate plaintiff"

is the movant that "has the largest financial interest in the relief sought by the class" and

"otherwise satisfies the requirements of" Rule 23. *Id.*; *see also Chilton v. Chiumento Grp.*, 365 F.

App'x 298, 299 (2d Cir. 2010) (discussing qualifications for Lead Plaintiff presumption).

**1.**     **Mr. Birnbaum Has the Largest Financial interest in the relief the *Birnbaum* Class seeks.**

Mr. Birnbaum should be appointed Lead Plaintiff for the *Birnbaum* Action because he

believes that he has the largest financial interest in the relief sought by the Class. 15 U.S.C.

§ 78u-4(a)(3)(B)(iii). Mr. Birnbaum sustained total losses of approximately \$5925.80 from his

*Birnbaum* Class Period transactions.[5] To the best of Mr. Birnbaum's knowledge, there is no other

---

[5] Mr. Birnbaum's PSLRA-required Certification is attached to the complaint he filed in the *Birnbaum* Action. ECF No. 1. In addition, a chart setting forth calculations of Mr. Birnbaum's losses is attached as Exhibit B to the Ottensoser Declaration.

applicant seeking Lead Plaintiff appointment that has a larger financial interest in the litigation. Accordingly, Mr. Birnbaum has the largest financial interest of any qualified movant seeking Lead Plaintiff status and is the presumptive "most adequate plaintiff" for the *Birnbaum* Action. *Id*.

### 2.    Mr. Birnbaum otherwise satisfies the requirements of Rule 23.

In addition to possessing the largest financial interest in the outcome of the Birnbaum *Action*, Mr. Birnbaum otherwise satisfies the requirements of Rule 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). On a motion to serve as Lead Plaintiff, the movant must make only "a preliminary showing" that it satisfies the adequacy and typicality requirements of Rule 23. *Clark v. Barrick Gold Corp.*, No. 13 CIV 3851(RPP), 2013 WL 5300698, at *2 (S.D.N.Y. Sept. 20, 2013). Here, Mr. Birnbaum unquestionably satisfies both requirements.

Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Id.* (citation omitted)*.* The requirement is "easily met" when the proposed lead plaintiff "assert[s] that it purchased [the company's] securities during the class period and was injured by false and misleading representations made by defendants." *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, No. 11 Civ. 5097(JFK), 2011 WL 4831209, at *2 (S.D.N.Y. Oct. 12, 2011).

Mr. Birnbaum's claims are typical of the claims of other purchasers of GE common stock during the period from October 12 through October 29, 2018. Mr. Birnbaum's and all the other Class members' claims arise from the same course of events, and their legal arguments are nearly identical. Indeed, like all other Class members, Mr. Birnbaum (1) purchased GE common stock during the Class Period alleged in the *Birnbaum* Action (2) at prices artificially inflated by

22

Defendants' materially false and misleading statements and omissions, and (3) was damaged. As such, Mr. Birnbaum is a typical Class representative.

Additionally, the representative party must "fairly and adequately protect the interests of the Class." Fed. R. Civ. P. 23(a)(4). In order for the Class' interests to be fairly and adequately represented, a Lead Plaintiff must "not have interests that are antagonistic to the class that he seeks to represent and has retained counsel that is capable and qualified to vigorously represent the interests of the class." *Clark v. Barrick Gold Corp.*, No. 13 CIV 3851 RPP, 2013 WL 5300698, at *2 (S.D.N.Y. Sept. 20, 2013). Mr. Birnbaum is an adequate class representative because his substantial financial stake in the litigation provides the ability and incentive to vigorously represent the claims. Mr. Birnbaum's interests are perfectly aligned with those of the other Class members and are not antagonistic in any way.

Finally, Mr. Birnbaum has demonstrated his adequacy through his selection of Keller Lenkner to represent the Class in this action. As discussed more fully below, Keller Lenkner is highly qualified and experienced in the area of securities class action litigation and has repeatedly demonstrated an ability to conduct complex securities class action litigation effectively.

**D.    The Court Should Approve Mr. Birnbaum's Selection of Lead Counsel.**

The Court should approve Mr. Birnbaum's selection of Keller Lenkner as Lead Counsel on behalf of the Class. The PSLRA provides that a movant shall, subject to Court approval, select and retain counsel to represent the class it seeks to represent, and the Court should not disturb Lead Plaintiff's choice of counsel unless it is necessary to "protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa); § 78u-4(a)(3)(B)(v). "The PSLRA evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to

counsel selection and counsel retention." *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 398 (S.D.N.Y. 2008) (citations and internal quotations omitted).

Keller Lenkner is a leading national law firm representing a broad array of clients as plaintiffs in complex litigation at both the trial and appellate levels. Based in Chicago, Keller Lenkner provides unparalleled advocacy to individuals, companies, and governmental entities by combining its lawyers' expert legal knowledge with their significant financial experience managing litigation-related investments. This unique skill set allows Keller Lenkner to represent clients using alternative-fee arrangements in capital-intensive matters, assess litigation risks with a higher degree of confidence, and ultimately maximize client recoveries. Attorneys at Keller Lenkner have extensive experience litigating securities fraud cases and complex corporate class actions, including having litigated the following successful cases at previous firms: *In re Marsh & McLennan Cos., Inc. Securities Litigation* (S.D.N.Y.) ($400 million recovery); *In re Freeport-McMoRan Copper & Gold, Inc. Derivative Litigation* (Del. Ch.) ($153.5 million recovery, representing the second largest derivative settlement in Delaware); *In re Aetna, Inc. Securities Litigation* (E.D. Pa.) ($82.5 million recovery); *In re Triton Energy Ltd. Securities Litigation* (E.D. Tex.) ($49.5 million recovery); and *City of Austin Police & Retirement Fund v. Kinross Gold Corp.* (S.D.N.Y.) ($33 million settlement). Keller Lenkner was recently appointed lead counsel in another case subject to the PSLRA now pending in the Northern District of Illinois: *Walleye Trading LLC v. AbbVie*, No. 18-cv-05114. *See* Ottensoser Decl., Ex. C.

Accordingly, the Court should approve Mr. Birnbaum's selection of Keller Lenkner as Lead Counsel for the *Birnbaum* Class.

## CONCLUSION

For the reasons discussed above, Mr. Birnbaum respectfully requests that the Court: (1) not consolidate the Actions; (2) appoint him to serve as Lead Plaintiff for the *Birnbaum*

Action; (3) approve his selection of Keller Lenkner as Lead Counsel for the Class; and (4) grant

such other relief as the Court may deem just and proper.

Date: April 2, 2019                             Respectfully Submitted,

                                                /s/ U. Seth Ottensoser
                                                U. Seth Ottensoser
                                                   so@kellerlenkner.com
                                                KELLER LENKNER LLC
                                                1330 Avenue of the Americas
                                                New York, NY 10019
                                                (212) 653-9715

                                                Ashley C. Keller (pro hac vice forthcoming)
                                                   ack@kellerlenkner.com
                                                Seth A. Meyer (admission to SDNY pending)
                                                   sam@kellerlenkner.com
                                                Marquel P. Reddish (pro hac vice forthcoming)
                                                   mpr@kellerlenkner.com
                                                KELLER LENKNER LLC
                                                150 N. Riverside Plaza, Suite 4270
                                                Chicago, Illinois, 60606
                                                (312) 741-5222

                                                *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that the foregoing document was served on all counsel of record via CM/ECF.

Date: April 2, 2019

/s/ U. Seth Ottensoser
U. Seth Ottensoser