**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

IN RE GENERAL ELECTRIC SECURITIES
LITIGATION

Case No.:        1:19-cv-1013 (DLC)

**<u>AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION .................................................................................... 1
      A.    GE's Return to Its Industrial Roots.......................................................... 2
      B.    GE's Cover-Up of the Oxidation Defect in the H-Class Turbine Ultimately
            Fails........................................................................................................... 3
      C.    GE Insists Goodwill Need Not be Impaired, Only to Have Its Belated
            Impairment Trigger Criminal and Civil Government Investigations ................... 7

II.   JURISDICTION AND VENUE ............................................................................ 12

III.  PARTIES ............................................................................................................. 13

IV.   FORMER EMPLOYEE......................................................................................... 16

V.    SUBSTANTIVE ALLEGATIONS ....................................................................... 16
      A.    In 2014-2015, GE Sought Financial Rescue by Returning to Its Industrial
            Roots, Developing the H-class Turbine and Purchasing Alstom.......................... 16
      B.    Beginning in 2015 and Continuing through September 2018 GE,
            Unequivocally Touted Its Flagship H-class Turbine Despite Knowledge of
            a Major Defect ........................................................................................ 18
            1)    GE Dubbed the H-Class Gas Turbine the "Crown Jewel" of its
                  Product Portfolio........................................................................... 18
            2)    In 2015, GE Touted H-class Turbines as A Core Component of the
                  Synergies Resulting from GE's Acquisition of Alstom.......................... 21
            3)    Throughout 2016 and 2017, Defendants Described the H-class
                  Turbine Rollout as a Success ....................................................... 24
            4)    From the Beginning of the Class Period on December 4, 2017
                  Through Late 2018, GE Boasted About H-Class Turbines,
                  Resulting in Stock Price Increases .............................................. 25
            5)    In 2015 GE Learned of Two Incidents of Blade Oxidation on 9FB
                  Turbines—Which Use the Same Technology As H-class
                  Turbines—Yet Concealed the Defects from Investors for the Next
                  Three Years ................................................................................. 27
            6)    During the Class Period, the Pakistani Government Complained
                  about H-Class Turbine Problems .................................................. 29
            7)    At a September 12-13, 2018 Users Meeting Attended by GE,
                  Power Plants Expressed Widespread Concerns about Oxidation
                  and Vibration in the H-Class Turbine ........................................... 31
            8)    Between September 20-25, 2018, GE's Stock Price Dropped
                  12.36% as Investors Learned of Oxidation Shutdowns in Five

Power Plants in Texas and GE Revealed the Problem May Impact 51 Other H-Class Turbines ................................................................ 32

9)  In Late September 2018, GE Denies the Severity of the H-Class Turbines' Problems .................................................................. 36

10) In October 2018, Analysts React with their Own Estimate of the Severity of the H-Class Turbine Costs, Causing GE's Stock Price to Fall More than 10% .............................................................. 37

11) On October 30, 2018, GE Announces Devastating Third Quarter 2018 Results: Along With a $22 Billion Goodwill Impairment, It All But Eliminated the Dividend, and Reserved $600 Million for the Oxidation Defect and Other "Execution Issues" within Power ......... 40

12) On December 7, GE Stock Dropped Again as the Oxidation Issue "Goes Global" and Forces Power Plant Shutdowns Worldwide ............. 42

13) *Reuters* Reveals that GE Privately Admitted to Insurers and Customers That It Had Been Aware of the Severe and Systemic Nature of the Oxidation Issue Since 2015 ................................ 43

C.  Due to the Nature of these Turbine Defects, GE's Highest-Level Executives Would Have Approved Technical Information Letters Sent to Customers to Prevent Permanent Damage ........................................... 44

D.  Additional Facts Giving Rise to a Strong Inference of Scienter ......................... 45

1)  GE Admitted That It Knew of the Oxidation Problem and Its Impact on the H-Class Turbines Since 2015 .............................................. 45

2)  GE's Shipments and Sales of the H-Class Turbine Were Disrupted Due to GE's Attempt to Fix the Oxidation Problem ................................. 46

3)  GE's Loss of Market Share During the Class Period Demonstrates the Significant Adverse Impact of the Oxidation Defect to the Company as a Whole ............................................................... 47

4)  The Importance of the H-Class to GE's Power Segment Made Defendants Aware of the Oxidation Problems Throughout the Class Period ............................................................................... 48

5)  Tusa Accurately Predicted the Systemic Nature of the H-class Defect, Even Drawing Board-Level Scrutiny that He Relied on High-Level Insider Information ................................................... 50

E.  GE Maintains $22 Billion in Artificially Inflated Goodwill in the Power Segment for Quarters Ending December 31, 2017, March 30, 2018 and June 30, 2018, Despite Admitting that the Alstom Acquisition Was a Disappointment and Despite Clear Evidence of the Power Segment's Collapse .................................................................................. 51

1)  GE Acquired Alstom and Touted Immediate Benefits and Significant Synergies ........................................................... 51

2)     A Primer on Goodwill Accounting and GE's Recording of $17 Billion in Goodwill for Its $10 Billion Alstom Purchase ........................ 54

3)     GAAP Required GE to Monitor and Test for Goodwill Impairment ....... 56

4)     In Fourth Quarter 2017 GE Reported Materially Inflated Goodwill Attributable to the Power Segment ......................................................... 60

5)     In First Quarter 2018 GE Reiterated Its Materially Inflated Goodwill Despite a Complete Collapse of the Power Business and Market ........................................................................................................ 68

6)     In Second Quarter 2018 GE Maintained Materially Inflated Goodwill in its Financial Statements Despite the Collapse of Business and Market for Power's Products ............................................... 70

7)     In October 2018, GE Abruptly Dismissed Defendant Flannery and Announces its Intent to Impair Tens of Billions in Goodwill, Civil and Criminal Government Investigations into Goodwill, and a Drastic Dividend Cut ................................................................................ 73

F.    Additional Facts Giving Rise to a Strong Inference of Scienter .......................... 80

1)     The Speed and Volume of the Goodwill Impairment Alongside Flannery's Removal as CEO Strongly Demonstrates Goodwill was Inflated at All Times During the Class Period ......................................... 80

2)     Defendants Were Motivated to Record Materially Inflated Goodwill in Violation of GAAP In an Effort to Maintain GE's Credit Rating ...................................................................................................... 81

3)     Defendants' Desire to Maintain GE's Dividend Motivated Them to Conceal that GAAP Required a Goodwill Impairment ........................... 82

4)     Defendants Were Motivated to Record Materially Inflated Goodwill to Conceal the H-Class Turbine Problems ................................ 83

5)     Defendants Were Personally Motivated to Maintain Goodwill That Violated GAAP Because Jobs Were on the Line ...................................... 83

6)     Defendants Were Motivated to Conceal the Need for a Goodwill Impairment in an Effort to Prevent a Further Stock Decline Which Threatened General Electric's Participation in the Dow Jones Industrial Average ................................................................................... 85

VI.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................... 85

VII.   ITEM 303 OF SEC REGULATIONS S-K, 17 CFR. § 229.303 ...................................... 97

VIII.  CLASS ACTION ALLEGATIONS ................................................................................ 98

IX.    LOSS CAUSATION AND ECONOMIC LOSS ........................................................... 100

iii

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE - FRAUD ON THE
        MARKET DOCTRINE AND AFFILIATED UTE ALLEGATIONS .......................... 101

XI.     NO SAFE HARBOR ................................................................................................ 102

XII.    CAUSES OF ACTION ............................................................................................ 103

XIII.   JURY TRIAL DEMAND ........................................................................................ 104

XIV.    PRAYER FOR RELIEF .......................................................................................... 104

Lead Plaintiff Teachers' Retirement System of Oklahoma ("Lead Plaintiff"), by and through its undersigned attorneys, allege the following based upon personal knowledge, on information and belief, and on the investigation of Lead Plaintiffs' counsel, which included a review of relevant U.S. Securities and Exchange Commission ("SEC") filings by General Electric Company ("GE" or the "Company"), records of judicial proceedings in the United States District Court for the Southern District of New York, regulatory filings and reports, press releases, conference call transcripts, public statements, interviews with a former employee of GE (referred to herein as "Former Employee" or "FE"), news articles, other publications, securities analysts' reports and advisories about GE, and other readily obtainable information. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.     This action is brought on behalf of purchasers of GE securities between December 4, 2017 and December 6, 2018 (the "Class Period") who relied on GE's false and misleading statements and omissions regarding two initiatives in the Power segment that were intended to rescue GE's flailing business and the Company's financial future: the launch of GE's flagship H-class gas turbine and the acquisition of French manufacturer Alstom S.A, ("Alstom") for which GE recognized over $17 billion in goodwill.  At the end of the Class Period, investors learned that since 2015 GE had concealed a material and systemic oxidation defect in the H-class gas turbine, causing GE to reserve hundreds of millions of dollars in service charges and warranty claims. Investors also learned that GE had been materially inflating goodwill, which was revealed through the abrupt ouster of CEO John Flannery (architect of the Alstom acquisition), the announcement

1

of a $22 billion goodwill impairment including all of the goodwill recognized from the Alstom acquisition, and a simultaneous near-elimination of GE's historically stable dividend.

2.        In response to this cascade of bad news, GE's stock price crashed, its credit rating was cut to a level barely above investment grade, and the U.S. government instituted criminal and civil investigations.

### A.        GE's Return to Its Industrial Roots

3.        GE's cover-up of the H-class gas turbine problem and inflated goodwill accounting occurred amidst GE's effort to re-invent itself by returning to its industrial roots.  This reinvention was forced by the demise of GE Capital, the Company's financial arm which for years was the principal source of GE profitability and cash flow.  When the mid-2000s financial crisis struck, however, GE Capital collapsed. GE investors became concerned not only about stock price decline as the steady source of cash flow diminished, but also whether GE could continue to pay investors its meaningful and regular dividend as it had done for decades.

4.        In 2014 GE's CEO John Immelt and his principal lieutenant John Flannery launched GE's return to its industrial roots. They determined that GE's Power segment could lead cash flow and profitability with momentum from two major Power initiatives. First, GE would begin sales of its advanced H-class gas turbine ("H-class") which it claimed was the "most efficient and technologically advanced" gas turbine in the market. Second, GE would complete the largest industrial acquisition in its history, paying approximately $13.5 billion for French power company Alstom. Alstom's business of coal fire plant construction and sales of steam turbines and related equipment was presented to investors as "complementary" with GE's existing Power business and gas turbines sales. Since the success of these initiatives had such broad implications for GE's future profitability, GE continuously touted their success both before and during the Class Period, until

by the end, conditions had so deteriorated that GE fraudulently concealed the problems from investors until new leadership came in and tried to clean up the mess.

5.     The success of the Alstom acquisition was so critical to GE that some analysts viewed it as a potential kingmaker, with Barclays analysts stating in January 2016: "Power head Steve Bolze needs to seamlessly integrate Alstom and drive the promised accretion from that deal. If he succeeds, his odds of being GE's next CEO go up substantially."   Indeed, when GE announced Flannery would succeed Immelt, the press release emphasized that Flannery had led the Company "through the successful acquisition of Alstom's energy and grid businesses."

6.     In addition to the Alstom acquisition, in 2014 GE tried to resuscitate Power's dropping market share by moving quickly to sell its H-class gas turbine. At the time, GE's competitors Siemens AG ("Siemens") and Mitsubishi Heavy Industries, Ltd. ("Mitsubishi") were already in the market with similar models.  As a result, GE had fallen from first to third in the sale of advanced gas turbines.

7.     In an effort to catch up, GE heavily promoted its H-class turbines' "advanced technology" and "advanced materials" as allowing the turbines to operate at higher temperatures which in turn created more electricity using less fuel. GE also claimed these advances allowed the gas turbine to operate for 25,000 hours without needing to be shut down for replacement of key hot-section components such as blades. These claimed benefits were attractive to GE's potential customers since the generation of more power using less fuel and with less down time for repairs meant greater profits.

**B.     GE's Cover-Up of the Oxidation Defect in the H-Class Turbine Ultimately Fails**

8.     The Class Period begins on December 4, 2017 with GE's unequivocally positive claims about both the operational and sales success of the H-class gas turbine. For example, on

December 4, 2017 GE claimed that H-class turbines continued to operate at the highest level of efficiency (i.e. 64%) and that this "proven technology" had already translated into "71 units ordered and 17 turbines already operational."

9.      On January 3, 2018, GE emphasized that its H-class turbines incorporated "advances in cooling and sealing, improved aerodynamics, and the use of materials and coatings designed for use in higher temperatures." Soon after, on January 24, 2018, Defendant Stokes, the President of GE's Power segment, stated that GE was "proud of the HA gas turbine technology" as "[i]t is operating in line with performance guarantees" and that all of the 23 units installed were "performing to specifications and guarantees."

10.     On September 12, 2018, GE issued a press release touting the selection of its "industry leading HA gas turbine technology" for a natural gas power plant in Ohio claiming its HA fleet of gas turbines had achieved "more than 175,000 operating hours" and had been recognized by industry third parties, specifically noting that "Exelon's HA-powered Wolf Hollow II project was honored as Power Engineering's Best Gas-Fired Project in 2017." That day, GE's stock increased by 2.27% to close at $12.61 per share, up from $12.33 per share the day before, on a volume of 40,185,622.

11.     Unfortunately for GE investors however, these positive statements regarding the H-class turbines were blatantly false and misleading. The true facts were that regardless of the "advanced technologies and materials" deployed in these turbines, GE had known as early as the end of 2015 that the H-class turbine suffered from oxidation, causing the turbine blades (components which rotate at speeds as high as 3600 rotations per minute) to crack or even break off, critically damaging other turbine components. To manage this problem, power plants had to shut down their operations to replace the turbine blades after only 7,000 hours – rather than the

4

25,000 hours GE promised.  Thus, in reality, far from the H-class turbine being "more efficient," this undisclosed defect forced customers during the Class Period to either halt power production entirely or to dramatically reduce the number of continuous hours the turbines could operate.

12.     Specifically, GE learned of two incidents in 2015 where GE's model 9FB gas turbine blades had degraded because of oxidation. In both situations the damage was significant enough that the blades needed to be replaced altogether; indeed, in one of those incidents, the blades had actually broken off in the turbine. When GE did a root-cause analysis it learned that the same technology that caused oxidation in the 9FB turbine was also deployed in the H-class turbine. Rather than advise H-class customers and investors of the problem and halt all future H-class turbine sales until a fix was developed, GE continued selling the turbines and pushing them out to power plants, all the while concealing the problem from investors who were relying on GE's enthusiastic claims about the H-class turbine.

13.     In 2017 and 2018, customers reported and GE observed the oxidation problem in several H-class gas turbines within the U.S. and abroad, ultimately contributing to H-class turbine sales' collapse. Still, GE concealed the root cause, using as pretext "soft" market conditions to explain the shortfall of units sold.

14.     Beginning in September 20, 2018, the truth began to emerge and caused material declines in GE's stock price. On September 20, 2018, and in response to a stream of warnings issued by JP Morgan analyst Stephen Tusa, GE disclosed that four H-class turbines at the Exelon power generation facilities in Texas had been shut down after a turbine blade broke due to oxidation. GE stated that it "expected" this problem to "affect more of the 51 [H-class] units" it had already sold and shipped to customers, misleadingly suggesting that GE was unsure of the scope and severity of the oxidation issue.  GE's Power segment CEO misleadingly diminished the

problem's impact, claiming that only a "minor adjustment" was needed, without providing details or identifying the number of power plants involved.

15.     Even more troublingly, GE falsely claimed it had only recently discovered the problem, telling *Reuters* "the problem was first discovered on turbine blades…in Texas a few weeks ago." This statement was later revealed to be false as *Reuters* revealed that GE knew of the blade defect in 2015, had conducted a root-cause analysis and began working on a fix ever since. In fact, GE had arranged to inspect and replace blades for certain customers starting in 2017.

16.     GE's stock price fell by approximately 5.37%—from $12.86 on September 19, 2018 to $12.17 on September 21, 2018, on heavy volume.

17.     The market's belief in GE's claim that the blade oxidation issue was minor was undone one month later. On October 10, 2018, Stephen Tusa published the problems that H-class customers had revealed in an internal meeting held on September 12-13, 2018.  Those customers not only identified blade oxidation as one of the most prominent problems affecting multiple power generation facilities, but also expressed frustration that the defect caused havoc by disrupting planned shipments and forcing some customers to shut down power generation entirely. Customers also expressed concerns that the oxidation "fix" GE had come up with had not yet been proven to work. The next day, GE's stock price fell – dropping from $13.55 on October 9, 2018 before the news was revealed to $12.72 on October 11, again on heavy volume.

18.     On October 12, 2018, it became clear that the oxidation defect affected 14 of the 51 installed 7HA turbines, and as many as 70 of GE's 9FB turbines. Customers were immediately impacted. For example, Japan's Chubu Electric learned in October 2018 that its six new GE turbines had blade problems and so restricted operating time and performed repairs on the blades.

19.     Finally, on December 7, 2018 *Reuters* published an exclusive report that 18 power plants utilizing GE H-class turbines "from Taiwan to France" were shut down for repairs and that GE was setting aside $480 million for repairs of its H-class and 9FB gas turbines. Significantly GE admitted to *Reuters* for the first time that it had "***identified the oxidation problem in 2015***, and developed a fix before the [blade] failure in Texas"[1] in September 2018, leaving unanswered why GE had concealed from customers and investors for years both the problem and that GE did not have a proven "fix." GE's stock fell another 4.6%—from $7.35 on December 6, 2018 to $7.01 on December 7, 2018.

20.     After the end of the Class Period, investors learned the full story.  In 2015, there was another incident where a gas turbine blade had broken due to oxidation. The article confirmed that GE told customers and insurers that "at risk" H-class blades could be run for only 7000 hours—less than one-third of the 25,000 hour run time that GE had originally claimed—before needing to be replaced. This meant that customers like Exelon, PSEG, and others were "looking at potentially dwindling profits as their electricity output could suffer."

### C.     GE Insists Goodwill Need Not be Impaired, Only to Have Its Belated Impairment Trigger Criminal and Civil Government Investigations

21.     GE's concealment of the H-class turbine issues not only deceived investors regarding the quality and reliability of this purported flagship product but also supported GE's materially inflated goodwill figures on its balance sheet in each of its financial statements for the quarters ending on December 31, 2017, March 31, 2018 and June 30, 2018.

22.     In connection with the Alstom acquisition, which closed in November 2015, GE recorded on its balance sheet goodwill of $17.2 billion attributable to that acquisition. This figure

---

[1] Emphasis is added unless otherwise specified throughout the Amended Complaint.

was unusual not merely because of its magnitude, but also because the amount significantly exceeded the $10.3 billion purchase price that GE paid for Alstom. GE justified this enormous goodwill figure by claiming that the combination of companies would result in enormous cost and revenue "synergies." These synergies were going to arise from the fact that, *inter alia*, the companies sold "complementary products" such as GE's supposedly best-in-class gas turbines (including its new H-class model) and Alstom's leading steam turbines and Heat Recovery Steam Generators ("HRSGs") and provided growth opportunities for service contracts based on the combined $50 billion in backlog between the companies.

23.     Generally Accepted Accounting Principles ("GAAP") permit goodwill to exceed the purchase price of an acquisition. But, GAAP also requires that the carrying value of the goodwill be tested for impairment (in other words, writing down) at least annually or more frequently where there are material changes in business or market conditions. ASC 350-20-35-30. In analyzing the extent of impairment GAAP requires an examination of financial performance and projected future cash flow in the current period.

24.     As of the fourth quarter of 2017, $25.3 billion in goodwill was attributed to GE's Power segment after recording a *de minimis* impairment charge of $.217 million or .86% of GE Power's goodwill. This reported goodwill figure was materially false and misleading because of myriad factors that adversely impacted the reporting unit's fair value based on clearly diminished business and market conditions in the Power segment.

25.     First, as noted above, the undisclosed defect in the Power segment's flagship product—the H-class turbine—not only materially undermined projections of future sales from that product but also reduced the profitability of service contracts attendant to those sales.

26.     Second, by December 31, 2017 financial results in the Power segment had collapsed.  Power's profit slumped *84.7%* in the fourth quarter of 2017 compared to the same quarter in 2016, profit margins were down by *88.5%* compared to the same quarter in the prior year, and its cash flow dropped by *26.7%* from 2016. The cash flow crisis forced GE to cut its dividend in half because it could no longer support the typical dividend.

27.     Third, by the fourth quarter of 2017 any meaningful positive cash flow or earnings synergies from the Alstom acquisition had clearly failed to materialize. Indeed, on November 13, 2017, GE's CEO Defendant Flannery (the architect of the Alstom transaction) was forced to admit that Alstom was a "disappointment" for which GE "overpaid."

28.     Fourth, GE saw significantly reduced orders and shipments compared to the same quarter in the prior year.

29.     Fifth, and most significantly in terms of projected cash flow and future earnings which was so critical to the GAAP impairment analysis, *GE itself forecasted in the fourth quarter of 2017 that it would ship 30-40% fewer gas turbines in 2018 as compared to 2017* and admitted that the global power market was "substantially worse" than forecasted, resulting in GE laying off 12,000 Power employees around the globe.

30.     External factors, as well as GAAP, all pointed to GE taking a massive impairment to goodwill in the fourth quarter of 2017.  Having failed to do so, and given the ongoing decline in the market and problems in the Power segment continuing into the first and second quarter of 2018, the goodwill number was materially inflated until it was ultimately, belatedly impaired in October 2018.

31.     By the fourth quarter of 2017 all of the publicly known business and market conditions relevant to the assessment of goodwill appeared to  mandate a massive impairment

charge.  But investors and analysts did not have full visibility into GE's goodwill determination, which includes unknown internal analyses, including GE's determination of future cash flow, earnings, and the discount rate it applied as well as the comparable companies examined and how GE recognized revenue from service agreements (which was the subject of an SEC investigation launched during the Class Period).

33.     When GE failed to meaningfully impair goodwill during the Class Period, investors were forced to trust that GE performed its calculations based on reasonable internal metrics, which were concealed by GE's opaque financial reporting and led GE to a different result than what the publicly known data demanded.

33.     Although Defendants had no basis in fact for their failure to impair goodwill, they were highly motivated to avoid taking an impairment. First, an impairment would confirm the abject failure of Alstom, Flannery's signature project. Second, it would likely result in a credit downgrade (which ultimately did occur in October and November 2018 following the $22 billion goodwill impairment) and increase GE's cost of borrowing. Third, an impairment would reveal GE's cash flow crisis and the need to reduce the dividend.  Fourth, in fourth quarter 2017 and 2018, GE was in the midst of concealing the existence and effects of the H-class turbine problems and a dramatic impairment of goodwill would signal material and structural issues in the Power segment. And fifth, impairment would cause a further stock decline, threatening GE's participation in the Dow Jones Industrial Average.

34.     After announcing in early October the Company's intention to impair up to $23 billion in goodwill, GE announced on October 12, 2018 that the third-quarter earnings would be delayed to give Culp time to review the businesses.

35.     On this news, the stock price fell from $12.72 on October 11, 2018, on a volume of 116,161,903 shares traded to $12.32 on October 12, 2018 on a volume of over 123 million shares traded.

36.     Underscoring that the impairment of goodwill in the Power segment was long overdue, within thirty days of Flannery's departure and the ascendancy of Larry Culp as GE's new CEO, on October 30, 2018 GE took one of the largest impairments of goodwill in corporate history—writing off $22 billion dollars of goodwill in one fell swoop.

37.     That day, GE also announced that the SEC and the U.S. Department of Justice ("DOJ") were conducting civil and criminal investigations into GE's goodwill accounting practices.  As former SEC Chairman Harvey Pitt noted, "*[c]ompanies don't write down this amount of money and not get held accountable* . . . You have to get it right, and you start behind the eight-ball when the number is $22 billion."

38.     GE also announced that it was slashing its historically stable and significant dividend to a single penny because it had been paying dividends that its cash flow could not sustain in light of the serious problems with GE's flagship gas turbine and the adverse impact of Alstom.

39.     On October 30, 2018, GE's stock price dropped by 8.78% from $11.16 at close on October 29, 2018 to $10.18 at close on October 30, 2018, with volume of 344,976,676 shares traded. This was GE's single worst trading day since the financial crisis.

40.     The goodwill impairment and dividend cut—related reflections of insufficient future cash flow—spurred the credit rating agencies to downgrade GE.  On October 31, 2018, Moody's lowered GE's credit rating from A2 to Baa1 and on November 2, 2018, Fitch lowered GE's credit rating two levels to BBB or just three levels above junk grade.

41.     On this news the stock price fell again, dropping 8.1% from $9.71 at close on October 31, 2018 to $9.21 per share on November 1, 2018 and dropping further to $8.93 per share on November 2, 2018 on heavy volume.

42.     GE bonds and preferred stock also materially declined on this negative news.  GE's $11.4 billion issuance of 8.7% bonds (cusip 36164QNA2) were issued July 1, 2016 and due 2035. That bond dropped 4.6%, starting at 90.08 of par at close on October 29 and declining to 85.94 on November 2, 2018.  Similarly, GE's perpetual preferred stock dropped 4.5% from $94.07 at close on October 29, 2018 to $89.88 on November 2, 2018.

## II.     JURISDICTION AND VENUE

43.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

44.     This Court has jurisdiction over the subject matter of this action pursuant to 28

45.     U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

46.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because the Company conducts a substantial amount of business in this Judicial District and a significant portion of Defendants' actions, and the subsequent damages, took place within this District. Further, GE's common stock trades on the NYSE, located within this District.

47.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.   PARTIES

48.      Lead Plaintiff **Teachers' Retirement System of Oklahoma** ("TRS) is a public pension fund for public education employees in Oklahoma. It seeks to manage retirement funds and provide financial security for more than 170,000 active and former employees of the school districts, career technology schools, public colleges, and universities of Oklahoma.   TRS purchased and/or acquired GE securities during the Class Period and was damaged thereby. Throughout the Class Period, TRS purchased a total of 2,808,234 shares of GE common stock at artificially inflated prices up to $17.81 per share, totaling $31,147,560.31.   Additionally, TRS owned bonds in GE throughout the Class Period. TRS's holdings in GE are reflected in the certification and Schedule A in Exhibit A.

49.      Defendant **GE** is incorporated in the State of New York and maintains its corporate headquarters in Boston, Massachusetts. GE contains a number of business units, including Lighting, Aviation, Healthcare, Power, Renewable Energy, Additive, Digital, and Capital.   GE made numerous false and misleading statements and omissions during the Class Period including those identified in Section VI, *infra*.

50.      Defendant **John L. Flannery** ("Flannery") was named Chief Executive Officer ("CEO") and Chairman of GE in August 2017. He was deeply involved in and a champion of the Alstom acquisition, and was elevated to CEO in large part because of his work on that deal. However, after a little over one year on the job, it was announced on October 1, 2018 that the Board of Directors had unanimously voted him out and replaced him with H. Lawrence Culp, Jr. Defendant Flannery was GE's eleventh CEO and the Company's tenth chairman.   Flannery made numerous false and misleading statements and omissions during the Class Period including in GE's 2017 results filed on Form 10-K on February 23, 2018, which Flannery signed, and in the June 26, 2018 investor call.

51.     Defendant **Jamie S. Miller** ("Miller") was, at all relevant times, Senior Vice President and Chief Financial Officer ("CFO") of GE. Defendant Miller joined GE in 2008 as Vice President, Controller and Chief Accounting Officer, and later became CFO in October 2017. Miller made false and misleading statements and omissions during the Class Period including in GE's 2017 results filed on Form 10-K on February 23, 2018, which Miller signed.

52.     Defendant **Jan R. Hauser** ("Hauser") was, at all relevant times, Vice President and Controller and Principal Accounting officer for GE.  Hauser made false and misleading statements and omissions during the Class Period including in GE's 2017 results filed on Form 10-K on February 23, 2018, first quarter 2018 results filed on Form 10-Q on May 1, 2018, and second quarter 2018 results filed on Form 10-Q on July 27, 2018, all of which Hauser signed. On July 24, 2018, Hauser announced her intent to retire from GE.

53.     Defendant **Russell Stokes** ("Stokes") joined GE in 1997 in the Financial Management Program. He served as the President and CEO of GE Energy Connections, the electrification, grid and controls business of GE the Chief Executive Officer and President of GE Power, and then with the reorganization of the Power business in October 2018 became the Chief Executive Officer of GE Power Portfolio.  Stokes made numerous false and misleading statements and omissions during the Class Period including during GE's January 24, 2018 investor call, in the March 28, 2018 *Power* article, in the September 20, 2018 *Reuters* article, and on September 21, 2018.

54.     Defendant **Chuck Nugent** ("Nugent") was, at all relevant times, Chief Executive Officer and President of Gas Power Systems.  He was elevated to that role in March 2018.  He is a thirty-year GE veteran who previously served as Vice President of Manufacturing for Oil & Gas and Vice President of Supply Chain for Healthcare.  Nugent made numerous false and misleading

statements and omissions during the Class Period including in the September 20, 2018 *Bloomberg* article and the September 28, 2018 LinkedIn article and press release.

55.     Defendant **Scott Strazik** ("Strazik") was, at all relevant times, Chief Executive Officer of GE's Power Services Business and Gas Power Business.  He has more than 18 years of finance, operations, and leadership experience with GE.   Strazik made numerous false and misleading statements and omissions during the Class Period including in the September 28, 2018 LinkedIn article and press release.

56.     Defendant **Joe Mastrangelo** ("Mastrangelo") was, at all relevant times, the Chief Executive Officer and President of GE's Gas Power Systems.   He left GE in January 2018. Mastrangelo made false and misleading statements and omissions during the Class Period including in GE's December 4, 2017 press release.

57.     Defendants Flannery, Miller, Hauser, Stokes, Nugent, Strazik, and Mastrangelo are collectively referred to hereinafter as the "Individual Defendants." Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information and were the result of the collective actions of the Individual Defendants, While the Individual Defendants are liable for this group published information, their defined roles at GE necessarily required them to have specific knowledge of either the

misrepresentations and concealment of H-class turbine defect or the material inflation of goodwill related to the Alstom acquisition. Miller and Hauser would have been familiar with the H-class turbine issues by virtue of their involvement in GE finance and accounting matters because the oxidation defect had such a profound impact on sales, profits, revenues, and warranty claims. Because of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of GE's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

## IV.    FORMER EMPLOYEE

58.    Former Employee 1 ("FE1") worked at General Electric from December 1999 through January 2018, working his way up to Principal Engineer. He was located in GE's Atlanta headquarters office.  He was responsible for technical issues related to gas turbines and steam turbines, including supporting installation and troubleshooting problems. FE1 reported to the general manager for the global monitoring and diagnostics center, global product services organization, and the services warrantee function.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    In 2014-2015, GE Sought Financial Rescue by Returning to Its Industrial Roots, Developing the H-class Turbine and Purchasing Alstom

59.    GE is one of the most prominent public companies in the United States. At its peak in 2000, GE was the most valuable company in the world, worth $600 billion. In August 2000, GE operated 150 factories in the United States, 176 factories in 34 countries around the world, and employed over 300,000 individuals.

60.    GE's roots are heavy industry. Its core business was the manufacture of heavy machinery such as power turbines, jet engines, trains, and MRI machines. Starting in 1981 under

CEO Jack Welch, GE expanded its portfolio into a wide range of businesses – movies, credit cards, and insurance. Welch's main innovation, though, was the development of GE Capital. GE Capital was a financial services arm that provided commercial lending and leasing, offering everything from credit cards to commercial real estate to freight financing to pet insurance.

61.     Significantly, GE was able to take advantage of the AAA credit rating that it had obtained through its successful industrial businesses to borrow money for GE Capital very inexpensively, providing an advantage over traditional banks. It also provided an accessible source of funds to smooth over financial issues in other parts of the Company. After September 11, 2001, under new CEO Jack Immelt, GE's aviation and insurance business significantly declined and GE Capital's significance ballooned; by 2008, lending represented 38% of GE total revenue. At its peak, GE Capital created more than half of GE's profits.

62.     As a result of GE Capital generating a disproportionate amount of revenue, when the financial crisis hit GE Capital collapsed and GE as a whole was hit hard. The stock price shrank to as low as $6.66 in March 2009, and GE Capital had to get an emergency cash infusion from Warren Buffett and other investors to keep the business afloat.

63.     In an effort to save GE, Immelt and his core of lieutenants sold off GE Capital's remaining assets, including real estate and mortgages. But, they needed a plan to replace the earnings and cash flow that came from GE Capital, to ensure that GE had sufficient funds for operations and to pay the expected dividend.

64.     Immelt turned back to GE's industrial roots – specifically, the Power segment. In 2014, the Power segment represented 20% of GE's total revenues and with 21.8% profit margins, was one of the most profitable segments in the Company.

65.     Immelt seized on two major initiatives in the Power segment to turn around GE: the launch of the new, world-class H-class turbine and the acquisition of French steam turbine manufacturer Alstom S.A.

66.     As discussed further below, these two initiatives intended to save the Power segment instead came to doom it, as each revealed major problems that GE attempted to cover up – at the expense of its public investors.

**B.     Beginning in 2015 and Continuing through September 2018 GE, Unequivocally Touted Its Flagship H-class Turbine Despite Knowledge of a Major Defect**

       **1)     GE Dubbed the H-Class Gas Turbine the "Crown Jewel" of its Product Portfolio**

67.     In GE's sixty-year history of power generation, the Company has continually developed and manufactured new models of gas turbines as well as various products used to increase the efficiency of existing turbines, such as Advanced Gas Path "AGP" products.

68.     In a gas turbine, extremely hot air passes through rows of subsequently larger spinning blades. As the turbine spins it generates electricity. Each row of turbine blades is referred to as a "stage." Stage 1 is the hottest; each subsequent stage is cooler. Stage 1 of the gas turbine is where the greatest advances can be made in energy efficiency and output, because increasing the temperature in Stage 1 increases energy efficiency and output. Companies like GE and its competitors therefore try to push the temperature of Stage 1 higher and higher.

69.     In 1989, GE launched the 9F family of turbines with the 9FA model. GE later launched the 9FB which used the same compressor aerodynamics as the original 9FA but offered new technology and materials in the "hot section" of the turbine—that is, Stages 1 and 2. Because of this new technology and materials, the hot section of the 9FB could operate at a higher firing

temperature – thereby providing higher energy output and efficiency then the 9FA. GE was a leader of the global turbine market with its 9F family of turbines.

70.     In 2014, GE began to sell its next-generation H-class turbine, which GE spent over $2 billion to develop, and which became the flagship product of GE's Power segment. By this time, however, GE had fallen behind its rivals Mitsubishi and Siemens, who released their next-generation turbines before GE and began to capture market share, leaving GE behind in the high-powered gas turbine market.

71.     The H-class turbine utilized similar hot-section materials and technology as the 9FB model, but the Stage 1 blades ran at an even higher temperature (as high as 2900 degrees Fahrenheit) – and so offered even greater energy efficiency and output. This was the key benefit of the H-class.

72.     In modern gas turbines (including the 9F family and H-class), the temperature of the air flow path exceeds the melting point of the Stage 1 turbine blade. In order to prevent the blade from melting, cooling air is circulated through the interior of the blade, exiting through tiny holes drilled in the leading edge and face of the blade. In addition, a ceramic coating is placed on the exterior of the blade. Together, this protects the blade from melting or becoming overstressed. However, if the coating fails or there is insufficient cooling air circulated through the blade, the high temperatures in Stage 1 can cause a chemical reaction between the metal of a turbine blade and oxygen in the air, causing the metal to corrode. This process is known as "oxidation." If improperly designed or manufactured, turbine blades can be susceptible to high levels of oxidation in the interior of the blade, the exterior of the blade, or both, thus requiring substantial repairs or complete replacement.

73.     Turbine blade replacement is no small feat. The gas turbine generator must be turned off and after cooldown the large casing must be opened up. Highly specialized tools and highly trained laborers are necessary. Under ideal circumstances, with readily available spare parts and quality crews working two or three shifts, turbine blade replacement can take 3-4 weeks – during which time the gas turbine generator is not operating (and therefore not generating electricity or money). Power plants schedule outages based on the estimated inspection and repair schedule to ensure that they can plan for all necessary repairs and the impact on their business.

74.     GE touted the H-class as the Company's most powerful, technologically advanced, and efficient turbine generators. Defendants lauded the H-class turbines as "the crown jewel of our product portfolio" and the "key to the future of energy." The H-class was comprised of the "7HA" model for countries like the U.S. and Canada where electricity is produced at 60 Hz, and the "9HA.02" model for most countries in Europe and Asia that utilize 50 Hz electricity.

75.     Though GE does not reveal its price list, sales of the first 15 H-class turbines produced $1 billion in revenue, according to GE, which equates to about $60 million for each H-class turbine.

76.     Most sales of advanced gas turbines include long-term service contracts, which are a significant source of revenue for GE. GE described the H-class turbine as "a key driver in both our backlog growth and future services growth." For instance, revenue from GE service agreements (excluding the subsequent Alstom acquisition) were $10.9 billion in both 2015 and 2016, representing 9.3% of GE's total consolidated revenues in 2015 and 8.8% in 2016. Indeed, GE touted its multi-billion-dollar power services backlog as a driver of growth for the Company.

**2)**      **In 2015, GE Touted H-class Turbines as A Core Component of the Synergies Resulting from GE's Acquisition of Alstom**

77.      On November 2, 2015, GE announced that it had completed the acquisition of Alstom. Alstom was a French company engaged in heavy industry manufacturing and servicing. It was particularly renowned for its steam machinery for power plants, including steam turbines and heat recovery steam generators.

78.      In 2014, then-CEO Immelt and his lieutenant Flannery identified Alstom as a key opportunity in their effort to return GE to its industrial roots through a new source of cash flow and earnings to replace GE Capital and sustain the Company going forward.

79.      GE's primary rationale for the Alstom acquisition was that the acquisition would lead to major synergies in the combined-cycle power plant business. A combined-cycle power plant utilizes both a steam and gas turbine to generate electricity, as depicted below:



80.      The first machine in the combined-cycle power plant is an electric generator, which is attached to the "cold end" of the gas turbine. The generator produces electricity when turned by the shaft power produced by the gas turbine. In the gas turbine, filtered air enters the compressor and is compressed and flows into the turbine combustion chamber. High pressure natural gas is injected into the combustion section and is ignited, producing a high temperature flame in the

combustor. The hot combustion gases exit the combustion chamber and enter the turbine section where 3 or 4 rows or "stages" of increasingly large turbine blades cause the turbine shaft, and the generator connected to the compressor end of the shaft, to spin, as depicted in the diagram above. This is how the turbine generator set produces electricity.

81.     In summary, the hot gases of combustion spin the gas turbine shaft as the gases flow across the stages of turbine blades. After exiting the last turbine stage, the hot exhaust gases flow into the HRSG. This is the innovation of the combined-cycle power plant: rather than the turbine exhaust simply being vented off into the atmosphere, it is captured and utilized to create steam. The steam is delivered to a steam turbine generator set thus producing additional electricity.

82.     GE believed Alstom would complement its Power segment because each company claimed to be the best in the world at manufacturing a different component of the combined-cycle power plant. Alstom built and operated coal-fired power facilities all over the world and manufactured and serviced HRSGs and steam turbines, while GE manufactured the flagship H-class gas turbine and efficiency-boosting products like AGPs. Since the Alstom and GE products were so complementary, GE claimed the acquisition would allow it to become a juggernaut provider of the components and services for combined-cycle power plants.

83.     GE depicted the synergies in the following diagram of a combined-cycle power plant, indicating where each business held a significant market advantage – and showing that together, the combined companies should dominate the bulk of the plant:



84.     Thus, as it acquired Alstom, GE stated that "[c]ustomers will realize immediate benefit from the combination of GE and Alstom, including at these current projects," all of which had purchased a new H-class turbine:

- PSEG Sewaren (New Jersey combined cycle power plant): GE 7HA gas turbine + Alstom heat recovery steam generator (HRSG)

- Punjab Pakistan Bhikki (Pakistan combined cycle power plant): two GE 9HA gas turbines + Alstom steam turbine

- Exelon Power Plants (Texas power projects): four GE 7HA gas turbines + four Alstom HRSGs

- Chempark (Leverkusen, Germany combined heat and power project): GE 9HA gas turbine.

85.     By 2016, GE had overtaken its rivals Mitsubishi and Siemens to become the number one seller of high-powered gas turbines, capturing 45% of the market according to analyst Stephen Tusa of Morgan Stanley.

86.     Years later, however, these impressive sales were belatedly revealed to have been achieved at a significant cost: In its rush to gain market share, GE sold the H-class turbines by undercutting the retail price of its competitors by approximately 20% and concealed serious structural issues with its H-class turbines.

> 3)     **Throughout 2016 and 2017, Defendants Described the H-class Turbine Rollout as a Success**

87.     GE led the public to believe that its rollout of its flagship H-class turbine was off to a great start.

88.     On June 17, 2016, GE announced that operations had begun on the first-ever combined cycle power plant equipped with a GE H-class turbine at a plant in Bouchain, France. GE also announced that day that the Company was recognized by Guinness World Records for powering the world's most efficient combined-cycle power plant at the Bouchain site.

89.     In November 2016, GE gave a presentation to investors in which it touted its world-record turbine efficiency, and confidently stated that the H-class launch was "on-track":



90.     On November 13, 2017, John Flannery noted that GE had shipped 38 H-class turbines to date, and 17 were in commercial operation. He noted that GE did have "some launch issues" including scheduling challenges, but swiftly pushed those issues aside by insisting "the product is delivering the value that we expected to customers and is performing well where it's running."

       4)       **From the Beginning of the Class Period on December 4, 2017 Through Late 2018, GE Boasted About H-Class Turbines, Resulting in Stock Price Increases**

91.     Over the next several months, GE continued to repeatedly reaffirm the quality of its gas turbines, boosting its stock price as investors gained confidence in GE's ability to turn around its business prospects.

92.     The Class Period begins on December 4, 2017, when GE issued a press release on its website announcing that GE's "largest and most efficient gas turbine, the HA, is now available at more than 64 percent efficiency in combined cycle power plants, higher than any other competing technology today." GE further stated:

> The HA is our most advanced gas turbine technology, and we've never stopped pushing the boundaries of what it can do," said Joe Mastrangelo, president and CEO, GE's Gas Power Systems. "With the ability to deliver 64 percent efficiency, GE is proud to achieve an industry first and offer customers the most efficient gas technology available in the world today." According to GE Power's estimates, an additional percentage point of efficiency in gas turbines can translate to millions in fuel savings for customers globally. . . . The new combustion system has already been successfully tested at full-load and full-speed at GE's test stand in Greenville, South Carolina."
>
>            *       *       *
>
> The HA is a proven technology – with 70+ orders to date – and is being deployed by customers worldwide.

93.     On January 3, 2018, GE emphasized that its H-class gas turbines incorporated "advances in cooling and sealing, improved aerodynamics, and the use of materials and coatings designed for use in higher temperatures."

94.     On January 24, 2018, GE announced its fourth quarter 2017 and full year results and held a conference call with investors. During the conference call, Defendant Stokes stated that GE was "proud of the HA gas turbine technology" as "[i]t is operating in line with performance guarantees." Defendant Stokes acknowledged "some issues related to commissioning at certain sites," but he represented that GE had "readily addressed them" and "have commenced working on supply chain and project organizations to address volume ramp issues and things considered normal learning curve process." Defendant Stokes also stated that all of the 23 units installed were "performing to specifications and guarantees."

95.     During the same conference call, Defendant Stokes explained that total gas turbine shipments would decrease in 2018 to 60-70 units, compared with 102 units in 2017. He explained the decrease in turbine shipments by stating: "the markets were softer than expected. Deals are taking longer to close and are very competitive. We are expecting the markets to be less than the [sic] 35 gigawatts in 2017 and we are preparing our restructuring plans for a market that could be as low as 30 gigawatts in 2018."

96.     On March 28, 2018, the magazine *Power* published an article titled "GE HA Turbine Snags Another World Record for CCGT Efficiency," in which GE Power "noted that the Bouchain and Nishi-Nagoya world records highlight HA turbine contributions at the world's most efficient power plants in both the 50 Hz and 60 Hz segments." Defendant Stokes further stated in the article: "We're very proud to make history once again and to partner with Chubu and Toshiba to bring GE's industry-leading HA turbine to Japan . . .  Our HA technology enables the power

plant of the future, delivering unprecedented levels of efficiency and reliability that can help countries everywhere meet today's power demands and reach more aggressive emissions goals."

97.     On June 26, 2018, GE conducted a business update conference call with analysts. In discussing GE Power, Defendant Flannery represented that GE Power "is a fundamentally strong franchise with leading technology, a valuable installed base, and expansive global research" with "approximately 7,000 gas turbines in our installed base and we have a 20- year plus track record that demonstrates we can improve output, reliability, and performance of those assets when we service them." That day, GE's stock skyrocketed 7.76% to close at $13.74 per share, up from $12.75 per share the day before, on exceptionally high volume of 213,833,225 shares traded.

98.     On September 12, 2018, GE issued a press release touting the selection of its "industry leading HA gas turbine technology" for a natural gas power plant in Ohio.  GE stated that its HA fleet of gas turbines had achieved "more than 175,000 operating hours" and had been recognized by industry third parties, specifically noting that "Exelon's HA-powered Wolf Hollow II project was honored as Power Engineering's Best Gas-Fired Project in 2017." That day, GE's stock increased by 2.27% to close at $12.61 per share, up from $12.33 per share the day before, on a volume of 40,185,622.

### 5)     In 2015 GE Learned of Two Incidents of Blade Oxidation on 9FB Turbines—Which Use the Same Technology As H-class Turbines—Yet Concealed the Defects from Investors for the Next Three Years

99.     Unbeknownst to investors, in GE's rush to gain market share, it pushed the H-class turbine to market despite a known defect causing severe oxidation of the blades, leading to blades cracking and, in some cases, completely breaking.

100.     A turbine blade break is an extremely serious event. If a blade breaks in Stage 1 of the gas turbine, the remnants can fall into Stage 2 and Stage 3, breaking additional blades and causing serious damage along the way that is time-consuming and expensive to repair.

101.   In 2015, oxidation led a turbine blade to completely break in one of GE's 9FB units. The blade broke after only 22,000 hours of use, even though GE advised its customers that the blade did not need to be serviced until after 25,000 hours of use. GE also learned in 2015 of premature oxidation in another 9FB unit.

102.   GE conducted a root-cause analysis of the blade break, which revealed that the break was caused by oxidation in a component in the 9FB model that was similar to a component in the 9HA model. The 2015 turbine blade break prompted GE to work on new protective coatings and to alter a heat treatment process for the component. But when GE inspected turbines containing blades with the supposedly improved special coating, it found blades showing early stages of cracking after only *7,000 hours* and observed cracking after 12,000 and 16,000 hours.

103.   None of these defects in GE's supposedly world class turbines was timely disclosed to the public. Instead, GE touted the quality of its turbine coatings. In a February 2015 report (which is still available on GE's website), GE notes that "creep, oxidation, and corrosion are the dominant life limiters for continuous duty" gas turbines, and that "surface degradation due to corrosion or oxidation was considered to be a performance issue" in earlier generation models, but "*[t]his is no longer the case* at the higher firing temperatures of current generation designs."

104.   Instead of disclosing the oxidation issues, GE plowed ahead with its aggressive plan to seize market share by shipping out dozens of H-class gas turbines, which contained a similarly defective component susceptible to oxidation.

105.   GE attempted to engineer a fix for the oxidation issue by working on new protective coatings. In 2017, GE began inspecting customer's H-class turbine blades and planning to repair or replace the blade. GE launched a "Gen II" (second generation) turbine blade in an effort to

resolve the problem. Yet even with the rollout of a new Gen II blade, GE continued to conceal the oxidation issue from the public.

### 6)   During the Class Period, the Pakistani Government Complained about H-Class Turbine Problems

106.    At the same time that GE was attempting to manage the oxidation issue, news began emerging about problems with GE's 9HA gas turbines that began operating in Pakistan in 2017. Within months, the turbines began to experience numerous issues, including vibration, which may be linked to the oxidation defect.

107.    On December 27, 2017, *Reuters* published an article titled, "In Pakistan, Questions Raised over GE's Flagship Power Turbines," reporting that GE's "flagship gas turbines ran into problems in Pakistan earlier this year, leading to delays and lengthy outages at three newly built power stations." The article stated that GE's 9HA gas turbines in Bhikki, Haveli, and Balloki were "producing power at levels well below their capacity and the problem was acute in the crucial summer months, when temperatures in the country frequently exceed 40 degrees Celsius (104 °F)." The Bhikki plant was one of the plants touted by GE in its November 2, 2015 press release claiming "immediate benefits" to customers from the Alstom acquisition. In a statement to *Reuters*, GE denied there were any systemic or structural issues with the H-class turbines, assuring the public that "every commercial HA site today is demonstrating exceptional performance levels for both output and efficiency." Specific to GE Power's gas turbines running in Pakistan, GE represented, "[W]e've encountered and communicated openly about launch challenges and readily resolved issues during this time. It's important to note that challenges are common with power plants of this size and complexity during the commissioning and early operations phase."

108.    Analysts expressed concern that the problem in Pakistan may have a larger scope. On December 27, 2017, *Reuters* reported Stephen Tusa of JP Morgan noting that "'[t]he risk is

that if these issues are not remedied, GE has already 'sold' another around 30 units (around 10 plus of which are in operation), some of which are at higher output ratings,' he wrote. 'Remedies would have to be applied up the curve, something we view as a challenge, especially as senior management tries to cut costs aggressively.'"

109.    A few weeks later, on January 22, 2018, *Reuters* published an article titled "Pakistan's PM Says Confident GE Will Fix 'Technical' Issues with Gas Turbines." *Reuters* reported that Pakistan's Prime Minister had said that some of GE's flagship new gas turbines "were still suffering from technical issues such as 'vibration.'" *Reuters* also reported that Pakistan's former petroleum minster said the gas turbines "'have vibration issues, some have technical issues.'" In response, GE reiterated its December 27, 2017 statement to *Reuters*: "Together we've encountered and communicated openly about launch challenges and readily resolved issues during this time – it's important to note that challenges are common with power plants of this size and complexity during the commissioning and early operations phase. We remain committed to supporting customer and site needs with the highest standards of quality and excellence."

110.    Then, on April 27, 2018, JP Morgan analyst, Stephen Tusa reported that GE's projects "are not on track" and raising the specter of GE being assessed liquidated damages. *See* "It's Getting Hot in Pakistan: Key H-Frame Project Remains Uncertain, Highlighting GE Specific Risks." Tusa noted, "The bottom line is that while the HDGT market is challenging, GE's operating predicament looks quite company specific."

111.    Ultimately, in a January 31, 2019 earnings call, CFO Jamie Miller revealed that GE had incurred $350 million in costs related to Gas Power projects arising from "*project execution issues resulting in liquidated damages as well as partner execution issues*."

### 7)   At a September 12-13, 2018 Users Meeting Attended by GE, Power Plants Expressed Widespread Concerns about Oxidation and Vibration in the H-Class Turbine

112.   Over the course of 2017 and early 2018, GE secretly attempted to manage the problems with the H-class gas turbine blades by inspecting and replacing blades – without revealing the problem or need for the fix to customers.  But in September 2018, customers' frustration with the scope of the problem and GE's lack of a time-tested fix bubbled up and risked exposing the problem to the outside world – including the investing public.

113.   On September 12-13, 2018, users of H-class turbines from various power plants met for a two-day conference in Texas, which was also attended by GE. At the conference customers expressed concern about the havoc created by the oxidation issue, insufficient replacement parts, and uncertainty over whether the "fix" would actually work, and noted that the vibration problems were experienced "fleet-wide."

114.   At the meeting, a customer stated that its H-class turbine had a blade fail after less than 10,000 operating hours.  Users at the meeting said that GE had acknowledged to them individually (but not to investors more broadly) that oxidation is a "fleet-wide issue." Another user noted that the first opportunity to look at a machine running the supposedly improved Gen II hardware was during a scheduled outage in several months – revealing that GE was already aware of the problem, had come up with a proposed solution, and had already installed new blades in at least one plant by September 2018. Multiple customers expressed concern as to whether the "fix" would work, noting that the machines using the supposedly improved Gen II hardware had not been running long enough.  Users also mentioned that they were scheduled for stage 1 blade replacement in 2019, further demonstrating that GE was aware of and working on this issue well before this meeting.

115.    Multiple users noted vibration issues and stated that GE "recently acknowledged these were fleet-wide issues, with half a dozen other machines experiencing the same problems." A user noted that "[e]xcessive vibration leads to secondary issues, such as oil leakage at the defector plate from generator rotor bearings, loose terminal strips, and failures of exhaust-thermocouple attachments, many of which are being replaced." A user stated that GE "didn't attempt to solve" the vibration problem.

### 8)    Between September 20-25, 2018, GE's Stock Price Dropped 12.36% as Investors Learned of Oxidation Shutdowns in Five Power Plants in Texas and GE Revealed the Problem May Impact 51 Other H-Class Turbines

116.    On September 20, 2018—just a few days after the user meeting—the oxidation problem that GE had known about, but concealed, since 2015 abruptly came to light after causing a major wreck at one of the Exelon plants.

117.    Back in 2014, GE closed a deal valued at $500 million with Exelon, one of the largest power generators in the United States, to supply four new 7HA gas turbines, steam turbines, and generators. The turbines would be installed at Exelon's Wolf Hollow plant near Dallas and its Colorado Bend facility near Houston. The H-class turbines, steam turbines, and generators were designed to add 2,000 megawatts of output and help Exelon grow its market share.

118.    As set forth above, GE touted the Texas Exelon projects in the November 2, 2015 press release as a demonstration of the synergies to be gained from the Alstom acquisition.

119.    On September 20, 2018, *Reuters* published an article titled "Four General Electric Power Turbines Shut Down in U.S. Due to Blade Issue" which reported "that four of [GE's] new flagship power turbines in [Texas] have been shut down due to an 'oxidation issue' and warned it ***expects the problem to affect more of the 51 units*** it has shipped." The article quoted GE as stating that "[t]he problem was first discovered on turbine blades in a natural gas-fueled turbine operated

by Exelon Corp. in Texas few weeks ago," despite that GE knew of the oxidation issue since 2015. The article further quoted Stokes stating that "[t]he minor adjustments that we need to make do not make the HA any less of a record setting turbine—they are meeting—and in many cases exceeding—their performance goals at every customer site today[.]"

120.    Also on September 20, 2018, *The Wall Street Journal* revealed that GE knew about the oxidation problems for months and had been working on solutions with customers, but that the problem struck Exelon earlier than expected. The oxidation issue related to a metal alloy that could cause distress to the gas turbine blades. This was the same issue that the 9FB faced back in 2015, and which GE claimed in its 2015 report to have eliminated for future generations (like the H-class).

121.    *Bloomberg* corroborated *The Wall Street Journal's* report, noting that the oxidation problem was discovered earlier that year and reported to customers, and that GE was planning to repair the issue for Exelon at some point in 2018.

122.    Also, a Scranton, Pennsylvania power plant scheduled to begin operations in January 2019 with an H-class turbine was working on a blade replacement plan scheduled for spring 2019 – just months after the plant began operations.

123.    That day, GE Gas Power Systems CEO Chuck Nugent provided false assurances concerning the oxidation issue: "I am confident this is not a significant issue from a customer perspective."

124.    The same day, analysts expressed concern about the impact of the oxidation issue beyond Exelon to other H-class turbines, and on the Power segment's finances more generally. JP Morgan analyst Stephen Tusa, for instance, described the turbine blade failure as "a negative development for a company that has little wiggle room" in the struggling Power segment. He noted

that "[w]hile the debate can rage around the structural versus cyclical nature of the power industry downturn is as bad as it seems, we believe there should be no longer any doubt that GE Power has company-specific issues . . . Not only due to the decline in the profit pool from its large installed base of services, but now around the H-frame technology."

125.    He also questioned GE's claims that the issues were minor and relatively insignificant. Indeed, he felt that the H-class blade failure risked franchise impairment. He noted that "this is the most difficult part to design, manufacture and repair, made from proprietary nickel based single crystal alloys requiring close to perfection at a microscopic level," and it "will be a massive undertaking to establish the cause of failure, redesign the turbine blade, develop hard tooling at casting vendors, learn to cast, machine and apply coatings to the new blade, schedule customer outages and send service crews to sites around the world."

126.    Tusa also questioned whether GE had a lasting solution. He emphasized that even after having "conversations with management implying that the new blade is already in production, we wonder why the new blades were not being used to prevent such a situation. In other words, we struggle to believe that the fix is permanent or to just to keep the turbine running in the near term."

127.    Analyst Jim Corridore from CFRA similarly noted that "[t]his issue, if not quickly resolved, could hurt GE's turbine brand image and market share."

128.    On September 20, 2018, the stock price fell 3.11% from $12.86 at close on September 19, 2018 to $12.46 at close on September 20, 2018, on a volume of 88,325,588 shares traded.

129.    On September 21, 2018, GE Power spokesman Chris Shigas elaborated that oxidation is a broader issue but again reiterated that the company has a solution, stating, "[a] few

weeks ago, there was an event at Exelon's Colorado Bend site that resulted from an issue with an HA turbine component. We expect the same issue to impact other HA units. We have identified the solution and have a plan in place, and we have been proactively working with customers on a case-by-case basis to address any impacted unit. We expect the Exelon unit to return to service soon." In fact, the Exelon facility was ultimately shut down for two months.

130.    Additionally, that day GE issued another press release in which GE stated—for the first time—that the component with the oxidation "is only used in stage-one blades in GE's highest-efficiency turbines—HA *and* 9FB[.]" But GE Power CEO Russell Stokes again reassured the public that GE had a solution:

> GE engineers and teams identified a fix and have been working proactively with our customers on a case-by-case basis to quickly return impacted units to service and mitigate any future issues … In all industries and new technology, developing and launching products at this scale and complexity involves fine-tuning and adjusting the technology . . . We always strive to jointly solve technical issues with our customers as they arise and are committed to delivering on our products.

131.    On September 21, 2018, the stock price fell an additional 2.33% to close at $12.17, on a volume of 95,419,064 shares traded.

132.    The following trading day, on September 24, 2018, Gabelli analyst Justin Bergner reported that GE confirmed that the turbine issue was a manufacturing issue related to the shared heat treat process for the HA *and* 9FB turbines, and that GE reverted to an earlier heat treatment process to ship a fixed blade to Exelon. Gabelli also confirmed earlier reports from media that this risk was known to GE before the Exelon break: "Because the problem was shared with the 9FB, **GE had known about it for a year** and had been working towards what they believe is a now permanent fix. They had expected problems with the HA turbine although the Exelon failure presented itself sooner than expected."

133.    That day, GE's stock continued its sharp decline, closing at $11.74 per share, down 3.53% from its prior close at $12.17 per share, on a large volume of 148,589,856 shares traded.

134.    The following day, on September 25, 2018, *Reuters* revealed that Electricite de France SA shut down its HA-class turbine at the Bouchain, France power plant – the first plant in the world to install a GE 9HA turbine – to replace the blades.

135.    That day, GE's stock fell an additional 4% to close at $11.27 on a volume of 133,694,188 shares traded.

136.    Over the course of the four trading days between September 20-25, GE's stock fell 12.36%, from $12.86 per share to $11.27 per share.

**9)    In Late September 2018, GE Denies the Severity of the H-Class Turbines' Problems**

137.    On September 27, 2018, an analyst from RBS described the gas turbine blade failures as a "self-inflicted" issue, unrelated to broader market trends, and observed that GE's reputational damage stemming from this incident could cause loss of market share to competitor Siemens.

138.    In response to this flurry of analyst criticism, on September 28, 2018, GE published an article by Chief Executive Officer and President of Gas Power Systems Chuck Nugent and Chief Executive Officer of GE's Power Services Business and Gas Power Business Scott Strazik on the gas turbine issues via LinkedIn and as a press release in which GE denied the impact predicted by analysts and other media sources. Their article explained that "[t]he issue involves oxidation that *could* cause distress on 9FB and HA gas turbine Stage 1 Blades (S1B)." The article further reported that "[w]e identified the solution and have a plan in place to implement it."

139.    Additionally, the article noted that GE was "already working with Exelon when the event occurred at Colorado Bend in early September. As a precaution, Exelon chose to proactively

shut down their additional HA units. Over the last few weeks we have worked with them to return all 4 of their HA units back to service. The good news is 2 are already back online with new blades … ahead of schedule." Finally, the article vehemently denied any endemic issues with the H-class turbine. It stated: "As we move forward, we remain very confident in our technology and the future of gas . . . The HA is the world's largest and most efficient turbine. There's nothing like it in operation today. It's meeting – and in many cases exceeding – performance goals at every customer site today."

### 10)  In October 2018, Analysts React with their Own Estimate of the Severity of the H-Class Turbine Costs, Causing GE's Stock Price to Fall More than 10%

140.    As discussed above, GE attended a September 12-13, 2018 meeting of H-class turbine users.  When the results of that meeting were reported to the investing community on October 10, 2018 by JP Morgan analyst Stephen Tusa, investors reacted strongly and negatively to the new information he revealed about the scope of the oxidation defect and GE's lack of a proven fix.

141.    On October 10, 2018, Tusa published an analyst report about the H-class turbine blade issues in the context of the overall deteriorating situation in GE Power. He explained that multiple users reported Stage 1 blade failures, and noted numerous specific concerns:

- "Bucket [turbine blade] issue has impacted schedule of machine delivery to U.S. customers. One said that the buckets destined for their machine (first 'Gen II' SIBs [Stage 1 blades] were now being diverted as replacements in the failed units, postponing commercial operating dates (COD)."

- "With no commercial operating experience with Gen II hardware, users wonder whether this 'fix' would be the right one."

- "The next opportunity to 'look at them' in the first machine incorporating it was not expected until a scheduled outage many months out."

- "An operating site cited 9-10 months delay on spare parts while 'desperate' for stage 1 blades."

- "Another was expecting S1B replacements in 2019, now coming earlier than expected."

- "Another got a mix of Gen I and II hardware."

- "Site with several thousand hours on HA.01 machine reported that dampening pins for stage 1 buckets had already been replaced twice."

142.    These comments revealed material information that GE had concealed throughout the Class Period:

- Prior to September 2018, GE developed a "Gen II" (second generation) Stage 1 blade to replace the problematic "Gen I" (first generation) Stage 1 blade.

- But GE did not have sufficient Gen II replacement blades for every H-class turbine, so GE was forced to replace some customers' blades at the expense of other customers who had to continue using the faulty Gen I blades and hope it did not suffer a similar break.

- Despite knowing about the oxidation problem since 2015, GE had not timely addressed the problem and so power plants were delayed in going into operation.

- Although in September 2018 after the Exelon break GE reassured customers that the problem was solved and it had a fix, in fact GE did not know this and GE could not know for many months whether the oxidation issue was resolved or recurring.

143.    Customers with H-class turbines were in a difficult spot. Their best-case scenario was promptly receiving Gen II Stage 1 blades – but replacing a blade required shutting down the plant for an unexpected outage that would last at least 3-4 weeks without knowing whether the Gen II blades had even resolved the problem. For customers that could not promptly get Gen II blades, they had to continue running on Gen I blades and risk a break.

144.    Customers could attempt to mitigate the problem by running their gas turbine at a lower temperature, but that would eliminate the very benefit of the H-class turbine: That supposedly it could be run at a very high temperature to extract more energy and efficiency. The uncertainty and possibility of a total shutdown of the plant for replacement was extremely costly.

145.     Tusa also shared numerous user complaints about vibration and that GE had "recently acknowledged these were fleet-wide issues" but that GE had not attempted to solve these problems.  These are the same problems that were reported in the Pakistan plants months earlier.

146.    Additionally, Tusa noted, "While most of the focus has been on the technology around the blades, which GE has more or less admitted to with a reference to a fix, details below indicate a myriad of shortfalls in other parts of the turbine that we find hard not to consider 'technology flaws.'"

147.    Tusa commented on the potentially dire results for GE's bottom line:

The commentary is a reminder of the hurdles to a "fix" for a Power business that is already set to lose money on a GAAP basis, with pronounced free cash outflows, facing not only macro headwinds, but more competition/overcapacity, and now company specific technology issues. We are not sure what is left to determine "asset value" here as issues like this are not solved by a simple recall and re-ship. These are engineering feats that need to be validated, typically taking time measured in years not months, and in long cycle technology businesses where a new product gets introduced every couple of decades, missing a cycle has long term implications . . . for a company in this position, there is no room for error to deal with these issues while trying to take out costs and fix service levels.

148.    He added that the news revolving around the situation at GE Power, including the issues with the H-class blades, was "a legitimate driver of the related stock decline, with enough uncertainty and downside implications for a highly levered company with no available cash flow, and little room for error, to justify further downside, especially from current levels." As a result, it seemed to Tusa "that GE overpromised and likely took on risk for customers to win deals."

149.    Finally, he noted the financial impact of the additional work on customer plant operations and new blade installation. The long-term service agreements guarantee a fixed rate for the customer, with GE setting its margin based on expected productivity, which is based on a few major outages and overhauls – but the oxidation issue means "likely multiple more overhauls, at GE's expense" and "higher insurance premiums and customer hesitancy, without the past crutch of GE Capital, means impaired share position and an installed base that will fade."

150.    Tusa's analysis and similar negative news from another analyst from William Blair were published on October 12, 2018. Also by October 12, 2018, it became clear that the oxidation defect affected 14 of the 51 installed 7HA turbines, and as many as 70 of GE's 9FB turbines.

151.    As a result of the foregoing, the stock price dropped precipitously: from a close of $13.55 on October 9, 2018, GE stock fell to $13.28 on October 10, 2018; it fell again to $12.72 on October 11, 2018, on a volume of 116,161,903 shares traded; shares dropped again to $12.32 on October 12, 2018 on a volume of over 123 million shares traded; and then dropped further the next trading day, October 15, 2018, to close at $12.15 with over 83 million shares trading. Over these four trading days, GE's stock fell 10.33%.

**11)    On October 30, 2018, GE Announces Devastating Third Quarter 2018 Results: Along With a $22 Billion Goodwill Impairment, It All But Eliminated the Dividend, and Reserved $600 Million for the Oxidation Defect and Other "Execution Issues" within Power**

152.    On October 30, 2018, GE announced in its Form 10-Q that, during the third quarter of 2018, Gas Power Systems recorded a $200 million charge "related to an oxidation issue within the HA and 9FB Stage 1 turbine blades, resulting in increased warranty and maintenance reserves" and its Power segment recognized "approximately $0.4 billion in charges associated with an increase in issues on our existing projects driven by execution as well as partner and customer challenges."

153.    GE also announced that it was slashing $22 billion in goodwill and cutting the dividend to a penny. Both decisions reflected the lack of revenues, profits, and cash flow in the Power segment, stemming in large part from the H-class turbine issues.

154.    That day, the stock price dropped by 8.78% from $11.16 at close on October 29, 2018 to $10.18 at close on October 30, 2018, on an exceptional volume of 344,976,676 shares traded.

155.     GE's stock price continued to fall over the next few days as credit rating agencies downgraded GE due to concerns about cash flow at GE – the concern about which was triggered by the goodwill impairment and dividend cut, both of which were symptoms of insufficient current and future cash flow.

156.     On October 31, 2018, Moody's lowered GE's credit rating from A2 to Baa1, reflecting "Moody's view that the adverse impact on GE's cash flows from the deteriorating performance of the Power business will be considerable and could last some time . . . The weaker than expected performance at Power is not only attributable to a considerable drop in market demand and ensuing heightened competition, but also to GE's misjudgment of financial prospects and operational missteps." On November 2, 2018, Fitch lowered GE's credit rating two levels to BBB or just three levels above junk grade. In response, Jonathan Duensing, director of investment grade corporate debt at Amundi Pioneer, noted, "this is a company that has been struggling to manage their overall business platforms from an operational standpoint, and now it's in a situation where it's not only impacting the equity price, it's impacting the debt spreads because credit agencies moved on the credit rating and investors have lost confidence."

157.     On this news the stock price fell 5.15% from $9.71 at close on October 31, 2018 to $9.21 per share on November 1, 2018 on a volume of 245,822,100 shares traded.  Then, the stock fell an additional 3% to close at $8.93 per share on November 2, 2018 on a volume of 274,055,200 shares traded.

158.     The price of GE bonds also fell during this period.  For example, the reported price of GE 4.418 (36164QNA2 CUSIP) fell from $90.08 at close on October 29, 2018 to $85.94 at close on November 2, 2018.

**12)    On December 7, GE Stock Dropped Again as the Oxidation Issue "Goes Global" and Forces Power Plant Shutdowns Worldwide**

159.    On December 7, 2018, *Reuters* published an article titled "Exclusive: GE's push to fix power turbine problem goes global." The article revealed that GE was undertaking a global shutdown of 18 of the 55 H-class gas turbines. The consensus after conducting a "dozen interviews with plant operators and industry experts" was that "[p]ower plant operators in Japan, Taiwan, France and at multiple U.S. sites have shut down – or plan to shut down – at least 18 of the 55 new HA-model turbines that GA has shipped so far." As a result, "GE is setting aside $480 million to repair its 9HA, 7HA and 9FB model turbines as it restructures its power business."

160.    Moreover, the article revealed that—despite GE "undercut[ting] its rivals' prices by about 20 percent 'to go from 0 percent to about 45 percent share of this turbine class by 2016,'"—"GE fell from first to third place in new turbine orders by capacity, behind Mitsubishi and Siemens" in 2018. The fact that GE not only lost orders but also lost market share demonstrates that customers were choosing other options, likely due to the issues plaguing the H-class gas turbines and GE's inability to timely and smoothly address the problems.

161.    The article also showed the widespread problems with the H-class gas turbine, noting that from January 2017 to October 2018, the power plant in Bouchain had logged 86 outages for equipment failure, testing, or other reasons – five times the average of non-GE plants with turbines made by, among other competitors, Siemens.



162.    Nevertheless, GE gas power systems CEO Chuck Nugent continued to insist that the turbines were performing "extremely well," chalking up the issues with the blades as simply "early maintenance." Scott Strazik, the new chief executive of GE Gas Power, said that "customers are happy with GE's response to the blade issue and GE has no plans to change . . . how it tests turbines, noting GE's test facility is the largest and most comprehensive in the world."

163.    That day, the end of the Class Period, the stock price dropped by 4.63% from $7.35 at close on December 6, 2018 to $7.01 at close on December 7, 2018, on a volume of 114,480,098 shares traded.

### 13)    *Reuters* Reveals that GE Privately Admitted to Insurers and Customers That It Had Been Aware of the Severe and Systemic Nature of the Oxidation Issue Since 2015

164.    After the Class Period, on January 25, 2019, a *Reuters* article revealed the full extent of GE's knowledge of the oxidation risk to the H-class turbines and its private disclosure to customers and insurers regarding the extent of the problem.

165.    *Reuters* reported that at December 2018 private meetings in London and Florida— where attendees were asked to sign non-disclosure agreements—GE Power executives Marcus Scholz and Tom Dreisbach disclosed to customers and insurers the Company's knowledge of the 2015 turbine blade break, that the break prompted the Company to work on new protective coatings, and that new parts with the supposedly improved special coating showed early stages of cracking after only 7,000 hours and were cracking after 12,000 and 16,000 hours. *Reuters* revealed that, in the December 2018 meeting, GE executives shared their recommendation to shut down power plants for maintenance of the at-risk blades after less than 7,000 hours of run time, rather than the initial guidance of 25,000 hours.

166.    GE executives also announced that the Company would offer extended warranty coverage and make spare parts available in an effort to reassure insurers, lenders, and utilities who may want to purchase gas turbines.

167.    This was little solace to "companies like Exelon Corp., PSEG and others that rely on the GE machines, [which] are now looking at potentially dwindling profits as their electricity output could suffer[.]"

168.    *Reuters* further reported that, since the turbine blade break at the Exelon plant in September 2018, GE had to scale down deliveries of its 9FB and HA models by 22%, with 102 new turbines being installed instead of the previously estimated 130 turbines.

**C.    Due to the Nature of these Turbine Defects, GE's Highest-Level Executives Would Have Approved Technical Information Letters Sent to Customers to Prevent Permanent Damage**

169.    GE admitted it had known "for a year" before September 2018 that the oxidation issue affected HA units and that GE had been communicating and working with customers to resolve the issue.

170.    GE communicates with its turbine customers regarding issues with their machines through "Technical Information Letters."

171.    For example, on January 9, 2017, GE sent a Technical Information Letter to certain F-class turbine customers, informing them of an oxidation issue affecting turbine blades.[2]  The letter instructed users to return sets of spare turbine blades to GE and to inspect blades for cracks every 2,000 hours for units under 8,000 hours of operation and every 4,000 hours for units over 8,000 hours of operation.  The letter warned that failure to comply "could result in equipment damage or facility damage" including a "liberation event."  The letter also noted that the

---

[2] *See* https://www.scribd.com/document/336354816/t2024

"availability of replacement [blades] is limited."  Finally, the letter instructed customers to log the actions they took pursuant to the Technical Information Letter into the GE Power ServiceNow portal for review by a GE Power Services representative.

172.   FE1 explained that Technical Information Letters undergo internal review to analyze the problem, operational metrics, and occurrence data.  The Technical Information Letter is reviewed from an engineering and financial perspective. The recommendation in the Technical Information Letter is assessed for financial and resource consequences, including impact on warranty claims, inventory capabilities, available manpower, sourcing channels for replacement costs, the total costs that will ultimately be absorbed by General Electric and the total costs to customers as well.  Executives review the Technical Information Letters and impact assessment before they are disseminated to customers.  FE1 is of the opinion that the July/August 2017 Technical Information Letter would have gone all the way to the CEO because of the financial and reputational impact of the letter.

173.   FE1 explained that the length of time between GE beginning its root-cause analysis and its dissemination of a Technical Information Letter to customers varied and could recall instances where this period of time took between two and six months or even up to a year

**D.      Additional Facts Giving Rise to a Strong Inference of Scienter**

1)      <u>**GE Admitted That It Knew of the Oxidation Problem and Its Impact on the H-Class Turbines Since 2015**</u>

174.   It is undisputed that GE had knowledge throughout the entire Class Period of the H-class oxidation problem.  After the Exelon break, GE revealed to investors, for the first time, that it had been aware of the oxidation problem and had been working with customers for over a year to inspect and replace their H-class gas turbine blades.  A few months later, GE admitted that

in fact it had identified the oxidation issue and performed a root-cause analysis all the way back in 2015.

175.    That knowledge would have been shared by each Individual Defendant given their positions in the Company, the importance of the H-class gas turbine to the Power segment's success, and the serious financial consequences of the oxidation defect on GE (including sales, profits, and warranty claims), and GE's clear admission.

176.    After the Class Period, new CEO Culp admitted that the January 31, 2019 analyst call that "the useful life" of the H-class gas turbine blades was short and described it as "regrettable."

### 2)    GE's Shipments and Sales of the H-Class Turbine Were Disrupted Due to GE's Attempt to Fix the Oxidation Problem.

177.    The oxidation issue's disruption to H-class gas turbines shipments and sales further supports the Defendants' scienter.

178.    The oxidation issue was not easily or smoothly solved.  GE had to inspect the blades in H-class gas turbines across the United States and the globe to determine whether they had begun demonstrating symptoms of oxidation.  GE had to replace many gas turbine blades altogether.  But GE could not manufacture enough blades in time and so had to stagger the replacements, based on the urgency of the problem.

179.    According to power plants with H-class gas turbines that participated in the September 12-13, 2018 user meeting, this created chaos.  Machine delivery was delayed.  Blades intended for one power plant were diverted to other power plants who had experienced total failures of their turbine blades. Some plants received a mix of the new and old turbine blades. Plants were delayed in beginning commercial operations because they could not get blades.

Because the issue manifested over time, users (and investors) had no idea if the "fix" GE promised would actually work.

180.     The financial impact of the unanticipated inspection and repair work was significant.  In the third quarter of 2018 GE had $240 million of warranty and other accruals related to the H-class gas turbine blades and in the fourth quarter of 2018 GE incurred $400 million of charges on service contracts related to the same.

181.     Nor did the problem end at the close of the Class Period. By February 2019, GE was replacing blades in 52 H-class gas turbines and 50 F-class gas turbines.

182.     The disruption to the efficient shipment and sale of H-class gas turbines further supports an inference of scienter.  This is not a minor problem with the sale of a consumer product – GE has a limited universe of repeat customers (power plants) who make one-time purchases of heavy machinery for tens of millions of dollars.  The chaotic environment and customer discontent caused by the oxidation defect, and the financial impact on GE's customer reputation, would have elevated the oxidation issue to the highest levels of the Company, including all Defendants.

### 3)     GE's Loss of Market Share During the Class Period Demonstrates the Significant Adverse Impact of the Oxidation Defect to the Company as a Whole

183.      The oxidation defect is not a technical problem that would have been addressed by a team of engineers – it was a major problem affecting the entire Company, including significantly affecting GE's financials.  The widespread nature of this adverse problem further supports an inference of scienter.

184.     GE began reaching out to customers to inspect and replace H-class gas turbine blades at risk of oxidation in 2017.  Once that process was underway, GE experienced a dramatic drop in gas turbine orders: 4 orders in the first quarter of 2018 compared to 12 in the same quarter of the prior year and 7 orders in the second quarter of 2018 compared to 24 in the prior year.

185.    The declining orders were not just the result of a declining global power market, but rather GE was losing market share to competitors. While GE was scrambling to address the oxidation defect in 2017 and 2018, GE fell from first to third in worldwide turbine orders behind competitors Siemens and Mitsubishi:



186.    The oxidation defect's significant financial and reputational consequence further supports an inference of scienter by the Defendants.

### 4)    The Importance of the H-Class to GE's Power Segment Made Defendants Aware of the Oxidation Problems Throughout the Class Period

187.    Defendants' scienter is evidenced by the importance of the H-class gas turbine to the Power segment, and the Power segment to GE as a whole during the Class Period.

188.    During the Class Period, the Power segment was supposed to be GE's keystone. In acquiring Alstom, GE described its goal of returning to industrial businesses as 75% of GE's operating earnings and described Alstom as central to GE's "transformation" back to its core industrial growth. GE became increasingly dependent on the Power segment for the company's overall success – by the second quarter of 2018, Power represented approximately 45% of total

revenues. And GE had no other option but to rely on Power because the rest of the company was in crisis:

- GE Capital was winding down.

- In the first quarter of 2018, in January 2018, GE wrote off $6.2 billion in connection with GE Capital's long-term care insurance business and announced that it anticipated another $15 billion of write-offs over the next seven years. The SEC opened an investigation into this issue on January 24, 2018.

- In the first quarter of 2018, in February 2018, GE revealed that the Justice Department was investigating WMC Mortgage, another component of GE Capital.

- In the first quarter of 2018, in April 2018, GE announced a $1.5 billion reserve related to the WMC Mortgage issues and in May 2018, said it may put WMC into bankruptcy.

189.    Within Power, the H-class turbine was central to GE's success. GE had spent $2 billion to develop the H-class gas turbine and it was described by the Company as "the crown jewel of our product portfolio." Industry publication *World Energy News* stated that the H-class gas turbine "represent[s] GE's highest gas-fueled technical achievement and [is] crucial to GE's power division, which is struggling with declining sales and profits."

190.    GE depended on the H-class gas turbine to regain market share lost to competitors. *The Wall Street Journal* described GE's H-class turbine as "central to GE's efforts to compete with rivals such as Siemens AG in a difficult power market."

191.    The oxidation issue presented a risk to that goal of regaining market share.  As *World Energy News* noted, GE could lose sales to competitors from a persistent oxidation issue. Defendants' efforts to conceal the scope of the problem from investors supports its importance and

their contemporaneous knowledge. In December 2018, for example, senior executives within GE Power held a private meeting with insurers to discuss the problem where it asked participants to sign a non-disclosure agreement.  Investors are aware of this meeting only because information leaked.

> **5)** **Tusa Accurately Predicted the Systemic Nature of the H-class Defect, Even Drawing Board-Level Scrutiny that He Relied on High-Level Insider Information**

192.    Over and over again throughout the Class Period, JP Morgan Analyst Stephen Tusa accurately predicted the scope, severity, and systemic nature of the H-class defect.   He "had an uncanny knack, time and again, for uncovering deep problems before they were public," including that GE's H-class turbine blade issue was systemic and widespread.

193.    Tusa was right about GE—and GE's Board knew it.   "One former senior GE executive said" to *The Wall Street Journal* that "Mr. Tusa's reports were painful to read, but were thorough and largely correct. 'I tip my hat,' this executive said. 'At the end of the day, our problem is not Steve Tusa.'"

194.    Tusa's reports were so accurate that the Board believed he was relying on an insider.  According to *The Wall Street Journal*, "[t]he board and advisers would scrutinize Mr. Tusa's reports. ***GE even launched a hunt for leakers, a board member questioned JP Morgan about the research and the bank conducted an internal review***, people familiar with the matter said . . . At GE, there has long been a suspicion that Mr. Tusa had a network of contacts inside the company that fed him information, according to former executives and people familiar with the board. The detailed knowledge of the company in his research notes was seen by some as being suspiciously accurate . . . *In looking for leaks, no one was above suspicion, even board members were commanded to keep their mouths shut*, the people said, and GE took extra steps to keep any developments under wraps."

195.    Along the way, GE attempted to refute the accuracy of Tusa's reporting by minimizing the scope and extent of the problems with the H-class gas turbine. But when the truth was finally revealed, Tusa's reporting was shown to be extremely accurate.  The consistency and accuracy of Tusa's reports and the Board's attention to them supports an inference that the Defendants were aware of the problems plaguing GE Power.

### E.    GE Maintains $22 Billion in Artificially Inflated Goodwill in the Power Segment for Quarters Ending December 31, 2017, March 30, 2018 and June 30, 2018, Despite Admitting that the Alstom Acquisition Was a Disappointment and Despite Clear Evidence of the Power Segment's Collapse

196.    Serious and costly troubles with GE's flagship product was only part of the truth that GE concealed.  Defendants also concealed the need to impair goodwill recognized in the acquisition of French steam turbine manufacturer Alstom.

### 1)    GE Acquired Alstom and Touted Immediate Benefits and Significant Synergies

197.    On April 30, 2014, GE announced its offer to buy Alstom's power and grid businesses. In an email to its employees, GE framed the transaction as "fully aligned with our strategy to grow our industrial businesses so that they account for approximately 75% of our operating earnings." The internal communication specifically congratulated John Flannery, Steve Bolze and the deal team for its work getting the deal to this point.

198.    On December 16, 2014, GE held its annual investor outlook meeting. The presentation was titled "The Pivot" and emphasized that by 2016 more than 75% of GE's earnings would come from its industrial segments. Immelt positioned Alstom as a central component of that pivot, noting that with "GE plus Alstom there's $60 billion in growth markets. We are just profoundly well-positioned in just about every country that counts around the world. It's going to give us scale. It's going to give us competitive advantage. It's going to improve our scope."

199.    On November 2, 2015, GE announced that it had completed its acquisition of Alstom power and grid businesses for approximately $10.6 billion. GE described the acquisition as an important step in GE's "transformation" back to its industrial roots. GE announced that the acquisition would yield billions of dollars in synergies and a significant increase in earnings per share. GE particularly emphasized the complementarity and "immediate benefits" that the acquisition would have for customers – specifically, power plants that had purchased an H-class gas turbine.

200.    The November 2, 2015 press release shared the following details:

GE expects the deal to generate $0.05-0.08 of earnings per share in 2016 and $0.15-0.20 of earnings per share by 2018. GE is targeting $3.0 billion in cost synergies in year five and strong deal returns. The overall economics and strategic rationale remain the same as GE announced in April 2014.

"The completion of the Alstom power and grid acquisition is another significant step in GE's transformation," said Jeff Immelt, chairman and CEO, GE. "The complementary technology, global capability, installed base, and talent of Alstom will further our core industrial growth. We are open for business and ready to deliver one of the most comprehensive technology offerings in the energy sector for our customers."

Customers will realize immediate benefit from the combination of GE and Alstom, including these current projects:

- PSEG Sewaren (New Jersey combined cycle power plant): GE 7HA gas turbine + Alstom heat recovery steam generator (HRSG)
- Punjab Pakistan Bhikki (Pakistan combined cycle power plant): two GE 9HA gas turbines + Alstom steam turbine
- Exelon Power Plants (Texas power projects): four GE 7HA gas turbines + four Alstom HRSGs
- Chempark (Leverkusen, Germany combined heat and power project): GE 9HA gas turbine.

In addition, GE and Alstom are both preferred bidders for a combined cycle plant project in Asia that would use two GE 7HA gas turbines, two Alstom HRSGs and one Alstom steam generator, and Alstom is the preferred bidder for Arabelle steam turbines in two UK nuclear reactors; the preferred bidder for boilers, steam turbines and generators a clean coal project in the Middle East; and has successfully delivered India's first 800 kV High Voltage Direct Current (HVDC) power transformer for the Champa-Kurukshetra project.

201.    On December 3, 2015, GE held a call to discuss the full details of the Alstom acquisition. Executives again touted the financial benefits of the acquisition to GE and investors and said GE expected to realize $3 billion of annual cost synergies, $700 million of which would come through in 2016 according to GE Power President and CEO Steve Bolze. Bolze announced that 70% of these synergies would be realized from GE Power and described a "line of sight to $2.2 billion of the $3 billion of cost synergies for GE by 2020." GE Power CFO Lynn Calpeter reiterated that the deal would be accretive to shareholders, increasing by $0.15 to $0.20 their earnings per share.

202.    GE executives emphasized that the Alstom acquisition would allow GE to win a greater share of the components necessary for the "power island," referring to the power equipment required in a combined cycle power plant. GE claimed that it had the best-in-class gas turbine and Alstom had the best-in-class steam turbine and HRSG – as a combined business, they could beat competitors like Mitsubishi and Siemens and put their stamp on a larger portion of each combined-cycle power plant. Immelt explained, "[t]here is tremendous pull-through opportunities for grid products with gas turbines. About 75% of all the gas turbines that Siemens sells pulls-through grid. At GE that number is 5% today, so we just haven't had the product line that we now have with Alstom. We think that is worth about $2 billion in incremental orders over the next few years."

203.    Additionally, GE claimed that the Alstom acquisition would allow it to win bids to build new power plants in the Middle East (an area where GE did not have a strong foothold) and squeeze profit from the old coal-fueled power plants Alstom operated in Europe and Asia.

204.    Finally, Mark Hutchinson (President and CEO of GE Europe and Integration Leader, Alstom) discussed specific power plant projects identified in the November 2, 2015 press release where they were "already seeing what we can do together with the new Alstom capability":

We already have seen some very early wins.  GE with Alstom has been technically selected on the Bhikki combined cycle power plant in Pakistan that would use two GE 9HA gas turbines, two Alstom HRSGs and one Alstom steam turbine. We've also recently won a similar project in Germany.

On these two projects, we won with our 9HA gas turbines. However, we were able to pull through the steam tail or the bottoming cycle products from Alstom. This clearly demonstrates the breadth of capability we now have for our customers and the feedback from the customers has been very positive about the expanded product scope.

205.    GE also saw Alstom as a driver of sales of GE's highly profitable AGPs (which increase the efficiency of gas turbines) and aeroderivative units.

### 2)    A Primer on Goodwill Accounting and GE's Recording of $17 Billion in Goodwill for Its $10 Billion Alstom Purchase

206.    The Alstom acquisition was unusual for a number of reasons. It was GE's largest ever industrial acquisition. Additionally, it was a highly unorthodox transaction in which GE paid an enormous premium for Alstom—billions of dollars above the value of Alstom's identifiable net assets. In the Alstom acquisition, GE recognized $17 billion of goodwill, as compared with a purchase price of $10 billion.

207.    Goodwill is an accounting practice that is used only when one business acquires another business and the purchase price exceeds the value of the acquired company's identifiable net assets.

208.    Accounting expert Professor J. Edward Ketz of Pennsylvania State University noted that although GAAP permitted GE's recognition of $17 billion of goodwill, he could not recall any other situation where the goodwill a company recognized from an acquisition exceeded the purchase price.

209.    GAAP provides that at the time of an acquisition, the total purchase price must be allocated to all of the identifiable assets and liabilities of the acquired company. The assets can be

tangible (such as inventory or accounts receivable) or intangible (such as patents and trademarks). The purchase price allocation must also consider the identifiable liabilities (such as accrued contract liabilities or accounts payable).

210.    However, GAAP recognizes that an acquired business may have an asset with value to the acquirer that cannot be treated as an identifiable asset. For example, an assembled workforce or pending sales contracts may have great value to the acquiring company, but under GAAP those are not deemed identifiable assets. In order to account for the value of non-identifiable assets, GAAP permits the acquiring company to book that value as "goodwill."

211.    If the acquired company's identifiable assets exceed its identifiable liabilities, the goodwill number reflects the amount by which the purchase price exceeds the company's net identifiable assets (which equals identifiable assets minus identifiable liabilities). If the acquired company's identifiable liabilities exceed its identifiable assets, as was the case with Alstom, the goodwill number equals the amount of the purchase price plus the amount of identifiable net liabilities (identifiable liabilities – identifiable assets):

**Identifiable Net Liabilities**

Purchase Price + [Identifiable Liabilities – Identifiable Assets] = Goodwill

212.    Under GAAP, a company has one year to closely examine the company that it acquired before booking the final goodwill number related to the acquisition.

213.    After completing its goodwill review following the Alstom acquisition, GE booked $17.3 billion in goodwill. $12.9 billion of the $17.3 billion of goodwill booked as a result of the Alstom acquisition was attributed to the Power segment. Including Alstom, the total goodwill in the Power segment was $19.8 billion.

214.    GE published this information on November 2, 2016 in its third quarter financial results on Form 10-Q, in which it claimed that the goodwill number was justified by the tremendous "GE-specific synergies" between the companies including "additional revenue from cross-selling complementary product lines."

215.    The significant differential between Alstom's purchase price and identifiable net liabilities revealed that Alstom's value was exclusively in the non-identifiable assets that the company touted—principally the synergies between the two businesses and the ability to capture a significantly larger portion of the power island due to the complementary strengths in steam and gas turbines.  The acquisition's success depended on continued growing demand for GE and Alstom's purportedly complementary products.

### 3)    GAAP Required GE to Monitor and Test for Goodwill Impairment

216.    Under GAAP, GE was required to conduct a "goodwill impairment test" at least annually, or more frequently "if an event occurs or circumstance changes that would more likely than not reduce the fair value of a reporting unit below its carrying amount." In analyzing the extent of impairment GAAP requires an examination of financial performance and projections in the current period.

217.    A goodwill impairment test determines whether carrying value of goodwill on the books exceeds its fair value.  If so, goodwill must be impaired, or written down.

218.    The goodwill impairment test has two parts:

a.  In step one, GE would have determined the fair value of the reporting unit (how much it could be sold for on the market) using a discounted cash flow analysis based on internal forecasts of future cash flows.  Factors considered in estimating future cash flows would have included a deteriorating market; declining cash flow, revenue, or earnings; and increasing costs. Next, GE would

have to compare the fair value of the reporting unit against the net assets (including goodwill) on the books of that reporting unit. If the estimated fair value of the reporting unit was less than the net assets on the books, that indicated that the net assets were overvalued – and in particular, that goodwill may be too high. In that case, GE would have to proceed to the second step of the goodwill impairment test.

b. In the second step, GE would have to determine the fair value of each identifiable asset and liability in the reporting unit. GE would then have to compare the current fair value of the reporting unit to the current fair value of the net identifiable assets (that net number equals assets minus liabilities). Doing so generated a new, more accurate goodwill number. If that new goodwill number was less than the goodwill number on the books, goodwill was considered impaired and had to be impaired.

219.    GE's practice was to perform its annual goodwill impairment assessment in the third calendar quarter of each year. The goodwill impairment test examined the current finances and projections at the level of the reporting unit in each segment (for example, the Power Conversion reporting unit in the Power segment).

220.    Forecasted cash flow was the key metric in GE's goodwill impairment analysis, because forecasted cash flow determined the fair value of the reporting unit. If forecasted cash flow for a reporting unit were reduced, fair value would also be reduced – and goodwill might be impaired. Accordingly, when future cash flow forecasts changed, GE needed to carefully consider whether its goodwill number was still supported.

221.    By the fourth quarter of 2017, it was clear from the publicly available information that substantial impairment was necessary. Alstom was not and would not produce the anticipated synergies, GE was incurring significant costs from the H-class gas turbine blade issues, and GE acknowledged that the global power market had turned downward and would get worse in 2018. Moreover, GE's predictions of a worsening market were realized in the first and second quarters of 2018.   The changed business conditions manifested in clear, objective data including dramatically lower shipments, orders, and profits.   All of this evidence, which indicated that the fair value of GE Power's reporting units had declined significantly and that goodwill was vastly overstated by the fourth quarter of 2017, required GE to massively impair the goodwill on the books for the Power segment, including the goodwill recognized from the Alstom acquisition. But as described further below, GE failed to take more than a *de minimis* impairment in the fourth quarter of 2017 and continued reporting this substantially and severely recklessly inflated number in each of its subsequent quarterly reports.

222.    But the goodwill impairment test also relies heavily on internal information known only to GE.   For example, the discounted cash flow analysis is based on internal forecasts of future cash flows that are opaque to investors.

223.    The inconsistency between trends in the gas power market and GE's own declining shipments and orders on the one hand, and GE's decision not to impair the goodwill on the other, forced investors to trust that Defendants had performed the goodwill impairment test properly and with reasoned assumptions.

224.    First, the cash flow discount rate that GE used for its goodwill impairment test was unknown to outsiders.   The closest that GE came to revealing this number was stating that the goodwill valuation for the fourth quarter of 2017 used a discount rate of between 9% and 18% for

the various reporting units.  This wide range would produce significantly different results and investors had no way to know where the discount rate for a particular reporting unit fell within that spread.

225.    Second, GE's opaque cash flow accounting prevented the public from seeing the full picture.  Analysts expressed concern that GE's opaque accounting made it difficult for them to determine GE's true cash flows. Melius Research analyst Scott Davis said he couldn't build a quarterly cash flow for GE "that has any credibility" and compared GE's earnings releases to "an IQ test – they give you 10,000 numbers and you have to figure out which 10 matter." Charles Mulford, accounting professor at Georgia Tech and Director of the Financial Reporting and Analysis Lab, stated that when a company is "disposing of a lot of businesses as [GE is], it's difficult to separate out what assets are here, what assets are gone, and their effects on cash flow." Vertical Research Partners analyst Jeffrey Sprague noted that it's "unclear" how GE measured its cash flow in the fourth quarter of 2017.

226.    Third, GE obfuscated many metrics related to service agreements, which made up a significant portion of the Power segment's revenue during the Class Period.  GE concealed from investors:

- the assumptions and methodology that it used to determine expected profits over the life of service agreements;

- the timing of customer payments over the life of the contract; and

- the method for predicting utilization rates for turbines and other equipment.

227.    As GE noted in its 2017 Form 10-K, predicting the use of GE turbines and other equipment over the life of a contract is critically important to assessing expected revenues and profit margins from service contracts: "a significant estimate in determining expected revenues of

a contract is estimating how customers will utilize their assets over the term of the agreement." GE further stated that it "gain[s] insight into future utilization and cost trends . . . through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods."

228.    Through GE's Data Center in Atlanta, Georgia, GE had real-time access to customer utilization rates for gas turbines and other equipment under service contracts that were otherwise unknown to the public.

### 4)    In Fourth Quarter 2017 GE Reported Materially Inflated Goodwill Attributable to the Power Segment

229.    In its 2017 Form 10-K, issued on February 23, 2018, GE reported $25.269 billion in goodwill attributable to its Power segment. GE explained that because the fair value of "the Power Conversion" unit within the Power segment was below its carrying value, the Company had recorded a non-cash goodwill impairment charge of $217 million in the fourth quarter of 2017 – representing merely .86% of the total amount of goodwill at the end of that quarter. However, this *de minimis* charge did not appear to be related to the core operations of GE's power equipment but rather was limited to "renewables and oil and gas" customer segments.  Thus, GE recklessly determined that the vast bulk of goodwill need not be impaired despite objective facts known to GE that directly undermined this conclusion.

#### a.    GE's Fourth Quarter 2017 Finding of No Material Impairment Was at Odds with Its Decision in that Same Quarter to Slash the 2018 Gas Turbine Shipment Forecast by *40%* Due to Adverse Market Conditions and the Impact of the H-Class Turbine Defect

230.    Due to declining demand, in the fourth quarter of 2017 GE dramatically slashed its 2018 shipment forecast. GE announced that it anticipated shipping between 31% and 41% fewer gas turbines and 50% fewer AGPs in 2018 than it had shipped in 2017:

| DRASTIC REDUCTION IN SHIPMENT FORECAST compared to prior year | | | |
|---|---|---|---|
| | **Actual Shipments in 2017** | **Forecasted Shipments in 2018** | *% Decline* |
| **Gas Turbines** | 102 | 60-70 | *-31% - 41%* |
| **AGPs** | 80 units | 40 units | *-50%* |

231.    The forecast reduction not only meant fewer sales of machines – it also meant a significant hit to the Power segment's profitability due to fewer service agreements.  A major component of GE's business model was selling service agreements to maintain, repair and obtain supply parts for gas turbine generators and steam turbine generators. The profit margin on long-term service agreements exceeded the profit margin on selling new machines, and was an important component of GE's business model.

232.    Long-term service agreements' profitability dropped for three distinct reasons:

a.      Reduced demand for gas turbines reduced the number of new long-term service agreements, because the customer base was not expanding;

b.      Reduced utilization of gas turbines due to the global trend towards renewable energy sources increased the time between necessary services, and therefore the time period over which customer payments occurred and revenue was recognized was extended; and

c.      GE bore the cost of inspecting and replacing H-class turbine blades due to the oxidation problem, which forced the Company to take on a significant unplanned expense.

233.    The reduction in forecasted shipments and actual orders not only meant less revenues and profits for GE, but also demonstrated that GE had not realized the growth synergies

that were supposed to come from the Alstom acquisition. It became clear by fourth quarter 2017 that those benefits could not be achieved because of reduced construction of and demand for new power plants.

234.    In addition, GE completely disregarded that the problems with its flagship H-class Turbine had affected orders and would further adversely impact 2018 Power cash flow and earnings.

**b.    GE Made a Historic Cut to Its Dividend in Fourth Quarter 2017 Because of Significant Declines in Cash Flow**

235.    The failure to materially impair goodwill in fourth quarter 2017 is also undermined by GE's dramatic diminution in cash flow since before the Alstom acquisition:

| ANNUAL INDUSTRIAL CASH FROM OPERATING ACTIVITIES Excluding Deal Taxes and Pensions Compared to Pre-Alstom Acquisition | | | | |
|:---:|:---:|:---:|:---:|:---:|
| **2015 (*Alstom acquisition*)** | **2016** | ***% Decline*** | **2017** | ***% Decline*** |
| $12,237 | $11,611 | *5.10%* | $8,963 | *26.7%* |

236.    GE's cash flow crisis in fourth quarter 2017 necessitated a dramatic and historic dividend cut.  On November 13, 2017, GE announced that it was cutting its dividend for only the second time since the Great Depression.  Defendant Flannery explained that the dividend cut was necessary because GE didn't have sufficient cash to support the planned dividend.  Indeed, even after the dividend cut, approximately 85% of GE's estimated free cash flow had to be expended to meet GE's dividend payments.

**a.    Fourth Quarter 2017 Orders Declined Dramatically by 58-87%**

237.    Fourth quarter 2017 orders were also down significantly compared to the same quarter in the prior year, including for high-margin aeroderivatives and AGPs:

| DRASTIC REDUCTION IN ORDERS compared to prior year | | | |
|---|---|---|---|
| | **Q4 2016** | **Q4 2017** | *% Decline* |
| **Aeroderivatives** | 24 | 3 | *-87.50%* |
| **AGPs** | 58 | 24 | *-58.62%* |

**b.**    **Fourth Quarter 2017 Shipments Declined Significantly**

238.    Additionally, shipments were down significantly during fourth quarter 2017 compared to the same quarter in the prior year, including a 90% drop in aeroderivative shipments and nearly 60% drop in AGP shipments:

| DRASTIC REDUCTION IN SHIPMENTS compared to prior year | | | |
|---|---|---|---|
| | **Q4 2016** | **Q4 2017** | *% Decline* |
| **Aeroderivatives** | 31 | 3 | *-90.32%* |
| **AGP** | 62 | 25 | *-59.68%* |
| **H-class gas turbines** | 9 | 8 | *-11.11%* |

**c.**    **Fourth Quarter 2017 Power Profit Margins Collapsed by 88%**

239.    Additionally, the Power segment's profit margins took a dramatic downward turn by the fourth quarter of 2017:

| DRASTIC REDUCTION IN PROFIT MARGIN compared to prior year | | |
|---|---|---|
| **Q4 2016**[3] | **Q4 2017** | *% Decline* |
| 24.4% | 2.8% | *-88.5%* |

---

[3] Alstom's profit margin for this quarter was less, at only 18.5%.

240.    On November 14, 2017, JP Morgan analyst Stephen Tusa opined that the price to keep customers was hitting GE's profit margins as well: "We believe in general the 'cost to keep' [utility services customers] is higher than most think, also as price pressure."

### d.    In Fourth Quarter 2017, Defendant Flannery Admitted that Alstom Was a "Disappointment" and that GE Had "overpaid"

241.    Even as early as 2016—the last year GE reported separate financial results for Alstom and for the Power segment as a whole—it was clear that Alstom had been a drag on GE's profitability. In every quarter of 2016, Alstom was *less profitable* than GE as a whole, with profit margins that were 6-12% lower than GE Power's for the same quarter.

242.    Flannery admitted this openly on November 13, 2017, when he revealed on an analyst call that the "negative[s]" to the Alstom acquisition have been "significant" and that the expected single-digit returns from the business were "disappointing, below expectations."

243.    Flannery reiterated his conclusions the next day. On November 14, 2017 in an interview with CNBC, Defendant Flannery expressed that the "*deal in total has been a disappointment*" and was "*not an acceptable deal from a financial framework right now*." He said he was looking at a single-digit return, rather than a high-teens return. Flannery concluded that "[i]f we can go back in a time machine today, we would pay a substantially lower price than we paid, there's no doubt about that."

### e.    By Fourth Quarter 2017 GE Acknowledged a Negative Turn in Market Conditions

244.    During a November 13, 2017 investor call, Defendant Flannery said the Power market was a "tough market" and, moreover, that GE "exacerbated the market situation with some really poor execution."

245.    During a November 14, 2017 CNBC interview, Flannery concluded that after spending "100 days just exhaustively crawling through the company," the Power segment faced

"a challenging macro environment right now." He noted that "the market clearly has been substantially worse than what we forecast" at the time of the Alstom acquisition.

246.    Just a few weeks later, on December 7, 2017, GE laid off 12,000 employees in the Power segment —about a fifth of the global workforce. Defendant Stokes stated that the layoffs were "necessary for GE Power to respond to the disruption in the power market, which is driving significantly lower volumes in products and services," and that he anticipated those challenges continuing into the future.

247.    Further, in fourth quarter 2017, GE reduced the total sales forecast for new plant orders to 40 gigawatts. That reduction in orders, to the lowest level in twenty years, was also a dramatic reduction from GE's March 2017 forecast of 78 gigawatts. This metric also reflected a significant downturn in the global market.

## f.    By Fourth Quarter 2017, GE's Own Global Forecasts Expected Significant Adverse Changes in the Power Market

248.    Even before the Class Period, the global power market was in decline.

249.    As of July 6, 2017, GE materially cut its own forecast of global demand for coal power, as compared to other forms of power.  By that date, GE forecast that approximately 12% of total global power would be coal, compared to approximately 20% a year and a half earlier and 28% five years earlier.  GE anticipated a quick shift to renewable energy sources such as wind and solar in lieu of coal power.

250.    As the following figures demonstrate, the market was undergoing a significant reduction in the outlook for coal power plants due to the shift to renewable sources of energy instead of coal power:



**g.** **The SEC Launched an Investigation into GE's Revenue Recognition for Long-Term Service Agreements, Calling into Question a Major Claimed Benefit of the Alstom Acquisition and Revenue Generator for the Power Segment**

251. In November 2017, the SEC launched an investigation into how GE recognized revenue from long-term service agreements. Under those agreements, GE booked revenue at present although the Company might not collect the cash itself for years or even decades.

252. The launch of this investigation called into question a major claimed benefit of the Alstom acquisition and a key source of revenue for GE. By the fourth quarter of 2017, revenue generated from long-term service contracts (such as performing repairs and maintenance) originating from GE and acquired with Alstom became increasingly important to the Power segment:





Figure 1: GE Contract Assets by Segment

253.    Analysts noted that the SEC's investigation into revenue recognition for long-term service agreements reinforced concerns about the opacity of GE's accounting.  Deutsche Bank analyst John Inch was quoted in *The Wall Street Journal* after the investigation announcement as saying, "[i]f you were concerned about black box issues in the past, aren't you much more concerned about it today?"

254.    Investors expected that GE would use reliable, reasonable metrics and assumptions when performing the goodwill impairment test and could not have discerned if GE had used improperly manipulated revenue numbers for long-term service agreements.

### h.    Additional Financial Factors Mandated Impairment in Fourth Quarter 2017

255.    It was later revealed that other financial pressures contributed to the problems in Power that should have forced an impairment during fourth quarter 2017.

256.    For example, a February 21, 2018 article in *The Wall Street Journal* reported that in September 2017, the GE Board learned that Power had too much unsold inventory and was discounting prices because of pressure to hit projected revenue targets. *The Wall Street Journal* reported that Immelt told GE's Board that the Power segment downplayed the impact on profit

margins of offloading inventory at fire sale prices.  Nevertheless, it was too late to reverse the tide of declining profit margins during the Class Period.

### i.     GE Materially Inflated Goodwill in Fourth Quarter 2017

257.    As discussed above at paragraph 216, GE is required to conduct a goodwill impairment test annually or more frequently if business conditions change such that it would more likely than not reduce the fair value of a reporting unit below the amount of its net assets (including goodwill) on the books. Despite the significant downturn in the power market and known defect in the H-class turbine, GE failed to take a meaningful impairment of goodwill in fourth quarter 2017, causing goodwill to be materially overstated throughout the Class Period.

### 5)     In First Quarter 2018 GE Reiterated Its Materially Inflated Goodwill Despite a Complete Collapse of the Power Business and Market

258.    In the first quarter of 2018 GE reported a goodwill balance for the Power segment of $25.886 billion.

259.    However, the reporting of $25.886 billion of unimpaired goodwill was belied by the facts known to GE, but not to its investors, that Power's flagship product suffered from a defect which had caused havoc in the shipment and sale of this product and its attendant service contracts.

260.    Moreover, the financial condition of the Power segment continued to collapse as reflected in reduced orders, shipments, and profit margin, underscoring both the adverse circumstances specific to GE as well as the adverse conditions facing the power market as a whole.

### a.     First Quarter 2018 Orders Collapsed by 66-100%

261.    In the first quarter of 2018, GE's prediction that Power segment sales would grind to a near halt was realized.  Orders were down significantly compared to the same quarter in the prior year – indeed, GE did not receive *any* orders for H-class gas turbines in the first quarter of 2018:

| DRASTIC REDUCTION IN ORDERS compared to prior year | | | |
|---|---|---|---|
| | Q1 2017 | Q1 2018 | *% Decline* |
| **All gas turbine models** | 12 | 4 | *-66.67%* |
| **H-class gas turbines** | 2 | 0 | *-100.00%* |
| **AGPs** | 20 | 4 | *-80.00%* |

262.    Additionally, the drop in orders meant GE would not recognize profit from long-term service agreements that were cross-sold with new machine sales.

### b.    First Quarter 2018 Shipments Declined by 40-71%

263.    Shipments fell significantly in the Power segment in first quarter 2018 compared to the prior year:

| DRASTIC REDUCTION IN SHIPMENTS compared to prior year | | | |
|---|---|---|---|
| | Q1 2017 | Q1 2018 | *% Decline* |
| **All gas turbines** | 20 | 12 | *-40.00%* |
| **AGP** | 21 | 6 | *-71.43%* |

### c.    First Quarter 2018 Profit Margins Dropped by 30%

264.    The Power segment's dropping profit margins continued in the first quarter of 2018:

| DRASTIC REDUCTION IN PROFIT MARGIN compared to prior year | | |
|---|---|---|
| **Q1 2017** | **Q1 2018** | *% Decline* |
| 5.5% | 3.8% | *-30.9%* |

69

6)    **In Second Quarter 2018 GE Maintained Materially Inflated Goodwill in its Financial Statements Despite the Collapse of Business and Market for Power's Products**

265.    In the second quarter ended June 30, 2018 GE reported a goodwill balance for the Power segment of $23.186 billion.  Once again, GE maintained this materially inflated figure even as the adverse financial performance for the Power segment that GE had forecasted in the fourth quarter proved to be dramatically worse. Indeed, GE claimed in its Form 10-Q to have performed an interim step-one impairment test of the Power Generation and Grid Solutions reporting units within Power but to have concluded that the fair value of those reporting units exceeded carrying value and thus required no impairment to goodwill. GE's failure to take any impairment in the second quarter (based on an unverifiable impairment test or otherwise) allowed the Company to maintain $23 billion of unimpaired goodwill in blatant disregard for the collapsed business and market conditions reported in the Second Quarter, as follows below.

a.    **Second Quarter 2018 Orders of Power's Main Product Dropped Precipitously by 70-75%**

266.    In the second quarter of 2018, equipment orders fell between 70% and 75% as compared to the same quarter in the prior year.  GE's prediction that Power segment sales would grind to a near halt was realized with orders down significantly compared to the same quarter in the prior year:

| DRASTIC REDUCTION IN ORDERS compared to prior year | | | |
|---|---|---|---|
| | **Q2 2017** | **Q2 2018** | *% Decline* |
| **All gas turbine models** | 24 | 7 | *-70.83%* |
| **Aeroderivatives** | 12 | 3 | *-75.00%* |

267.   Once again, the reduction in orders meant GE would not generate future profits from long-term service agreements that were cross-sold with new machine sales.

### b.   Second Quarter 2018 Shipments of Power's Main Products Declined Substantially by 66-70%

268.   Additionally, shipments dramatically declined in the second quarter of 2018 as compared with the same quarter in 2017:

| DRASTIC REDUCTION IN SHIPMENTS compared to prior year | | | |
|---|---|---|---|
| | Q2 2017 | Q2 2018 | *% Decline* |
| **All gas turbines** | 21 | 7 | *-66.67%* |
| **Aeroderivatives** | 17 | 5 | *-70.59%* |

### c.   Second Quarter 2018 Power's Profits Declined Significantly by 47%

269.   Correspondingly, the Power segment's profitability took a dramatic downward turn by the second quarter of 2018:

| DRASTIC REDUCTION IN PROFIT MARGIN compared to prior year | | |
|---|---|---|
| **Q2 2017** | **Q2 2018** | *% Decline* |
| 10.6% | 5.6% | *-47.1%* |

270.   The reduction in profit margins also demonstrated that even if any cost synergies that were supposed to come from the Alstom acquisition had been realized, they were a drop in the bucket given the dramatic downturn in GE Power's profitability.

**d.   Cash Flow from Operating Activities Also Declined Significantly in 2018**

271.    In 2018, GE also saw significantly declining cash flow.  By the end of 2018, cash flow had fallen 31% as compared to the prior year—again demonstrating markedly worse circumstances that, along with all the other business and market conditions, required both an impairment test and substantial impairment:

| ANNUAL INDUSTRIAL CASH FROM OPERATING ACTIVITIES Excluding Deal Taxes and Pensions Compared to Pre-Alstom Acquisition | | |
|---|---|---|
| **2015 (*Alstom acquisition*)** | **2018** | *% Decline* |
| $12,237 | $8,438 | *-31%* |

**e.   GE Continued Losing Market Share to Key Competitors**

272.    As a result of the anticipated estimate of a substantial decline in turbine shipments as reflected in the fourth quarter 2017 financials, from 2017 to 2018, GE lost significant market share, dropping from first in worldwide gas turbine orders to third behind competitors Siemens and Mitsubishi:



**f.      Nonetheless, GE Maintained Materially Inflated Goodwill in the Second Quarter of 2018**

273.    For the second quarter of 2018 as announced in Form 10-Q on July 27, 2018, GE performed an interim step-one impairment test of the Power Generation and Grid Solutions reporting units within Power but concluded that the fair value of those reporting units exceeded carrying value and did not take any impairment. That quarter, GE maintained a materially inflated goodwill balance for the Power segment of $23.186 billion.

**7)      In October 2018, GE Abruptly Dismissed Defendant Flannery and Announces its Intent to Impair Tens of Billions in Goodwill, Civil and Criminal Government Investigations into Goodwill, and a Drastic Dividend Cut**

274.    After joining GE's Board of Directors in April 2018, Larry Culp was named GE's new CEO on October 1, 2018, simultaneous with the announcement that the Board had terminated Defendant Flannery.

275.    On October 2, 2018, S&P downgraded GE to BBB+ from A.  S&P said in a release, "The latest news on power performance [announcing a potentially $23 billion goodwill impairment] has led us revise down our view of GE's aggregate competitive positioning, with solid performance in aviation and health care further overshadowed by weakness in the power segment."

276.    That same day, Moody's placed GE under review for a credit downgrade.  Moody's explained: "Among the range of issues that Moody's will consider is the impact on GE's earnings and cash flow prospects of the continuing deterioration in its Power business, which is likely to persist for some time."

277.    Culp's next step was to delay GE's third quarter 2018 earnings announcement.  In a brief email to investors on October 12, 2018, GE said the delay would allow Culp to "complete initial business reviews and site visits following his appointment on October 1st."

278.    The stock price fell from $12.72 on October 11, 2018, on a volume of 116,161,903 shares traded, to $12.32 on October 12, 2018, on a volume of over 123 million shares traded.

279.    On October 30, 2018, GE confirmed a goodwill impairment charge of $22 billion related to GE Power and slashed the dividend to one cent. The goodwill impairment erased nearly all the goodwill for the Power segment, including GE's entire investment in Alstom just three years after the acquisition was completed and even more, reflected structural problems related to its leading product, the H-class turbine. GE also disclosed that the DOJ had launched a criminal investigation into GE's goodwill accounting.  Additionally, it revealed that the SEC had expanded its investigation beyond just GE's revenue recognition for long-term service agreements and into its goodwill impairment. Finally, GE announced a reorganization of the Power segment to separate its Gas Power Systems business from the rest of the segment and to make the entire segment report to new CEO Culp, rather than to Defendant Stokes.

280.    The news came out first in a morning press release stating:

GE announced results today for the quarter ended September 30, 2018. The Company reported a loss of $2.63 per share from GAAP continuing operations. As summarized in the attached reconciliation, adjusted earnings per share (non-GAAP) were $0.14, down 33 percent from the same period in 2017. The Company recorded a non-cash goodwill impairment charge of $22 billion, before tax, related to GE Power.

The Company also announced immediate actions to strengthen its balance sheet and position its businesses for success.

First, GE plans to reduce its quarterly dividend from $0.12 to $0.01 per share beginning with the Board's next dividend declaration, which is expected to occur in December 2018. This change will allow GE to retain ~$3.9 billion of cash per year compared to the prior payout level.

Second, GE intends to reorganize Power to accelerate the business' operating and financial improvements. GE plans to create two units — a unified Gas business combining GE's gas product and services groups, and a second unit constituting the portfolio of GE Power's other assets including Steam, Grid Solutions, Nuclear, and Power Conversion. The Company also intends to consolidate Power's headquarters structure to ensure these units can best serve their customers.

281.    On the October 30, 2018 conference call, GE's CFO Defendant Miller shared that "the SEC expanded the scope of its ongoing investigation to include the goodwill charge" and that the "Department of Justice is also investigating this charge."

282.    GE's third quarter 2018 results released that day also revealed the decimation of GE's gas turbine business and GE's own role in the failing Power segment. Customers around the globe were halting orders and the Company was incurring significant costs to inspect and replace blades at existing machines. GE sold only 32 turbines in the first three quarters of 2018, compared to 51 in the previous year, contributing to a decline in the loss of service agreements accompanying those sales.

283.    GE's third quarter 2018 Form 10-Q elaborated on why GE took the goodwill impairment.  As set forth above, all of these issues had been known to GE throughout the Class Period despite GE's severely reckless decision to avoid impairing goodwill:

> Based on the results of our step one testing, the fair values of each of our reporting units exceeded their carrying values except for the Power Generation and Grid Solutions reporting units, within our Power segment. The majority of the goodwill in our Power segment was recognized as a result of the Alstom acquisition at which time approximately $15,800 million of goodwill was attributed to our Power Generation and Grid Solutions reporting units. As previously disclosed, the Power market as well as its operating environment continues to be challenging. ***Our outlook for Power has continued to deteriorate driven by the significant overcapacity in the industry, lower market penetration, uncertain timing of deal closures due to deal financing, and the complexities of working in emerging markets. In addition, our near-term earnings outlook has been negatively impacted by project execution and our own underlying operational challenges. Finally, market factors such as increasing energy efficiency and renewable energy penetration continue to impact our view of long-term demand***. These conditions have resulted in downward revisions of our forecasts on current and future projected earnings and cash flows at these businesses.

284.    That day, GE's stock price dropped by 8.78% from $11.16 at close on October 29, 2018 to $10.18 at close on October 30, 2018, on an exceptional volume of 344,976,676 shares traded.

285.     GE bonds and preferred stock also materially declined on this negative news.  GE's

$11.4 billion issuance of 8.7% bonds (cusip 36164QNA2), were issued July 1, 2016 and due 2035.

That bond dropped 4.6%, starting at 90.08 of par at close on October 29 and declining to 85.94 on

November 2, 2018.  Similarly, GE's perpetual preferred stock dropped 4.5% from $94.07 at close

on October 29, 2018 to $89.88 on November 2, 2018.

286.     Also, on October 30, 2018, *The Wall Street Journal* published an article titled

"GE's $22 Billion Charge Intensifies Regulatory Scrutiny." Former SEC Chairman Harvey Pitt

noted the significance of the massive write-down and how the expanded investigations would

focus in large part on the accounting for goodwill. The article stated:

> "*Companies don't write down this amount of money and not get held accountable*,"
> said former Securities and Exchange Commission Chairman Harvey Pitt. "You
> have to get it right, and you start behind the eight-ball when the number is $22
> billion."
>
> The charge is now a focus of two federal investigations into GE's accounting. The
> Justice Department is conducting a criminal investigation into GE's recent
> accounting practices, company finance chief Jamie Miller said on the company's
> quarterly earnings call Tuesday.
>
> That probe is in addition to an SEC investigation launched in November. GE Chief
> Executive Larry Culp declined to comment on the investigations. "They will play
> out as they play out," he told The Wall Street Journal.
>
> The investigations by the Justice Department and the SEC likely will focus on
> examining whether GE accurately followed accounting rules and corporate law
> when allocating goodwill on its balance sheet and when estimating the size of the
> write-down, Mr. Pitt said.
>
> "At issue will be how hard they [GE] looked at this, how diligent they were in
> considering whatever warnings were circulated internally and the rationale for
> ignoring those warnings," he said.

287.     On October 31, 2018, Moody's lowered GE's credit rating from A2 to Baa1.  In

explaining its decision to downgrade GE, Moody's wrote: "The downgrade reflects Moody's view

that the adverse impact on GE's cash flows from the deteriorating performance of the Power

business will be considerable and could last some time," Moody's continued, "The weaker than

expected performance at Power is not only attributable to a considerable drop in market demand and ensuing heightened competition, but also to GE's misjudgment of financial prospects and operational missteps."

288.    On November 2, 2018, Fitch lowered GE's credit rating two levels to BBB – just three levels above junk grade. In response, Jonathan Duensing, director of investment grade corporate debt at Amundi Pioneer, noted, "this is a company that has been struggling to manage their overall business platforms from an operational standpoint, and now it's in a situation where it's not only impacting the equity price, it's impacting the debt spreads because credit agencies moved on the credit rating and investors have lost confidence."

289.    GE's stock price continued a downward spiral in reaction to this news.   On November 1, GE's stock price closed at $9.21 per share and on November 2, it closed at $8.93 per share, following news that GE's credit rating had been lowered by Moody's.

290.    Likewise, GE's bond and preferred stock were affected by this news.  GE's $11.4 billion issuance of 8.7% bonds (cusip 36164QNA2) were issued July 1, 2016 and due 2035. That bond dropped 4.6%, starting at 90.08 of par at close on October 29, 2018 and declining to 85.94 on November 2, 2018.  Similarly, GE's perpetual preferred stock dropped 4.5% from $94.07 at close on October 29, 2018 to $89.88 on November 2, 2018.

291.    The bond price declines, in particular, reflected the increased riskiness of lending to GE and resulting difficulty it would face in borrowing additional funds, thus pushing the Company to rely more heavily on its credit lines.

292.    On November 16, 2018, *The Wall Street Journal* commented on the decline in GE's credit rating.  "Bond prices began their recent fall in late October when the company disclosed $22 billion in unexpected charges tied to its power unit, after reporting a $6 billion shortfall in

insurance reserves in the first quarter. ***GE's bonds have been the most actively traded in the U.S. corporate-debt market over the past two weeks with more than $10 billion changing hands***, according to MarketAxess."[4]

293.    The following chart demonstrates the dramatic decline in GE's bond price following GE's October 2018 disclosures:



294.    Predictably, the goodwill write-down had a major impact on GE's balance sheet. At the end of the second quarter of 2018, GE's balance sheet included $342.8 billion in total assets, $267.6 in total liabilities, and $71.8 billion in total equity. In the third quarter of 2018, after GE wrote off $22.0 billion of goodwill related to Power, GE saw *a 31% reduction in equity in a single quarter*, revealing that GE Power had significantly reduced cash flow prospects and that Power segment's future was uncertain.

---

[4] https://www.wsj.com/articles/ge-credit-crunch-ripples-across-wall-street-1542220488.

295.    GE's share price at the end of 2018 represented a 74% decline and loss of $193 billion of shareholder wealth since 2016. During the same time period, the S&P 500 *increased* 33%:



*Source: Yahoo Finance, ChartIQ (accessed 3 May 2019, GE benchmarked against the S&P 500).*

296.    After the close of the Class Period, the extent of GE's manipulation of long-term service agreements—a key revenue booster for the Power segment and therefore critical metric in the goodwill impairment analysis—continued to trickle out.  One way that GE manipulated service contracts was by offering steep price reductions on equipment to entice customers with the hope of securing a high volume of service agreements, which had the effect of appearing to generate income but at the expense of maximizing profitability.

297.    On February 13, 2019, in an article entitled, "GE Power has a 92 Billion Backlog. For the New Boss, That's a Problem," *The Wall Street Journal* reported that CEO Culp acknowledged that compensating sales representatives on the number or duration of service agreements skewed internal modeling of expected revenue, which had to be corrected by focusing instead on margins. *The Wall Street Journal* explained, "The power backlog is large, but there is little information on what it contains partly because the details of commercial agreements with

customers are kept private. The backlog includes both equipment orders and service contracts, some of which cover more than a decade. Once the machines are delivered or work is performed, GE books the backlog as revenue."

298.     The article also described the sort of practices that led to false internal assumptions and delayed the impairment of Alstom goodwill.  For example, "It sold equipment upgrades to some customers by rolling them into existing service contracts. It also changed its profit assumptions for such agreements to record gains."

### F.     Additional Facts Giving Rise to a Strong Inference of Scienter

#### 1)     <u>The Speed and Volume of the Goodwill Impairment Alongside Flannery's Removal as CEO Strongly Demonstrates Goodwill was Inflated at All Times During the Class Period</u>

299.     The sheer volume of the goodwill impairment and the fact that it occurred in one fell swoop immediately after a new CEO joined the Company supports an inference of scienter.

300.     GE's impairment charge was reported by *The Wall Street Journal* as the largest goodwill impairment in recent corporate history.  The last such significant impairment was over ten years earlier, in 2008.

301.     A massive goodwill impairment preceded by only *de minimis* prior impairments is indicative of at least severe recklessness if not outright fraud.  Indeed, the impairment immediately caught the eye of the United States government. GE announced on October 2, 2018 that it anticipated taking a goodwill impairment and by October 31, 2018 when it actually took the goodwill impairment, civil and criminal government investigations by the SEC and DOJ were underway.

302.     When combined with the abrupt termination of the CEO, particularly one whose most important achievement launching him to the helm of GE had been the acquisition of Alstom, the inference of at least severe recklessness is further compounded.

### 2) **Defendants Were Motivated to Record Materially Inflated Goodwill in Violation of GAAP In an Effort to Maintain GE's Credit Rating**

303.    As discussed above, GE was wholly reliant on the Power segment for its success during the Class Period.  Impairing goodwill—and thereby revealing the problems in the Power segment—threatened GE's ability to maintain a sufficiently high credit rating.  Analysts noted this connection before the impairment.  On September 25, 2018, a Motley Fool analyst stated that "a recovery in the power segment is an integral part of GE's plan to reduce its net debt-to-earnings ratio *in line with what credit rating agencies typically expect* for investment-grade debt."

304.    This analyst's prediction came to pass.  Immediately after the goodwill impairment, GE's credit rating suffered.  S&P's October 2, 2018 release announcing GE's downgrade from A to BBB+ cited the "latest news," just a day after GE announced that it anticipated a $23 billion impairment. Moody's put GE under review that day and then on October 31, 2018, after GE actually took the impairment, Moody's lowered GE's long-term debt credit rating from A2 to Baa1, just two notches above the non-investment grade cutoff. Just a few days later, on November 2018, Fitch lowered GE's credit rating from A to BBB+, just three levels above junk grade. A few months later, in February 2019, Fitch changed the outlook from Stable to Negative.

305.    Credit ratings agencies look to cash flows to determine how likely a company will be able to pay interest and principal on debt. As the following chart showing one-year maturity interest rates by credit rating during the Class Period demonstrates, the reduction in GE's credit rating significantly impacts its cost of borrowing.  This is because lower credit ratings result in increased rates on debt and increased interest expense.



306.   Defendants were therefore incented to avoid any acknowledgment of reduced expected future cash flows, including a write-down of goodwill, because of the known negative impact that would have on its credit rating.

**3)** **Defendants' Desire to Maintain GE's Dividend Motivated Them to Conceal that GAAP Required a Goodwill Impairment**

307.   Because cash flow and future demand are such central metrics in the goodwill impairment test, significantly impairing the Power segment's goodwill would reveal that GE had insufficient cash flow to pay out future dividends, and that the prospects for Power were weak.

308.   When GE stopped inflating its cash flow forecasts, it was forced to reduce its dividend and cut the goodwill—both of which are direct expressions of cash flow. While GE referred to the goodwill write-down as a "non-cash" impairment, the goodwill write-down was in fact an acknowledgment of the reduction in GE's expected future cash flows. Specifically, the goodwill write-down resulted from reducing the fair value of sub-units within the Power segment as estimated using discounted cash flow analyses. When expected future cash flows are reduced, fair value correspondingly goes down.

309.    GE's 10-Q for third quarter 2018 announced the goodwill impairment and noted that various conditions had resulted in "downward revisions of our forecasts on current and future projected earnings **and cash flows**…"

310.    GE's dividend has historically been a major attraction to investors and the consistency of the dividend had made GE unique among its peers.  In November 2017, and based on impairments in other GE business, GE cut its dividend almost in half.  Cutting the dividend already had been a difficult decision, but Defendants knew that nearly eliminating the dividend would cause a major backlash from investors.  Accordingly, Defendants were motivated to maintain the goodwill number to maintain the appearance that the prior dividend reduction had been sufficient.

### 4)    Defendants Were Motivated to Record Materially Inflated Goodwill to Conceal the H-Class Turbine Problems

311.    At the same time that Defendants were recording materially inflated goodwill and failing to timely impair it, they were covering up the major oxidation and vibration problems with the H-class gas turbine.

312.    Defendants were motivated to not timely impair the materially inflated goodwill because doing so would expose the problems in the Power segment, including that the H-class gas turbine had not proved to be the "crown jewel" and driver of the Power segment's future success that GE touted it to be.

### 5)    Defendants Were Personally Motivated to Maintain Goodwill That Violated GAAP Because Jobs Were on the Line

313.    Defendants were motivated to conceal the need for a goodwill impairment because admitting the need for the impairment put their jobs at risk.

314.    Defendant Flannery was brought in as the CEO of General Electric in large part due to his role in the Alstom acquisition. The press release announcing his appointment noted the acquisition as a major accomplishment.

315.    Flannery was deeply knowledgeable about developments in the Power segment because of its importance to GE overall.  As a William Blair & Company research analyst wrote after Flannery's ouster, "[u]nder Flannery, GE Power would have been core."

316.    If Alstom failed, the Power segment failed, and so too did Flannery. Indeed, when the Company finally reckoned with the need for the total goodwill impairment, Flannery was fired. After Flannery's ouster, a report noted that the issues in the Power segment "carried a particular sting for Flannery" because his plan to turnaround GE depended on salvaging Power, as well as aviation and healthcare.

317.    Flannery's personal motivation was to hope for a turnaround, despite the clear facts to the contrary, in order to salvage his job and reputation.

318.    After five years at GE, Defendant Hauser left the Company shortly before the goodwill impairment cover-up was revealed.  Hauser was GE's Vice President, Controller, and Chief Accounting Officer.  She is the only signatory to GE's Form 10-Q for the first and second quarter of 2018, which contain the materially inflated goodwill numbers.

319.    On July 26, 2018, Hauser announced her intention to retire.  She was replaced effective just a few weeks later on September 10, 2018.

320.    Then on October 1, 2018, after GE announced it anticipated needing to take a massive goodwill impairment, the Company installed a new CEO (Culp), new Chief Accounting Officer, and new General Counsel—replacing GE's homegrown leadership that had fraudulently

concealed the structural issues within the Power segment.  Outsider Culp took drastic, immediate steps to re-position Power.

**6)**     **Defendants Were Motivated to Conceal the Need for a Goodwill Impairment in an Effort to Prevent a Further Stock Decline Which Threatened General Electric's Participation in the Dow Jones Industrial Average**

321.     Taking the necessary goodwill impairment would have resulted in a major stock drop, which would significantly increase the likelihood of GE's removal from the Dow Jones index in which GE had been a continuous member since 1907 and claimed status from being its last original member.  Accordingly, Defendants were motivated to conceal the need for impairment in order to maintain General Electric's spot on the elite index.

322.     Indeed, GE was removed in June 2018 – and the S. & P. Dow Jones Indices which owns the Dow cited GE's sliding stock price as a contributing factor in its removal.

## VI.     FALSE AND MISLEADING STATEMENTS AND OMISSIONS

323.     On December 4, 2017 (the first day of the Class Period), GE issued a press release on its website announcing that GE's "largest and most efficient gas turbine, the HA, is now available at more than 64 percent efficiency in combined cycle power plants, higher than any other competing technology today." GE further stated:

> The HA is our most advanced gas turbine technology, and we've never stopped pushing the boundaries of what it can do," said Joe Mastrangelo, president and CEO, GE's Gas Power Systems. "With the ability to deliver 64 percent efficiency, GE is proud to achieve an industry first and offer customers *the most efficient gas technology available in the world today.*" According to GE Power's estimates, *an additional percentage point of efficiency in gas turbines can translate to millions in fuel savings for customers globally . . . . The new combustion system has already been successfully tested at full-load and full-speed* at GE's test stand in Greenville, South Carolina.
>
> *The HA is a proven technology* – with 70+ orders to date – and is being deployed by customers worldwide. . . .

85

324.    The quoted statements in the foregoing paragraph regarding the efficiency of the H-class turbine, its "successful" testing, and the "proven" nature of the H-class turbine technology were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects—eliminating the benefits of "efficiency" GE touted. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made because, among other things, (1) there were two instances of oxidation in 2015, one leading to a blade break; (2) in response to the 2015 incidents, GE conducted a root-cause analysis, worked on new protective coatings and altered a heat treatment process for the defective component; (3) when GE inspected turbines containing blades with the supposedly improved special coating, it found blades showed early stages of cracking after only 7,000 hours and observed cracking after 12,000 and 16,000 hours; (4) in mid-2017 and prior to this statement, GE sent a technical information letter to customers and worked with some HA unit customers to resolve the oxidation issue; (5) on September 24, 2018, it was revealed that GE had known of the oxidation issue for at least a year; and (6) throughout the Class Period, Defendants followed Tusa's commentary regarding the turbine issues at GE.

325.    On December 27, 2017 in a statement to *Reuters*, GE denied there were any systemic or structural issues with the H-class turbines, assuring the public that "***every commercial HA site today is demonstrating exceptional performance levels for both output and efficiency***."

326.    The bold and italicized statements in the foregoing paragraph regarding the efficiency of the H-class turbine and its "exceptional performance" were false and/or misleading

and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects – eliminating the "exceptional" "output and efficiency" GE touted. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324.

327.    On January 3, 2018, the journal *Power* published an article titled "Efficiency Improvements Mark Advances in Gas Turbines," quoting GE Gas Power Systems' Executive Product Manager for gas turbines, Guy DeLeonardo, who stated that "***the company also is innovating with advances in cooling and sealing, improved aerodynamics, and the use of materials and coatings designed for use in higher temperatures, including ceramic material composites.***"

328.    The bold and italicized statements in the foregoing paragraph regarding GE's innovation and advances in materials and coatings for use at high temperatures were false and/or misleading and omitted material facts. The claim led investors to believe that GE's advanced technologies and materials allowed its H-class turbines to operate at higher temperatures when in fact that was blatantly false. The truth was that the blades defectively oxidized at high temperatures causing potential blade breakage such that the opposite was true make—its advances did not allow for effective and efficient operation at high temperatures. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324.

329.   On January 24, 2018, GE held a conference call with investors, during which Defendant Stokes stated that GE was "proud of the HA gas turbine technology" as "*[i]t is operating in line with performance guarantees.*" Defendant Stokes acknowledged "*some issues related to commissioning at certain sites*," but that GE had "*readily addressed them*" and had "commenced working on supply chain and project organizations to address volume ramp issues and things considered *normal learning curve process*." Defendant Stokes also stated that all of the 23 units installed were "*performing to specifications and guarantees.*"

330.   The bold and italicized statements in the foregoing paragraph regarding GE's H-class turbines "performing to specifications and guarantees," as well as his explanation that issues were "normal learning curve process" were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and performing as intended with world-class efficiency. In fact, the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the H-class units for fewer hours before testing for defects.   Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324.

331.   During the same call on January 24, 2018, Defendant Stokes warned that total gas turbine shipments would decrease in 2018 to 60-70 units, compared with 102 units in 2017. Yet, he obfuscated a significant reason, instead blaming the reduced shipments on factors external to GE: "*the markets were softer than expected. Deals are taking longer to close and are very competitive. We are expecting the markets to be less than the [sic] 35 gigawatts in 2017 and we are preparing our restructuring plans for a market that could be as low as 30 gigawatts in 2018.*"

332.     The bold and italicized statements in the foregoing paragraph regarding the reasons for the lower projected gas turbine shipments were false and/or misleading and omitted material facts. When these statements were made, Defendants knew in addition it was triaging H-class blade inspections and repairs due to the oxidation issue, which was preventing its ability to ship new turbines because employee teams and machines were being deployed elsewhere. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324.

333.     On February 23, 2018, GE filed its 2017 Form 10-K, reporting a goodwill year-end balance for its Power segment of **$25.3 billion**, taking only a *de minimis* $217 million impairment charge which represented .86% of the total amount of goodwill booked that quarter

334.     The bold and italicized goodwill number in the foregoing paragraph was false and/or misleading and omitted material facts. This statement assured investors that GE conducted an accurate assessment of goodwill impairment using reliable data and reasonable assumptions and concluded that GE Power had $25.3 billion in goodwill. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made because, among other reasons 1) even preceding fourth quarter 2017, Alstom was dragging down GE's profitability, 2) during the fourth quarter 2017 Defendant Flannery admitted Alstom was a disappointment, and that GE overpaid for it, 3) significant declines in cash flow forced GE to cut its historic dividend in half, 4) year over year orders and shipments dropped significantly in 2017, 45) forecasted shipments, profit margins and other financial factors in 2018 mandated impairment, particularly in light of Power's sales team having to steeply discount excess unsold inventory, and 6) the SEC launched an investigation into GE's revenue recognition for long-term

service agreements, calling into question a major claimed benefit of the Alstom acquisition and revenue generator for the Power segment, as set forth in further detail in paragraphs 229 to 257.

335.    On March 28, 2018, the magazine *Power* published an article titled "GE HA Turbine Snags Another World Record for CCGT Efficiency," in which GE Power "noted that ***the Bouchain and Nishi-Nagoya world records highlight HA turbine contributions at the world's most efficient power plants in both the 50 Hz and 60 Hz segments.***" Defendant Stokes further stated in the article: "We're very proud to make history once again and to partner with Chubu and Toshiba to bring GE's ***industry-leading HA turbine*** to Japan . . . ***Our HA technology enables the power plant of the future, delivering unprecedented levels of efficiency and reliability that can help countries everywhere meet today's power demands and reach more aggressive emissions goals***."

336.    The bold and italicized statements in the foregoing paragraph regarding the "unprecedented levels of efficiency and "reliability" of the "industry-leading HA turbine" were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the H-class units for fewer hours before testing for defects – eliminating the "efficiency" GE touted and contradicting its assurances of "reliability." Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324.

337.    On May 1, 2018, GE filed its first quarter 2018 results on Form 10-Q, reporting a materially inflated goodwill balance for the Power segment of **$25.9 billion**.

338.    The bold and italicized goodwill number in the foregoing paragraph was false and/or misleading and omitted material facts. This statement assured investors that GE conducted an accurate assessment of goodwill impairment using reliable data and reasonable assumptions and concluded that GE Power had $25.9 billion in goodwill. Defendants knew or recklessly disregarded that this statement was false and/or misleading and omitted material facts when made because, among other reasons, it failed to account for the dramatic decline in the Power segment as reflected by the objective measures revealed prior to and during the Class Period, including those set forth in paragraph 334 above as well as the fact that things were only getting worse as evidenced by the fact that: 1) orders falling even below the reduced forecast, 2) year over year shipments were substantially lower, and 3) profit margins also had dropped compared to the prior year, as  set forth in further detail in paragraphs 258 to 264.

339.    On June 26, 2018, GE held a conference call with analysts, during which Defendant Flannery stated that GE Power "i**s *a fundamentally strong franchise with leading technology*, a valuable installed base, and expansive global research" with "approximately 7,000 gas turbines in our installed base and we have a 20- year plus track record that demonstrates *we can improve output, reliability, and performance of those assets when we service them*."

340.    The bold and italicized statements in the foregoing paragraph regarding GE's "leading technology" in the Power segment and its ability to "improve output, reliability, and performance" when it "service[s]" Power assets was false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were reliable and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shut downs, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours

before testing for defects – and thus the HA units were not "performing to specifications and guarantees" but rather subject to warranty claims. Further, GE's ability to "improve output, reliability, and performance" by "servic[ing]" its turbines was severely compromised by shortfalls in materials and labor to replace defective blades with Gen II blades. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324.

341.    On July 27, 2018 filed the second quarter 2018 results on Form 10-Q, reporting a goodwill balance for the Power segment of **$23.2 billion**.

342.    The bolded and italicized goodwill number in the foregoing paragraph was false and/or misleading and omitted material facts.  This statement assured investors that GE conducted an accurate assessment of goodwill impairment using reliable data and reasonable assumptions and concluded that GE Power had $23.2 billion in goodwill.  Defendants knew or recklessly disregarded that this statement was false and/or misleading and omitted material facts when made because, among other reasons, it failed to account for the dramatic decline in the Power segment as reflected by the objective measures revealed prior to and during the Class Period, including those issues referenced in paragraph 334 and 338 above and as evidenced by the fact that GE Power's business continued its decline: 1) orders fell even below the reduced forecast, 2) year over year shipments were substantially lower,  3) profit margins had dropped compared to the prior year, 4) cash flow significantly declined from the prior year, and 5) GE continued losing market share to key competitors, as set forth in further detail in paragraphs 265 to 273.

343.    On September 12, 2018, GE issued a press release touting the selection of its "***industry leading HA gas turbine technology***" for a natural gas power plant in Ohio.  GE stated that its HA fleet of gas turbines had achieved "***more than 175,000 operating hours***" and had been

recognized by industry third parties, specifically noting that "***Exelon's HA-powered Wolf Hollow II project was honored as Power Engineering's Best Gas-Fired Project in 2017***."

344.    The bold and italicized statements in the foregoing paragraphs regarding GE's "industry leading HA gas turbine technology" and the success of the Wolf Hollow project were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines—including specifically at the Wolf Hollow plant—had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324.

345.    On September 20, 2018, GE Gas Power Systems CEO Chuck Nugent minimized the oxidation issue in an interview with *Bloomberg*, claiming that "***the concerns were overblown,***" noting, "***the turbine's performance has been highly reliable,***" and adding "***I am confident this is not a significant issue from a customer perspective.***"

346.    The bold and italicized statements in the foregoing paragraph regarding the magnitude of the issues stemming from the oxidation defect and the "reliab[ility]" of the H-class turbines were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shut downs, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects.

Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324, and because GE had attended an H-class turbine user meeting in September 2018 where it acknowledged the oxidation was a "fleet-wide issue."

347.    On September 20, 2018, GE told *Reuters* that the oxidation issue "was first discovered on turbine blades in a natural gas-fueled turbine operated by Exelon Corp. in Texas a few weeks ago." Defendant Stokes also told *Reuters* that "[t]he minor adjustments that we need to make do not make the HA any less of a record setting turbine—they are meeting—and in many cases exceeding—their performance goals at every customer site today."

348.    The statements in the foregoing paragraph that the oxidation issue was "discovered" "a few weeks ago," the reassurance that the only fixes required are "minor adjustments" and that the HA is meeting and exceeding performance goals at every site were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects – and thus the HA units were not meeting or exceeding "performance goals" and certainly were not doing so "at every customer site." Further, the statement that the oxidation issue was only discovered "a few weeks ago" was false and misleading because GE discovered the oxidation issue in 2015, had been working on a fix ever since, and had arranged to inspect and replace blades for certain customers starting in 2017. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324, and because GE had attended an H-

94

class turbine user meeting in September 2018 where it acknowledged the oxidation was a "fleet-wide issue."

349.   On September 21, 2018, GE Power spokesman Chris Shigas stated: "A few weeks ago, there was an event at Exelon's Colorado Bend site that resulted from an issue with an H-class turbine component. We expect the same issue to impact other HA units. ***We have identified the solution and have a plan in place, and we have been proactively working with customers on a case-by-case basis to address any impacted unit. We expect the Exelon unit to return to service soon.***"

350.   The bold and italicized statements in the foregoing paragraph regarding GE's "solution" and "plan" to address defects on a "case-by-case" basis, and that the Exelon unit would return to service "soon" were false and/or misleading and omitted material facts. These statements grossly understated the magnitude of the problem, assuring investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in catastrophic turbine blade breaks and prolonged plant shutdowns (over two months in the case of Exelon) to resolve the issues. Further, the statements reassured investors that the problem was solved and it had a fix, when in fact it would not be known for many months whether the oxidation issue was resolved or recurring.  Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324, and because GE had attended an H-class turbine user meeting in September 2018 where it acknowledged the oxidation was a "fleet-wide issue" and users expressed concern whether the Gen II "fix" would work.

351.   On September 21, 2018, Defendant Stokes stated:

GE engineers and teams identified a fix and have been working proactively with our customers on a case-by-case basis to quickly return impacted units to service and mitigate any future issues … ***In all industries and new technologies, developing and launching products at this scale and complexity involves fine-tuning and adjusting the technology . . .***

352.    The statements in the foregoing paragraph regarding GE's "fine-tuning" to "quickly" return units to service were false and/or misleading and omitted material facts. These statements grossly understated the magnitude of the problem, assuring investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in catastrophic turbine blade breaks and prolonged plant shutdowns (over two months in the case of Exelon) to resolve the issues. Further, the statements regarding identification of a "fix" reassured investors that the problem was solved and it had a fix, when in fact it would not be known for many months whether the oxidation issue was resolved or recurring. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324, and because GE had attended an H-class turbine user meeting in September 2018 where it acknowledged the oxidation was a "fleet-wide issue" and users expressed concern whether the Gen II "fix" would work.

353.    On September 28, 2018, GE published an article by Chuck Nugent and Scott Strazik on the gas turbine issues via LinkedIn and as a press release, stating: "***The issue involves oxidation that could cause distress on 9FB and HA gas turbine Stage 1 Blades (S1B).***" Nugent and Strazik further stated that "***[w]e identified the solution and have a plan in place to implement it.***" "***As we move forward, we remain very confident in our technology and the future of gas . . . The HA is the world's largest and most efficient turbine. There's nothing like it in operation today. It's meeting – and in many cases exceeding – performance goals at every customer site today.***"

354.    The bold and italicized statements in the foregoing paragraph that oxidation "*could*" impact HA gas turbine blades, GE's plan to solve the issue, and GE's reassurance that the HA is meeting and exceeding performance goals at every site were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects – and thus the HA units were not meeting or exceeding their performance goals, and certainly were not doing so at "*every customer site*." Further, the statements regarding GE having "identified the solution" reassured investors that the problem was solved and it had a fix, when in fact it would not be known for many months whether the oxidation issue was resolved or recurring.  Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 324, and because GE had attended an H-class turbine user meeting in September 2018 where it acknowledged the oxidation was a "fleet-wide issue" and users expressed concern whether the Gen II "fix" would work.

## VII.    ITEM 303 OF SEC REGULATIONS S-K, 17 CFR. § 229.303

355.    Pursuant to Item 303 and the SEC's related interpretive guidance, an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues or income from continuing operations. Such disclosure is required by an issuer in the management's discussion and analysis section of annual and quarterly filings, such as Form 10-K and 10-Q filings for domestic issuers.

356.    In May 1989, the SEC issued an interpretive release on Item 303 which set forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

357.    Throughout the Class Period, Item 303 required Defendants to disclose that:

   a. the oxidation and/or vibration defect in the H-class would lead to lower revenues and profits related to that product due to the unexpected costs of inspecting, repairing, and replacing turbine blades;

   b. the oxidation and/or vibration defect in the H-class would lead to lower revenues and profits related to that product due to lower sales of the product;

   c. revenues, profits, and cash flow were declining for the Power segment due to the oxidation and/or vibration defect;

   d. reduced cash flow would lead to a major goodwill impairment; and

   e. reduced cash flow would lead to a major dividend reduction.

## VIII.    CLASS ACTION ALLEGATIONS

358.    Lead Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on their own behalf and on behalf of:

All persons and entities, their agents, successors in interest, assigns, heirs, executors, and administrators who purchased GE securities during the period between December 4, 2017 through and including December 6, 2018, and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

359.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Lead Plaintiff at

this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by General Electric or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

360.    Lead Plaintiff's claims are typical of the claims of the Class in that all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought is common to the Class.

361.    Numerous questions of law or fact arise from Defendants' conduct that is common to the Class, including but not limited to:

      a.    whether the federal securities laws were violated by Defendants' acts during the Class Period, as alleged herein;

      b.    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and legal/regulatory compliance of GE;

      c.    whether the price of GE securities was artificially inflated and/or maintained during the Class Period; and

      d.    to what extent the members of the Class have sustained damages and the proper measure of damages.

362.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

363.    Lead Plaintiff will fairly and adequately represent the interests of the Class in that they have no conflict with any other members of the Class. Furthermore, Lead Plaintiff has retained competent counsel experienced in class action and other complex litigation.

364.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

365.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

366.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## IX.    LOSS CAUSATION AND ECONOMIC LOSS

367.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of GE securities and operated as a fraud or deceit on Class Period purchasers of GE securities by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed through a series of partial corrective disclosures and became apparent to the market, the price of GE securities declined significantly as the prior artificial inflation came out of the price of GE securities.

368.     As a result of their purchases of GE securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e. damages, under the federal securities laws.

369.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company, including that Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the problems with the H-class turbine and its launch and the need to impair the $22 billion of goodwill in the Power segment in light of dramatically declining profits, cash flow, and demand. When the truth about GE was revealed to the market through a series of partial corrective disclosures, the price of GE

securities fell significantly. This decline removed the inflation from the price of GE securities, causing real economic loss to investors who had purchased GE securities during the Class Period.

370.    The economic loss, i.e. damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of GE securities and the subsequent decline in the value of the securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE - FRAUD ON THE MARKET DOCTRINE AND AFFILIATED UTE ALLEGATIONS

371.    Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

372.    In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for GE securities was an efficient market for the following reasons, among others:

   a.  GE securities met the requirements for listing, and was listed and actively traded, on the Nasdaq, a highly efficient, electronic stock market;

   b.  as a regulated issuer, GE filed periodic public reports with Nasdaq;

   c.  GE regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   d.  GE was followed by securities analysts employed by major brokerage firms, including JPMorgan, Wells Fargo Securities, LLC, and Compass Point Research & Trading LLC, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

## XI.   NO SAFE HARBOR

373.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Amended Complaint.

374.   Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements, GE's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

375.   Furthermore, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as GE's Forms 10-K and 10-Q issued throughout the Class Period.

376.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

377.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of GE who knew that the forward-looking statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future

economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XII.  CAUSES OF ACTION

### COUNT ONE
**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

378.    Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

379.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

380.    Defendants:

   a.  employed devices, schemes, and artifices to defraud;

   b.  made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and

   c.  engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

381.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GE securities. Lead Plaintiff and the Class would not have purchased GE securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

382.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of GE securities during the Class Period.

**COUNT TWO**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

383.     Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

384.     The Individual Defendants acted as controlling persons of GE within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of GE, and their ownership of GE securities, and their culpable participation, as alleged above, the Individual Defendants had the power and authority to cause GE to engage in the wrongful conduct complained of herein.

385.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**XIII.     JURY TRIAL DEMAND**

386.     Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiff demands a trial by jury of all of the claims asserted in this Amended Complaint so triable.

**XIV.     PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.     This action may proceed as a class action, with Lead Plaintiff as the designated Class representative and Lead Plaintiff's counsel designated as Class Counsel;

B.     Lead Plaintiff and the members of the Class recover damages sustained by them, as provided by law, and that a judgment in favor of Lead Plaintiff and the Class be entered against the Defendants, jointly and severally, in an amount permitted pursuant to such law;

C.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conduct alleged herein;

D.     Lead Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.     Lead Plaintiff and members of the Class recover their reasonable costs and expenses of this suit, including attorneys' fees and expert fees; and

F.     Lead Plaintiff and members of the Class receive such other and further relief as may be just and proper.

Dated: June 21, 2019

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

/s/ *Michael B. Eisenkraft*
Joel P. Laitman (JL8177)
Michael B. Eisenkraft (ME6974)
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 838-7797
jlaitman@cohenmilstein.com

Steven J. Toll (*pro hac vice*)
Julie Goldsmith Reiser (*pro hac vice*)
Molly J. Bowen (*pro hac vice pending*)
Eric S. Berelovich (EB7243)
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
mbowen@cohenmilstein.com
eberelovich@cohenmilstein.com

*Counsel for TRS and Lead Counsel for the Class*