**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE GENERAL ELECTRIC SECURITIES LITIGATION | 19 Civ. 1013 (DLC)<br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

LATHAM & WATKINS LLP
Miles N. Ruthberg
Blake T. Denton
885 Third Avenue
New York, New York 10022
(212) 906-1200

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700

William J. Trach (*pro hac vice*)
200 Clarendon Street
Boston, Massachusetts 02116
(617) 948-6000

*Attorneys for Defendants*

August 2, 2019

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................................1

BACKGROUND ..........................................................................................................................3

    A.    GE and the Individual Defendants ..........................................................................3

    B.    GE's Goodwill Accounting and Reported Goodwill Balances..............................4

    C.    GE Power's H-Class Turbine and the September 2018 Blade Failure ...................9

    D.    Plaintiff's Putative Class Action ..........................................................................12

ARGUMENT ..............................................................................................................................12

I.      THE AC FAILS TO PLEAD A SECTION 10(B) CLAIM ..............................................12

    A.    Plaintiff Fails Adequately to Plead a False or Misleading Statement...................13

            1.    Defendants' Estimates of Goodwill Are Non-Actionable Opinions..........14

            2.    Defendants' Statements Regarding H-Class Turbines Were Not
                  False or Misleading..................................................................................19

    B.    Plaintiff Fails Adequately to Plead a Strong Inference of Scienter ......................26

            1.    Plaintiff Has Not Pled a Cognizable Motive...............................................27

            2.    Plaintiff Has Not Pled Recklessness ..........................................................29

    C.    Plaintiff Fails Adequately to Plead Loss Causation..............................................36

II.    THE AC FAILS TO PLEAD A SECTION 20(A) CLAIM..............................................40

CONCLUSION...........................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)........................................................................................27

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)..................................................................................1, 40

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................12

*Campo v. Sears Holdings Corp.*,
  371 F. App'x 212 (2d Cir. 2010) ............................................................................33

*Central States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
  543 F. App'x 72 (2d Cir. 2013) ..........................................................37, 38, 39, 40

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
  679 F.3d 64 (2d Cir. 2012)....................................................................................17

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd.*,
  655 F. Supp. 2d 262 (S.D.N.Y. 2009)....................................................................15

*Cortina v. Anavex Life Scis. Corp.*,
  2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ......................................................31

*Dingee v. Wayfair Inc.*,
  2016 WL 3017401 (S.D.N.Y. May 24, 2016) .......................................................13

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..............................................................................................36

*ECA v. J.P. Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..............................................................................27, 28

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)..................................................................................14

*Fila v. Pingtan Marine Enter. Ltd.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016)....................................................................39

*Fogel v. Wal-Mart de México SAB de CV*,
  2017 WL 751155 (S.D.N.Y. Feb. 27, 2017)........................................................13

*Glaser v. The9, Ltd*.,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................................33

*Hensley v. IEC Elecs. Corp.*,
  2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014).....................................................27

*Higginbotham v. Baxter Int'l Inc*.,
  495 F.3d 753 (7th Cir. 2007) ..........................................................................22

*In re Agnico-Eagle Mines Ltd. Sec. Litig*.,
  2013 WL 144041 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden
  v. Agnico-Eagle Mines Ltd*., 533 F. App'x 38 (2d Cir. 2013) ...............................22

*In re Apple Computer, Inc.*,
  127 F. App'x 296 (9th Cir. 2005) ....................................................................34

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018)...............................................................25

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
  2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .....................................................20

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)...............................................................14

*In re Barrick Gold Corp. Sec. Litig.*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018)...............................................................37

*In re Bausch & Lomb, Inc. Sec. Litig*.,
  592 F. Supp. 2d 323 (W.D.N.Y. 2008)..............................................................24

*In re Carter-Wallace Sec. Litig.*,
  220 F.3d 362 (2d Cir. 2000).............................................................................34

*In re CRM Holdings, Ltd. Sec. Litig.*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2012) .....................................................39

*In re Elan Corp. Sec. Litig*.,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008)..........................................................24, 33

*In re Express Scripts Holding Co. Sec. Litig.*,
  2018 WL 2324065 (S.D.N.Y. May 22, 2018) .....................................................16

*In re Ferrellgas Partners, L.P. Sec. Litig.*,
  2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) .....................................................35

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)........................35

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).......................31

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)......................................................................................22

*In re Omega Healthcare Inv'rs, Inc. Sec. Litig.*,
    375 F. Supp. 3d 496 (S.D.N.Y. 2019)......................................................................................28

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008)......................................................................................25

*In re PXRE Grp., Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009)......................................................................................30

*In re Razorfish, Inc. Sec. Litig.*,
    2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001).........................................................................21

*In re Rockwell Med., Inc. Sec. Litig.*,
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) .........................................................................34

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816
    F.3d 199 (2d Cir. 2016)............................................................................................................1

*In re Supercom Inc. Sec. Litig.*,
    2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) .........................................................................30

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac*
    *Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) .................17, 31

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .........................................................37, 38, 40

*Jones v. Perez*,
    550 F. App'x 24 (2d Cir. 2013) ...............................................................................................34

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).........................................................................................27, 28, 29

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom. Central States*, 543 F.
    App'x 72 ...................................................................................................................................40

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)....................................................................................36, 40

*Lucescu v. Zafirovski*,
    2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018)................................................. *passim*

*Metzler Inv. GMBH v. Corinthian Colls.*,
    540 F.3d 1049 (9th Cir. 2008) ............................................................................38

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).................................................................................27

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps.
    Ret. Sys. v. Xerox Corp.*, 2019 WL 2394302 (2d Cir. June 6, 2019) ....................24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)................................................................................15, 24

*Pearlstein v. Blackberry Ltd.*,
    93 F. Supp. 3d 233 (S.D.N.Y. 2015)....................................................................20

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    673 F. Supp. 2d 718 (S.D. Ind. 2009), *aff'd*, 2012 WL 1813700 (7th Cir. May
    21, 2012) ............................................................................................................22

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
    Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)..................................................................33

*Police & Fire Ret. Sys. of Detroit v. La Quinta Holdings Inc.*,
    2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir.
    2018) ..................................................................................................................22

*Pollio v. MF Glob., Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009)..................................................................20

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).........................................................................13, 27

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)....................................................................26, 28, 29

*Schwab v. E*Trade Fin. Corp.*,
    285 F. Supp. 3d 745 (S.D.N.Y. 2018)..................................................................35

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010).................................................................................22

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008)..................................................................................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................26, 27, 35

*Total Equity Capital LLC v. Flurry, Inc.*,
  2016 WL 3093993 (S.D.N.Y. June 1, 2016) ........................................................27

*Trueblood v. Culp et al.*,
  No. 655552/2018 (July 3, 2019), Doc. #27......................................................17, 18

*Turner v. MagicJack VocalTec, Ltd.*,
  2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)......................................................36, 39

*Waters v. Gen. Elec. Co.*,
  2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010), *aff'd*, 447 F. App'x 229 (2d
  Cir. 2011) ............................................................................................................37

*Williams v. Citibank, N.A.*,
  565 F. Supp. 2d 523 (S.D.N.Y. 2008)..................................................................23

## STATUTES

15 U.S.C. § 78t..........................................................................................................40

15 U.S.C. § 78u-4(b)............................................................................................13, 26

## RULES

Fed. R. Civ. P. 8........................................................................................................36

Fed. R. Civ. P. 9(b) ...........................................................................................13, 36, 40

Defendants General Electric Co. ("GE" or the "Company"), John L. Flannery, Jamie S. Miller, Jan R. Hauser, Russell Stokes, Chuck Nugent, Scott Strazik, and Joe Mastrangelo (the "Individual Defendants," and together with GE, "Defendants") submit this memorandum of law in support of their motion to dismiss the Amended Complaint ("AC") (Ex. 1, cited as "¶ _").[1]

## PRELIMINARY STATEMENT

This case is about adverse business developments—a write-down of the goodwill estimates for GE's Power segment, and technical challenges with the blades on GE's new H-class power plant turbines—which Plaintiff concedes were disclosed to investors (and preceded by risk warnings). Plaintiff's sole (and baseless) theory is that GE should have disclosed these events a few quarters earlier, even though GE was prohibited by the accounting rules from taking a goodwill charge before it did, and GE timely disclosed the challenges with the H-class turbine's blades once GE determined the nature and extent of the problem. In both cases, in an effort to portray business challenges as securities fraud, Plaintiff strings together a series of "would have" and "must have" allegations, but these cannot substitute for well-pled allegations that a fraud occurred. Under the applicable heightened pleading standards, Plaintiff fails to establish a single actionable false or misleading misstatement, or to raise a strong inference of scienter as to any Defendant. Further, Plaintiff fails to put forward a plausible theory that the purported frauds caused any losses.

*First*, Plaintiff alleges, cursorily, that the goodwill balances reported for GE's Power segment were overstated prior to announcement of the impairment. But estimates of goodwill

---

[1]     Unless otherwise indicated, all internal citations and quotations are omitted, emphasis is added, and citations to "Ex. __" refer to exhibits attached to the Declaration of Blake T. Denton. The Court may consider documents or statements incorporated into the AC by reference, SEC filings, and "information already in the public domain and facts known or reasonably available to the shareholders." *See, e.g.*, *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 539 n.13 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

indisputably require subjective assumptions and judgments of value, and therefore must be analyzed as opinion statements—and Plaintiff does not come close to plausibly alleging that Defendants did not actually believe the goodwill estimates (which were reviewed by GE's outside auditor, KPMG) were accurate at the time they were made.  Plaintiff points to the magnitude of the goodwill impairment charge ultimately taken, but does not allege with particularity how and when GE's testing should have led it to take an impairment charge sooner, or any amount by which the goodwill balance was overstated at any point in time.  As this Court recognized in *Lucescu v. Zafirovski*, 2018 WL 1773134, at *7 (S.D.N.Y. Apr. 11, 2018), pleading false opinions is "no small task" in complaints about goodwill, and Plaintiff fails here, just as the plaintiffs in *Lucescu* did.

*Second*, Plaintiff claims Defendants misled investors about an oxidation issue that ultimately affected a single blade component in GE's newly launched H-class turbine.  Tellingly, however, Plaintiff bases its claim largely upon supposed misstatements that have nothing to do with turbine blade oxidation.  Instead, Plaintiff seeks to twist general optimistic statements regarding the quality, performance, and technology of the new H-class turbines into a fraudulent cover-up of oxidation problems.  None of the disclosures cited by Plaintiff supports a fraud claim.  Even Plaintiff's own allegations concede that GE was dutifully investigating the frequency and severity of the problem during the purported class period and, once those determinations were made, the cause of the problem, the plan to fix it, and a reserve to cover the cost of those fixes were all disclosed.  There are simply no particularized facts to support Plaintiff's theory that Defendants concealed "systemic manufacturing defects" or that Defendants had a duty to disclose GE's ongoing examination of the oxidation issues earlier.

*Third*, Plaintiff's claims fail under either theory for the independent reason that the AC does not—and cannot—raise a strong inference that Defendants acted with scienter.  Plaintiff identifies no personal motive for any of the Individual Defendants to commit fraud, so Plaintiff

must meet the high burden of pleading facts creating a strong inference of reckless or conscious misbehavior.  The AC, however, alleges no facts, internal documents, or confidential witnesses with any knowledge of information in any Individual Defendant's possession that contradicts the challenged goodwill opinions or statements regarding GE's H-class turbines.  Indeed, the AC has just one confidential witness, a former low-level employee ("FE") whose beliefs have no probative value at all, given that the FE had zero interaction with any Individual Defendant, let alone first-hand knowledge of any of the relevant topics in the AC.

*Finally*, Plaintiff fails to advance any viable theory of loss causation.  The AC asserts that there were a series of partial corrective disclosures by Defendants, but none of these disclosures revealed any alleged relevant "truth"; rather, they merely repeated previously known information or said nothing about the alleged fraud.  Moreover, GE's stock price *increased* when GE first announced a potential goodwill impairment charge, and when the H-class turbine issues were first disclosed.  The AC therefore does not plead loss causation.

These deficiencies cannot be cured.  The AC should be dismissed with prejudice.

## **BACKGROUND**

### A.      **GE and the Individual Defendants**

GE is a global industrial company headquartered in Massachusetts, incorporated in New York, and traded on the New York Stock Exchange.  ¶¶ 46, 49, 59-60.  The Individual Defendants are current or former executives of GE.[2]  ¶¶ 50-56.  The Company offers a wide range of products

---

[2]      Mr. Flannery served as Chief Executive Officer ("CEO") and Chairman of GE from August 2017 to October 2018.  ¶ 50.  Ms. Miller has served as GE's Chief Financial Officer since October 2017.  ¶ 51.  Ms. Hauser served as GE's Controller and Principal Accounting Officer during the Class Period, until she retired in September 2018.  ¶¶ 52, 319.  Mr. Stokes served as CEO and President of GE Power until October 2018, when he became CEO of GE Power Portfolio following the reorganization of Power.  ¶ 53.  Mr. Mastrangelo served as CEO and President of GE's Gas Power Systems until January 2018.  ¶ 56.  Mr. Nugent became CEO and President of Gas Power Systems in March 2018, and, prior to that, he served as Vice President of Manufacturing for Oil

and services ranging from aircraft engines, power generation, and oil and gas production equipment, to medical and financial products.  ¶¶ 59-60; *see also* Ex. 45, 2018 Form 10-K, at 4. The AC focuses on GE's Power segment.  ¶¶ 1, 49.

### B.    GE's Goodwill Accounting and Reported Goodwill Balances

One of Plaintiff's two theories of liability relates to GE's reported goodwill balances for its Power segment.  Under GAAP, in connection with certain corporate transactions, an acquiring company accounts for the value of certain non-identifiable assets it has gained as "goodwill." ¶¶ 207, 209-11.  Goodwill is an intangible asset that represents the excess of the purchase price of an acquired company over the total value of its assets and liabilities.  Ex. 4, ASC 805-30-30-1; ¶¶ 207, 210.  It therefore incorporates a dimension of going concern value—*i.e.*, the ability of an established business to earn a higher rate of return on an assembled collection of net assets than if each asset were acquired separately—as well as the synergies from the combination of the two companies' net assets.  *See* Ex. 4, ASC 805-30-20.  Goodwill is also evaluated by "reporting unit," *see* Ex. 3, ASC 350-20-35-41, and for a company like GE that has over 150 subsidiaries, a "reporting unit" can be a group of multiple subsidiaries, *see* Ex. 45, 2018 Form 10-K, at Ex. 21. Once a company finalizes its allocation of the purchase price one year after the acquisition, goodwill stemming from the transaction is allocated to the goodwill balances of the company's relevant business segments.  *See* Ex. 3, ASC 350-20-15-2, 350-20-20; Ex. 11, 2016 Form 10-K, at 160.

GAAP requires that companies conduct annual impairment testing of goodwill balances at the reporting unit level.  Ex. 3, ASC 350-20-35-28; ¶ 216.  In step one of that testing, a company

---

& Gas and Vice President of Supply Chain for Healthcare.  ¶ 54.  Mr. Strazik served as CEO of GE Power Services, and then Gas Power, during the Class Period.  ¶ 55.

determines the fair value of the reporting unit and compares it to the carrying amount of the unit's net assets on the balance sheet.  Ex. 3, ASC 350-20-35-4; ¶¶ 217, 218(a); Ex. 20, 2017 Form 10-K, at 146.  ***Only*** if the fair value of a reporting unit is less than its carrying amount does GAAP permit the company to proceed to step two, in which the company determines the fair value of the unit's identifiable assets and liabilities.  Ex. 3, ASC 350-20-35-6, 8, 9, 14; ¶ 218(a)-(b); Ex. 20, 2017 Form 10-K, at 146.  The difference between the fair value of the unit based on step one, and the fair value of its identifiable assets and liabilities determined in step two, is the implied fair value of the remaining goodwill for the unit. Ex. 3, ASC 350-20-35-14, 16; ¶ 218(b); Ex. 20, 2017 Form 10-K, at 146.  The goodwill recorded at the business segment level must then be written down to this implied fair value, and the company takes a non-cash impairment loss in the amount of the difference between the two.  Ex. 3, ASC 350-20-35-11; Ex. 20, 2017 Form 10-K, at 146.

Goodwill impairment testing is not a mechanical calculation.  Under the relevant accounting standards, there are multiple different methods that can be used to calculate the fair value of a reporting unit.  Ex. 20, 2017 Form 10-K, at 146.  Thus, there can be multiple different results that would all be acceptable under GAAP.  Further, even once a method of calculating fair value has been selected, companies and auditors must still make numerous judgment calls and assumptions.  *See id.*  Because goodwill is a non-cash asset, and not a measure of how a company is performing at a particular point in time, short-term fluctuations in a company's profitability do not necessarily mean that the company's estimate of goodwill must be impaired.  Rather, a goodwill impairment is required—indeed permitted—only when there is a determination that the carrying value of a reporting unit exceeds its fair value and the difference between the unit's fair value and the fair value of its identifiable assets and liabilities is less than the recorded goodwill.  Ex. 3, ASC 350-20-35-6, 8, 9, 11, 14, 16; ¶ 218(a)-(b); Ex. 20, 2017 Form 10-K, at 146.  Consistent with GAAP, GE conducts goodwill impairment testing annually (in the third quarter), as well as

in interim periods if circumstances change that, in its judgment, could more likely than not reduce the fair value of a reporting unit below its carrying amount.  *See* Ex. 3, ASC 350-20-35-30; ¶ 219; Ex. 13, Q3 2017 Form 10-Q, at 85; Ex. 23, Q1 2018 Form 10-Q, at 73.  In 2017 and 2018, GE's external auditor, KPMG, audited goodwill balances at year-end and reviewed them each quarter. Ex. 20, 2017 Form 10-K, at 119; Ex. 45, 2018 Form 10-K, at 93.

Plaintiff's allegations relate to the goodwill balance reported for the Company's Power business segment for the fourth quarter of 2017 and the first two quarters of 2018.  A substantial portion of the goodwill values recorded for Power Generation, a reporting unit within Power, and Grid Solutions, a reporting unit that later became part of Power, was initially booked in connection with GE's November 2, 2015 acquisition of French power company Alstom S.A.'s ("Alstom") Thermal, Renewables, and Grid businesses for approximately $10.1 billion.  ¶¶ 4, 199; Ex. 8, 2015 Form 10-K, at 159; Ex. 39, Q3 2018 Form 10-Q, at 81.  GE recognized $17.3 billion in goodwill in connection with the transaction.   ¶¶ 212-13; Ex. 11, 2016 Form 10-K, at 159.  Of that, $12.9 billion was recorded for reporting units then in GE's Power segment.   ¶ 213.

In the second half of 2017, the global power market had slowed, signaling a risk to Power Generation's fair value, but GE believed that the decline was only "in the short term" and that Power Generation's gas turbines would still be "an important contributor to the energy mix going forward."  *See* Ex. 14, Nov. 13, 2017 Update Call Tr., at 18.  During this time, Mr. Flannery, who had served as CEO of GE Healthcare since 2014, was named GE's CEO effective August 1, 2017. Ex. 12, June 12, 2017 GE Press Release, at 2-3 (cited at ¶ 5).  GE's ordinary goodwill impairment testing in the third quarter showed that Power Generation's fair value still exceeded its carrying amount, but in light of "downturns in certain . . . customer segments" of the Power Conversion reporting unit that were "extended"—rather than short-term—GE recognized a $947 million goodwill impairment for Power Conversion.  Ex. 13, Q3 2017 Form 10-Q, at 85.

In the fourth quarter of 2017, even though it had already conducted its annual goodwill impairment testing in the previous quarter, GE performed interim impairment tests for three of its Power reporting units because of a concern that the units' fair values may have declined below their carrying values due to deteriorating market conditions. Ex. 20, 2017 Form 10-K, at 84.  That testing led GE to take an additional impairment of $217 million for Power Conversion (leaving no goodwill remaining for that unit), but the first-step analysis for Power Generation and Grid Solutions revealed that the fair values of these units still exceeded their carrying values.  *Id.* Accordingly, GE did not—and was not permitted to—take impairments in those units at that time, reporting an audited Power goodwill balance of $25.269 billion. *Id.* at 119, 145.  However, at the same time, GE repeatedly warned investors of the risk of a future impairment.  *See, e.g.*, *id.* at 106 (explaining that GE "recorded significant goodwill and other intangible assets on [its] balance sheet" as a result of "acquisitions such as the Alstom acquisition," and that "if [it is] not able to realize the value of these assets [it] may be required to incur charges relating to the impairment of these assets").  GE noted that Power Generation's "fair value has declined" given "the overall decline in the [p]ower market," and that GE would "continue to monitor the [p]ower market[] and the impact it may have on this reporting unit." *Id.* at 146.  That said, GE still believed that the slowdown was temporary, Power had a plan to address slow-moving inventory, cost overruns, and project execution challenges, and gas turbine orders and shipments were up in the quarter compared to the prior year.  *See* Ex. 18, Q4 2017 Earnings Call Tr., at 10-12, 15.

In the first quarter of 2018, GE did not perform interim goodwill impairment testing, and it reported a Power goodwill balance of $25.886 billion, which was reviewed by KPMG.  *See* Ex. 23, Q1 2018 Form 10-Q, at 72-73.  As it told investors, GE continued to believe that the power market would improve.  *See* Ex. 22, Q1 2018 Earnings Call Tr., at 13.  In fact, GE's industrial margin rate increased in the first quarter of 2018, in part due to cost-cutting at Power.  *Id.* at 3-4.

In the second quarter of 2018, GE again performed interim goodwill impairment testing for the Power Generation and Grid Solutions reporting units.  ¶ 273; Ex. 27, Q2 2018 Form 10-Q, at 81.  As the Company disclosed, the results of that testing indicated that fair value was in excess of carrying value by approximately 10% for Power Generation and 9% for Grid Solutions.  Ex. 27, Q2 2018 Form 10-Q, at 81.  As in prior quarters, under GAAP, GE was not permitted to take goodwill impairments in those business units, and it reported a Power goodwill balance of $23.186 billion, which was reviewed by KPMG.  *Id.*  Moreover, GE explained to investors that it believed the market showed signs it would improve in coming years, citing a *Bloomberg* report that electricity from gas would increase by 20% by 2050.  Ex. 24, June 26, 2018 Update Call Tr., at 16 ("[W]e've got to keep a long-term perspective, I think, on the power industry and our position in it; and then to the challenges we're working through right now.").  However, as in prior quarters, GE continued to warn investors of the risk of goodwill impairment, particularly in the event that synergies of the Company's acquisition of Alstom were not realized.  *See* Ex. 20, 2017 Form 10-K, at 106; Ex. 23, Q1 2018 Form 10-Q, at 73; Ex. 27, Q2 2018 Form 10-Q, at 81.

Ultimately, the power market further deteriorated in the second half of 2018, leading GE to lower not only its guidance for 2018, but also its long-term power demand projections, resulting in decreased forecasts of Power's future earnings and cash flows.  Ex. 39, Q3 2018 Form 10-Q, at 81.  Because GE calculates fair value for purposes of goodwill testing based on projected cash flows, downward revisions to GE's long-term cash flow projections have a compounding effect. *See* Ex. 3, ASC 350-20-35-3C; Ex. 45, 2018 Form 10-K, at 118-19.  On October 1, 2018, GE announced that, as a result of its third quarter goodwill impairment testing, it expected to take a non-cash goodwill impairment charge representing "substantially all" of Power's goodwill balance of approximately $23 billion.  *See* Ex. 38, Oct. 1, 2018 Press Release, at 1 (cited at ¶ 320).

Following the announcement, GE's stock price increased, closing on October 1 at $11.63, a 7.09% increase over the prior business day's price of $10.86.  *See* Ex. 5, GE Historical Stock Price.

On October 30, 2018, GE confirmed its earlier announced goodwill impairment charge related to GE Power, which it then estimated would be $21.973 billion.  ¶ 279; *see also* Ex. 45, 2018 Form 10-K, at 119 (reporting a finalized, audited charge of $22.042 billion).  As GE disclosed when explaining the impairment, it now believed that the issues with the power market would "persist longer and with deeper impact than [it] had initially expected."  Ex. 40, Q3 2018 Earnings Call Tr., at 4.

## C.    GE Power's H-Class Turbine and the September 2018 Blade Failure

Plaintiff's other theory focuses on GE Power's gas turbine business.  Over the past 60 years, GE has grown to be the world's largest manufacturer and supplier of gas turbine technology. ¶ 67; Ex. 7, 2014 Form 10-K, at 32-33.  GE technology generates one-third of the world's electricity, with more than 7,500 gas turbine units operating in over 150 countries for more than 200 million hours.  *See* Ex. 45, 2018 Form 10-K, at 14; Ex. 37, Sept. 28, 2018 Press Release, at 2 (cited at ¶ 138).  Gas turbines are complex combustion engines that convert natural gas or other liquid fuels to electrical energy that powers homes and businesses.  ¶ 68; Ex. 6, Feb. 2015 GER-3620M, at 3, 7 (cited at ¶ 103); Ex. 45, 2018 Form 10-K, at 14.  GE offers several different models of gas turbines, including the H-class turbine, which is the focus of Plaintiffs' allegations.  Ex. 6, Feb. 2015 GER-3620M, at 46 (cited at ¶ 103); Ex. 10, Q4 2016 Earnings Call Tr., at 6.

GE began taking orders for H-class turbines in 2014, *see* ¶ 70, and the first H-class turbine entered commercial service in June 2016, *see* ¶ 88; Ex. 15, Dec. 4, 2017 Press Release, at 2 (cited at ¶ 323).  The H-class turbine employs GE's most advanced technology, securing two world records for achieving the highest gross and net combined cycle efficiency rates, due in part to greater compressor and blade speed.  ¶ 96; Ex. 28, Sept. 12, 2018 Press Release, at 2 (cited at ¶ 98).

9

In gas turbines, hot air passes through rows of spinning blades in the air flow path, and the extreme temperatures of that air can sometimes cause a form of corrosion in the blades called "oxidation."  ¶¶ 68, 72.  In 2015, before any H-class turbines entered service, two GE customers out of hundreds experienced oxidation issues with an older model of gas turbine (the 9FB), causing blade breakage in one unit.  ¶ 101.  These blade issues were only found at that time in the F-class series of technology—created in the 1980s—and not the H-class, which was not even in operation yet.  *See* Ex. 43, Jan. 25, 2019 *Reuters* Article, at 2 (cited at ¶ 164); Ex. 41, Dec. 3, 2018 *Diesel & Gas Turbine* Article, at 1-2 (cited at ¶ 74).  Following these events, GE initiated a root-cause analysis to investigate the cause of the F-class incidents.  ¶ 102.  H-class units began to ship while GE was performing its analysis of the F-class blade issue.  *See id.*; Ex. 43, Jan. 25, 2019 *Reuters* Article, at 2 (cited at ¶ 164).

As a result of the root-cause analysis of the 2015 F-class incidents, GE worked to devise a solution, initially evaluating whether a special coating could protect affected blades from oxidation, *see* ¶¶ 102, 165, 324, and then developing a replacement component to resolve the risk of oxidation, the "Generation II," or "Gen II," blade, *see* ¶¶ 105, 114.  The Company ultimately determined that there was a similar risk of oxidation issues in H-class turbine blades, *see* Ex. 43, Jan. 25, 2019 *Reuters* Article, at 2 (cited at ¶ 164), and in 2017, GE developed a plan to upgrade existing units with Gen II blades, *see* ¶ 105.

In early September 2018, an H-class turbine at the Colorado Bend site of GE customer Exelon experienced oxidation issues in a blade component, causing the blade to break.  Ex. 37, Sept. 28, 2018 Press Release, at 1 (cited at ¶ 138); Ex. 41, Dec. 3, 2018 *Diesel & Gas Turbine* Article, at 1 (cited at ¶ 74).  This was the first H-class turbine that suffered blade breakage.  *See* Ex. 42, Dec. 7, 2018 *Reuters* Article, at 2 (cited at ¶ 19).  As a precautionary measure, GE recommended that Exelon shut down a second turbine at that site, as well as two turbines at

Exelon's Wolf Hollow site, while it addressed the issue.  Ex. 37, Sept. 28, 2018 Press Release, at 1 (cited at ¶ 138); Ex. 41, Dec. 3, 2018 *Diesel & Gas Turbine* Article, at 2 (cited at ¶ 74).  Gen II upgrades that would have prevented the blade failure had been planned for GE's H-class units, but Exelon's blades had not yet been replaced.  *See* Ex. 32, Sept. 20, 2018 *Bloomberg* Article, at 1-2 (cited at ¶ 121); Ex. 34, Sept. 24, 2018 Gabelli Report, at 1 (cited at ¶ 132).

GE disclosed on September 19, 2018[3] that it had identified an oxidation issue expected to impact its H-class turbines and was working proactively to address the impacted turbines, and it confirmed the Exelon shutdown the following day.  Ex. 29, Sept. 20, 2018 *Reuters* Article, at 1-2 (cited at ¶ 119).  Just over one week later, two of the four Exelon units were back online with new blades, ahead of schedule.  Ex. 37, Sept. 28, 2018 Press Release, at 1-2 (cited at ¶ 138).  Exelon stated that GE was "quick, thorough and consistent" and that it "fe[lt] confident about the replacement product," noting that "with any new technology in our industry—especially something as groundbreaking as the HA—there is an expectation that adjustments will be made along the way."  Ex. 41, Dec. 3, 2018 *Diesel & Gas Turbine* Article, at 2 (cited at ¶ 74); *see also* Ex. 32, Sept. 20, 2018 *Bloomberg* Article, at 2 (cited at ¶ 121) (quoting Exelon as stating, "You have some growing pains, you have some startup challenges.  General Electric and Exelon realize that.").  At the time, analysts noted that "it [was] still too early to quantify the financial impact" of

---

[3]     *See* Russell Stokes, *Making The Best Turbines Is Hard Enough.  At GE, We Never Stop Making Them Better*, LINKEDIN (Sept. 19, 2018), https://www.linkedin.com/pulse/making-best-turbines-hard-enough-ge-we-never-stop-them-russell-stokes/; Tomas Kellner, *Cooking With Gas: This New GE Turbine Is Lighting Up The Future Of Power Generation*, GE REPORTS (Sept. 19, 2018), https://www.ge.com/reports/cooking-gas-new-ge-turbine-lighting-future-powergeneration; *see also* Ex. 34, Sept. 24, 2018 Gabelli Report, at 1 (cited at ¶ 132) ("There was a post on 'GE Reports' on September 19th, and also on Power CEO Russell Stokes' LinkedIn page, which indicated that an HA turbine at a power plant encountered an oxidation issue that affects the lifespan of a single blade component.").

the now more urgent repairs that would preempt the oxidation issue in other H-class units.  *E.g.*, Ex. 36, Sept. 27, 2018 RBC Capital Markets Report, at 1 (cited at ¶ 137).

On October 30, 2018, GE announced its third quarter 2018 results, which included an approximately $240 million charge related to the oxidation issue, resulting in increased warranty and maintenance reserves.[4]  ¶¶ 152, 180; Ex. 39, Q3 2018 Form 10-Q, at 16.  To put that charge in perspective, Power had $5.7 billion in revenues in the third quarter of 2018, GE's consolidated revenues were $29.6 billion in the same quarter, and the 82 H-class turbines ordered as of September 2018 each produced about $60 million in revenue, for $4.92 billion total.  Ex. 39, Q3 2018 Form 10-Q, at 9, 14; ¶ 75; Ex. 35, Sept. 25, 2018 *Motley Fool* Article, at 2 (cited at ¶ 303). GE continued replacing blades into early 2019, and in spite of the disclosed oxidation issues, GE received more H-class orders than anticipated at the start of that year.  *See* Ex. 44, Q4 2018 Earnings Call Tr., at 19; Ex. 46, Q1 2019 Earnings Call Tr., at 14.

### D.     Plaintiff's Putative Class Action

Two putative class actions were filed and subsequently consolidated into the above-captioned case before this Court.  On June 21, 2019, Plaintiff filed the AC, which includes a putative class period of December 4, 2017 to December 6, 2018 (the alleged "Class Period").

### ARGUMENT

## I.     THE AC FAILS TO PLEAD A SECTION 10(B) CLAIM

To assert a Section 10(b) claim, Plaintiff must plead facts showing, *inter alia*, (i) a material misrepresentation or omission, (ii) scienter, and (iii) loss causation.  *See Lucescu*, 2018 WL 1773134, at *6.  In addition to the requirements under *Bell Atlantic Corp. v. Twombly*, 550 U.S.

---

[4]     Power also recognized charges of approximately $400 million "associated with an increase in issues on our existing projects driven by execution as well as partner and customer challenges," which were for expenses unrelated to the oxidation issue.  *See* Ex. 39, Q3 2018 Form 10-Q, at 16.

544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), that Plaintiff allege facts establishing a "plausible" claim, Plaintiff must also satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  *See Dingee v. Wayfair Inc*., 2016 WL 3017401, at *3 (S.D.N.Y. May 24, 2016) (Cote, J.).  Under the PSLRA, Plaintiff must (i) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"; and (ii) "with respect to each [alleged] act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (scienter).  *See* 15 U.S.C. §§ 78u-4(b)(1), (2).  Here, the AC does not plead particularized facts that establish that any Defendant made any misstatement or omission of a material fact or acted with scienter, or that the alleged fraud caused any losses.

### A.     Plaintiff Fails Adequately to Plead a False or Misleading Statement

Plaintiff hinges its claims on the reported goodwill balances for GE's Power segment in its Form 10-K for 2017 and Forms 10-Q for the first and second quarters of 2018, as well as a series of statements by Defendants regarding the technology, performance, and commercial potential of GE's H-class turbines.[5]  But Plaintiff "must do more" than allege a statement is false in a conclusory fashion, it "must demonstrate with specificity why and how that is so."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  The AC does not meet this basic requirement.

As an initial matter, the AC identifies only isolated statements with respect to several Individual Defendants.  *See* Ex. 2, App'x of Alleged Misstatements.  For example, the only alleged misstatements attributed to Mmes. Miller and Hauser are the goodwill balances reported in the

---

[5]      A table identifying the challenged statements, alleged speakers, and the reasons why each challenged statement is not actionable is attached as Exhibit 2.  *See Fogel v. Wal-Mart de México SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (accepting appendices that serve as "organizational tools").

Company's public filings, *see, e.g.*, ¶¶ 51-52; Plaintiff does not even attempt to attribute any misstatements to them regarding H-class turbines.  Along the same lines, the AC alleges that the only instances in which Messrs. Strazik or Mastrangelo made a supposed misstatement occurred in two disparate press releases issued by the Company regarding the H-class turbine, and it never alleges that they made any statements regarding the Company's reported goodwill.  *See* ¶¶ 323, 353.  Likewise, the AC alleges that Mr. Nugent made only two supposed misstatements, once in a press release and once in a news article, both of which discussed the H-class turbine.  ¶¶ 345, 353.

Left grasping at straws, Plaintiff seeks to hold all of the Individual Defendants liable under the unworkable theory that the allegedly false statements challenged in the AC were "group-published" information and the result of their "collective actions."  *See* ¶ 57.  But the group-pleading doctrine did not survive the PSLRA.  *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 637-41 (S.D.N.Y. 2017) (concluding that "especially in light of the particularity requirements imposed on securities fraud pleadings . . . the group-pleading/group-published documents doctrine . . . is [] no longer viable").  And in any event, regardless of their maker, as set forth below, none of the alleged misstatements supports a claim for securities fraud.

1.     Defendants' Estimates of Goodwill Are Non-Actionable Opinions

Plaintiff alleges that goodwill balances reported for GE's Power segment during the Class Period were false and misleading because the "fair value of GE Power's reporting units had declined significantly as of the fourth quarter of 2017," and goodwill was thus "vastly overstated." *See, e.g.*, ¶¶ 221, 333-34, 337-38, 341-42.  But—as this Court's recent decision regarding plaintiffs' analogous theory in *Lucescu* instructs—Plaintiff's conclusory allegations fail to meet fundamental pleading standards.  *See* 2018 WL 1773134.

Estimates of goodwill "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact." *Fait v. Regions*

*Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).   As such, goodwill balances are quintessential opinion statements, for which Plaintiff must satisfy the pleading standards articulated in *Omnicare*. *See Lucescu*, 2018 WL 1773134, at *7; *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327, 1332 (2015).   As this Court has cautioned, that is "no small task." *Lucescu*, 2018 WL 1773134, at *7.   To avoid dismissal, a plaintiff arguing that a defendant failed to record an impairment charge properly—like Plaintiff here—must "'point to objective standard[s] such as market price' that the plaintiff claims defendants 'should have but failed to use in determining the value' of the company's assets." *Id*.   Absent such a showing, Plaintiff must plausibly allege with particularity facts showing that Defendants did not genuinely believe GE's goodwill balances were accurate at the time they were reported. *Id.*   The AC alleges no such facts.

*First*, although Plaintiff alleges that GE did not conduct an accurate assessment of goodwill, *see* ¶¶ 334, 338, 342, it does not "point to objective standard[s]" that GE "should have but failed to use in determining" the fair value of Power's assets. *Lucescu*, 2018 WL 1773134, at *7.   Nor does Plaintiff allege with any particularity how and when GE's interim impairment testing should have led it to take an impairment charge sooner or the specific amount of any such interim charge that should have been taken. *See, e.g.*, *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd.*, 655 F. Supp. 2d 262, 269-70 (S.D.N.Y. 2009) (dismissing claim that "fail[ed] to allege at what point in time an impairment charge should have been taken and which specific losses known to the Company should have triggered [it]").   Specifically, nowhere does Plaintiff allege that the Company's long-term business projections for GE Power—which Plaintiff concedes drive goodwill impairment testing—should have been reduced at any point in time by any specific amount, prior to the third quarter of 2018. *See, e.g.*, ¶¶ 222-24 (acknowledging that GE's goodwill impairment testing relies on "internal forecasts of future cash flows that are opaque to investors" and discounted cash flow analyses).

15

Instead, Plaintiff relies on various short-term Power performance declines observed (and disclosed) by GE throughout the Class Period, ¶¶ 229-73, to support its allegation that GE should have reduced its long-term projections for Power earlier that it did, ¶¶ 221, 283, 334, 338, 342. But as GE disclosed, the downturn in the power market was still developing during the Class Period, and the expected duration and severity of that downturn was unknown. *See, e.g.*, Ex. 22, Q1 2018 Earnings Call Tr., at 13 (noting that the Company continued to believe that the power market would improve). Plaintiff also alleges that GE should have concluded earlier than it did that synergies would not materialize from the Alstom acquisition, in part due to GE's forecasted declining demand for gas turbines and related upgrades in 2018 versus 2017. ¶¶ 221, 230-33. But merely pleading facts that allegedly "should have" led Defendants to take an impairment charge sooner plainly does not suffice. *Lucescu*, 2018 WL 1773134, at *8.

*Second*, Plaintiff pleads no facts—based on the statements of confidential witnesses, internal documents, or otherwise—that would establish that any Defendant did not believe that GE's goodwill balances were accurate at the time they were made. Plaintiff speculates that, based on certain adverse market- or GE-specific trends and the size of the ultimate impairment charge, GE's reported goodwill balances must have been inaccurate. ¶¶ 221, 230, 232, 237-39, 244-46, 261, 263-64, 266. But the AC does not and cannot plead that these adverse trends led any Defendant to believe that GE's goodwill estimates were incorrect. *Lucescu*, 2018 WL 1773134, at *12 ("Even if [Defendants] knew of facts that cut against the representations of . . . goodwill, that does not make the statements, which are statements of opinion, false or misleading."); *see also In re Express Scripts Holding Co. Sec. Litig.*, 2018 WL 2324065, at *8-9 (S.D.N.Y. May 22, 2018) ("[E]ven if plaintiff had plausibly plead facts to show that [the] accounting treatment should have been different, [it had] not allege[d] that Defendants 'did not believe' that the accounting treatment was appropriate during the Class Period; and therefore [did] not state[] a claim."). Indeed, Plaintiff

16

is unable to contest that—in response to certain changed circumstances—GE conducted interim impairment testing during the Class Period, and concluded in each instance that impairment was not permitted. *See* ¶¶ 229, 265;[6] *see also City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) (reasoning that various allegations of the "downward trajectory" of a company's overall market capitalization, its "declining . . . revenues," "analysts' expectations regarding the [relevant] business environment," and its own "anticipation of an economic slowdown" suggested only that defendants were "overly optimistic," not that they knew or should have known that impairment testing would reveal that goodwill was overvalued).

For these exact reasons, just weeks ago, the New York Supreme Court rejected a shareholder lawsuit premised on GE's alleged failure to recognize sooner its October 2018 impairment charge. *See* Decision & Order at 11-12, *Trueblood v. Culp et al.*, No. 655552/2018 (July 3, 2019), Doc. #27.  Dismissing the plaintiff's claim based on allegations nearly identical to those in the AC, the New York Supreme Court held that the complaint did not "plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them," and "failed to allege any specific instances where . . . Defendants acted in bad faith or [to] include an allegation that could plausibly be read to infer bad faith." *Id.* at 11.  The same is true here.  At bottom, Plaintiff pleads nothing more than a hindsight disagreement with GE's impairment analysis, and allegations that a defendant should have taken a more significant and earlier write-down are insufficient to plead fraud. *See, e.g.*, *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *19 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys.*

---

[6]     The remainder of Plaintiff's allegations rest upon the speculation of a former SEC Chairman regarding the size of GE's ultimate impairment charge, ¶¶ 37, 286, and an accounting expert's inability to "recall any other situation" where goodwill recognized exceeded the purchase price of a company, ¶ 208, which speak to neither GE's actual goodwill impairment testing, nor any Defendant's state of mind.

*v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ("[M]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.").

*Finally*, Plaintiff also ignores that leading up to and throughout the Class Period, GE warned investors of the risks of a potential impairment charge, particularly if expected synergies from the Alstom acquisition did not materialize or market demand continued to decline.   In connection with its annual goodwill impairment testing for 2017, for instance, GE told investors that with respect to Grid Solutions, a reporting unit formed as a result of the Alstom acquisition, "there could be an impairment in the future," particularly "if expected synergies of the acquisition with Alstom are not realized or if the reporting unit was not able to execute on customer opportunities." *See, e.g.*, Ex. 13, Q3 2017 Form 10-Q, at 85.   Likewise, in connection with the disclosure of the results of its interim goodwill impairment testing in the following quarter, GE warned investors that "[a]s a result of [the Alstom acquisition] and other acquisitions over time, we have recorded significant goodwill and other intangible assets on our balance sheet, and if we are not able to realize the value of these assets we may be required to incur charges relating to the impairment of these assets." Ex. 20, 2017 Form 10-K, at 106.   Because "the 2017 Form 10-K warned of future impairments in the event the synergies from the Alstom acquisition were not realized," Plaintiff cannot "claim surprise at the October 2018 announcement." *See, e.g.*, Decision & Order at 14, *Trueblood*, Doc. #27.[7]   Accordingly, the AC fails to establish the falsity of the goodwill reported for GE's Power segment.

---

[7]     *See also, e.g.*, Ex. 23, Q1 2018 Form 10-Q, at 73 (warning investors that "the Power and Oil & Gas markets continue to be challenging and there can be no assurances that goodwill will not be impaired in future periods as a result of sustained declines in macroeconomic or business conditions affecting our reporting units"); Ex. 27, Q2 2018 Form 10-Q, at 81 (warning investors that "the Power and Oil & Gas markets continue to be challenging which could result in changes in our projected future earnings and net cash flows at these businesses").

2.  <u>Defendants' Statements Regarding H-Class Turbines Were Not False or Misleading</u>

Plaintiff also fails to plead an actionable misstatement or omission by Defendants regarding GE's H-class turbines:  Defendants' statements of fact were true when made, they had no duty to disclose developing oxidation issues (even though they did so within days of the first and only incident of blade failure in an H-class turbine), and their corporate optimism, opinions, and forward-looking statements (which, prior to the Exelon blade failure, had nothing to do with oxidation) are all inactionable under well-settled law.

a.  *Defendants Made No False Statements Regarding the Quality, Operational Success, or Commercial Potential of H-Class Turbines*

Relying almost exclusively on thinly sourced news articles and analyst speculation, Plaintiff alleges that Defendants' statements regarding the general quality, operational success, or commercial potential of the H-class turbine were false or misleading because, according to Plaintiff, the H-class turbine suffered from "systemic manufacturing defects" that led to oxidation in its blades, which "eliminat[ed] the benefits" of its efficiency.  *E.g.*, ¶ 324; *see also* ¶¶ 323, 325, 327, 329, 331, 335, 339, 343, 347, 345, 353.  These allegations fail for multiple reasons.

*First*, Plaintiff fails to identify a single false statement of fact.  For example, Plaintiff challenges GE's statement that the "[t]he new [H-class] combustion system ha[d] already been successfully tested at full-load and full-speed at GE's test stand in Greenville, South Carolina," ¶ 323, but nowhere alleges that such combustion system testing did not actually occur or that the results were unsuccessful.  Likewise, Plaintiff challenges statements that GE's HA fleet had achieved "more than 175,000 operating hours" and that "Exelon's HA-powered Wolf Hollow II project was honored as Power Engineering's Best Gas-Fired Project in 2017," ¶ 343, but does not (and cannot) allege that the HA fleet did not achieve those operating hours or that the project did not receive that award.  Accurate statements regarding the H-class turbine's accomplishments

cannot serve as the basis for a fraud claim.  *See Pollio v. MF Glob., Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) ("It is well-established . . . that defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy."); *see also, e.g.*, ¶ 327 (challenging the statement that "the [C]ompany also [wa]s innovating with advances in cooling and sealing, improved aerodynamics, and the use of materials and coatings designed for use in higher temperatures, including ceramic material composites," but failing to provide any facts suggesting that it was not, in fact, innovating in those areas), ¶ 329 (challenging the statement that H-class technology was "operating in line with performance guarantees," but failing to identify how the technology failed to operate in line therewith).

Indeed, the majority of the statements challenged by Plaintiff are not statements of fact at all, but expressions of corporate optimism that are inactionable because they are "too general to cause a reasonable investor to rely upon them."  *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) (Cote, J.) ("Simple expressions of puffery and corporate optimism do not violate securities laws, as companies are not required to take a gloomy, fearful or defeatist view of the future.").  Plaintiff challenges statements that GE Power was a "fundamentally strong franchise with leading technology," ¶ 339, and had a track record demonstrating it could "improve output, reliability, and performance" of turbines when it serviced them, *id.*; that "HA technology enables the power plant of the future, delivering unprecedented levels of efficiency and reliability that can help countries everywhere meet today's power demands and reach more aggressive emissions goals," ¶ 335; or that there was "nothing like [the H-class turbine] in operation today," ¶ 353; *see also* ¶¶ 323, 325, 327, 329, 331, 343, 345, 349; Ex. 2, App'x of Alleged Misstatements.  Courts routinely have concluded, however, that nearly identical statements touting a product and operational successes are inactionable as a matter of law.  *See, e.g.*, *Pearlstein v. Blackberry Ltd.*, 93 F. Supp. 3d 233, 240-41 (S.D.N.Y. 2015) (statements

expressing positive outlook regarding rollout of new product constituted inactionable puffery); *In re Razorfish, Inc. Sec. Litig.*, 2001 WL 1111502, at *3 (S.D.N.Y. Sept. 21, 2001) (statements that company was "successfully executing our growth strategy" and "do[ing] an outstanding job" were "classic expressions of optimism [or] puffery of the kind that cannot possibly support a securities fraud claim").

*Second*, Plaintiff's allegations that Defendants' optimistic statements regarding the H-class turbine's quality or technology were misleading because they purportedly omitted material facts about "systemic" issues impacting its blade components likewise miss the mark.  As an initial matter, nothing in the news articles or analyst reports cited by Plaintiff supports its narrative that the H-class turbine's technology is fundamentally flawed or that the product was destined to fail— and, in fact, the allegations in the AC show precisely the opposite.  As Plaintiff concedes, GE proactively worked to identify a solution for the affected blade component in H-class turbines, *see, e.g.*, ¶¶ 105, 114, 120, 129-30, 139; Ex. 41, Dec. 3, 2018 *Diesel & Gas Turbine* Article, at 2-3 (cited at ¶ 74), and recorded $240 million (which constitutes less than 1% of GE's 2018 annual revenue) to increase associated warranty and maintenance reserves, *see* ¶¶ 152, 180; Ex. 40, Q3 2018 Earnings Call Tr., at 5, 10.  And since these oxidation issues arose and were resolved, GE has received more orders for H-class turbines than anticipated.  *See* Ex. 46, Q1 2019 Earnings Call Tr., at 14.  Plaintiff relies on speculation about the risk that the blade oxidation issue would harm GE Power's brand or market share, *e.g.*, ¶ 124, and scattered complaints from unidentified customers allegedly impacted by the oxidation issue, *e.g.*, ¶¶ 112-15, rather than pleading any facts showing internally-known blade defects so significant that they would permanently undermine the value of all H-class turbines, *see, e.g.*, ¶¶ 14, 107-27, 132, 134, 137, 140-50, 159-61, 164-68.

*Third*, Plaintiff fails to allege that Defendants had any duty to disclose potential oxidation issues impacting the H-class turbine earlier than they did.  Under the securities laws, issuers are

not required to make continuous disclosure.  *See, e.g.*, *Police & Fire Ret. Sys. of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482, at *9 (S.D.N.Y. Aug. 24, 2017) *aff'd*, 735 F. App'x 11 (2d Cir. 2018) ("'A company is generally not obligated to disclose internal problems because the securities laws do not require management to bury the shareholders in internal details and because public disclosure of internal management and engineering problems falls outside the securities laws.'") (quoting *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000)). Equally important, "[t]aking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (quoting *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007)); *see also In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013*), aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013) (defendants "were entitled to devote a reasonable amount of time to investigation and remediation before disclosing an assessment of the [] situation any gloomier than that contained in its July and October 2011 disclosures"); *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc*., 673 F. Supp. 2d 718, 738 (S.D. Ind. 2009) ("It is difficult to see how Defendants' decision to investigate quality systems problems further before fully disclosing them . . . was improper, never mind actionable . . ."), *aff'd*, 2012 WL 1813700 (7th Cir. May 21, 2012).

These principles are well-illustrated here.  Plaintiff's allegations show (at most) that during the Class Period, GE was investigating oxidation issues affecting blade components in its gas turbines, and working on possible fixes.  Indeed, Plaintiff cites to news articles describing blade oxidation issues impacting two GE F-class turbines in 2015, *see, e.g.*, ¶¶ 19, 119-20, 164-68, 324, which "prompted GE to work on new protective coatings and alter a heat treatment process for the parts."  *See, e.g.*, Ex. 43, Jan. 25, 2019 *Reuters* Article, at 2 (cited at ¶ 164).  Rather than support

Plaintiff's claims that GE was aware of and concealed "catastrophic" blade issues impacting H-class turbines,[8] Plaintiff's own cited articles maintain that "after the blade [in the 9FB turbine] broke in 2015, GE did not know at first that the [oxidation] problem would also afflict its HA models," and that when GE became aware that H-class turbines may be similarly impacted, it was "working on [a] solution" before the September 2018 Exelon incident unexpectedly occurred. *Id.*; Ex. 30, Sept. 20, 2018 *WSJ* Article, at 3 (cited at ¶ 120); *see Williams v. Citibank, N.A.*, 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").

When the Exelon incident occurred, GE confirmed the turbine shutdowns, then voluntarily disclosed that a similar oxidation issue may impact other H-class turbines, and later increased its reserves by approximately $240 million in response to the issue. *See* ¶¶ 119, 180; *supra* n.3; Ex. 29, Sept. 20, 2018 *Reuters* Article, at 1-2 (cited at ¶ 119); Ex. 40, Q3 2018 Earnings Call Tr., at 5, 10. Plaintiff does not allege any facts demonstrating any reason for GE to conclude that blade failures in H-class turbines would occur before GE could complete its planned replacements, or that oxidation issues affecting a single component would otherwise pose any threat to the H-class

---

[8]   Plaintiff attempts to conflate the oxidation issue with other routine operational challenges in an effort to make the H-class's oxidation issue appear more significant than it is. Plaintiff claims that in January 2017, GE Power issued a technical information letter ("TIL") to F-class customers in connection with the oxidation issue providing revised usage guidelines. ¶ 171. But the TIL that Plaintiff cites instead describes a "contamination" issue that was introduced into certain 7F and 9F units through repairs—one that has nothing to do with oxidation caused by "coating fail[ures]" or "insufficient cooling air circulat[ion]." *Compare* ¶¶ 72, 102, 105 *with* Ex. 9, TIL 2024 (cited at ¶ 171 n.2). Plaintiff also references coverage of "vibration" and other unrelated issues in turbines operated by the Pakistani government, speculating that they "may be linked" to oxidation, *see, e.g.*, ¶ 106, but the sources upon which it relies confirm that they were totally unrelated. *See, e.g.*, Ex. 16, Dec. 27, 2017 *Reuters* Article, at 1, 3 (cited at ¶ 107) (discussing delayed deliveries due to further testing, a combustion seal leak, and damage due to batteries and generator back-ups that failed during a power outage, and also noting that there was "no evidence" that H-class turbines had "fundamental design flaws").

turbine's overall success.  Accordingly, Plaintiff's allegations are insufficient to sustain a claim of securities fraud.  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008) ("Defendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises.").

Tellingly, Plaintiff nowhere even attempts to allege that GE should have recorded charges for H-class turbine maintenance and upgrades earlier than it did, or that the reserves GE has are insufficient to address the issue.[9]  That further undermines any argument that Defendants ever were obligated to disclose potential oxidation issues, or—once voluntarily disclosed in connection with the Exelon shutdown—express doubt about GE's ability to resolve these issues.  *See, e.g., Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 577 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 2019 WL 2394302 (2d Cir. June 6, 2019) (company did not have a duty to disclose the implementation challenges it was confronting until those challenges had ripened); *accord In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 348 (W.D.N.Y. 2008) (no duty to disclose until information "provide[s] statistically significant evidence that the ill effects may be caused by—rather than randomly associated with—use of the drugs and are sufficiently serious and frequent to affect future earnings.").[10]

---

[9]     Indeed, rather than pleading any facts needed to support such allegations, Plaintiff misconstrues the charges taken by GE in connection with Power's service agreements in an effort to make the oxidation issue seem more costly than it was.  *Compare, e.g.*, ¶ 180 (incorrectly implying that a $400 million charge taken by GE in the fourth quarter of 2018 was reserved solely for the oxidation issue), *with, e.g.*, Ex. 44, Q4 2018 Earnings Call Tr., at 8, 19 (explaining that the charge was the result of "normal cost standard updates, which included updates to our cost standards, including the impact of the stage 1 blade issue" and noting that "there are a host of elements [to] that update, not just the blade").

[10]     Several statements challenged in the AC regarding H-class turbines are also inactionable as genuinely held opinions, *see Omnicare*, 135 S. Ct. at 1322, 1327, 1332; *see, e.g.*, ¶¶ 323 (challenging statement that "[a]ccording to GE Power's estimates, an additional percentage point of efficiency in gas turbines can translate to millions in fuel savings"), ¶ 345 (challenging statements by Mr. Nugent that "concerns [regarding the oxidation issue] were overblown," that

b.      *Defendants Made No False Statements Regarding GE's Response*
        *to the September 2018 Blade Failure*

Plaintiff also alleges that statements regarding GE's response to the September 2018 blade

failure at Exelon were misleading because they falsely "reassured investors that the problem was

solved and it had a fix." *See, e.g.*, ¶¶ 346, 348, 350, 352, 354.  But Plaintiff again pleads no facts,

apart from the speculation of analysts and anonymous customers referenced in news coverage, *see,*

*e.g.*, ¶¶ 17, 113-14, suggesting that Defendants misspoke about the Company's response to the

incident, concealed a bigger problem, or should have concluded that its Gen II blades would not

resolve the issues.  *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008)

("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper

article than from plaintiffs' counsel.").  GE itself disclosed that it would need to upgrade H-class

turbines with Gen II blades, *see, e.g.*, Ex. 31, Sept. 20, 2018 J.P. Morgan Analyst Report, at 2-3

(cited at ¶ 124), and (as discussed) Plaintiff has yet to explain why Defendants should have doubted

the efficacy of those upgrades or concluded that the need therefor would make the turbines any

less innovative, efficient, or reliable overall or in the long term.   And indeed, Defendants'

statements regarding GE's "fix" for oxidation issues in the H-class turbine were indisputably true:

the Gen II blades did resolve the oxidation issues and they were used to repair Exelon's turbines—

in some cases, ahead of schedule.  *See* Ex. 37, Sept. 28, 2018 Press Release, at 1-2 (cited at ¶ 138);

_____

"the [H-class] turbine's performance ha[d] been highly reliable," and that he was "confident this
[wa]s not a significant issue from a customer perspective"); *see also, e.g.*, ¶¶ 325, 329, 331, 335,
339, 343, 347, 349, 351, 353; or as forward-looking statements protected by the PSLRA, *In re
Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018); *see, e.g.*, ¶ 331
("We are expecting the markets to be less than the [sic] 35 gigawatts in 2017 and we are preparing
our restructuring plans for a market that could be as low as 30 gigawatts in 2018."), ¶ 339 ("We
have a 20-year plus track record that demonstrates we can improve output, reliability, and
performance of those assets when we service them."); *see also* Ex. 2, App'x of Alleged
Misstatements.

*see* ¶ 105 (alleging that, as early as 2017, the Company was in the process of "inspecting customer's H-class turbine blades and planning to repair or replace them").

For the foregoing reasons, Plaintiff has failed to allege Defendants made any false or misleading statements regarding either GE's reported goodwill balances or its H-class turbines.[11]

## B.    Plaintiff Fails Adequately to Plead a Strong Inference of Scienter

The AC is devoid of cognizable motives or contemporaneous information—in the form of internal documents or confidential sources with *any* knowledge of the issues Plaintiff claims were misrepresented, let alone what any Defendant allegedly knew about them—contradicting Defendants' statements when made.  As such, the AC should be dismissed for the independent reason that Plaintiff fails completely to establish the requisite "strong inference" of scienter—*i.e.*, an "intent to deceive, manipulate, or defraud"—as to each Defendant and each alleged misstatement.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); 15 U.S.C. § 78u-4(b)(2).  "To meet the 'strong inference' standard, it is not sufficient to set out 'facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent,' for that gauge 'does not capture the stricter demand Congress sought to convey . . . .'"  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110-11 (2d Cir. 2009) (emphasis in original)

---

[11]    Along the same lines, the AC also alleges, again in conclusory fashion, that Defendants violated Item 303 of Regulation S-K because they knew that the Company's H-class turbines represented a known risk and uncertainty to its financials and/or that reduced cash flow projections would (allegedly) lead to a major goodwill impairment and a major dividend reduction.  *See* ¶¶ 355-57.  As explained above, however, Plaintiff provides no particularized facts to call into question any statements regarding H-class turbines, or the goodwill balances reported for GE's Power segment.  Likewise, GE provided warnings of the risks and uncertainties Plaintiff claims were concealed.  *See, e.g.*, Ex. 11, 2016 Form 10-K, at 122 (explaining that "there can be no assurance that we or our customers or other third parties will not experience operational process failures or other problems" that "could have a material adverse effect on our business"); Ex. 20, 2017 Form 10-K, at 106 (noting that Power Generation's "fair value has declined" given "the overall decline in the [p]ower market," and that GE would "continue to monitor the [p]ower market[] and the impact it may have on this reporting unit").

(quoting *Tellabs*, 551 U.S. at 314).  Instead, to be "strong," the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  A strong inference of scienter can be established by alleging facts showing either (i) defendants' "motive and opportunity to commit fraud," or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA v. J.P. Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  The AC fails to plead either.

### 1.   Plaintiff Has Not Pled a Cognizable Motive

Plaintiff cannot establish scienter through motives "'common to most corporate officers.'" *See Total Equity Capital LLC v. Flurry, Inc.*, 2016 WL 3093993, at *5 (S.D.N.Y. June 1, 2016) (quoting *ECA*, 553 F.3d at 198); *accord Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *4 (S.D.N.Y. Sept. 11, 2014).  As the Second Circuit has long recognized, if such motives were sufficient, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).  Instead, Plaintiff must plead a "concrete and personal benefit" by each Defendant from any purported fraud.  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Plaintiff fails to do so.  Indeed, the AC even lacks allegations of stock sales by senior executives—an "ordinary" hallmark of securities fraud.  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

*First*, Plaintiff alleges that Defendants were motivated by their general desire to "maintain the appearance" that (i) GE, and/or its Power segment, were financially strong; and (ii) the 50% dividend reduction GE announced in November 2017 was sufficient.  *See, e.g.*, ¶¶ 33, 97, 186, 188-89, 236, 310, 312.  But "[a]ction taken to maintain the appearance of corporate profitability, or of the success of an investment . . . does not entail concrete benefits sufficient to demonstrate motive."  *Rombach*, 355 F.3d at 177; *see also ECA*, 553 F.3d at 200 (desire to maximize corporate profits "actually benefits the shareholders" and "it would be an unusual case" where that objective

gives rise to a strong inference of scienter). Furthermore, GE's prior 50% dividend reduction announced in November 2017 (under one month before the Class Period), runs counter to Plaintiff's theory that GE was motivated to maintain an appearance of inflated financial strength.[12]

*Second*, Plaintiff alleges that Defendants engaged in fraud to maintain GE's credit rating, *see, e.g.*, ¶¶ 33, 303-06, which also does not qualify as a cognizable motive. *See S. Cherry St.*, 573 F.3d at 109 ("desire to maintain a high credit rating" is a goal "possessed by virtually all corporate insiders" and is not sufficient to show fraudulent intent).

*Third*, Plaintiff suggests that some Individual Defendants concealed facts regarding their "signature project[s]" or delayed disclosures to avoid their own terminations. *See, e.g.*, ¶¶ 33, 313-20. That again is insufficient. *See, e.g., Kalnit*, 264 F.3d at 139 (plaintiffs "must do more than merely charge that executives aim to prolong the benefits of the positions they hold"). Perplexingly, Plaintiff even alleges that Mr. Flannery was motivated to delay recognizing a goodwill impairment because it would "confirm the abject failure of Alstom, Flannery's signature project." ¶ 33. But as Plaintiff admits, on November 14, 2017—before the Class Period even began and only a few months after he became CEO—Mr. Flannery had already publicly stated that the Alstom deal was a "disappointment" and "not an acceptable deal from a financial framework" and that if GE "c[ould] go back in a time machine today, [it] would pay a substantially lower price than [it] paid, there's no doubt about that." ¶ 243. It defies logic that Mr. Flannery would be motivated to "inflate" goodwill to preserve the perceived success of GE Power's integration of Alstom after publicly stating that the deal was a disappointment. *See In re Omega Healthcare*

---

[12] To the extent Plaintiff contends that Defendants were motivated by a desire to maintain the current (reduced) dividend for GE shareholders, *see, e.g.*, ¶¶ 33, 307-10, a desire to earn profits for shareholders "is the essence of the duty of loyalty," and thus does not constitute the "requisite motive to defraud the shareholders." *ECA*, 553 F.3d at 200.

*Inv'rs, Inc. Sec. Litig.*, 375 F. Supp. 3d 496, 512 n.10 (S.D.N.Y. 2019) ("Courts often refuse to infer scienter . . . when confronted with illogical allegations.").

2.     <u>Plaintiff Has Not Pled Recklessness</u>

Without allegations of any cognizable motive, Plaintiff faces the difficult task of establishing a strong inference that Defendants, without cause, recklessly engaged in securities fraud. *Kalnit*, 264 F.3d at 142 (without motive, allegations of scienter must be "correspondingly greater"). "Recklessness," in this context, is more than "merely a heightened form of negligence"; it is "conscious . . . *i.e.*, a state of mind approximating actual intent." *S. Cherry St.*, 573 F.3d at 109. Here, Plaintiff fails to make such a showing.

a.     *Plaintiff's Conjecture Fails to Raise a Strong Inference of Scienter Regarding GE's Goodwill Estimates*

Plaintiff's theory that Defendants fraudulently overstated the goodwill reported for GE's Power segment rests only on unabashed speculation. The AC references *no* confidential witnesses who say anything about the Company's goodwill impairment testing, much less witnesses with any first-hand knowledge of the issue or direct contact with any Defendant. Instead, cobbling together various generalized, publicly available, and unrelated facts, Plaintiff asserts that Defendants must have known or recklessly disregarded that GE had not conducted an "accurate assessment of goodwill impairment using reliable data and reasonable assumptions." *See, e.g.*, ¶ 334 (alleging that scienter can be inferred from the fact that Alstom reduced GE's profitability; that Mr. Flannery admitted that Alstom's performance was a disappointment; that declines in cash flow forced GE to cut its dividend; that orders and shipments "dropped significantly" in 2017; that 2018 forecasts "mandated impairment"; and that the SEC's investigation into GE's revenue recognition called into doubt "a major claimed benefit of the Alstom acquisition"). But nowhere does the AC describe what particular data or assumptions GE actually used in its goodwill

29

impairment testing, let alone demonstrate how or why those data and assumptions were unreliable or unreasonable.  Plaintiff's remaining circumstantial allegations likewise fail to raise a strong inference of scienter.

*First*, Plaintiff alleges that the magnitude of the impairment charge ultimately taken by GE gives rise to a strong inference of scienter.  *See* ¶ 299.  But allegations regarding the size of an alleged fraud, standing alone, do no such thing.  *See, e.g.*, *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009); *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *32 (S.D.N.Y. Oct. 10, 2018); *cf. Lucescu*, 2018 WL 1773134, at *3-4, *13 (no scienter where impairment charge constituted "the entire amount of the reported goodwill associated with two of [the company's] business segments").

*Second*, Plaintiff attempts to shoehorn the "sudden" nature of the goodwill impairment charge into a scienter allegation.  *See* ¶ 299.  Plaintiff's theory is unconvincing, given that GE repeatedly told investors about its ongoing goodwill testing, GE could only write down goodwill if it failed the GAAP-mandated impairment test, GE announced interim impairments, and GE warned of risks of further goodwill impairments due to continued power market softness and Power's underperformance, rendering the final impairments anything but "sudden."  *See* Ex. 20, 2017 Form 10-K, at 106; Ex. 23, Q1 2018 Form 10-Q, at 73; Ex. 27, Q2 2018 Form 10-Q, at 81.  Investors were fully aware that events and changed circumstances during the Class Period indicated a risk of goodwill impairment, including due to GE's decision to conduct interim testing in between its ordinary annual goodwill impairment tests—which KPMG audited/reviewed—and GE's disclosure of the results of that testing to investors.  *See* Ex. 20, 2017 Form 10-K, at 84; Ex. 27, Q2 2018 Form 10-Q, at 81; Ex. 3, ASC 350-20-35-30.  GE's repeated disclosures are wholly inconsistent with a fraudulent intent to hide a potential goodwill impairment; to the contrary, GE disclosed in real time the potential for the very outcome that Plaintiff accuses Defendants of

concealing.  *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 298 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) (no scienter where company continually disclosed ongoing internal controls issues).

*Third*, Plaintiff points to the timing of the departure of several Individual Defendants from the Company as suggestive of recklessness.  *See, e.g.*, ¶ 316 (noting that Mr. Flannery's departure was announced on same day as goodwill impairment).  However, Plaintiff alleges no link between the alleged fraud and the departure of any Individual Defendant.  Of course, executive resignations and terminations during turbulent business times, without facts linking them to alleged fraud (which Plaintiff has not pled here), do not suffice.  *See In re UBS*, 2012 WL 4471265, at *18 (rejecting allegations of "forced resignations and terminations of key [] personnel" alone supported a strong inference of scienter).

*Last*, Plaintiff references a preexisting SEC inquiry into GE Power's revenue recognition practices, *see* ¶¶ 253, 334, and suggests that an investigation into its goodwill impairment evidences scienter, *see* ¶ 301.  But the existence of an "investigation[] cannot bolster allegations of scienter that do not exist."  *See, e.g.*, *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *8 (S.D.N.Y. Dec. 29, 2016) (reasoning that "Defendants' fraudulent intent cannot be inferred from the mere existence of two inconclusive investigations separated by over two years, especially in the absence of allegations of motive").

        b.    *The Vague Allegations of One FE and Defendants' Internal Monitoring of Oxidation Issues Fail to Raise a Strong Inference of Scienter Regarding GE's H-Class Turbines*

Plaintiff's reliance on one former employee and Defendants' internal monitoring of oxidation issues also fails to raise a strong inference of scienter on the part of any Defendant with respect to GE's H-class turbines.  In fact, the AC does not even make the basic allegation that any Defendant actually knew about the extent of the blade oxidation issue in the H-class turbines before

making any alleged misstatements.  Rather, Plaintiff asks the Court to accept its various assumptions about what Individual Defendants "would have" known.  *See, e.g.*, AC at V.C ("Due to the Nature of these Turbine Defects, GE's Highest-Level Executives *Would Have* Approved [TILs] Sent to Customers"); ¶ 182 ("The chaotic environment and customer discontent caused by the oxidation defect, and the financial impact on GE's customer reputation, *would have* elevated the oxidation issue to the highest levels of the Company, including all Defendants.").  But without pleading what any Defendant actually knew (and when), Plaintiff cannot satisfy the PSLRA.

As an initial matter, the negligible statements in the AC attributed to one former employee—who is not alleged to have interacted with *any* Individual Defendant or to have had *any* personal, first-hand knowledge of specific reports or information in any Individual Defendant's possession—fall well short of raising a strong inference of scienter.  In general terms, the FE describes the process by which GE issues TILs regarding gas turbines to customers, and then provides an "opinion" that an unspecified TIL in "July/August 2017" "would have gone all the way to the CEO [Mr. Flannery] because of the financial and reputational impact of the letter." ¶ 172.  The FE does not describe the contents of the TIL, identify any policies that would require any Individual Defendant (or anyone else for that matter) to review or approve that TIL, allege that the TIL was related to oxidation issues, or *even claim to have seen it*.[13]  The FE cannot be referring to the January 2017 TIL cited and quoted in the AC, *see* ¶ 171, since (as Plaintiff implicitly acknowledges) it had nothing to do with an alleged H-class oxidation issue, but rather discussed F-class oxidation issues caused by contamination introduced during repairs.  *See* Ex. 9, TIL 2024, at 2 (cited at ¶ 171 n.2).  Nor does Plaintiff or the FE explain how the mysterious TIL

---

[13]     The sole FE fails even to "opin[e]" on whether any of the Individual Defendants apart from Mr. Flannery "would have" seen the TIL, or even been aware of its existence.  *See* ¶ 172.  And to be clear, the FE says nothing whatsoever about GE's goodwill accounting or impairment testing.

contradicted anything that was said by Mr. Flannery or any other Defendant.  The FE's allegations thus should be afforded no weight.  *See, e.g.*, *Glaser v. The9, Ltd*., 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) (allegations premised on confidential sources "must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient") (citing *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010)); *In re Elan*, 543 F. Supp. 2d at 220 (concluding that a confidential source's "curiously vague" statement that "senior management was aware" could not be credited where "Plaintiffs d[id] not allege any facts indicating that [the source] was in a position to have knowledge regarding communication with senior management or the conclusions reached by . . . senior management upon receipt of this information").

Here, not only has Plaintiff failed to allege with particularity facts that directly contradict the H-class turbine statements it challenges, *see supra* § I.A.2, it supplies no specific facts regarding information even available to the Individual Defendants.  *See Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (plaintiff "must specifically identify the reports or statements that are contradictory to the statements made," or must "provide specific instances in which Defendants received information that was contrary to their public declarations.").  Plaintiff submits, for example, that Defendants must have known of or recklessly disregarded "systemic manufacturing defects that led to oxidation" in GE Power's H-class turbines because, *inter alia*: (i) GE conducted a root-cause analysis of oxidation in an F-class turbine discovered in 2015, (ii) GE observed instances of cracking even on F-class turbine parts that had a special coating, (iii) in 2017, GE issued a TIL to customers and worked with some H-class customers to implement upgrades to avoid oxidation, and (iv) Defendants "followed Tusa's commentary regarding the turbine issues

at GE." *See* ¶ 324.  But none of those allegations establishes systemic manufacturing defects in the H-class turbines, much less systemic manufacturing defects that any Defendant recklessly disregarded when making general statements regarding the H-class turbines' performance and commercial success.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

As Plaintiff acknowledges, GE was assessing the scope of blade oxidation issues and the efficacy of potential fixes throughout the Class Period.  ¶ 105.  Contrary to Plaintiff's theory, while GE was doing so, Defendants did not have to abandon their optimism for the H-class turbine.  *See, e.g.*, *In re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 41-42 (2d Cir. 2000) (no recklessness pled because, although early adverse reports may have indicated a "potential problem," the law does not require a corporation to "abandon its product on what, at the time, would have been speculation"); *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at * 15 (S.D.N.Y. Mar. 30, 2018) (finding no recklessness where company did not provide "overly gloomy" reports on sales prospects for new drug because, even if company "took a more optimistic view" than outside analysts, the "law is clear that 'misguided optimism is not a cause of action, and does not support an inference of fraud'") (quoting *Jones v. Perez*, 550 F. App'x 24, 26 (2d Cir. 2013)); *In re Apple Computer, Inc.*, 127 F. App'x 296, 303 (9th Cir. 2005) ("Because design, marketing and manufacturing problems are common to business, a securities fraud claim must do more than allege the existence of such problems; plaintiffs must allege with particularity that a speaker knew that the severity, timing and extent of such problems rendered the statement false when made.").

The remainder of Plaintiff's allegations rely on the routinely rejected supposition that, as a result of their senior positions or access to internal data, the Individual Defendants must have possessed information contradicting their public statements.  *See, e.g.*, ¶ 57 ("Because of their

positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading."); *see also* ¶¶ 174-75, 182.  But these "must have known" allegations are "entitled to no weight."  *See, e.g.*, *In re Ferrellgas Partners, L.P. Sec. Litig.*, 2018 WL 2081859, at *17 (S.D.N.Y. Mar. 30, 2018); *Schwab v. E*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 757 (S.D.N.Y. 2018) ("[B]oilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their . . . executive positions are insufficient.").

c.   *The Non-Fraudulent Inference Is More Compelling*

When "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323.  Here, the most cogent and compelling inferences to be drawn from the facts in the AC are non-fraudulent—*i.e.*, that GE: (i) tested goodwill often and in good faith, and took an impairment charge when, consistent with GAAP, internal testing required it to do so; and (ii) investigated, worked to resolve, and ultimately chose to disclose blade oxidation issues in a new product, its H-class turbines, along with a solution they believed would fix these issues.  Plaintiff's allegations thus do not raise any plausible inference of scienter, much less a strong one.  *See, e.g.*, *Lucescu*, 2018 WL 1773134, at *13 (reasoning that "[a]n expectation that Nortel's new management would be able to rebuild the company's fortunes does not constitute an intent to deceive or defraud investors" absent "plausible allegations of fraudulent intent or an extreme departure from the standards of ordinary care");  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 582-83 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (rejecting that a "need for quality in order to maintain its brand would lead a company to make intentionally false statements regarding its remediation of quality problems" as that would "only result in inevitable discovery with defective products").

35

### C.      Plaintiff Fails Adequately to Plead Loss Causation

The AC also does not adequately allege loss causation, meaning, a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."[14]  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  In order to avoid dismissal under a corrective disclosure theory of loss causation, as pled in the AC, Plaintiff must allege facts showing that the disclosure of a previously concealed relevant "truth" caused GE's stock price to decline.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43, 347 (2005).  Plaintiff fails to do so.

Instead, in vague terms, Plaintiff alleges that the "truth" concerning GE's alleged manipulation of goodwill accounting and defects in GE's H-class turbines "was revealed to the market through a series of partial disclosures," beginning on September 20, 2018 and continuing through the end of the Class Period on December 6, 2018.  ¶ 369; *see also* ¶¶ 119-20, 129-30, 132, 134, 140-49, 150, 152-53, 156, 277, 283, 287-88, 367.  But none of the obliquely referenced "partial disclosures" revealed the alleged relevant "truth"; rather, these disclosures merely repeated previously known information or disclosed nothing about the alleged fraud.

*First*, Plaintiff alleges that GE's "confirm[ation]" of a $22 billion goodwill impairment charge and corresponding dividend cut on October 30, 2018 revealed that GE's prior goodwill accounting was fraudulent and caused its stock price to drop from $11.16 to $10.18.  ¶¶ 279-84.  But Plaintiff concedes that GE announced *on October 1, 2018* that it intended to "impair up to $23 billion in goodwill," ¶¶ 34, 304, following which GE's stock price *rose* from $10.86 to $11.63, a fact which is judicially noticeable that Plaintiff tellingly omits.  *See* Ex. 5, GE Historical Stock

---

[14]      Although the Second Circuit has not addressed whether loss causation must be pled with particularity under Rule 9(b), at least one Court has suggested that a heightened pleading standard applies.  *See Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *13 (S.D.N.Y. Feb. 3, 2014).  The Court need not reach this issue, however, because Plaintiff fails even to meet the more lenient standard under Fed. R. Civ. P. 8.

Price; *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 367 (S.D.N.Y. 2018).  This stock price increase fatally undermines Plaintiff's loss causation theory.  *See Waters v. Gen. Elec. Co.*, 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010) (granting defendants' motion to dismiss and observing that "[t]he Court c[ould not] find, and Plaintiffs ha[d] not cited, a single section 10b-5 case in which the plaintiff prevailed on a motion to dismiss when the stock price *increased* after an announcement revealing an alleged fraud"), *aff'd*, 447 F. App'x 229 (2d Cir. 2011).

Moreover, GE's confirmation of the impairment charge on October 30 was entirely consistent with its earlier disclosures related to its assessment of goodwill, and revealed nothing new or fraudulent.  Specifically, GE observed that the goodwill impairment resulted from, *inter alia*, a deteriorating outlook due to "the significant overcapacity in the industry, lower market penetration, uncertain timing of deal closures due to deal financing, and the complexities of working in emerging markets," as well as "market factors such as increasing energy efficiency and renewable energy penetration."  ¶ 283 (quoting Ex. 39, Q3 2018 Form 10-Q).  Such cumulative disclosures that do not reveal any "relevant truth" cannot support loss causation.  *See Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) (finding announcement lowering projected margins due to "shifting [currency] exchange rates" that did not "concern[] improper revenue recognition, sham transactions or deficient controls, and thus did not reveal any 'relevant truth' about the purported fraud," warranted dismissal for failure to plead loss causation); *see also Central States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 77 (2d Cir. 2013).  Because the public knew that GE was poised to take an impairment of "substantially all" of Power's goodwill balance of approximately $23 billion on October 1, if

anything the stock drop on October 30 represented the materialization of a known, previously disclosed risk.  It thus cannot support loss causation.  *See Central States*, 543 F. App'x at 77.[15]

*Second*, Plaintiff claims that media articles and analyst reports published on and after September 20, 2018 regarding the shutdown of H-class turbines at Exelon due to blade oxidation issues were partially corrective of Defendants' alleged prior misstatements related to the performance of its H-class turbines.  *See* ¶¶ 119-28, 134.  However, these articles and reports did not correct any of Defendants' prior relevant statements regarding the general performance of GE's H-class turbines (none of which had anything to do with oxidation, or the lack thereof), or reveal to the market the "relevant truth" alleged by Plaintiff, *i.e.*, that GE had known about oxidation issues affecting the performance of its H-class turbines since 2015 and actively concealed them.  *See* ¶¶ 119-20, 132.  The disclosures simply reported the undisputed facts that, starting in 2017, GE had begun to investigate potential oxidation issues in its H-class turbines and develop a fix.  ¶¶ 119-20, 134.  Indeed, rather than revealing previously concealed fraud, many of these reports "reassured the public that GE had a solution."  ¶¶ 130, 162.

Furthermore, GE first disclosed the existence of oxidation issues in its H-class turbines through internet posts on September 19, 2018—prior to Plaintiff's first alleged "partial disclosure."  *See* Ex. 34, Sept. 24, 2018 Gabelli Report, at 1 (cited at ¶ 132) (stating that GE disclosed oxidation issues in September 19, 2018 LinkedIn and "GE Reports" articles).  GE's stock price again *increased* from $12.17 to $12.37 as of market close on September 19.  Ex. 5, GE Historical Stock

---

[15]      Moreover, it is well-settled that GE's additional disclosure on October 30, 2018 that the SEC and DOJ intended to investigate GE's goodwill accounting cannot support loss causation. *Metzler Inv. GMBH v. Corinthian Colls.*, 540 F.3d 1049, 1059 (9th Cir. 2008) (disclosure of Department of Education investigation insufficient to establish loss causation, because a disclosure that merely "reveals a 'risk' or 'potential' for widespread fraudulent conduct" is insufficient); *see also Janbay*, 2012 WL 1080306, at *15 ("The announcement of an SEC [] internal investigation is itself insufficient to plead loss causation.").

Price.  Plaintiff supposes that public coverage of the H-class oxidation issues caused GE's stock price to fall on September 20, 2018, *see* ¶ 128, but subsequent reports merely repeating or analyzing information that is already public cannot establish loss causation.  *See, e.g.*, *Turner*, 2014 WL 406917, at *13 (no loss causation where plaintiffs "fail[ed] to allege with particularity any facts connecting the specific alleged misrepresentations to declines in stock value" because the alleged corrective disclosures contained information that was already public); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *31 (S.D.N.Y. May 10, 2012) (dismissing for failure to plead loss causation because "[i]nvestors cannot establish loss causation merely by relying on an after-the-fact negative characterization of already-public information").

For the same reasons, Plaintiff's reliance on (i) analyst reports commenting that GE's turbine blade issue was "a negative development" that "if not quickly resolved, could hurt GE's turbine brand image and market share," ¶¶ 124, 127, and (ii) reports that some of GE's customers shut down their HA-class turbine for repairs, ¶ 134, as well as (iii) GE's own announcements that it was working on a solution, ¶ 130, is misplaced.  These reports and announcements not only failed to provide new information to the market, but they also did not disclose that GE acted fraudulently in any way.  *See Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 498 (S.D.N.Y. 2016) (dismissing complaint because plaintiffs failed to plausibly allege facts sufficient to show that the purported fraud, rather than discussion of public information, proximately caused their loss); *Central States*, 543 F. App'x at 75 (affirming dismissal for failure to plead loss causation where "[a]n article report[ed] on the reasons for a *previous* decline in stock value based on the same underlying conduct [plaintiff] claims was being concealed").  Without a causal connection to any alleged misconduct, stock drops in response to these announcements simply reflect "a negative effect on stock prices, but not a corrective effect." *Janbay*, 2012 WL 1080306,

at *15, *17 (dismissed on loss causation because the alleged partial disclosures "did not reveal any 'relevant truth' about the purported fraud").

*Finally*, Plaintiff cites to three downgrades of GE's credit ratings, ¶¶ 155-58, 275-78, 287-88, 292, which courts routinely hold are merely negative assessments of public information that do not amount to corrective disclosures. *E.g.*, *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 177 (S.D.N.Y. 2012) (finding credit downgrade was insufficient to establish loss causation), *aff'd sub nom. Central States*, 543 F. App'x 72; *see also Lentell*, 396 F.3d at 175 & n.4 (holding that stock price drop following downgrade of stock did not amount to corrective disclosure because downgrades did not reveal to the market the falsity of the prior recommendations); *Central States*, 543 F. App'x at 75 (speculation about a company's insolvency based on inadequate capitalization and insufficient internal controls did not support loss causation).

Plaintiff thus has failed to plead a causal connection between any of its purported losses and the alleged fraud, and the Court also should dismiss the AC for failure to plead loss causation.

## II.    THE AC FAILS TO PLEAD A SECTION 20(A) CLAIM

A claim under Section 20(a) must have, as a predicate, a primary violation of the Securities Exchange Act of 1934.  15 U.S.C. § 78t.  Because Plaintiff fails to state a claim under Section 10(b), its Section 20(a) claim must also be dismissed.  *See ATSI*, 493 F.3d at 108.

**CONCLUSION**

The AC states no claim under the stringent pleading requirements of Rule 9(b) and the PSLRA.  It should be dismissed with prejudice.

Dated: New York, New York
       August 2, 2019

Respectfully submitted,

LATHAM & WATKINS LLP

By:   /s/ Miles N. Ruthberg
      Miles N. Ruthberg
      Blake T. Denton
      885 Third Avenue
      New York, New York 10022
      (212) 906-1200
      miles.ruthberg@lw.com
      blake.denton@lw.com

      Sean M. Berkowitz (*pro hac vice*)
      330 North Wabash Avenue, Suite 2800
      Chicago, Illinois 60611
      (312) 876-7700
      sean.berkowitz@lw.com

      William J. Trach (*pro hac vice*)
      200 Clarendon Street
      Boston, Massachusetts 02116
      (617) 948-6000
      william.trach@lw.com

      *Attorneys for Defendants General Electric Company, John L. Flannery, Jamie S. Miller, Jan R. Hauser, Russell Stokes, Chuck Nugent, Scott Strazik, and Joe Mastrangelo*