**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GENERAL ELECTRIC SECURITIES LITIGATION | Case No.:     1:19-cv-1013 (DLC) |

<u>**SECOND AMENDED COMPLAINT**</u>

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................................ 4

II.     JURISDICTION AND VENUE ................................................................................ 10

III.    PARTIES .................................................................................................................. 11

IV.     FORMER EMPLOYEE ............................................................................................ 14

V.      SUBSTANTIVE ALLEGATIONS .......................................................................... 14

        A.      GE Seeks Financial Rescue by Returning to Its Industrial Roots,
                Developing the H-class Turbine and Purchasing Alstom .................................... 14

                1)      GE Launches its "Crown Jewel" - the H-class Turbine ........................... 16

                2)      GE Acquires Alstom for $10.6 Billion – the Largest Industrial
                        Acquisition in History ............................................................................. 18

                3)      The H-class Turbine was a Critical Component to Achieving
                        Synergies from the Alstom Acquisition ................................................... 21

        B.      GE's Fraud in Connection with Its Flagship H-class Turbine ............................. 25

                1)      GE Learns of a Serious Oxidation Defect ................................................ 25

                2)      The Truth About the Turbine Defect Begins to Emerge, Causing
                        Stock Price Declines ................................................................................. 33

                3)      Post-Class Period Revelations Relating to the H-class Turbine
                        Fraud ........................................................................................................ 47

                4)      Additional Facts Evidencing GE's Scienter Regarding the H-class
                        Turbine Fraud ........................................................................................... 50

        C.      GE's Fraud in Connection with Its Goodwill Accounting .................................. 54

                1)      Goodwill Accounting Standards ............................................................... 55

                2)      Based on Purported "Synergies" in 2016, GE Records Massive
                        Goodwill from the Alstom Acquisition, Substantially Exceeding
                        the Purchase Price ..................................................................................... 56

                3)      GAAP Required GE to Conduct a Goodwill Impairment Test
                        Based on a "Realistic" Assessment of the "Fair Value" of Its
                        Goodwill Derived from Future Cash-Flow Projections ........................... 57

        D.      GE Falsely Told Investors it was Accurately Determining the Need to
                Impair Goodwill .................................................................................................. 59

                1)      GE's 2017 10-K Falsely Purports to Accurately Determine
                        Goodwill ................................................................................................... 59

2)     GE's First Quarter 2018 10-Q Falsely Purports to Accurately Determine Goodwill...................................................................... 60

3)     GE's Second Quarter 2018 Form 10-Q Falsely Purports to Accurately Determine Goodwill ........................................ 60

E.     GAAP Required that GE's Power Segment Goodwill be Materially Impaired by the Fourth Quarter of 2017 and First Quarter of 2018, and by $22 Billion at least by the Second Quarter of 2018 ............................................... 61

1)     GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that There Were No Alstom Synergies ............. 62

2)     GE's Projected Cash Flows and Fair Value Determinations Recklessly Disregarded that Increasing Energy Efficiency and Renewable Energy Penetration Had Caused a Market Dislocation.......... 64

3)     GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that there was Severe Overcapacity in the Energy Industry.......................................................................... 65

4)     GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that GE Had to Slash the 2018 Gas Turbine Shipment Forecast by 40% ........................................................ 67

5)     GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that GE's Orders, Sales, Revenue and Profit Margins Had Crashed ........................................................... 69

6)     GE was Motivated to Defer Impairing its Power Segment Goodwill in the Fourth Quarter 2017 Because it Had Already Taken a Dividend Cut and Rationalized its Workforce .......................... 71

7)     GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that It was Struggling to Close Deals in Emerging Markets.................................................................... 74

8)     GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that GE had Profound Executional and Operational Issues .................................................................... 75

9)     GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded the Falling Profitability of Long-Term Service Agreements .................................................................... 81

10)    GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded Additional Financial Factors ............................ 82

F.     GE's Sudden Impairment of $22 Billion in Goodwill Without Identifying a Single Specific Changed Circumstance or Event Underscores the Falsity of Its Goodwill and Fair Value Determinations.................................................. 84

G.   The $22 Billion Write-Down Reflected Not Changed Circumstances but Rather that New Leadership at GE Demanded Realistic Accounting Assumptions ................................................................................................. 91

H.   GAAP Obligated GE to Conduct an Accurate Assessment of Goodwill Based on Reasonable Assumptions Which Required a Material Impairment in the Fourth Quarter of 2017 and First Quarter of 2018 and a $22 Billion Impairment in the Second Quarter of 2018 ...................................... 94

I.   Post-Class Period Revelations ............................................................ 97

J.   Additional Facts Evidencing Scienter Regarding GE's Failure to Materially Impair Goodwill by the End of Fourth Quarter 2017 ......................... 98

   1)   There Was No Transformative Internal or Industry Event that Justifies the Magnitude of the Third-Quarter 2018 Impairment .............. 98

   2)   The Speed and Volume of the Goodwill Impairment Alongside Flannery's Removal as CEO and Divisional Reorganization Strongly Demonstrates Goodwill was Inflated at All Times During the Class Period ..................................................................................... 98

   3)   Defendants, Particularly Flannery, Were Personally Motivated to Maintain Goodwill That Violated GAAP Because Jobs Were on the Line ................................................................................................ 100

   4)   The Board was Paying Close Attention to Tusa's Reports .................... 101

   5)   Non-Impairment Gave Defendants' Cover to Conceal the HA Turbine Problems and Consequent Financial Implications .................... 102

   6)   Defendants Conceal their Goodwill Fraud through Inappropriate Treatment of Service Agreements Under GAAP .................................... 103

   7)   The Individual Defendants Were Well Aware of the Power Segment's Collapse ............................................................................ 104

   8)   Defendants Were Motivated to Maintain GE's Credit Rating ............... 105

   9)   Defendants Were Motivated to Maintain GE's Dividend ..................... 107

   10)   Defendants Were Motivated to Remain on the Dow Jones Industrial Average ............................................................................. 109

   11)   GE Has a Long History of Similar Accounting Concealment ............... 109

   12)   KPMG's Audit Opinions Do Not Immunize Management's Unreasonable Estimates ..................................................................... 110

VI.   FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................. 111

VII.   ITEM 303 OF SEC REGULATIONS S-K, 17 CFR. § 229.303 ................................... 133

VIII.   CLASS ACTION ALLEGATIONS .................................................................. 134

IX.     LOSS CAUSATION AND ECONOMIC LOSS ............................................................ 136

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE - FRAUD ON THE
        MARKET DOCTRINE AND AFFILIATED UTE ALLEGATIONS .......................... 138

XI.     NO SAFE HARBOR .................................................................................................... 139

XII.    CAUSES OF ACTION ................................................................................................ 140

XIII.   JURY TRIAL DEMAND ............................................................................................. 142

XIV.    PRAYER FOR RELIEF .............................................................................................. 142

Lead Plaintiff Teachers' Retirement System of Oklahoma ("Lead Plaintiff"), by and through its undersigned attorneys, allege the following based upon personal knowledge, on information and belief, and on the investigation of Lead Plaintiffs' counsel, which included a review of relevant U.S. Securities and Exchange Commission ("SEC") filings by General Electric Company ("GE" or the "Company"), records of judicial proceedings in the United States District Court for the Southern District of New York, regulatory filings and reports, press releases, conference call transcripts, public statements, interviews with a former employee of GE (referred to herein as "Former Employee" or "FE"), news articles, other publications, securities analysts' reports and advisories about GE, and other readily obtainable information. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. <u>NATURE OF THE ACTION</u>

1.      This is a case of a catastrophic equipment failure and an egregious accounting fraud so widespread and systemic that it resulted in a $22 billion impairment charge – one of the largest goodwill impairments in United States history. After nearly being destroyed during the financial crisis and forced to shutter its cash cow, GE Capital, GE told investors it was embarking on a two-pronged initiative to save its critical Power segment – and the Company as a

whole – from financial ruin: the launch of a flagship H-class gas turbine[1] and the acquisition for approximately $10 billion of French manufacturer Alstom S.A, ("Alstom"), for which GE recognized over $17 billion in goodwill.  GE embarked on these initiatives in order to create the false impression that it was a healthy, profitable and growing company, duping unsuspecting investors into purchasing its artificially inflated securities.

2.    Specifically, throughout the Class Period,[2] Defendants touted their "crown-jewel" H-class turbine, assuring investors that its launch had gone well and that it was the "most efficient and technologically advanced" gas turbine on the market, with "proven technology" that was "operating in line with performance guarantees." In reality, GE's H-class turbines were suffering from a significant and systemic oxidation defect, among other issues, resulting in not only lost orders and long-term service agreements, but causing GE to reserve hundreds of millions of dollars in service charges and warranty claims.  Indeed, Defendants knew as early as the end of 2015 that the oxidation defect was causing turbine blades (components which rotate at speeds as high as 3600 rotations per minute) to crack or even break off, critically damaging other turbine components, and resulting in power plants having to shut down their operations to replace parts after only 7,000 hours – rather than the 25,000 hours GE promised.

3.    Rather than come clean about the catastrophic impact of the oxidation defect and other execution issues with the H-class turbine, Defendants insisted throughout the Class Period that the turbines were delivering "unprecedented levels of efficiency and reliability." The truth about these problems trickled out in a series of disclosures over the course of three months, causing GE's stock price to crash.  First, on September 20, 2018, GE disclosed that four H-class

---

[1] H-class is synonymous with the HA turbine.

[2]  December 4, 2017 through and including December 6, 2018 (the "Class Period").

turbines at power generation facilities in Texas had been shut down after a turbine blade broke due to oxidation. Then, on October 10, 2018, JP Morgan analyst, Stephen Tusa, disclosed that the H-class turbine issues were significantly more widespread than GE previously stated, reporting that during an secret meeting held on September 12-13, 2018, attended by GE executives, customers had not only identified blade oxidation as one of the most prominent problems affecting multiple power generation facilities, but also expressed frustration that the defect caused havoc by disrupting planned shipments and forcing some customers to shut down power generation entirely. Tusa also disclosed that customers were concerned that the oxidation "fix" GE had come up with had not yet been proven to work. Two days later, on October 12, 2018, it became clear that the oxidation defect affected 14 of the 51 installed 7HA turbines – or 27% – and as many as 70 of GE's 9FB turbines. Finally, on December 7, 2018, Reuters disclosed that 18 power plants utilizing GE H-class turbines "from Taiwan to France" were shut down for repairs, and that GE was setting aside $480 million for repairs of its H-class and 9FB gas turbines. Significantly, GE admitted to Reuters for the first time that it had "identified the oxidation problem in 2015," leaving unanswered why GE had concealed from customers and investors for years both the problem and that GE did not have a proven "fix."

4.     At the same time that GE's "Crown Jewel" was falling apart, GE told investors that the Company's cash flow from Alstom "synergies" and orders and sales of turbines and other Power segment products justified keeping over $17 billion in goodwill on the Company's books—approximately $7 billion more in non-identifiable assets than it paid for Alstom in November 2015. While Generally Accepted Accounting Principles ("GAAP") permit goodwill to exceed the purchase price of an acquisition, GAAP requires that the carrying value of the goodwill be tested for impairment at least annually or more frequently where there are material

changes in business or market conditions.    Further, GAAP requires that the metrics used in conducting that impairment test be reasonable and reflect how market participants would price the assets or liabilities.

5.      By the end of 2017, not only were the problems plaguing GE's H-class turbine causing sales forecasts to plummet and service revenue to diminish, but the gas energy market as a whole was in the midst of a severe structural dislocation unprecedented in both scope and speed, or, as one of GE's primary competitors accurately put it: the power market was "burning to the ground." Renewable energy sources were quickly taking significant market share from traditional forms of energy as their costs plummeted.   Further, as more cost-effective energy sources became available, energy surpluses (called "overcapacity") entered the system, resulting in a significantly smaller market for gas turbines and other traditional gas-powered products.   As a result, by the end of 2017, demand for gas turbines like the H-class had plummeted, decreasing nearly 50% between 2011 and 2017.   Between 2016 and 2017 alone, worldwide demand dropped by nearly a third, and that trend was expected to continue, with forecasts that demand would fall an additional 10% in 2018. GE's promised "synergies" – and resultant revenues – from the Alston deal also failed to materialize, resulting in admissions by the Company's then-CEO by the end of 2017 that the deal was "a disappointment" and was far too costly for the Company.

6.      As a result of all of these factors, GE's Power segment collapsed by the end of 2017: profit slumped 84.7% in the fourth quarter of 2017 compared to the same quarter in 2016, profit margins were down 88.5% compared to the same quarter in the prior year, and cash flow dropped by 26.7% from 2016. Critically, GE was also forecasting that its key revenue generator, turbine sales, would be down 30-40% in 2018 from the previous year.   And, because GE was selling less turbines and the turbines they had sold were working less due to the excess energy

available to consumers, their long-term service agreements—a traditionally significant source of revenue generation for the Company—became considerably less profitable. As a result, in December 2017 GE was forced to cut 12,000 jobs (18% of the Power segment's workforce), recognizing that the market dislocation was expected to continue long-term.

7.     Due to these vastly changed business and market conditions, GE was required under GAAP to downwardly revise its cash flow projections and take a massive impairment charge by the end of 2017. Instead, Defendants assured investors that there was no need for a material impairment. Defendants' refusal to write down the Power segment's goodwill became even more absurd over the course of the first two quarters of 2018, when Defendants undoubtedly knew that a full $22 billion impairment was required. Indeed, GE failed to even conduct interim impairment testing in the first quarter of 2017, and in the second quarter of 2018 concluded that the fair value of two of its key Power segment reporting units exceeded their carrying value by 9% and 10% respectively. But, just nine weeks later, the very same metrics led the Company to announce a $22 billion goodwill impairment. The fact that the Power segment's fair value somehow swung so drastically in just weeks, resulting in all of its goodwill suddenly being impaired, lays bare the fraudulent nature of the Company's Class Period statements and accounting. This abrupt change also reveals that GE did not conduct the meaningful inquiry required under GAAP in conducting its goodwill analysis or have a reasonable basis in fact for its goodwill balance throughout the Class Period.

8.     The explanation for the sudden, enormous impairment does not lie in legitimate changes to accounting conclusions or changed market conditions. Rather, it was the result of the fact that GE brought in new officers and board members (Culp and the former chair of the Financial Accounting Standards Board ("FASB")), who required the Company to adopt good-

faith, GAAP-compliant accounting assumptions long after they should have, and caused the abrupt ouster of the architect of the Alstom deal, CEO Flannery. In fact, in announcing the drastically changed financial outlook for the Company, GE finally admitted what Defendants should have admitted three quarters earlier: that that the Company's previous accounting assumptions and revenue outlook did not reflect "reality," and that the Company had not projected its expected cash flow and returns in good faith.

9.       As the risks of Defendants' goodwill fraud materialized, GE's securities prices crashed again.  Specifically, after announcing in early October the Company's intention to impair up to $23 billion in goodwill, GE announced on October 12, 2018 that the third-quarter earnings would be delayed to give the Company's new CEO, Culp, time to review the businesses.

10.       Then, on October 30, 2018, GE took one of the largest impairments of goodwill in corporate history—writing off $22 billion dollars of goodwill in one fell swoop – and announced that the SEC and the U.S. Department of Justice ("DOJ") were conducting civil and criminal investigations into GE's goodwill accounting practices.  As former SEC Chairman Harvey Pitt noted, "[c]ompanies don't write down this amount of money and not get held accountable . . . You have to get it right, and you start behind the eight-ball when the number is $22 billion."  GE also announced that it was slashing its historically stable and significant dividend to a single penny because it had been paying dividends that its cash flow could not sustain in light of the serious problems with GE's flagship gas turbine and the adverse impact of Alstom.  On this news, GE's stock price suffered its single worst trading day since the financial crisis.

11.       Finally, GE's goodwill impairment also spurred the credit rating agencies to downgrade GE.  On October 31, 2018, Moody's lowered GE's credit rating from A2 to Baa1,

9

and on November 2, 2018, Fitch lowered GE's credit rating two levels to BBB or just three levels above junk grade.

12.     Together, disclosures of GE's H-class turbine issues compounded by its swiftly slashed goodwill and after effects caused GE's stock price to fall from $12.17 on September 21, 2018 to $7.01 on December 7, 2018, or 41%. GE bonds and preferred stock also materially declined on the negative news.

13.     By this action, Plaintiff (on behalf of itself and the Class it seeks to represent) brings claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") to recover damages for the substantial losses they suffered as a result of Defendants' false and misleading statements.

## II. JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because the Company conducts a substantial amount of business in this Judicial District and a significant portion of Defendants' actions, and the subsequent damages, took place within this District. Further, GE's common stock trades on the NYSE, located within this District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III. PARTIES

18.     Lead Plaintiff **Teachers' Retirement System of Oklahoma** ("TRS")) is a public pension fund for public education employees in Oklahoma. It seeks to manage retirement funds and provide financial security for more than 170,000 active and former employees of the school districts, career technology schools, public colleges, and universities of Oklahoma.   TRS purchased and/or acquired GE securities during the Class Period and was damaged thereby. Throughout the Class Period, TRS purchased a total of 2,808,234 shares of GE common stock at artificially inflated prices up to $17.81 per share, totaling $31,147,560.31.   Additionally, TRS owned bonds in GE throughout the Class Period. TRS's holdings in GE are reflected in the certification and Schedule A at Dkt. 70-1.

19.     Defendant **GE** is incorporated in the State of New York and maintains its corporate headquarters in Boston, Massachusetts. GE contains a number of business units, including Lighting, Aviation, Healthcare, Power, Renewable Energy, Additive, Digital, and Capital.   GE made numerous false and misleading statements and omissions during the Class Period including those identified in Section VI.

20.     Defendant **John L. Flannery** ("Flannery") was named Chief Executive Officer ("CEO") and Chairman of GE in August 2017. He was deeply involved in and a champion of the Alstom acquisition, and was elevated to CEO in large part because of his work on that deal. However, after a little over one year on the job, it was abruptly announced on October 1, 2018 that the Board of Directors had unanimously voted him out and replaced him with H. Lawrence Culp, Jr. Flannery made numerous false and misleading statements and omissions during the

Class Period, including in GE's 2017 results filed on Form 10-K on February 23, 2018, which Flannery signed, and on the June 26, 2018 investor call.

21.     Defendant **Jamie S. Miller** ("Miller") was, at all relevant times, Senior Vice President and Chief Financial Officer ("CFO") of GE. Defendant Miller joined GE in 2008 as Vice President, Controller and Chief Accounting Officer, and later became CFO in October 2017. On July 31, 2019, less than two years after she became CFO, GE announced that Jamie Miller was stepping down. To date, GE has not identified a new CFO. Miller made false and misleading statements and omissions during the Class Period including in GE's 2017 results filed on Form 10-K on February 23, 2018, which Miller signed.

22.     Defendant **Jan R. Hauser** ("Hauser") was, at all relevant times, Vice President and Controller and Principal Accounting officer for GE.  Hauser made false and misleading statements and omissions during the Class Period including in GE's 2017 results filed on Form 10-K on February 23, 2018, first quarter 2018 results filed on Form 10-Q on May 1, 2018, and second quarter 2018 results filed on Form 10-Q on July 27, 2018, all of which Hauser signed. On July 24, 2018, Hauser announced her intent to retire from GE.

23.     Defendant **Russell Stokes** ("Stokes") joined GE in 1997 in the Financial Management Program. He served as the President and CEO of GE Energy Connections, the electrification, grid and controls business of GE, the Chief Executive Officer and President of GE's Power segment, and then with the reorganization of the Power business in October 2018, became the Chief Executive Officer of GE Power Portfolio.  Stokes made numerous false and misleading statements and omissions during the Class Period, including during GE's January 24, 2018 investor call, in the March 28, 2018 *Power* article, in the September 20, 2018 *Reuters* article, and in the September 21, 2018 announcement.

12

24.     Defendant **Chuck Nugent** ("Nugent") was, at all relevant times, Chief Executive Officer and President of Gas Power Systems.  He was elevated to that role in March 2018.  He is a thirty-year GE veteran who previously served as Vice President of Manufacturing for Oil & Gas and Vice President of Supply Chain for Healthcare.  Nugent made numerous false and misleading statements and omissions during the Class Period including in the September 20, 2018 *Bloomberg* article and the September 28, 2018 LinkedIn article and press release.

25.     Defendant **Scott Strazik** ("Strazik") was, at all relevant times, Chief Executive Officer of GE's Power Services Business and Gas Power Business.  He has more than 18 years of finance, operations, and leadership experience with GE.  Strazik made numerous false and misleading statements and omissions during the Class Period, including in the September 28, 2018 LinkedIn article and press release.

26.     Defendant **Joe Mastrangelo** ("Mastrangelo") was, at all relevant times, the Chief Executive Officer and President of GE's Gas Power Systems.  He left GE in January 2018. Mastrangelo made false and misleading statements and omissions during the Class Period, including in GE's December 4, 2017 press release.

27.     Defendants Flannery, Miller, Hauser, Stokes, Nugent, Strazik, and Mastrangelo are collectively referred to hereinafter as the "Individual Defendants." Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or

misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information and were the result of the collective actions of the Individual Defendants. While the Individual Defendants are liable for this group published information, their defined roles at GE necessarily required them to have specific knowledge of either the misrepresentations and concealment of H-class turbine defect or the material inflation of goodwill related to the Alstom acquisition. Miller and Hauser would have been familiar with the H-class turbine issues by virtue of their involvement in GE finance and accounting matters because the oxidation defect had such a profound impact on sales, profits, revenues, and warranty claims.  Because of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of GE's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

## IV. <u>FORMER EMPLOYEE</u>

28.     Former Employee 1 ("FE1") worked at General Electric from December 1999 through January 2018, working his way up to Principal Engineer. He was located in GE's Atlanta headquarters office.  He was responsible for technical issues related to gas turbines and steam turbines, including supporting installation and troubleshooting problems. FE1 reported to the general manager for the global monitoring and diagnostics center, global product services organization, and the services warrantee function.

## V. <u>SUBSTANTIVE ALLEGATIONS</u>

**A.      <u>GE Seeks Financial Rescue by Returning to Its Industrial Roots, Developing the H-class Turbine and Purchasing Alstom</u>**

29.     GE is one of the most prominent public companies in the United States. At its peak in 2000, GE was the most valuable company in the world, worth $600 billion. In August

2000, GE operated 150 factories in the United States, 176 factories in 34 countries around the world, and employed over 300,000 individuals.

30.     GE's roots are heavy industry. Its core business was the manufacture of heavy machinery such as power turbines, jet engines, trains, and MRI machines. Starting in 1981 under then-CEO Jack Welch, GE expanded its portfolio into a wide range of businesses – movies, credit cards, insurance. Welch's main innovation, though, was the development of GE Capital. GE Capital was a financial services arm that provided commercial lending and leasing, offering everything from credit cards to commercial real estate to freight financing to pet insurance.

31.     GE took advantage of the AAA credit rating that it obtained through its successful industrial businesses to borrow money for GE Capital very inexpensively, providing an advantage over traditional banks. It also provided an accessible source of funds to smooth over financial issues in other parts of the Company. In 2001, under new CEO Jack Immelt, GE's aviation and insurance business significantly declined and GE Capital's importance to the Company ballooned; by 2008, lending represented 38% of GE total revenue. At its peak, GE Capital created more than half of GE's profits.

32.     Because GE Capital generated such a disproportionate amount of GE's revenue, when the financial crisis hit, GE Capital collapsed and GE as a whole was hit hard. The stock price shrank to as low as $6.66 in March 2009, and GE Capital needed an emergency cash infusion from Warren Buffett and other investors to keep the business afloat.

33.     In an effort to save GE, Immelt and his core lieutenants sold off GE Capital's remaining assets, including real estate and mortgages. But, they needed a plan to replace the earnings and cash flow that came from GE Capital, to ensure that GE had sufficient funds for operations and to pay the critical dividend expected by investors.

34.     Immelt turned back to GE's industrial roots – specifically, its Power segment. Immelt seized on two major initiatives in the Power segment to turn around GE: the launch of the new, purportedly world-class H-class turbine and the acquisition of French steam turbine manufacturer Alstom S.A.

35.     In 2014, the Power segment represented 20% of GE's total revenues and was one of the most profitable segments in the Company, with 21.8% profit margins. The Power segment came to generate $26.8 billion of GE's overall revenue of $123.7 billion in 2016 and $36.0 billion of GE's overall revenue of $122.1 billion in 2017, representing approximately 30% of GE's total revenue in 2017.

### 1)  GE Launches its "Crown Jewel" - the H-class Turbine

36.     In GE's sixty-year history of power generation, the Company has continually developed and manufactured new models of gas turbines, as well as various products used to increase the efficiency of existing turbines, such as Advanced Gas Path ("AGP") products.

37.     In a gas turbine, extremely hot air passes through rows of subsequently larger spinning blades. As the turbine spins it generates electricity. Each row of turbine blades is referred to as a "stage." Stage 1 is the hottest; each subsequent stage is cooler. Stage 1 of the gas turbine is where the greatest advances can be made because increasing the temperature in Stage 1 increases energy efficiency and output. Companies like GE and its competitors, therefore, try to push the temperature of Stage 1 higher and higher.

38.     In 1989, GE launched the 9F family of turbines. The first model was the 9FA model. GE later launched the 9FB, which used the same compressor aerodynamics as the original 9FA, but offered new technology and materials in the "hot section" of the turbine, known as Stages 1 and 2. Because of this new technology and materials, the hot section of the

9FB could operate at a higher firing temperature – thereby providing higher energy output and efficiency then the 9FA.

39.     GE became the leader of the global turbine market with its 9F family of turbines.

40.     Over the years, though, GE fell behind its rivals Mitsubishi and Siemens, who released a next-generation turbine and began to capture market share back from GE.

41.     In 2014, GE began to sell its next-generation H-class turbine, which GE spent over $2 billion to develop, and which became the flagship product of GE's Power segment. The H-class was comprised of the "7HA" model, for countries like the U.S. and Canada where electricity is produced at 60 Hz, and the "9HA.02" model for most countries in Europe and Asia that utilize 50 Hz electricity.

42.     The H-class turbine utilized similar hot-section materials and technology as GE's 9FB model, but the H-class's Stage 1 blades ran at an even higher temperature (as high as 2900 degrees Fahrenheit) intended to generate greater energy efficiency and output. This was the key benefit of the H-class.

43.     GE touted the H-class as the Company's most powerful, technologically advanced, and efficient turbine. They lauded the H-class turbines as "*the crown jewel of our product portfolio*" and the "*a key driver in both our backlog growth and future services growth.*"[3]

44.     Industry news noted the importance of the HA to GE's return to its industrial roots. *Bloomberg* stated that the investment in the HA turbine reflects its importance to GE's "plan to strengthen GE's industrial business while shrinking the volatile lending arm." Similarly, *Reuters* noted that the success of the HA turbine was "of increasing importance as [GE] slims

---

[3] Emphasis is added unless otherwise specified throughout the Second Amended Complaint.

down to focus on power plants, jet engines and wind turbines in a flurry of restructuring. GE spent more than two decades developing the 400-ton machines, but brought them to market after rivals Siemens and Mitsubishi were gaining market share, forcing GE to catch up."

45.     The H-class turbine was important because of equipment sales and, more significantly, from the value of the highly profitable long-term service agreements to maintain these machines. Revenue from GE service agreements (excluding the subsequent Alstom acquisition) was $10.9 billion in both 2015 and 2016, representing 9.3% and 8.8% of GE's total consolidated revenues in 2015 and 2016, respectively.

### 2) GE Acquires Alstom for $10.6 Billion – the Largest Industrial Acquisition in History

46.     The second critical initiative that was designed to save GE was its acquisition of Alstom.

47.     In 2014, then-CEO Immelt and his lieutenant Flannery identified Alstom as a key opportunity in their effort to return GE to its industrial roots through a new source of cash flow and earnings to replace GE Capital and sustain the Company going forward.

48.     On April 30, 2014, GE announced its offer to buy Alstom's power and grid businesses. In an email to its employees, GE framed the transaction as "fully aligned with our strategy to grow our industrial businesses so that they account for approximately 75% of our operating earnings." The internal communication specifically congratulated John Flannery, Steve Bolze, and the deal team for its work getting the deal to this point.

49.     A few months later, in an annual investor presentation entitled "The Pivot", GE again emphasized that by 2016, more than 75% of GE's earnings would come from its industrial segments. Immelt positioned Alstom as a central component of that pivot, noting that with "GE plus Alstom there's $60 billion in growth markets.  We are just profoundly well-positioned in

18

just about every country that counts around the world. It's going to give us scale. It's going to give us competitive advantage. It's going to improve our scope."

50.     In the years that it took to close the Alstom acquisition, GE made significant concessions that called into question the value of the acquisition.

51.     A main attraction of the Alstom deal was its profitable service program, but regulators barred GE from purchasing Alstom's power-plant service arm. Instead, that program was sold to Power Systems Manufacturing, a long-time competitor of GE.

52.     Alstom's profit margins were less than one-third of GE's. And, GE did not have clear information about what it was buying, as European and Alstom officials limited GE's ability to review Alstom's order book before completing the purchase, which *The Wall Street Journal* described as "a black box of immeasurable risk since the French company had been lowballing bids just to keep sales coming in."

53.     The Alstom acquisition would add 65,000 employees to GE's payroll and dozens of factories and service centers around the globe, at a time when GE was trying to cut costs. Additionally, GE committed to the French government to add 1,000 jobs in France, risking fines from the French government if it failed to live up to this promise.

54.     Alstom's business suffered during the delay to closure, with new orders dropping off in the 18 months prior to deal closure due to customer uncertainty.

55.     GE's advisers determined that the concessions might have grown costly enough to trigger a provision allowing GE to back out of the transaction. But Immelt and his close advisers, including Defendant Flannery, pushed forward rather than heeding the concerns of these advisers and some of GE's directors.

56.     On November 2, 2015, GE announced that it had completed its acquisition of Alstom's power and grid businesses. GE described the acquisition as an important step in GE's "transformation" back to its industrial roots.

57.     The Alstom transaction was unusual for a number of reasons, most significant of which was the fact that GE recognized $17 billion of goodwill on its balance sheet despite having paid only $10 billion for the acquisition.

58.     Goodwill is an accounting practice used when one business acquires another. It allows the acquiring company to recognize on its balance sheet the value of unidentifiable assets that are capable of being separated from the company and sold.  For example, goodwill can be associated with an assembled workforce, going-concern, customer relationships, proprietary technology, and synergies that may have significant value to the acquiring company.   The acquiring company is able to treat these unidentifiable assets as "goodwill."

59.     According to accounting expert Professor J. Edward Ketz of Pennsylvania State University, GE's accounting for the Alstom goodwill was "aggressive." Indeed, he could not recall another situation where the amount of goodwill exceeded the cost of the acquisition (let alone by $7 billion).

60.     GE justified the significant amount of goodwill it recognized by claiming that the Alstom acquisition would be accretive and yield billions of dollars in synergies, emphasizing the complementarity and "immediate benefits" that the acquisition would have for customers.

61.     Specifically, in a November 2, 2015 press release, GE told investors that the Alstom deal would generate "$0.05-0.08 of earnings per share in 2016 and $0.15-0.20 of earnings per share by 2018," and that it expected an additional "$3.0 billion in cost synergies in year five and strong deal returns." GE also told investors that the newly combined company was

a "preferred bidder" for a number of large, combined cycle plan projects in Asia, the United Kingdom, and the Middle East.

62.     In that press release, GE also identified specific power plants where "[c]ustomers will realize immediate benefits from the combination of GE and Alstom," including the following plants with HA turbines:

- PSEG Sewaren (New Jersey combined cycle power plant): GE 7HA gas turbine + Alstom heat recovery steam generator (HRSG)

- Punjab Pakistan Bhikki (Pakistan combined cycle power plant): two GE 9HA gas turbines + Alstom steam turbine

- Exelon Power Plants (Texas power projects): four GE 7HA gas turbines + four Alstom HRSGs

- Chempark (Leverkusen, Germany combined heat and power project): GE 9HA gas turbine.

63.      On a December 3, 2015 call with investors to discuss the full details of the Alstom acquisition, Power segment President and CEO, Steve Bolze, provided the additional detail that $700 million in cost synergies would come through in 2016, and explained that 70% of these synergies would be realized from the Power segment.

### 3) The H-class Turbine was a Critical Component to Achieving Synergies from the Alstom Acquisition

64.     GE's primary rationale for the Alstom acquisition was that the acquisition would lead to major synergies in the combined-cycle power plant business. A combined-cycle power plant utilizes both a steam and gas turbine to generate electricity, as depicted below:



65.     The first machine in the combined-cycle power plant is an electric generator, which is attached to the "cold end" of the gas turbine. The generator produces electricity when turned by the shaft power produced by the gas turbine. In the gas turbine, filtered air enters the compressor and is compressed and flows into the turbine combustion chamber.  High pressure natural gas is injected into the combustion section and is ignited, producing a high temperature flame in the combustor. The hot combustion gases exit the combustion chamber and enter the turbine section where 3 or 4 rows or "stages" of increasingly large turbine blades cause the turbine shaft, and the generator connected to the compressor end of the shaft, to spin, as depicted in the diagram above. This is how the turbine generator set produces electricity.

66.     In summary, a turbine generator set produces additional electricity in a combined-cycle power plant by capturing and using steam rather than allowing it to vent off into the atmosphere. This process requires multiple machines working together, including a gas turbine, steam turbine, and heat recovery steam generator (HRSG).

67.     GE believed Alstom would complement its Power segment because each company claimed to be the best in the world at manufacturing a different component of the combined-cycle power plant. Alstom built and operated coal-fired power facilities all over the

world and manufactured and serviced HRSGs and steam turbines, while GE manufactured the flagship H-class gas turbine and efficiency-boosting products like AGPs (which upgrade existing gas turbines to work at higher efficiency and for longer intervals without requiring major servicing). Since the Alstom and GE products were complementary, GE claimed the acquisition would allow it to become a juggernaut provider of the components and services for combined-cycle power plants.

68.     GE depicted the synergies in the following diagram of a combined-cycle power plant, indicating where each business held a significant market advantage – and showing that together, the combined companies should dominate the bulk of the plant:



69.     GE executives emphasized to investors that the Alstom acquisition would allow GE to win a greater share of the components necessary for the "power island," referring to the power equipment required in a combined cycle power plant. GE claimed that it had the best-in-class gas turbine and Alstom had the best-in-class steam turbine and HRSG – as a combined

business, they could beat competitors like Mitsubishi and Siemens and put their stamp on a larger portion of each combined-cycle power plant. Immelt explained, "[t]here is tremendous pull-through opportunities for grid products with gas turbines. About 75% of all the gas turbines that Siemens sells pulls-through grid. At GE that number is 5% today, so we just haven't had the product line that we now have with Alstom. We think that is worth about $2 billion in incremental orders over the next few years."

70.     Additionally, GE claimed that the Alstom acquisition would allow it to win bids to build new power plants in the Middle East (an area where GE did not have a strong foothold), and squeeze profit from the old coal-fueled power plants Alstom operated in Europe and Asia.

71.     Finally, Mark Hutchinson (President and CEO of GE Europe and Integration Leader, Alstom) discussed specific power plant projects identified in the November 2, 2015 press release where they were "already seeing what we can do together with the new Alstom capability":

> We already have seen some very early wins.   GE with Alstom has been technically selected on the Bhikki combined cycle power plant in Pakistan that would use two GE 9HA gas turbines, two Alstom HRSGs and one Alstom steam turbine. We've also recently won a similar project in Germany.
>
> On these two projects, we won with our 9HA gas turbines. However, we were able to pull through the steam tail or the bottoming cycle products from Alstom. This clearly demonstrates the breadth of capability we now have for our customers and the feedback from the customers has been very positive about the expanded product scope.

72.     GE also claimed that Alstom would drive sales of GE's highly profitable AGPs and aeroderivative units.

73.     As a result of the anticipated synergies from Alstom as well as the anticipated success of the HA turbine, Immelt believed the Power segment would see a long and sustained resurgence as the driver of GE's financial success.

24

74.     As set forth below, while both the H Class Turbine and the Alstom acquisitions were touted to investors as the pathways for GE's salvation both were fundamentally flawed

**B.      GE's Fraud in Connection with Its Flagship H-class Turbine**

**1)  GE Learns of a Serious Oxidation Defect**

75.     In 2016, GE rushed to sell its H-class Turbine to recover market share from its competitors – despite knowing of a defect that created a serious risk of a turbine blade break.

76.     As discussed above, paragraph 38, the HA turbine had certain components in common with its predecessor, the 9FB.

77.     In 2015, as GE was preparing to take the H-class Turbine to the market, a 9FB turbine suffered a total turbine blade break caused by oxidation in the component that is shared by the two models. The blade broke after only 22,000 hours of use, even though GE advised its customers that the blade did not need even require servicing until after 25,000 hours of use.

78.     That same year, GE learned of premature oxidation in another 9FB unit.

79.     In modern gas turbines (including the 9F family and H-class), the temperature of the air flow path exceeds the melting point of the Stage 1 turbine blade. To prevent the blade from melting, cooling air is circulated through the interior of the blade, exiting through tiny holes drilled in the leading edge and face of the blade. In addition, a ceramic coating is placed on the exterior of the blade. Together, this protects the blade from melting or becoming overstressed. However, if the coating fails or there is insufficient cooling air circulated through the blade, the high temperatures in Stage 1 can cause a chemical reaction between the metal of a turbine blade and oxygen in the air, causing the metal to corrode. This process is known as "oxidation." If improperly designed or manufactured, turbine blades can be susceptible to high levels of oxidation in the interior of the blade, the exterior of the blade, or both, thus requiring substantial repairs or complete replacement.

80.     Turbine blade replacement is no small feat. The gas turbine generator must be turned off and, after cooling down, the large casing must be opened. Highly specialized tools and highly trained laborers are necessary. Under ideal circumstances, with readily available spare parts and quality crews working two or three shifts, turbine blade replacement can take 3-4 weeks – during which time the gas turbine generator is not operating (and therefore not generating electricity or money). Power plants schedule outages based on the estimated inspection and repair schedule to ensure that they can plan for all necessary repairs and minimize the impact on their business.

81.     A turbine blade break is an even more serious event. It requires an unexpected plant shutdown to replace the blade. In particular, if a blade breaks in Stage 1 of the gas turbine, the remnants can fall into Stage 2 and Stage 3, breaking additional blades and causing serious damage along the way that is time-consuming and expensive to repair.

82.     GE knew that oxidation impacted not only turbine performance, but also the life of the turbine blade (in industry parlance, a "bucket"). As GE acknowledged in a formal report on its website throughout the Class Period, "creep, oxidation, and corrosion are the *dominant life limiters* for continuous duty" gas turbines and "surface degradation due to corrosion or oxidation was considered to be a performance issue and not a factor in bucket life in earlier generation models." As such, a shortened lifespan affected the profitability of the turbine.

83.     After learning of the issues back in 2015, GE conducted a root-cause analysis and tried to engineer a fix. That fix did not work. After the end of the Class Period, in 2019, Power segment executives Marcus Scholz and Tom Dreisbach finally admitted to customers and insurers that the Company knew about the 2015 turbine blade break and that the break prompted the Company to work on new protective coatings – but that new parts with the supposedly

improved special coating still showed early stages of cracking after only 7,000 hours and were cracking after 12,000 and 16,000 hours.[4]

84.     Despite knowing that a component in the new HA turbine was susceptible to oxidation and that GE's attempted fix was not fully validated, GE plowed ahead with its aggressive plan to seize market share. It shipped the turbines out to customers and failed to disclose this critical defect to investors.

85.     It was simply a matter of time before an HA turbine suffered the same catastrophic event as its predecessor.

   a.     **GE Attempts to Secretly Resolve the H-Class Turbine Defect**

86.     In 2017, GE was still struggling to engineer a fix to the oxidation issue plaguing its turbines without alerting investors of the problem or the need for a solution.

87.     Ultimately, GE launched a "Gen II" (second generation) turbine blade in an effort to resolve the problem.  GE's plan was to inspect customer's H-class turbine blades and add a new protective coating to repair the blades or replace the blades altogether.

88.     GE alerted its turbine customers of issues with their machines through "Technical Information Letters."

89.     For example, on January 9, 2017, GE sent a Technical Information Letter to certain F-class turbine customers, informing them of an oxidation issue affecting turbine blades.[5] The letter instructed users to return sets of spare turbine blades to GE and to inspect blades for

---

[4] This information was disclosed to customers years later – in December 2018 private meetings in London and Florida where attendees were asked to sign non-disclosure agreements. GE did not disclose this information to its shareholders.

[5] *See* General Electric, Technical Information Letter: TIL 2024, available at https://www.scribd.com/document/336354816/t2024 (last viewed Aug. 30, 2019).

cracks every 2,000 hours for units under 8,000 hours of operation and every 4,000 hours for units over 8,000 hours of operation.  The letter warned that failure to comply "could result in equipment damage or facility damage" including a "liberation event."  The letter also noted that the "availability of replacement [blades] is limited."  Finally, the letter instructed customers to log the actions they took pursuant to the Technical Information Letter into the Power segment's ServiceNow portal for review by a Power Services representative

90. A different Technical Information Letter sent in 2017 notified customers of the oxidation issue impacting H-class turbines.

91. FE1 explained that Technical Information Letters undergo internal review to analyze the problem, operational metrics, and occurrence data.  The Technical Information Letter is reviewed from an engineering and financial perspective. The recommendation in the Technical Information Letter is assessed for financial and resource consequences, including impact on warranty claims, inventory capabilities, available manpower, sourcing channels for replacement costs, the total costs that will ultimately be absorbed by General Electric and the total costs to customers as well.  Executives review the Technical Information Letters and impact assessment before they are disseminated to customers.  FE1 is of the opinion that the July/August 2017 Technical Information Letter would have gone all the way to the CEO because of the financial and reputational impact of the letter.

92. FE1 explained that the length of time between GE beginning its root-cause analysis and its dissemination of a Technical Information Letter to customers varied and could recall instances where this period of time took between two and six months or even up to a year.

93. FE1's explanation of the TIL process, along with GE's clear and repeated admissions that it was working with customers in 2017 to repair and replace turbine blades,

further demonstrates that Defendant Stokes and other Power segment executives would have been apprised of the HA turbine defect at least by the first half of 2017.

> **b.      GE Learns by the Summer of 2017 that Three of its H-Class Turbines in Pakistan Were Also Experiencing Significant Problems**

94.     While GE was attempting to secretly manage the oxidation issue, GE learned in the summer of 2017 about problems with its 9HA gas turbines operating in Pakistan. Within months of installation, the turbines began to experience numerous issues, including vibration, which may be linked to the oxidation defect.

95.     In 2015, GE won a contract to supply Pakistan with six HA turbines for three power plants – Bhikki, Haveli, and Balloki. Notably, the Bhikki plant was one of the plants touted by GE in the Company's November 2, 2015 press release claiming "immediate benefits" to customers from the Alstom acquisition.

96.     GE beat out competitors for this contract by lowballing the bid at the expense of profitability. However, GE had significant execution issues with the Pakistan plants. Deliveries were delayed up to three months because a turbine part needed additional testing, which meant that the plant was not operational in the critical summer months.

97.     Even after they were installed and operational, the 9HA turbines were "producing power at levels well below their capacity and the problem was acute in the crucial summer months, when temperatures in the country frequently exceed 40 degrees Celsius (104 °F)."

98.     Yuosaf Naseem Khokhar, the top civil servant in Pakistan's Energy Ministry's power division told *Reuters*, "It had terrible consequences because we lost a lot of power which would have come to the grid during the peak summer . . . It is now up to General Electric to rise to the challenge and to take care of these issues ... before next summer starts."

99.     When news of these serious problems with the Pakistani H-Turbines became public in a December 27, 2017 *Reuters* article, GE denied there were any systemic or structural issues with the H-class turbines, falsely assuring the public that "every commercial HA site today is demonstrating exceptional performance levels for both output and efficiency." Specific to the Power segment's gas turbines running in Pakistan, GE represented, "we've encountered and communicated openly about launch challenges and readily resolved issues during this time. It's important to note that challenges are common with power plants of this size and complexity during the commissioning and early operations phase."

100.     Analysts expressed concern that the problem in Pakistan indicated a much larger problem with all of GE's H-Turbines. In December 2017, Stephen Tusa of JP Morgan noted that "'[t]he risk is that if these issues are not remedied, GE has already 'sold' another around 30 units (around 10 plus of which are in operation), some of which are at higher output ratings,' he wrote. 'Remedies would have to be applied up the curve, something we view as a challenge, especially as senior management tries to cut costs aggressively.'"

101.     In response, GE falsely reassured the market that the problems were minor and were being handled: "Together we've encountered and communicated openly about launch challenges and readily resolved issues during this time – it's important to note that challenges are common with power plants of this size and complexity during the commissioning and early operations phase. We remain committed to supporting customer and site needs with the highest standards of quality and excellence."

102.     A senior Pakistani official in Islamabad said the problems had cast GE in a bad light. "Frankly speaking, they have lost a lot of credibility here in the government because of these plants," the official said.

103.    Pakistan then awarded its next power contract to Siemens.

        **c.      Defendants Continue to Tout the H-class Turbine without
                  Disclosing the Oxidation Issue or the Impact Such a Severe
                  Issue Had on the Company's Cash Flow**

104.    Despite the significant oxidation issues, GE falsely reaffirmed the quality of its

gas turbines to investors, boosting its stock price as investors gained confidence in GE's ability

to turn around its business prospects.

105.    For example, on December 4, 2017, GE issued a press release announcing that

GE's "largest and most efficient gas turbine, the HA, is now available at more than 64 percent

efficiency in combined cycle power plants, higher than any other competing technology today."

GE further stated:

> The HA is our most advanced gas turbine technology, and we've never stopped
> pushing the boundaries of what it can do," said Joe Mastrangelo, president and
> CEO, GE's Gas Power Systems. "With the ability to deliver 64 percent efficiency,
> GE is proud to achieve an industry first and offer customers the most efficient gas
> technology available in the world today." According to GE Power's estimates, an
> additional percentage point of efficiency in gas turbines can translate to millions
> in fuel savings for customers globally. . . The new combustion system has already
> been successfully tested at full-load and full-speed at GE's test stand in
> Greenville, South Carolina."
>
> *          *          *
>
> The HA is a proven technology – with 70+ orders to date – and is being deployed by
> customers worldwide.

106.    On January 24, 2018, GE announced its fourth quarter 2017 and full year results

and held a conference call with investors. During the conference call, Defendant Stokes stated

that GE was "proud of the HA gas turbine technology" as "[i]t is operating in line with

performance guarantees." While Defendant Stokes acknowledged "some issues related to

commissioning at certain sites," he represented that GE had "readily addressed them" and "have

commenced working on supply chain and project organizations to address volume ramp issues

and things considered normal learning curve process." Defendant Stokes also stated that all of the 23 units installed were "performing to specifications and guarantees."

107.    On March 28, 2018, the magazine *Power* published an article titled "GE HA Turbine Snags Another World Record for CCGT Efficiency," in which GE's Power segment "noted that the Bouchain and Nishi-Nagoya world records highlight HA turbine contributions at the world's most efficient power plants in both the 50 Hz and 60 Hz segments." Defendant Stokes stated in the article: "We're very proud to make history once again and to partner with Chubu and Toshiba to bring GE's industry-leading HA turbine to Japan . . . Our HA technology enables the power plant of the future, delivering unprecedented levels of efficiency and reliability that can help countries everywhere meet today's power demands and reach more aggressive emissions goals."

108.    On June 26, 2018, GE conducted a business update conference call with analysts. In discussing the Power segment, Defendant Flannery represented that it "is a fundamentally strong franchise with leading technology, a valuable installed base, and expansive global research" with "approximately 7,000 gas turbines in our installed base and we have a 20-year plus track record that demonstrates we can improve output, reliability, and performance of those assets when we service them." That day, GE's stock skyrocketed 7.76% to close at $13.74 per share, up from $12.75 per share the day before, on exceptionally high volume of 213,833,225 shares traded.

109.    On September 12, 2018, GE issued a press release touting the selection of its "industry leading HA gas turbine technology" for a natural gas power plant in Ohio. GE stated that its HA fleet of gas turbines had achieved "more than 175,000 operating hours" and had been recognized by industry third parties, specifically noting that "Exelon's HA-powered Wolf

Hollow II project was honored as Power Engineering's Best Gas-Fired Project in 2017." That day, GE's stock increased by 2.27% to close at $12.61 per share, up from $12.33 per share the day before, on a volume of 40,185,622.

### 2) The Truth About the Turbine Defect Begins to Emerge, Causing Stock Price Declines

#### a. At a September 12-13, 2018 Users Meeting Attended by GE, Power Plants Expressed Widespread Concerns about Oxidation and Vibration in the H-Class Turbine

110.   Over the course of 2017 and early 2018, GE secretly attempted to manage the problems with the H-class gas turbine blades by inspecting and replacing blades – without revealing the problem or need for the fix to investors.  But in September 2018, customers' frustration with the scope of the problem and GE's lack of a time-tested fix bubbled up and risked exposing the problem to the outside world – including the investing public.  On September 12-13, 2018, users of H-class turbines from various power plants including representatives from over a dozen facilities and five countries, responsible for over 30 turbines, met for a two-day conference in Texas. The conference was hosted by Exelon, and industry journal Combined Cycle reported that "GE was there in full force." At the conference, customers expressed concern about the havoc created by the oxidation issue, insufficient replacement parts, and uncertainty over whether the "fix" would actually work and noted that the vibration problems were experienced "fleet-wide."

111.   At the meeting, a customer stated that its H-class turbine had a blade fail after less than 10,000 operating hours.  Users at the meeting said that GE had acknowledged to them individually (but not to investors more broadly) that oxidation is a "fleet-wide issue." Another user noted that the first opportunity to look at a machine running the supposedly improved Gen II hardware was during a scheduled outage in several months – revealing that GE was already

aware of the problem, had come up with a proposed solution, and had already installed new blades in at least one plant before this September 2018 meeting. Multiple customers expressed concern as to whether the "fix" would work, noting that the machines using the supposedly improved Gen II hardware had not been running long enough to validate the supposed solution – GE and customers could not be confident until Gen II turbine blades successfully met their expected usable life.   Users also mentioned that they were scheduled for Stage 1 blade replacement in 2019, further demonstrating that GE was aware of and working on this issue well before this meeting.

112.    Multiple users noted vibration issues and stated that GE "recently acknowledged these were fleet-wide issues, with half a dozen other machines experiencing the same problems." A user noted that "[e]xcessive vibration leads to secondary issues, such as oil leakage at the defector plate from generator rotor bearings, loose terminal strips, and failures of exhaust-thermocouple attachments, many of which are being replaced." A user stated that GE "didn't attempt to solve" the vibration problem.[6]

        **b.**     **Between September 20-25, 2018, GE's Stock Price Dropped 12.36% as Investors Learned of Oxidation Shutdowns in Five Power Plants in Texas and GE Revealed the Problem May Impact 51 Other H-Class Turbines**

113.    On September 20, 2018—just a few days after the user meeting—the oxidation problem that GE had known about, but concealed, since 2015 belatedly came to light after causing a major wreck at one of the Exelon plants.

---

[6] The coverage of this meeting did not come out for a few weeks. On October 8, 2018, Combined Cycle Journal published an online article discussing the meeting. On October 10, 2018, Tusa issued a lengthy analyst report analyzing the financial consequences for the Power segment of the issues raised by HA users.

114.    Back in 2014, GE closed a deal valued at $500 million with Exelon, one of the largest power generators in the United States, to supply four new 7HA gas turbines, steam turbines, and generators. The turbines would be installed at Exelon's Wolf Hollow plant near Dallas and its Colorado Bend facility near Houston. The H-class turbines, steam turbines, and generators were designed to add 2,000 megawatts of output and help Exelon grow its market share.

115.    As set forth above, GE touted the Texas Exelon projects in the November 2, 2015 press release as a demonstration of the synergies to be gained from the Alstom acquisition.

116.    Exelon was an important customer for GE. In addition to purchasing GE's new HA technology, in 2016 Exelon agreed to use GE's software set for power plant analysis and management at 91 power plants in 48 states – the largest deployment of GE's technology in the power sector to date, nearly six times larger than its previous biggest deal.

117.    Defendants were focused on Exelon and the status of its HA turbine operations. For example, during the April 22, 2016 investor call, Defendant Mastrangelo described Exelon as "another powerful example of the Alstom and GE combination," noting that the two Exelon projects "have 100% GE power island technology."  Defendant Mastrangelo mentioned Exelon again on the March 8, 2017 investor call, describing it as "another great story, we are outperforming the grid and outperforming our design parameters and the machines will go and start producing power in the May/June timeframe."

118.    In September 2018, this major customer suffered a total failure of the Stage 1 blade in their HA turbine.

119.    On September 19, 2018, Defendant Stokes, posted an article on LinkedIn, and a similar article appeared on the GE Reports section of the Company's website, that began to

acknowledge that an oxidation issue had arisen with an HA turbine.  However, those articles failed to identify specifically where or when the problem had been encountered or the magnitude of the issue.  Indeed, Stokes downplayed the impact, stating it was an "oxidation issue that affects the lifespan of a single blade component."  GE also claimed it had "identified a fix and have been working proactively with HA operators to address impacted turbines," and again minimized its importance by stating that "[t]he minor adjustments that we need to make do not make the HA any less of a record setting turbine – they are meeting – and in many cases exceeding – their performance goals at every customer site today."

120.    On September 20, 2018, analysts and mainstream media picked up for the first time the LinkedIn article and elaborated on the scope and severity of the blade failure.  *Reuters* published an article titled "Four General Electric Power Turbines Shut Down in U.S. Due to Blade Issue," which reported "that four of [GE's] new flagship power turbines in [Texas] have been shut down due to an 'oxidation issue' and warned it *expects the problem to affect more of the 51 units* it has shipped." The article quoted GE as acknowledging for the first time that "[t]he problem was *first discovered on turbine blades in a natural gas-fueled turbine operated by Exelon Corp. in Texas few weeks ago*," despite that GE knew of the oxidation issue since 2015 and had been in the field inspecting and replacing turbine blades since 2017. The article further quoted Stokes stating that "[t]he minor adjustments that we need to make do not make the HA any less of a record setting turbine—they are meeting—and in many cases exceeding—their performance goals at every customer site today[.]"

121.    Although disruptive to Exelon's business, the defect had an "immaterial financial impact" on Exelon because the failure was under warranty and Exelon would "not be paying for the fix out of their pocket," according to Exelon investor relations.

122.    Also on September 20, 2018, *The Wall Street Journal* revealed that GE had known about the oxidation problems for months and had been working on solutions with customers, but that the problem struck Exelon earlier than expected. The oxidation issue related to a metal alloy that could cause distress to the gas turbine blades. *The Wall Street Journal* reported that "[a] GE spokeswoman said the problem was limited to this model [HA] and isn't expected to affect other products."

123.    But this was the same issue that the 9FB faced back in 2015.

124.    *Bloomberg* corroborated *The Wall Street Journal's* report, noting that the oxidation problem was discovered earlier that year and reported to customers (but not to investors), and that GE had planned to repair Exelon's turbines at some point in 2018.

125.    Also, a Scranton, Pennsylvania power plant scheduled to begin operations in January 2019 with an H-class turbine was working on a blade replacement plan scheduled for spring 2019 – just months after the plant began operations.

126.    On September 20, 2018, GE Gas Power Systems CEO Chuck Nugent provided false assurances concerning the oxidation issue: "I am confident this is not a significant issue from a customer perspective."

127.    The same day, analysts expressed concern about the impact of the oxidation issue beyond Exelon to other H-class turbines, and on the Power segment's finances more generally. JP Morgan analyst Stephen Tusa, for instance, described the turbine blade failure as "a negative development for a company that has little wiggle room" in the struggling Power segment. He noted that "[w]hile the debate can rage around the structural versus cyclical nature of the power industry downturn is as bad as it seems, we believe there should be no longer any doubt that GE

Power has company-specific issues . . . Not only due to the decline in the profit pool from its large installed base of services, but now around the H-frame technology."

128.    He also questioned GE's claims that the issues were minor and relatively insignificant. Indeed, he felt that the H-class blade failure risked franchise impairment. He noted that "this is the most difficult part to design, manufacture and repair, made from proprietary nickel based single crystal alloys requiring close to perfection at a microscopic level," and it "will be a massive undertaking to establish the cause of failure, redesign the turbine blade, develop hard tooling at casting vendors, learn to cast, machine and apply coatings to the new blade, schedule customer outages and send service crews to sites around the world."

129.    Tusa also questioned whether GE had a lasting solution. He emphasized that even after having "conversations with management implying that the new blade is already in production, we wonder why the new blades were not being used to prevent such a situation. In other words, we struggle to believe that the fix is permanent or to just to keep the turbine running in the near term."

130.    Analyst Jim Corridore from CFRA similarly noted that "[t]his issue, if not quickly resolved, could hurt GE's turbine brand image and market share."

131.    These analysts' concerns hinted at precisely what GE was attempting to conceal - that if defects with the star turbine caused a major blow in new orders and long-term service contracts, the increased cash flow and market share GE was banking on would not materialize.

132.    On September 20, 2018, GE's stock price fell 3.11% from $12.86 at close on September 19, 2018 to $12.46 at close on September 20, 2018, on a volume of 88,325,588 shares traded.

133.   On September 21, 2018, Power segment spokesman Chris Shigas acknowledged that the oxidation issue had some broader implications, but attempted to rebut the analysts' concerns and tamp down investor worries by reiterating that the Company had a solution, stating, "[a] few weeks ago, there was an event at Exelon's Colorado Bend site that resulted from an issue with an HA turbine component. We expect the same issue to impact other HA units. We have identified the solution and have a plan in place, and we have been proactively working with customers on a case-by-case basis to address any impacted unit. We expect the Exelon unit to return to service soon." In fact, the Exelon facility was ultimately shut down for two months.

134.   Additionally, that day GE issued another press release in which GE stated—for the first time—that the component with the oxidation "is only used in stage-one blades in GE's highest-efficiency turbines—HA *and* 9FB[.]" This directly contradicted the prior day's statement from the GE spokesperson that the problem was limited to the HA turbine and wasn't expected to affect other products. But Power segment CEO Russell Stokes again reassured the public that GE had a solution:

> GE engineers and teams identified a fix and have been working proactively with our customers on a case-by-case basis to quickly return impacted units to service and mitigate any future issues … In all industries and new technology, developing and launching products at this scale and complexity involves fine-tuning and adjusting the technology . . . We always strive to jointly solve technical issues with our customers as they arise and are committed to delivering on our products.

135.   On September 21, 2018, the stock price fell an additional 2.33% to close at $12.17, on a volume of 95,419,064 shares traded.

136.   The following trading day, on September 24, 2018, Gabelli analyst Justin Bergner reported that GE confirmed that the turbine issue was a manufacturing issue related to the shared heat treat process for the HA *and* 9FB turbines, and that GE reverted to an earlier heat treatment process to ship a fixed blade to Exelon. Gabelli also confirmed earlier reports from media that

this risk was known to GE before the Exelon break: "Because the problem was shared with the 9FB, *GE had known about it for a year* and had been working towards what they believe is a now permanent fix. They had expected problems with the HA turbine although the Exelon failure presented itself sooner than expected."

137.    That day, GE's stock continued its sharp decline, closing at $11.74 per share, down 3.53% from its prior close at $12.17 per share, on a large volume of 148,589,856 shares traded.

138.    The following day, on September 25, 2018, *Reuters* revealed that Electricite de France SA shut down its HA-class turbine at the Bouchain, France power plant – the first plant in the world to install a GE 9HA turbine – to replace the blades.

139.    That day, GE's stock fell an additional 4% to close at $11.27 on a volume of 133,694,188 shares traded.

140.    Over the course of the four trading days between September 20-25, GE's stock fell 12.36%, from $12.86 per share to $11.27 per share.

### c.    In Late September 2018, GE Continues to Deny the Severity of the H-Class Turbines' Problems

141.    On September 26, 2018, GE's Board of Directors convened for a previously unplanned meeting where they discussed the scope of the HA oxidation defect. According to *The Wall Street Journal*, Defendant Flannery continued to conceal the severity of issues within the Power segment in his communications with GE employees, counseling that "negative news reports about the power issues… have overstated the degree of the problems in the power division."

142.    On September 27, 2018, an analyst from RBS described the gas turbine blade failures as a "self-inflicted" issue, unrelated to broader market trends, and observed that GE's

reputational damage stemming from this incident could cause loss of market share to competitor Siemens.

143.    In response to this flurry of analyst criticism, GE continued to deflect any suggestion that the blade failures could have a large impact on future orders and cash flow which might call its goodwill assessment into question.   On September 28, 2018, GE published an article by Chief Executive Officer and President of Gas Power Systems Chuck Nugent and Chief Executive Officer of GE's Power Services Business and Gas Power Business Scott Strazik on the gas turbine issues via LinkedIn and as a press release in which GE denied the impact predicted by analysts and other media sources. Their article explained that, "[t]he issue involves oxidation that *could* cause distress on 9FB and HA gas turbine Stage 1 Blades (S1B)." The article further reported that GE had "identified the solution and [had] a plan in place to implement it." Additionally, the article noted that GE was "already working with Exelon when the event occurred at Colorado Bend in early September. As a precaution, Exelon chose to proactively shut down their additional HA units. Over the last few weeks we have worked with them to return all 4 of their HA units back to service. The good news is 2 are already back online with new blades … ahead of schedule." Finally, the article vehemently denied any endemic issues with the H-class turbine. It stated: "As we move forward, we remain very confident in our technology and the future of gas . . . The HA is the world's largest and most efficient turbine. There's nothing like it in operation today. It's meeting – and in many cases exceeding – performance goals at every customer site today."

> **d.      In October 2018, Analysts React with their Own Estimate of the Severity of the H-Class Turbine Costs, Causing GE's Stock Price to Fall More than 10%**

144.    On October 10, 2018, JP Morgan analyst Stephen Tusa, informed investors for the first time of the September 12-13 H-class turbine user meeting.  Investors reacted strongly and

negatively to the new information he revealed about the scope of the oxidation defect and GE's lack of a proven fix.

145.   In his report, Tusa explained that multiple users reported Stage 1 blade failures, and noted numerous specific concerns:

- "Bucket [turbine blade] issue has impacted schedule of machine delivery to U.S. customers. One said that the buckets destined for their machine (first 'Gen II' SIBs [Stage 1 blades] were now being diverted as replacements in the failed units, postponing commercial operating dates (COD)."

- "With no commercial operating experience with Gen II hardware, users wonder whether this 'fix' would be the right one."

- "The next opportunity to 'look at them' in the first machine incorporating it was not expected until a scheduled outage many months out."

- "An operating site cited 9-10 months delay on spare parts while 'desperate' for stage 1 blades."

- "Another was expecting S1B replacements in 2019, now coming earlier than expected."

- "Another got a mix of Gen I and II hardware."

- "Site with several thousand hours on HA.01 machine reported that dampening pins for stage 1 buckets had already been replaced twice."

146.   These comments revealed material information that GE had concealed throughout the Class Period:

- Prior to September 2018, GE developed a "Gen II" (second generation) Stage 1 blade to replace the problematic "Gen I" (first generation) Stage 1 blade.

- But GE did not have sufficient Gen II replacement blades for every H-class turbine, so GE was forced to replace some customers' blades at the expense of other customers who had to continue using the faulty Gen I blades and hope they did not suffer a similar break.

- Despite knowing about the oxidation problem since 2015, GE had not timely addressed the problem and so power plants were delayed in going into operation.

- Although in September 2018 after the Exelon break GE reassured customers that the problem was solved and it had a fix, in fact GE did not know this and GE could not know for many months whether the oxidation issue was resolved or recurring.

147.    Customers with H-class turbines were in a difficult spot. Their best-case scenario was promptly receiving Gen II Stage 1 blades – but replacing a blade required shutting down the plant for an unexpected outage that would last at least 3-4 weeks without knowing whether the Gen II blades had even resolved the problem. For customers that could not promptly get Gen II blades, they had to continue running on Gen I blades and risk a break.

148.    Customers could attempt to mitigate the problem by running their gas turbine at a lower temperature, but that would eliminate the very benefit of the H-class turbine: that supposedly it could be run at a very high temperature to extract more energy and efficiency. The uncertainty and possibility of a total shutdown of the plant for replacement was extremely costly.

149.    Tusa also shared numerous user complaints about vibration and that GE had "recently acknowledged these were fleet-wide issues," but that GE had not attempted to solve these problems.  These are the same problems that were reported in the Pakistan plants months earlier.

150.    Additionally, Tusa noted, "[w]hile most of the focus has been on the technology around the blades, which GE has more or less admitted to with a reference to a fix, details below indicate a myriad of shortfalls in other parts of the turbine that we find hard not to consider 'technology flaws.'"

151.    Tusa commented on the potentially dire results for GE's bottom line:

> The commentary is a reminder of the hurdles to a "fix" for a Power business that is already set to lose money on a GAAP basis, with pronounced free cash outflows, facing not only macro headwinds, but more competition/overcapacity, and now company specific technology issues. We are not sure what is left to determine "asset value" here as issues like this are not solved by a simple recall and re-ship. These are engineering feats that need to be validated, typically taking time measured in years not months, and in long cycle technology businesses where a new product gets introduced every couple of decades, missing a cycle has long term implications . . . for a company in this position, there is no room for error to deal with these issues while trying to take out costs and fix service levels.

152.    He added that the news revolving around the situation at GE's Power segment, including the issues with the H-class blades, was "a legitimate driver of the related stock decline, with enough uncertainty and downside implications for a highly levered company with no available cash flow, and little room for error, to justify further downside, especially from current levels." As a result, it seemed to Tusa "that GE overpromised and likely took on risk for customers to win deals."

153.    Finally, Tusa noted the financial impact of the additional work on customer plant operations and new blade installation. The long-term service agreements guarantee a fixed rate for the customer, with GE setting its margin based on expected productivity, which is based on a few major outages and overhauls – but the oxidation issue means "likely multiple more overhauls, at GE's expense" and "higher insurance premiums and customer hesitancy, without the past crutch of GE Capital, means impaired share position and an installed base that will fade."

154.    Tusa's analysis and similar negative news from another analyst from William Blair were published on October 12, 2018. Also by October 12, 2018, it became clear that the oxidation defect affected 14 of the 51 installed 7HA turbines – or 27% – and as many as 70 of GE's 9FB turbines.

155.    Claiming he needed an opportunity to "complete initial business reviews and site visits following his appointment on October 1st," Culp's announced in a brief email to investors on October 12, 2018 that he would delay GE's third quarter 2018 earnings announcement.

156.    As a result of the foregoing, GE's stock price dropped: from a close of $13.28 on October 10, 2018, it fell again to $12.72 on October 11, 2018, on a volume of 116,161,903

shares traded and shares dropped again to $12.32 on October 12, 2018 on a volume of over 123 million shares traded.

> **e.      On October 30, 2018, GE Announces Devastating Third Quarter 2018 Result, Including $600 Million for the Oxidation Defects**

157.    On October 30, 2018, GE announced in its Form 10-Q that, during the third quarter of 2018, Gas Power Systems recorded a $200 million charge "related to an oxidation issue within the HA and 9FB Stage 1 turbine blades, resulting in increased warranty and maintenance reserves" and its Power segment recognized "approximately $0.4 billion in charges associated with an increase in issues on our existing projects driven by execution as well as partner and customer challenges."

> **f.      On December 7, 2018 GE Stock Dropped Again as the Oxidation Issue "Goes Global" and Forces Power Plant Shutdowns Worldwide**

158.    On December 7, 2018, *Reuters* published an article titled "Exclusive: GE's push to fix power turbine problem goes global." The article revealed that GE was undertaking a global shutdown of 18 of the 55 – or nearly 10% – of its H-class gas turbines. The consensus after conducting a "dozen interviews with plant operators and industry experts" was that "[p]ower plant operators in Japan, Taiwan, France and at multiple U.S. sites have shut down – or plan to shut down – at least 18 of the 55 new HA-model turbines that GA has shipped so far." As a result, "GE is setting aside $480 million to repair its 9HA, 7HA and 9FB model turbines as it restructures its power business."

159.    Moreover, the article revealed that—despite GE "undercut[ting] its rivals' prices by about 20 percent 'to go from 0 percent to about 45 percent share of this turbine class by 2016,'" "GE fell from first to third place in new turbine orders by capacity, behind Mitsubishi and Siemens" in 2018. The fact that GE not only lost orders but also lost market share

demonstrates that customers were choosing other options, likely due to the issues plaguing the H-class gas turbines and GE's inability to timely and smoothly address the problems.

160.    The article also showed the widespread problems with the H-class gas turbine, noting that from January 2017 to October 2018, the power plant in Bouchain had logged 86 outages for equipment failure, testing, or other reasons – five times the average of non-GE plants with turbines made by, among other competitors, Siemens.



161.    Nevertheless, GE gas power systems CEO Chuck Nugent continued to insist that the turbines were performing "extremely well," chalking up the issues with the blades as simply "early maintenance." Scott Strazik, the new chief executive of GE Gas Power, said that "customers are happy with GE's response to the blade issue and GE has no plans to change . . . how it tests turbines, noting GE's test facility is the largest and most comprehensive in the world."

162.    That day, the end of the Class Period, the stock price dropped by 4.63% from $7.35 at close on December 6, 2018 to $7.01 at close on December 7, 2018, on a volume of 114,480,098 shares traded.

### 3)  Post-Class Period Revelations Relating to the H-class Turbine Fraud

      **a.**    ***Reuters* Breaks the News that Defendants Revealed to Customers That They Knew About the Oxidation Issue Dating Back to 2015, All the While Hiding that Information from their Investors**

163.    On January 25, 2019, *Reuters* broke the news that Defendants had admitted to customers that they knew about the oxidation issue in 2015, all the while keeping that information from their investors.

164.    *Reuters* reported that in December 2018, Power segment senior executives Marcus Scholz and Tom Dreisbach held private meetings with customers and insurers. Attendees at those meetings were asked to sign non-disclosure agreements.

165.    At the meetings, they disclosed the Company's knowledge of the 2015 turbine blade break, that the break prompted the Company to work on new protective coatings, and that new parts with the supposedly improved special coating showed early stages of cracking after only 7,000 hours and were cracking after 12,000 and 16,000 hours.

166.    GE executives also announced that the Company would offer extended warranty coverage and make spare parts available in an effort to reassure insurers, lenders, and utilities who may want to purchase gas turbines.

167.    GE did not disclose that same information to its shareholders back in 2015, or even in December 2018 when they shared it with customers and insurers.

168.    Investors are only aware of this piece of the story because information leaked and was reported.

> **b.**  **Continued Eroding Market Share Further Demonstrates that Dropping Orders Were Caused by the Oxidation Defect and Had Financial Implications Beyond the Immediate Repair Costs**

169.    GE lost market share shortly after it began reaching out to customers to inspect and replace H-class gas turbine blades at risk of oxidation in 2017.

170.    From 2017 to 2018 while GE was scrambling to address the HA oxidation defect, GE fell from first to third place in worldwide turbine orders behind competitors Siemens and Mitsubishi:



171.    GE received only 4 gas turbine orders in the first quarter of 2018, which was only 33% of the 12 orders from the same quarter of the prior year, and 7 orders in the second quarter of 2018 amounting to 29% of the 24 orders in the prior year.

172.    GE's erosion of market share continued after the Class Period and into the first quarter of 2019.

173.    Comparing the "utility grade" turbines (comparable to GE's H-class) that were sold externally[7] reveals GE's continued loss of market share:

| COMPANY | TURBINES SOLD FOR EXTERNAL DELIVERY BY YEAR-END 2020 |
|---|---|
| GE | 3 turbines / <1 GW [16.6%] |
| Mitsubishi | 7 turbines / 2.75 GWs [38.8%] |
| Siemens | 8 turbines / 2.6 GWs [44.4%] |

174.    Commenting on this loss of market share, JP Morgan's Tusa, wrote: "ongoing market share loss head to head reinforces our view that GE's technology is not as competitive as in the past, and means that going forward revenues will lag what many expect to be a flat market – both Siemens and MHI [Mitsubishi Heavy Industries] are calling for a stable market . . ."

175.    GE's continued loss of market share concurrent with the HA oxidation defect fallout reveals that GE's plummeting turbine sales were partially caused by company-specific issues – customers were simply choosing other options over GE.

176.    It reveals that the HA turbine defect goes beyond the immediate repair or warranty costs – it cost GE customers for gas turbines and accompanying long-term service agreements. Those are significant financial losses for the Company arising from the HA turbine defect that go beyond the immediate warranty or repair costs.

---

[7] The external delivery metric omits turbines sold within the company; in the first quarter of 2019, GE sold one turbine to GE Capital.

**4) Additional Facts Evidencing GE's Scienter Regarding the H-class Turbine Fraud**

        **a.**    **<u>GE Admitted That It Knew of the Oxidation Problem and Its Impact on the H-class Turbines Since 2015</u>**

177.    It is undisputed that GE had knowledge throughout the entire Class Period of the H-class oxidation problem. After the Exelon break, GE revealed to investors, for the first time, that it had been aware of the oxidation problem and had been working with customers for over a year to inspect and replace their H-class gas turbine blades. A few months later, GE admitted that in fact it had identified the oxidation issue and performed a root-cause analysis all the way back in 2015.

178.    Given their positions in the Company, the importance of the H-class gas turbine to the Power segment's success, the serious financial consequences of the oxidation defect on GE (including sales, profits, and warranty claims), and GE's clear admissions, each Individual Defendant was aware of the oxidation defect by the start of the Class Period.

179.    After the Class Period, new CEO Culp admitted on a January 31, 2019 investor call that "the useful life" of the H-class gas turbine blades was short and described it as "regrettable."

        **b.**    **<u>GE's Shipments and Sales of the H-class Turbine Were Disrupted Due to GE's Attempt to Fix the Oxidation Problem.</u>**

180.    The oxidation issue's disruption to H-class gas turbines shipments and sales further supports Defendants' scienter.

181.    The oxidation issue was not easily or smoothly solved. GE had to inspect the blades in H-class gas turbines across the United States and the globe to determine whether they had begun demonstrating symptoms of oxidation. GE had to replace many gas turbine blades

altogether.  But GE could not manufacture enough blades in time and so had to stagger the replacements, based on the urgency of the problem.

182.    According to power plants with H-class gas turbines that participated in the September 12-13, 2018 user meeting, this created chaos.  Machine delivery was delayed.  Blades intended for one power plant were diverted to other power plants who had experienced total failures of their turbine blades. Some plants received a mix of the new and old turbine blades. Plants were delayed in beginning commercial operations because they could not get blades. Users (and investors) had no idea if the "fix" GE promised would actually work, because the issue manifested over time so the fix could not be validated until plants with the new blades had successfully run for the intended life of the part, which would take thousands of hours.

183.    The fact that GE offered extended warranty coverage to customers was little solace to "companies like Exelon Corp., PSEG and others that rely on the GE machines, [which] are now looking at potentially dwindling profits as their electricity output could suffer[.]"

184.    *Reuters* further reported that, since the turbine blade break at the Exelon plant in September 2018, GE had to scale down deliveries of its 9FB and HA models by 22%, with 102 new turbines being installed instead of the previously estimated 130 turbines.

185.    Nor did the problem end at the close of the Class Period. By February 2019, GE was replacing blades in 52 H-class gas turbines and 50 F-class gas turbines.

186.    The financial impact of the unanticipated inspection and repair work was significant.  In the third quarter of 2018, GE had $240 million of warranty and other accruals related to the H-class gas turbine blades, including addressing the blade issue, and in the fourth quarter of 2018 GE incurred $400 million of charges for updates, including on service contracts related to the same oxidation issue.

187.    Additionally, the reputational harm stemming from the turbine blade issue and GE's inability to promptly and seamlessly resolve it led to lost orders and attendant service agreements.

188.    The disruption to the efficient shipment and sale of H-class gas turbines further supports an inference of scienter.  This is not a minor problem with the sale of a consumer product – GE has a limited universe of repeat customers (power plants) who make one-time purchases of heavy machinery for tens of millions of dollars.  The chaotic environment and customer discontent caused by the oxidation defect, and the financial impact on GE's customer reputation, would have elevated the oxidation issue to the highest levels of the Company, including all Defendants.

> c.    **The Importance of the H-class to GE's Power Segment and the Complexity of the Repairs and Replacements Made Defendants Aware of the Oxidation Problems Throughout the Class Period**

189.    Defendants' scienter is evidenced by the importance of the H-class gas turbine to the Power segment, and the Power segment to GE as a whole during the Class Period.

190.    During the Class Period, the Power segment was supposed to be GE's keystone. In acquiring Alstom, GE described its goal of returning to industrial businesses as 75% of GE's operating earnings and described Alstom as central to GE's "transformation" back to its core industrial growth. GE became increasingly dependent on the Power segment for the company's overall success – by the end of 2017, Power represented approximately 22% of total revenues for the entire Company. And GE had no other option but to rely on Power because the rest of the company was in crisis:

- GE Capital was winding down.
- In the first quarter of 2018, in January 2018, GE wrote off $6.2 billion in connection with GE Capital's long-term care insurance business and announced

that it anticipated another $15 billion of write-offs over the next seven years. The SEC opened an investigation into this issue on January 24, 2018.

- In the first quarter of 2018, in February 2018, GE revealed that the Justice Department was investigating WMC Mortgage, another component of GE Capital.
- In the first quarter of 2018, in April 2018, GE announced a $1.5 billion reserve related to the WMC Mortgage issues and in May 2018, said it may put WMC into bankruptcy.

191.    Within Power, the H-class turbine was central to GE's success. GE had spent $2 billion to develop the H-class gas turbine and it was described by the Company as "the crown jewel of our product portfolio." Industry publication *World Energy News* stated that the H-class gas turbine "represent[s] GE's highest gas-fueled technical achievement and [is] crucial to GE's power division, which is struggling with declining sales and profits."

### d.    The Lost Market Share for H-class Turbines Further Supports an Inference of Scienter

192.    GE depended on the H-class gas turbine to regain market share lost to competitors. *The Wall Street Journal* described GE's H-class turbine as "central to GE's efforts to compete with rivals such as Siemens AG in a difficult power market."

193.    The oxidation issue presented a risk to that goal of regaining market share.  As *World Energy News* noted, GE could lose sales to competitors from a persistent oxidation issue.

194.    Indeed, GE did see lost market share. Shortly after GE began reaching out to customers to inspect and replace H-class gas turbine blades at risk of oxidation in 2017, GE experienced a dramatic drop in gas turbine orders: 4 orders in the first quarter of 2018, which was only 33% of the 12 orders from the same quarter of the prior year, and 7 orders in the second quarter of 2018 amounting to 29% of the 24 orders in the prior year.

195.    The loss of market share to competitors further supports an inference of scienter, and further demonstrates that lost orders reflected company-specific problems on top of a global market decline.

   **e.**    **Defendants Intentionally Concealed the H-class Turbine Fraud from Investors**

196.    Defendants' efforts to conceal the scope of the problem from investors also supports an inference of scienter.

197.    In December 2018, for example, Power segment senior executives Marcus Scholz and Tom Dreisbach held private meetings with customers and insurers where they asked attendees to sign non-disclosure agreements. At the meetings, they disclosed the Company's knowledge of the 2015 turbine blade break, that the break prompted the Company to work on new protective coatings, and that new parts with the supposedly improved special coating showed early stages of cracking after only 7,000 hours and were cracking after 12,000 and 16,000 hours.  GE executives also announced that the Company would offer extended warranty coverage and make spare parts available in an effort to reassure insurers, lenders, and utilities who may want to purchase gas turbines.

198.    Investors are aware of these meetings only because information leaked.

  **C.**    **GE's Fraud in Connection with Its Goodwill Accounting**

199.    In addition to the H-class turbine fraud, Defendants engaged in a second fraud to hide from investors that the Alstom deal had failed and that millions of dollars in goodwill associated with the Alstom acquisition needed to be written off.

### 1) Goodwill Accounting Standards

200.    Goodwill is an accounting concept applied when one business acquires another. Goodwill is an entry on the balance sheet that represents future economic benefits when the purchase price exceeds the "fair value" of the acquired company's identifiable net assets.

201.    Generally Accepted Accounting Principles ("GAAP") provides that at the time of an acquisition, the total purchase price of that acquisition must be allocated to the identifiable assets and liabilities of the acquired company based on application of Accounting Standards Codification ("ASC") 805 - Business Combinations based on their Fair Value.

202.    ASC 805 uses the definition of "Fair Value" in ASC 820 - Fair Value Measurements and Disclosures, which defines Fair Value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."

203.    The assets can be tangible (such as inventory or accounts receivable) or intangible (such as patents, customer relationships, and trademarks). The purchase price allocation must also consider the identifiable liabilities (such as accrued contract liabilities or accounts payable).

204.    GAAP recognizes that a purchase price may exceed the amount of net identifiable assets because an acquired business may have assets with significant value to the acquirer that are not considered identifiable assets under GAAP.  These non-identifiable assets can include such things as an assembled workforce, going-concern, platform value, and/or synergies.  In order to account for these non-identifiable assets, GAAP permits acquiring companies to book the fair value of the non-identifiable assets as "goodwill."

205.    If the acquired company's identifiable assets exceed its identifiable liabilities, the goodwill number reflects the amount by which the purchase price exceeds the company's net identifiable assets (which equals identifiable assets minus identifiable liabilities). If the acquired

company's identifiable liabilities exceed its identifiable assets, as was the case with Alstom, the goodwill number equals the amount of the purchase price plus the amount of identifiable net liabilities (identifiable liabilities – identifiable assets):

Identifiable Net Liabilities



Purchase Price + [Identifiable Liabilities – Identifiable Assets] = Goodwill

206.     Under GAAP, an acquiring company has up to one year to closely examine the purchased company before recording a final goodwill amount related to the acquisition.

### 2) Based on Purported "Synergies" in 2016, GE Records Massive Goodwill from the Alstom Acquisition, Substantially Exceeding the Purchase Price

207.     The Alstom acquisition was unusual for a number of reasons. It was GE's largest ever industrial acquisition. Additionally, it was a highly unorthodox transaction in which GE paid an enormous premium for Alstom—billions of dollars above the value of Alstom's identifiable net assets.

208.     In the Alstom acquisition, GE ultimately booked $17.3 billion in goodwill, far exceeding the purchase price of $10 billion. $12.9 billion of that $17.3 billion of goodwill was attributed to GE's Power segment.

209.     The significant differential between Alstom's purchase price and identifiable net liabilities told investors that Alstom's value was exclusively in the non-identifiable assets that the Company touted—principally the "GE-specific synergies" between the two businesses and the ability to capture a significantly larger portion of the power value chain due to the complementary strengths in steam and gas turbines.  The acquisition's success depended on continued growing demand for GE and Alstom's purportedly complementary products.

### 3) GAAP Required GE to Conduct a Goodwill Impairment Test Based on a "Realistic" Assessment of the "Fair Value" of Its Goodwill Derived from Future Cash-Flow Projections

210.    GAAP required that after conducting its initial goodwill assessment, pursuant to ASC 350, Intangibles – Goodwill and Other, GE conduct a "goodwill impairment test" at least annually, or more frequently "if an event occurs or circumstance changes that would more likely than not reduce the fair value of a reporting unit below its carrying amount."

211.    The goodwill impairment test (performed in accordance with ASC 350) is a two-step process to assess whether the "fair value" of the goodwill declined below the carrying value (or net book value) of goodwill. If it does, an impairment of the goodwill is required.

212.    Step 1 of the goodwill impairment test requires estimation of the fair value (as defined in ASC 820) of the reporting unit and comparison of the fair value to the reporting unit's carrying value.

213.    Pursuant to ASC 820-10-35-9, GAAP required management's fair-value estimate to reflect current market realities: "A reporting entity shall measure the fair value of an asset or a liability using the estimates that market participants would use in pricing the asset or liability, assuming that market participants act in their economic best interest."

214.    While fair value could be determined using a market approach derived from metrics of publicly traded companies or historically completed transactions of comparable businesses, GE ultimately admitted that its goodwill impairment was caused by downward revisions in cash flow projections, demonstrating that GE used the income approach for the Power segment reporting unit's fair-value determination.

215.    The income approach required GE to determine current and future projected earnings and cash flows at the reporting units, including the goodwill assets, and then to apply a risk adjusted discount rate.  The determination of projected earnings and cash flows must have a

reasonable basis and required  GE to conduct a meaningful inquiry into both company-specific issues such as: the existence and/or purported likelihood of synergies with Alstom, GE's operational challenges, the likelihood of closure of deals and projected orders and sales, as well as market conditions that were or would in the future impact GE's Power segment, such as overcapacity in the industry and the growth of renewable energy sources.

216.    If the fair value of a reporting unit based on projected earnings and cash flows was less than its carrying value, GE was required to move to step 2 of the goodwill impairment test.

217.    Step 2 of the goodwill impairment test requires determination of the implied fair value of goodwill in the same manner that goodwill was determined in the business combination based on ASC 805 - Business Combinations. The fair value of the reporting unit established in step 1 is used as the "purchase price," and then the fair value of all assets and liabilities of the reporting unit as of the measurement date is estimated.  This includes determining the fair values of any previously unrecognized intangible assets. The difference between the fair value of the reporting unit's assets and liabilities (whether recorded or unrecorded on the balance sheet) represents the implied fair value of goodwill. The amount of the goodwill impairment loss, if any, is then measured by comparing the implied fair value of the reporting unit's goodwill with its carrying value.

218.    If the implied fair value of goodwill is less than its carrying amount, an impairment loss should be recognized equal to that difference. The loss cannot exceed the carrying amount of goodwill.

219.    The adjusted carrying amount of goodwill becomes its new accounting basis that will be used in future impairment tests.

220.    Accordingly, GAAP required – and investors expected – that GE's fair-value calculation had a reasonable basis, was derived from a meaningful inquiry, and reflected current, realistic estimates that comported with GAAP.

**D.    GE Falsely Told Investors it was Accurately Determining the Need to Impair Goodwill**

**1)  GE's 2017 10-K Falsely Purports to Accurately Determine Goodwill**

221.    At the commencement of the Class Period, in its Form 10-K for the year ended December 31, 2017, GE included the impairment testing methodology (set forth above) for the actual testing used for the Alstom goodwill.

222.    GE nevertheless also reassured investors with apparent precision that the fair value of Grid Solutions (one of the reporting units with Alstom-based goodwill) was now determined to be in excess of its carrying value by 8% – an increase of 5% from the prior quarter. GE stated:

> In the current annual impairment test, the fair value of Grid Solutions continued to be not substantially in excess of carrying value. Therefore, we performed an interim impairment test in the fourth quarter of 2017 which resulted in the fair value being in excess of its carrying value by approximately 8%.

223.    Accordingly, GE did not impair goodwill for the Grid Solutions reporting unit in the fourth quarter of 2017.

224.    GE also told investors that "due to the overall decline in the Power market," it also conducted interim impairment testing of the Power Generation reporting unit, but that it had concluded that its fair value "was still *significantly in excess* of its carrying value."

225.    This confident assertion in the high fair value of the Power Generation reporting unit is striking given the massive write-down of Alstom goodwill just three quarters later.

226.    Finally, GE reported that it had conducted an interim impairment test and took only a *de minimis* impairment of $217 million for the Power Conversion unit – representing merely .86% of the total amount of the Power segment's goodwill at the end of that quarter.

227.    After taking this *de minimis* impairment, GE reported a goodwill balance for the Power segment of $25.269 billion.

### 2) GE's First Quarter 2018 10-Q Falsely Purports to Accurately Determine Goodwill

228.    In the Form 10-Q for the first quarter of 2018 filed on May 1, 2018, GE reported that "we believe goodwill is recoverable for all of our reporting units." GE reported a goodwill balance for the Power segment of $25.9 billion.

229.    Despite claiming it considered all events or circumstances to date, GE gave only a boilerplate warning of the potential for impairment risks. GE did not conduct any interim impairment testing for any Power segment reporting unit and claimed goodwill was recoverable for all units.

### 3) GE's Second Quarter 2018 Form 10-Q Falsely Purports to Accurately Determine Goodwill

230.    In the Form 10-Q for the second quarter of 2018 filed on July 27, 2018, GE again reassured investors that Power segment goodwill required no impairment.

231.    GE claimed that it considered all events and circumstances in assessing fair value, including:

> (i) the results of our impairment testing from the most recent testing date (in particular, the magnitude of the excess of fair value over carrying value observed), (ii) downward revisions to internal forecasts or decreases in market multiples (and the magnitude thereof), if any, and (iii) declines in our market capitalization (and the magnitude and duration of those declines), if any.

232. GE then claimed that the fair value of the Power Generation reporting unit was 10% above carrying value, and the fair value of the Grid Solutions reporting unit was 9% above its carrying value (an increase of 1% from the prior quarter for that unit):

> As a result of this assessment, we performed an interim step-one impairment test at our Power Generation and Grid Solutions reporting units within our Power segment in the second quarter of 2018. The results of the analysis indicated that fair value was in excess of carrying value by approximately 10% for our Power Generation reporting unit and 9% at our Grid Solutions reporting unit. The goodwill associated with our Power Generation and Grid Solutions reporting units was $19,041 million and $4,586 million, respectively, representing approximately 23% and 6% of our total goodwill at June 30, 2018.

233. Here again, GE generically warned that a future impairment may be needed, but was silent as to the known impact of changed market conditions. Thus, GE affirmed that the fair value of goodwill in the two Power segment reporting units (which together comprised 29% of total goodwill) was well over its carrying value, reassuring investors in the security of goodwill.

234. GE reported a goodwill balance for the Power segment of $23.2 billion.

**E.** **GAAP Required that GE's Power Segment Goodwill be Materially Impaired by the Fourth Quarter of 2017 and First Quarter of 2018, and by $22 Billion at least by the Second Quarter of 2018**

235. Unfortunately for investors, the aforementioned statements regarding GE's goodwill were blatantly false and misleading because the finding that no impairment, or only a *de minimis* impairment, was necessary was based on a fair value determination and projected earnings and cash flows analysis that were materially false and misleading and omitted critical facts. Had Defendants conducted a meaningful inquiry into GE's impairment testing at the start of the Class Period, as they were required to do under GAAP, a material impairment would have occurred in the fourth quarter of 2017 and first quarter of 2018 and the full $22 billion impairment would have been taken at least by the second quarter of 2018.

### 1) GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that There Were No Alstom Synergies

236.    By the fourth quarter of 2017, it was abundantly clear that Alstom synergies had not and would not be realized. Defendant Flannery expressly stated that the "*deal in total has been a disappointment*" and was "*not an acceptable deal from a financial framework right now*." Flannery concluded that "[i]f we can go back in a time machine today, we would pay a substantially lower price than we paid, there's no doubt about that."

237.    In November 2015, GE identified four factors that would lead to significant synergies between the companies:

- $2 billion in incremental orders;

- Ability to win bids in the Middle East;

- Successful bid in Pakistan and elsewhere, because of combined cycle plant; and,

- Surge in sales of the highly profitable APGs.

238.    None of those factors materialized.

239.    First, even as early as 2016 and certainly by the fourth quarter of 2017, it was clear that Alstom was not producing incremental orders, but rather was a drag on GE's profitability. In every quarter of 2016 (the last year in which Alstom's finances were broken out from GE as a whole), Alstom was less profitable than the Power segment as a whole, with profit margins that were 6-12% lower than the Power segment for the same quarter. Flannery admitted this openly on November 13, 2017, when he revealed on an analyst call that the "negative[s]" to the Alstom acquisition have been "significant," and that the expected single-digit returns from the business were "disappointing, below expectations."

240.    Second, the combined companies did not win bids in the Middle East, as promised. In August 2017, Egypt announced that it had awarded the contract for two power

substations to Siemens – GE's main competitor – in a major project that ultimately added 14.4 GW to Egypt's power grid.

241.    The supposedly "successful bid in Pakistan" also had significant problems. GE's Pakistan operations were experiencing both delays and technical issues.

242.    Finally, there was no "[s]urge" in AGP sales. GE was forced to dramatically slash its 2018 gas turbine and AGP shipment forecasts in the fourth quarter of 2017. GE announced that it anticipated shipping between 31% and 41% fewer gas turbines and 50% fewer AGPs in 2018 than it had shipped in 2017. The reduction in forecasted shipments and actual orders not only meant less revenues and profits for GE, but is further evidence that GE had not realized the growth synergies that were supposed to come from the Alstom acquisition.

243.    Compounding these issues were external market factors that caused a paradigmatic shift in current and future projections for renewable energy, and a collapse in orders for GE's turbines and related revenue streams from servicing contracts, as set forth below. Significantly, these trends were predicted to continue to span through at least 2026.

244.    By the fourth quarter of 2017, GE admitted that Alstom failed to produce the expected accretiveness. For example, in a November 14, 2017 CNBC interview, Defendant Flannery commented, "we were looking at a high teens return.  I'd say were in a single-digit return." Significantly lower accretiveness than expected reflects that Alstom was not producing the hoped-for revenue; the cascading impact of the absence of Alstom synergies required GE to announce reduced earnings per share because the Power segment was weaker than expected.

245.    These fourth quarter 2017 facts reveal that a key risk for impairment – non-realization of Alstom synergies – had materialized by the fourth quarter of 2017. Nonetheless, GE did not materially impair goodwill.

### 2) GE's Projected Cash Flows and Fair Value Determinations Recklessly Disregarded that Increasing Energy Efficiency and Renewable Energy Penetration Had Caused a Market Dislocation

246.    GE further recklessly failed to have any reasonable basis for its projected cash flow because the gas power market was undergoing a severe dislocation.

247.    Reflecting the significant downturn in the global energy market, GE reduced its total sales forecast for new plant orders to 40 gigawatts in the fourth quarter of 2017, the lowest level in two decades, and 40% less than the average of the last fifteen years. That reduction in forecast orders, was a dramatic reduction even from GE's March 2017 forecast of 78 gigawatts, just eight months prior.

248.    In the fourth quarter of 2017, GE repeatedly noted the market dislocation.

249.    For example, on November 13, 2017, Stokes admitted on an investor conference call that the Company has had "a dislocation from where the market was going." Defendant Flannery described the Power market a "tough market" and, moreover, that GE had "exacerbated the market situation with some really poor execution."

250.    The next day, November 14, 2017, Flannery told CNBC that after spending "100 days just exhaustively crawling through the company," the Power segment faced "a challenging macro environment right now." He noted that "the market clearly has been substantially worse than what we forecast" at the time of the Alstom acquisition.

251.    GE's two primary competitors, Siemens and Mitsubishi – who together with GE are responsible for between 80 and 90% of the global market for large gas turbines – were even more outwardly pessimistic about the state of the energy market.  In November 2017, Siemens warned, "the [power] market is burning to the ground," and elaborated that "there are global trends coming that really indicate that this is a structural shift, a paradigm shift." According to Siemens, by 2017, "[t]he power generation industry [wa]s experiencing disruption of

unprecedented scope and speed. With their innovative strength and rapidly expanding generation capacity, renewables are putting other forms of power generation under increasing pressure." Siemens highlighted "massive changes in the market" and "dramatic overcapacity," arising from a market that was shifting "extremely quickly from conventional to renewable energies."

252.    Mitsubishi too acknowledged the market transformation's massive impact on its business by the end of 2017.  In 2015, it had forecast sales in 2017 of 2,000 billion yen. In a revision to its forecasts in late October 2017, it said that the 2017 sales for the Power Systems division (year ends March 31, 2018) would be about 25% less than this forecast and its projections for profitability would be missed by a far greater margin.  Mitsubishi explained that it "lowered [its] orders outlook because the booking of some large orders has been pushed back, and because the environment surrounding the thermal power plant business has become severe. Further, a decline in operational rates of gas turbines is eroding sales volume from after-sale servicing operations, and we expect this situation to continue for two to three years."

### 3) GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that there was Severe Overcapacity in the Energy Industry

253.    GE also did not have any reasonable basis for its fourth quarter 2017 cash flow estimates because there was significant overcapacity of energy in the power market.  Siemens AG cited the serious global overcapacity metric in its press release announcing drastic job cuts, noting that "[g]lobal demand for large gas turbines (generating more than 100 megawatts) has fallen drastically and is expected to level out at around *110 turbines* a year. By contrast, the technical manufacturing capacity of all producers worldwide is estimated at around *400 turbines*."

254.    The mismatch between demand and manufacturing capacity is referred to as overcapacity. Industry expert Stuart Slade from Forecast International explained that historically,

growing demand for electricity was met by increasing manufacturing of gas turbines and other traditional sources of generating electricity. But by the fourth quarter of 2017, improved methods of energy storage and the surge in renewable energy usage meant that increased energy demand no longer required increased gas turbine manufacturing.

255.    The dramatic drop in the price for renewable energy like wind and solar had fallen dramatically also contributed to the overcapacity problem affecting GE.

256.    As a result, worldwide demand for large gas turbines (like GE's signature H-class turbine) plummeted, with worldwide sales decreasing between 2011 and 2017 by nearly 49%. Between 2016 and 2017 alone, worldwide demand for large gas turbines dropped sharply by nearly a third in a single year. By 2017, Siemens forecasted that the demand for large gas turbines would continue to fall another 10% to just 110 per year:



257.    The very rapid decline in the markets for turbines and associated services adversely affected the prices that companies like GE could charge.  Specifically, between 2014 and 2017, the price of turbines (expressed as $ per kilowatt of capacity) had dropped 30%, as excess capacity drove producers to bid lower and lower prices. The implication of this is that the dollar value of the global gas turbine market fell by approximately 60% in that three-year period.

258.    At the same time, owners of gas-fired generating plants also became more reluctant to spend large sums upgrading their plants as the future of gas generation became murkier.

259.    Notably, using the United States as an example, overcapacity actually decreased by the time of the $22 billion write-down. By the end of 2017, peak demand was 766 GW, while the total capacity for the sector was 994 GW, leaving a spare capacity of 228 GW in the system. In 2018, peak demand was 777 GW, while the total capacity for the sector was 972 GW, leaving a spare capacity of 194 GW in the system (34 GW less than in 2017).

260.    Because of the overcapacity in the energy market and the ability to use greener energy as a first source, existing gas plants were working fewer hours each day, leading maintenance and emergency repair service needs to fall markedly. Servicing and maintenance needs are driven by the number of hours a gas turbine works (much like a car will need servicing sooner if it covers a large number of miles). The rise in renewables decreases the utilization of existing gas-fired power stations, at least in some countries, cutting into maintenance revenues for the main turbine suppliers.  Thus, for companies like GE who heavily relied on long-term servicing contracts for revenue, by the end of 2017, there were additional significant constraints on the Company's ability to generate cash flow.

### 4)  GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that GE Had to Slash the 2018 Gas Turbine Shipment Forecast by 40%

261.    GE took the dramatic step in the fourth quarter of 2017 to slash its 2018 shipment forecast – yet this fact was not incorporated in its projected cash flows used to determine the fair value of the Power segment goodwill during the Class Period.

262.    Specifically, GE announced that it anticipated shipping between 31% and 41% fewer gas turbines and 50% fewer AGPs in 2018 than it had shipped in 2017:

| DRASTIC REDUCTION IN SHIPMENT FORECAST compared to prior year | | | |
|---|---|---|---|
| | **Actual Shipments in 2017** | **Forecasted Shipments in 2018** | *% Decline* |
| **Gas Turbines** | 102 | 60-70 | *-31% - 41%* |
| **AGPs** | 80 units | 40 units | *-50%* |

263.    GE also forecast a clear collapse in the sales of Advanced Gas Path units that improve the performance of older turbines in late 2017.  This activity, part of the service side of GE's Power segment, had seen consistent rises in sales between 2013 and 2016, almost tripling in the period. In mid-2017, GE forecast that the rise would continue for that year, with expectations of 160 unit sales. On GE's third quarter earnings call, however, this number was reduced to 85, an almost 50% reduction in the space of three months. Then, in the November update, the estimate for 2018 was cut even further to "a number closer to 40."  This is a 75% reduction in sales forecasts for 2018 compared to the mid-2017 prediction for 2017. Sales estimate changes of this magnitude are extremely rare from large companies.

264.    The forecast reduction not only meant fewer sales of machines – it also meant a significant hit to the Power segment's profitability due to fewer service agreements.  A major component of GE's business model was selling service agreements to maintain, repair and obtain supply parts for gas turbine generators and steam turbine generators. The profit margin on long-term service agreements exceeded the profit margin on selling new machines, and was an important component of GE's business model.

265.    Long-term service agreements' profitability dropped for three distinct reasons:

- Reduced demand for gas turbines reduced the number of new long-term service agreements, because the customer base was not expanding;

- Reduced utilization of gas turbines due to the global trend towards renewable energy sources increased the time between necessary services, and therefore the time period over which customer payments occurred and revenue was recognized was extended; and

- GE bore the cost of inspecting and replacing H-class turbine blades due to the oxidation problem, which forced the Company to take on a significant unplanned expense.

266. The reduction in forecasted shipments and actual orders not only meant less revenues and profits for GE, but also demonstrated that GE had not realized the growth synergies that were supposed to come from the Alstom acquisition. It became clear by fourth quarter 2017 that those benefits could not be achieved because of reduced construction of and demand for new power plants.

267. In addition, GE completely disregarded that the problems with its flagship H-class turbine had affected orders and would further adversely impact 2018 Power cash flow and earnings.

### 5) GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that GE's Orders, Sales, Revenue and Profit Margins Had Crashed

268. The material collapse by the fourth quarter 2017 of critical Power segment orders, sales, revenues, and profit margins was also not incorporated in the projected cash flows.

269. For example, orders for GE's high-margin aeroderivatives and AGPs fell dramatically in the fourth quarter of 2017:

| DRASTIC REDUCTION IN ORDERS compared to prior year | | | |
|---|---|---|---|
| | *Q4 2016* | *Q4 2017* | *% Decline* |
| **Aeroderivatives** | 24 | 3 | *-87.50%* |
| **AGPs** | 58 | 24 | *-58.62%* |

270.    Additionally, sales were down significantly during fourth quarter 2017 compared to the same quarter in the prior year.

271.    GE at times refers to sales as shipments because the Company recognizes revenue – in other words, completes the sale – when it ships the product out to the customer.

272.    The fourth quarter 2017 saw a 90% drop in aeroderivative sales and nearly 60% drop in AGP sales:

| DRASTIC REDUCTION IN SALES | | | |
|---|---|---|---|
| compared to prior year | | | |
| | Q4 2016 | Q4 2017 | *% Decline* |
| **Aeroderivatives** | 31 | 3 | *-90.32%* |
| **AGP** | 62 | 25 | *-59.68%* |

273.    The Company's revenue was similarly hard hit.  As of March 2017, the Power segment forecast approximately $5.7 billion in operating profit for 2017.  But by November 2017, that figure was revised down to just under $4 billion, a cut of almost 30%.



274.   Additionally, the Power segment's profit margins took a dramatic downward turn by the fourth quarter of 2017:

| DRASTIC REDUCTION IN PROFIT MARGIN compared to prior year | | |
|---|---|---|
| Q4 2016[8] | Q4 2017 | *% Decline* |
| 24.4% | 2.8% | *-88.5%* |

275.   On November 14, 2017, JP Morgan analyst Stephen Tusa opined that the price to keep customers was hitting GE's profit margins: "We believe in general the 'cost to keep' [utility services customers] is higher than most think, also as price pressure."

**6)   GE was Motivated to Defer Impairing its Power Segment Goodwill in the Fourth Quarter 2017 Because it Had Already Taken a Dividend Cut and Rationalized its Workforce**

276.   By the fourth quarter of 2017, GE's financial situation had become dire. To save cash, it cut its dividend and laid off thousands of workers.

277.   The Power segment's devastating downward trajectory was particularly marked in GE's cash flow and cash flow assumptions. In June 2017, GE expected to generate a total of $12 billion of cash flow from its industrial operations. Just three months later, that figure was $7 billion. Of the $5 billion of deterioration, $3 billion was attributable to weaker cash flow in the Power segment.

---

[8] Alstom's profit margin for this quarter was less, at only 18.5%.

278.    Further, by the end of fiscal year 2017, GE's annual industrial cash from operating activities, had declined by nearly 27% from the year prior:

| ANNUAL INDUSTRIAL CASH FROM OPERATING ACTIVITIES Excluding Deal Taxes and Pensions Compared to Pre-Alstom Acquisition | | | | |
|---|---|---|---|---|
| 2015 (*Alstom acquisition*) | **2016** | *% Decline* | **2017** | *% Decline* |
| $12,237 | $11,611 | *5.10%* | $8,963 | *26.7%* |

279.    The cash-flow crisis demanded a material impairment in the Power segment in the fourth quarter of 2017.

### a.    GE Cuts the Dividend

280.    GE's cash flow crisis in fourth quarter 2017 necessitated a dramatic and historic dividend cut.  On November 13, 2017, GE announced that it was cutting its dividend for only the second time since the Great Depression.  Defendant Flannery explained that the dividend cut was necessary because GE did not have sufficient cash to support the planned dividend.  Indeed, even after the dividend cut, approximately 85% of GE's estimated free cash flow had to be expended to meet GE's dividend payments.

281.    GE's inability to maintain its dividend – a keystone of the Company from its inception – is in direct conflict with GE's maintenance of current and future earnings projections that allowed it to avoid a material or $22 billion goodwill impairment.

### b.    GE and its Competitors Conduct Mass Layoffs

282.    In the fourth quarter of 2017, GE and its competitors Siemens and Mitsubishi, all engaged in massive cost-cutting efforts, including tens of thousands of job losses around the world.

283.    In early December 2017, GE announced that it would reduce employment in the Power segment by 12,000, or about 18% of its worldwide workforce.  The job losses were planned to occur across the Division's worldwide locations.

284.    The Company pointed to the decline in the gas power market as the reason for the massive layoffs, stating that they were "driven by challenges in the power market worldwide. Traditional power markets including gas and coal have softened. Volumes are down significantly in products and services driven by overcapacity, lower utilization, fewer outages, an increase in steam plant retirements, and overall growth in renewables."

285.    In a December 7, 2017 press release targeted at UK workers, GE went further, finally admitting that:

> The market conditions have had a significant impact on GE's economic performance. Demand for new built power plants dramatically dropped in all OECD countries. Traditional utility customers have reduced their investments due to market deterioration and uncertainty about future climate policy measures.
>
> Today's actions are driven by challenges in the power market worldwide. Traditional power markets including gas and coal have softened. Volumes are down significantly in products and services driven by overcapacity, lower utilization, fewer outages, an increase in steam plant retirements, and overall growth in renewables. To get back to competitiveness GE Power needs to remove cost substantially from its businesses . . . These proposals are in response to changing market conditions; the worldwide power and grid segments are essentially flat, with regions such as Western Europe experiencing a decline. This increased pressure in the marketplace, coupled with intense competition and continuing pricing pressures, means GE Power has been working to eliminate costs, remain competitive and prepare for 2018 and beyond.

286.    Similarly, Defendant Stokes was quoted by *The Wall Street Journal* on December 7, 2017, stating that the layoffs were "necessary for GE Power to respond to the disruption in the power market, which is driving significantly lower volumes in products and services," and that he anticipated those challenges continuing into the future.

287.     Siemens and Mitsubishi both similarly reduced their headcount in reaction to the gas power market dislocation.  Siemens announced 6,900 layoffs in the fall of 2017, the vast majority of which would be in the company's power and gas division.  Mitsubishi cautioned that while it had sufficient orders in its power division to sustain profits for a few years, it planned to cut 30% of its power division workforce after 2021.  Mitsubishi also said it would reorganize factories and undertake other substantial cost reductions in the short term.

288.     Despite these severe measures, it was not enough.

### 7) GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that It was Struggling to Close Deals in Emerging Markets

289.     In the months preceding the start of the Class Period, GE repeatedly acknowledged – yet failed to incorporate in its projected cash flows by the fourth quarter of 2017 – the uncertain timing of deal closures and the complexities of working in emerging markets.  Indeed, the Company discussed these issues at length in 2017.  For example, during the January 20, 2017 investor call, Immelt stated: "On the negative side, we failed to close a couple of big Power deals in tough markets and in addition restructuring exceeded gains for the year." Bornstein added that: "We had six, arguably seven, but I would say six gas turbines that we absolutely thought were going to ship. Four of those were 13 E2 class turbines that were going into Bahrain and Iraq. These are just enormously difficulty geographies to get stuff done." He also noted that the Company was dealing with "really, really difficult geographies" like Libya where it is "really difficult" to get sales "across the finish line."

290.     During the October 20, 2017 call, Bornstein even explained the drivers of Power's "sharply lower" performance relative to expectations as a result of complex deal geography and financing issues: "Most of that miss was driven by aero and services volume. We'd expected to

ship twice as many aero units in the quarter, but due to customer financing needs and geographic deal complexity, these transactions did not close."

291.    Flannery reiterated that point a month later, during the November 13, 2017 investor call: "As we roll into 2017, we saw the market continue to soften. We believe that there will be lower convertible orders for our aero products than planned. Some of this just given market conditions, the complexity of doing some of those deals in some of the global markets, financing requirements that are needed."

292.    Nonetheless, these issues were not sufficiently taken into account by the Company in calculating its projected cash flows, reflecting that Defendants' fair value calculations lacked any reasonable basis.

### 8) GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded that GE had Profound Executional and Operational Issues

#### a.    Before and During the Class Period, GE Identified the Significant Financial Impact of its Project Execution and Operational Challenges

293.    By the fourth quarter of 2017 GE also acknowledged that project execution and operational challenges were a significant problem. However, yet again, it failed to sufficiently incorporate this known reality into its projected cash flows used to determine the fair value of its Power segment goodwill.  For example, on the July 21, 2017 investor call, Bornstein admitted that the shipment of at least three H-class Turbines were late due to both operational and execution issues. Similarly, during the October 20, 2017 investor call, one of the "three drivers" that Bornstein claimed caused the Power segment's dramatic underperformance was "poor execution resulting in project delays and cost of quality items."

294.    Flannery similarly acknowledged that the Company had significant execution problems in the fourth quarter 2017.  For example, during the November 13, 2017 investor call,

he explained that "field execution dynamics" led to underperformance in the transactional services business in 2017, including difficulty executing outages in the field that caused "overruns on some of the work."

295.    In a discussion of fourth-quarter financials, GE revealed that the Power segment's earnings were down 88% for the quarter for the fourth quarter of 2017, "driven by the market, certain execution misses, and other charges." And at the Barclays Industrial Select conference held on February 21, 2018, Jaimie Miller similarly emphasized that the Power segment's "very tough year" in 2017 was due both to market factors and "the execution side of it, so project overruns and/or just project execution."

### b.    The HA Turbine Defect and Related Loss of Orders and Long-Term Service Agreements

296.    In the fourth quarter of 2017, GE recklessly failed to incorporate in its projected cash flows the impact of the HA oxidation defect and its profound financial and reputational consequences. As Tusa revealed in his September 20, 2018 and October 10, 2018 reports, the financial consequences of the HA oxidation defect for GE were not limited to the immediate increased warranty and maintenance reserves. Rather, the HA oxidation defect destroyed the profitability of attendant long-term service agreements, required GE to pay make-goods to customers, cost GE market share, and revealed that the Power segment had no legs to stand on.

297.    Specifically, on September 20, 2018, right after GE partially disclosed the oxidation defect, Tusa immediately flagged that the defect had a profound impact on the profitability of long-term service impairments and put the $17 billion of Alstom goodwill at risk. Tusa noted that this could be a balance sheet issue for GE based on the $9.2 billion in contract assets reflecting expected cash profits from projected contract performance, as well as $5.1 billion in receivables and $8.9 billion in EFS assets.

298.     Tusa's October 10, 2018 report expressed further concern about the LTSA impact and related financial consequences for GE:

> *The issue as we see it is that with an unprecedented use of LTSAs, as reflected in their $71B services backlog (ironically viewed by everyone as a positive), they have guaranteed a fixed rate for the customer, and GE has based their margin on their expected productivity which is based on a few major outages and overhauls.* Interestingly, despite attrition, and flat to down unit sales, this backlog is UP from 2015, showing how important in 'value' these new H-frame deliveries are, typically a 100% capture rate for GE, *running against the argument that less than 1% of units makes the problem immaterial. We view this backlog more as a measure of exposure now* versus the positive moat Bulls believe it to be. Indeed, the issue here means likely multiple more overhauls, at GE's expense. Additionally, on the OE side, with the rapid decline in F-frame demand, *the future is owned by advanced class turbines like H, and we think higher insurance premiums and customer hesitancy, without the past crutch of GE Capital, means impaired share position and an installed base that will fade.*

299.     Tusa also pointed out that GE may be required to pay "make goods" for its customers missed operating hours representing "the difference between cost to produce and cost to buy power." That cost could not yet be calculated because GE could continue to incur these costs until all of the HA turbine blades were successfully replaced, a process which continues into 2019.

300.     Altogether, Tusa stated that the ultimate charges related to the oxidation defect could exceed $300 million, and looked more similar to problems that Alstom had with a new turbine model in the early 2000s, which totaled 4 billion euros in costs and liabilities for a remedy and make goods to customers.

301.     Tusa also concluded that the oxidation defect revealed broader issues at the Company and in the Power segment:

> [T]he issue at Power is much more fundamental and suggests something more systemic: the use of financial engineering to provide air cover for aggressive commercial behavior for which ultimately orders do not equal profits which do not equal FCF . . . We are cutting our estimates for Power and moving to a

Dec'19 PT of $10 on a lower multiple on a clearly impaired franchise that is set to deliver fundamentally weaker FCF.

302.   He further stated:

We are not sure what is left to determine 'asset value' here as issues like this are not solved by a simple recall and re-ship. These are engineering feats that need to be validated, typically taking time measured in years not months, and in long cycle technology businesses where a new product gets introduced every couple of decades, missing a cycle has long term implications.

303.   Additionally, the defect and GE's inability to promptly resolve the defect with sufficient, validated new turbine blades caused GE to lose orders. This is reflected in GE's market share loss to its competitors (see paragraphs 169 to 176).

304.   Tusa noted that this issue may lead to a lasting change in GE's place in the industry.  CCJ Online's October 8, 2018 report on the H-frame users September 12-13, 2018 group meeting compared the issues with GE's HA turbine to the introduction of the F-class turbine in the early 1990s, when problems quickly arose and units had to be air-lifted around the world to address serious deficiencies. That tumultuous period resulted in a drop from five major equipment manufacturers down to three. Tusa remarked that "these types of issues were enough last time around to *permanently change the balance of power and structure of the industry*, though we don't recall hearing about this volume of technology shortfalls with MHI and/or Siemens."

### c.   Problems at the Bhikki, Haveli, and Balloki Plants in Pakistan

305.   During the Class Period, GE also concealed from investors and omitted from its projected cash flows the scope and severity of the problems with its HA turbine in Pakistan (see paragraphs 94 to 103).

306.   While GE was attempting to manage the oxidation issue, GE learned about problems with its 9HA gas turbines that began operating in Pakistan in 2017. Within months, the

turbines began to experience numerous issues, including vibration, which may be linked to the oxidation defect.

307.    Specifically, GE's 9HA gas turbines in Bhikki, Haveli, and Balloki, Pakistan produced at levels well below their capacity and suffered from vibration problems. GE repeatedly denied the severity of the problems, including in a December 27, 2017 *Reuters* article denying any structural or systemic issues, and claiming that "every commercial HA site today is demonstrating exceptional performance levels for both output and efficiency." Ultimately, GE incurred $350 million in costs related to Gas Power projects arising from "project execution issues resulting in liquidated damages as well as partner execution issues."

### d.    The H-turbine and Closure of Inland Empire

308.    The failure of the H gas turbine – the predecessor to the HA[9] with its oxidation defect – and closure of the Inland Empire power plant also was not sufficiently incorporated into its projected cash flows.

309.    GE launched the H turbine in 2003. It was supposed to change the game for gas energy. It ran 200 degrees hotter than the earlier model and promised a 60% improvement in thermal efficiency. Trade publications described it as the "four minute mile" of gas turbine technology. However, although it may have been a technological success, it was "a commercial failure." GE anticipated selling thousands of these turbines, but only six combined cycle power plants were built using these turbines.

310.    The H turbine simply did not work well. Analyst Scott Davis with Barclays Plc said, "[t]he product was a disaster; it was just failing . . .They had to go back to the drawing board, and test and retest. It took them a long, long time."

---

[9] HA and H-class are synonymous; H is a different, predecessor model.

311.     In an April 2, 2015 Bloomberg News article, Victor Abate (then-CEO of power generation for the Power segment) said that the H turbine was overly complicated, making maintenance difficult and costly. He said, "[t]he serviceability was a little bit of a shortcoming . . . When you would take a power plant offline, it would take weeks just to get it where you could go in and do the maintenance you wanted."

312.     Two of these 7H turbines were installed at the Inland Empire Energy Center Project ("Inland Empire"), a $1 billion natural gas power plant in southern California owned by GE. Unit One went online in 2009 and Unit Two in May 2010.

313.     Unit Two had problems from the start. It was shut down at the time of commissioning due to damage, which was never fully explained by GE. But in a 2015 article, Matthew Layton, a supervising mechanical engineer with the California Energy Commission said one of the units suffered "a pretty massive failure" before it was connected to the grid and noted that "[w]e've seen very few catastrophic failures like that."

314.     And because GE did not have spare parts readily available, the restart was delayed.

315.     In March 2017, GE closed Unit Two for good, citing "economic considerations" as well as market and regulatory forces.

316.     GE ultimately closed the Inland Empire plant, just 10 years into its planned 30-year life cycle. GE stated that Inland Empire was not financially viable because of the changing market for and regulation of renewable energy in California and because the market for the 7H had never taken off; it was an "orphan" technology that GE would no longer support, including through the manufacture of replacement parts. GE stated that the plant "is uneconomical to support further." Industry analysts estimated that the early closure of the Inland Empire plant

represented a $670 million loss, plus lost revenue from the long-term service agreement on the plant, including due to the 2017 closure of one turbine.

317.    The Institute for Energy Economics and Financial Analysis's July 2019 report regarding the Inland Empire closure noted that GE's failure to candidly explain what went wrong at Inland Empire "show[s] signs of additional red flags. The limited transparency offered to investors regarding these significant failures should only push investment interest further away."

### 9) GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded the Falling Profitability of Long-Term Service Agreements

318.    GE also knew but failed to incorporate in its projected cash flows that by the fourth quarter of 2017 the profitability of Power segment long-term contracts was severely diminished.    A major component of GE's business model was selling service agreements to maintain, repair and obtain supply parts for gas turbine generators and steam turbine generators. The profit margin on long-term service agreements exceeded the profit margin on selling new machines, and was an important component of GE's business model.

319.    As discussed above in paragraph 265, GE's long-term service agreements' profitability dropped due to reduced demand, reduced utilization, and the unexpected cost of inspecting and replacing H-class turbines.

320.    All of these drags on GE's profitability and timing of billings on long-term service contracts manifested by the fourth quarter of 2017.

321.    Beyond those headwinds to profitability and timing of revenue generation, a February 21, 2018 *Wall Street Journal* article revealed that GE's sales tactics resulted in accounting manipulations that artificially bolstered revenue estimates: "[s]ome analysts have expressed concern GE's accounting for the upgrades masked pressure on the division. According

to former executives, the upgrades meant lower service fees for customers, in exchange for one-time upgrade costs, meaning that future sales were being pulled forward."

### 10) GE's Projected Cash Flows and Fair Value Determination Recklessly Disregarded Additional Financial Factors

322.    There were other financial pressures contributing to the problems in the Power segment that should have forced an impairment during the fourth quarter of 2017.

323.    For example, the *Wall Street Journal* reported that in September 2017, the GE Board learned that Power had too much unsold inventory and was discounting prices because of pressure to hit projected revenue targets. *The Wall Street Journal* reported that Immelt told GE's Board that the Power segment downplayed the impact on profit margins of offloading inventory at fire sale prices.

324.    This information should have caused the Board to closely examine and reduce the estimates of current and future earnings and cash flow. But the Board recklessly or intentionally allowed the inflated goodwill to remain on the books for another year.

325.    Additionally, in November 2017, the SEC launched an investigation into how GE recognized revenue from long-term service agreements. Under those agreements, GE booked revenue at present although the Company might not collect the cash for years or even decades.

326.    The launch of this investigation called into question a major claimed benefit of the Alstom acquisition and a key source of revenue for GE.  By the fourth quarter of 2017, revenue generated from long-term service contracts (such as performing repairs and maintenance) originating from GE and acquired with Alstom became increasingly important to the Power segment:



**GE contract assets, quarterly**

Source: the company

THE WALL STREET JOURNAL.



Figure 1: GE Contract Assets by Segment

327.   Analysts noted that the SEC's investigation into revenue recognition for long-term service agreements reinforced concerns about the opacity of GE's accounting.  Deutsche Bank analyst John Inch was quoted in *The Wall Street Journal* after the investigation announcement as saying, "[i]f you were concerned about black box issues in the past, aren't you much more concerned about it today?"

328.   Investors expected that GE would conduct a meaningful inquiry into factors affecting its goodwill analysis and would use reliable, reasonable metrics and assumptions when

performing the goodwill impairment test.  Investors could not know that GE relied upon improperly manipulated revenue numbers for long-term service agreements.

### F.      **GE's Sudden Impairment of $22 Billion in Goodwill Without Identifying a Single Specific Changed Circumstance or Event Underscores the Falsity of Its Goodwill and Fair Value Determinations**

329.    On October 1, 2018, the Company announced that Defendant Flannery was terminated, Larry Culp was named its new CEO, and that it anticipated taking a major goodwill impairment and would fall short of prior earnings and cash flow targets. Deutsche Bank noted the positive market reaction to the news about Larry Culp taking the helm, remarking that "GE stock's positive reaction to today's news (+10% at the time of writing this) speaks volumes about Larry Culp's market perception – and we totally get it." UBS stated "CEO Larry Culp likely to inspire confidence in turn-around potential." Tusa of JP Morgan said "I 'heart' Larry Culp."

330.    On October 30, 2018, thirty days after Defendant Flannery was abruptly terminated, and without any identification of a single specific change in circumstance, GE announced it was writing off $22 billion from its Power Segment ($15.8 billion in goodwill attributed to its Power Generation and Grid Solutions reporting units originally assigned from the Alstom acquisition).

331.     The goodwill impairment erased nearly all the goodwill for the Power segment, including GE's entire investment in Alstom, just three years after the acquisition was completed.

332.     Significantly, GE's justification for this massive $22 billion write-down was that in determining fair value, its "current and future projected earnings and cashflows" were adversely impacted by the "challenging" Power market, "overcapacity in the industry," "uncertain" deal closures, the "complexities of working in emerging markets," "increasing energy efficiency and  renewable energy penetration," and GE's "own underlying operational

challenges" – all conditions GE well knew had dramatically impacted the Power Segment beginning at least by the fourth quarter of 2017.

333.     GE explained its historically unprecedented goodwill write-down as follows:

Based on the results of our step one testing, the fair values of each of our reporting units exceeded their carrying values except for the Power Generation and Grid Solutions reporting units, within our Power segment. The majority of the goodwill in our Power segment was recognized as a result of the Alstom acquisition at which time approximately $15,800 million of goodwill was attributed to our Power Generation and Grid Solutions reporting units. As previously disclosed, the Power market as well as its operating environment continues to be challenging. Our outlook for Power has continued to deteriorate driven by the significant overcapacity in the industry, lower market penetration, uncertain timing of deal closures due to deal financing, and the complexities of working in emerging markets. In addition, our near-term earnings outlook has been negatively impacted by project execution and our own underlying operational challenges. Finally, market factors such as increasing energy efficiency and renewable energy penetration continue to impact our view of long-term demand. These conditions have resulted in downward revisions of our forecasts on current and future projected earnings and cash flows at these businesses.

334.     Thus, while GE claims these factors dramatically reduced the projected earnings and cash flows at these businesses in the third quarter of 2018, as demonstrated above, each of these market and company specific difficulties—including the known absence of Alstom synergies—were clearly established to have existed by the end of the fourth quarter of 2017 and demanded, at that moment, the profound downward revision in current and future projected earnings and cash flows that GE fraudulently delayed until the third quarter of 2018. Put differently, none of these factors underwent such an extraordinary increase between the second and third quarter of 2018 to justify the total reversal of GE's position on the fair value of the Power Generation and Grid Solutions reporting units.

335.     In addition to disclosing the $22 billion impairment, GE also disclosed that it was cutting its dividend to a penny, that the DOJ had launched a criminal investigation into GE's

goodwill accounting and that the SEC had expanded its investigation beyond just GE's revenue recognition for long-term service agreements and into its goodwill impairment. Finally, GE announced a reorganization of the Power segment to separate its Gas Power Systems business from the rest of the segment and to make the entire segment report to new CEO Culp, rather than to Defendant Stokes.

336.    The news came out first in a morning press release stating:

GE (NYSE: GE) announced results today for the quarter ended September 30, 2018. The Company reported a loss of $2.63 per share from GAAP continuing operations. As summarized in the attached reconciliation, adjusted earnings per share (non- GAAP) were $0.14, down 33 percent from the same period in 2017. The Company recorded a non-cash goodwill impairment charge of $22 billion, before tax, related to GE Power.

The Company also announced immediate actions to strengthen its balance sheet and position its businesses for success.

First, GE plans to reduce its quarterly dividend from $0.12 to $0.01 per share beginning with the Board's next dividend declaration, which is expected to occur in December 2018. This change will allow GE to retain ~$3.9 billion of cash per year compared to the prior payout level.

Second, GE intends to reorganize Power to accelerate the business' operating and financial improvements. GE plans to create two units — a unified Gas business combining GE's gas product and services groups, and a second unit constituting the portfolio of GE Power's other assets including Steam, Grid Solutions, Nuclear, and Power Conversion. The Company also intends to consolidate Power's headquarters structure to ensure these units can best serve their customers.

337.    On the October 30, 2018 investor call, GE's CFO Defendant Miller shared that "the SEC expanded the scope of its ongoing investigation to include the goodwill charge" and that the "Department of Justice is also investigating this charge."

338.    GE's third quarter 2018 results released that day also revealed the decimation of GE's gas turbine business and GE's own role in the failing Power segment. Customers around the globe were halting orders and the Company was incurring significant costs to inspect and

replace blades at existing machines. GE sold only 28 turbines in the first three quarters of 2018, compared to 63 in the previous year, also contributing to a decline in the loss of service agreements accompanying those sales.

339.    GE's third quarter 2018 Form 10-Q elaborated on why GE impaired the majority of the Power segment goodwill.  As set forth above, GE knew of all of these issues throughout the Class Period, yet recklessly insisted that its goodwill accounting was supported:

> Based on the results of our step one testing, the fair values of each of our reporting units exceeded their carrying values except for the Power Generation and Grid Solutions reporting units, within our Power segment. The majority of the goodwill in our Power segment was recognized as a result of the Alstom acquisition at which time approximately $15,800 million of goodwill was attributed to our Power Generation and Grid Solutions reporting units. As previously disclosed, the Power market as well as its operating environment continues to be challenging. Our outlook for Power has continued to deteriorate driven by the significant overcapacity in the industry, lower market penetration, uncertain timing of deal closures due to deal financing, and the complexities of working in emerging markets. In addition, our near-term earnings outlook has been negatively impacted by project execution and our own underlying operational challenges. Finally, market factors such as increasing energy efficiency and renewable energy penetration continue to impact our view of long-term demand. These conditions have resulted in downward revisions of our forecasts on current and future projected earnings and cash flows at these businesses.

340.    Even these explanations were misleading and subject to change. In GE's 10-K filed on February 26, 2019, it altered two key points in the explanation of the goodwill impairment. In the third quarter 10-Q, GE claimed that the discount rate it had used in the annual impairment test resulting in this goodwill impairment ranged from 9.5% to 17%. GE later changed that number. In the discussion of the annual impairment test in GE's 10-K filed on February 26, 2019, GE stated that the discount rate range for the 2018 annual impairment test ranged from 9.5% to 23.0% - a six percentage-point increase in the top end of the range, reflecting a larger range of discount rates than GE had contemporaneously claimed to have used.

Additionally, the 10-K stated that the goodwill impairment was caused by "increased price concessions on certain long-term contracts," a factor that GE omitted from its contemporaneous explanation.

341.    Also, on October 30, 2018, *The Wall Street Journal* published an article titled "GE's $22 Billion Charge Intensifies Regulatory Scrutiny." Former SEC Chairman Harvey Pitt noted the significance of the massive write-down and how the expanded investigations would focus in large part on the accounting for goodwill. The article stated:

> "Companies don't write down this amount of money and not get held accountable," said former Securities and Exchange Commission Chairman Harvey Pitt. "You have to get it right, and you start behind the eight-ball when the number is $22 billion."
>
> The charge is now a focus of two federal investigations into GE's accounting. The Justice Department is conducting a criminal investigation into GE's recent accounting practices, company finance chief Jamie Miller said on the company's quarterly earnings call Tuesday.
>
> That probe is in addition to an SEC investigation launched in November. GE Chief Executive Larry Culp declined to comment on the investigations. "They will play out as they play out," he told The Wall Street Journal.
>
> The investigations by the Justice Department and the SEC likely will focus on examining whether GE accurately followed accounting rules and corporate law when allocating goodwill on its balance sheet and when estimating the size of the write-down, Mr. Pitt said.
> "At issue will be how hard they [GE] looked at this, how diligent they were in considering whatever warnings were circulated internally and the rationale for ignoring those warnings," he said.

342.    The October 30, 2018 news caused GE's stock price to drop by 8.78%, from $11.16 at close on October 29, 2018 to $10.18 at close on October 30, 2018, on an exceptional volume of 344,976,676 shares traded.

343.    GE's stock price continued falling over the next few days as credit rating agencies downgraded GE following the goodwill impairment and dividend cut, both which are symptoms of insufficient current and future cash flow.

344.    On October 31, 2018, Moody's lowered GE's credit rating from A2 to Baa1.  In explaining its decision to downgrade GE, Moody's wrote: "The downgrade reflects Moody's view that the adverse impact on GE's cash flows from the deteriorating performance of the Power business will be considerable and could last some time." Moody's continued, "The weaker than expected performance at Power is not only attributable to a considerable drop in market demand and ensuing heightened competition, but also to GE's misjudgment of financial prospects and operational missteps."

345.    On November 2, 2018, Fitch lowered GE's credit rating two levels to BBB – just three levels above junk grade. In response, Jonathan Duensing, director of investment grade corporate debt at Amundi Pioneer, noted, "this is a company that has been struggling to manage their overall business platforms from an operational standpoint, and now it's in a situation where it's not only impacting the equity price, it's impacting the debt spreads because credit agencies moved on the credit rating and investors have lost confidence."

346.    GE's stock price continued a downward spiral in reaction to this news.   On November 1, GE's stock price closed at $9.58 per share and on November 2, it closed at $9.29 per share, following news that GE's credit rating had been lowered by Moody's.

347.    Likewise, GE's bond and preferred stock were affected by this news.  GE's $11.4 billion 8.7% bonds (cusip 36164QNA2) were issued July 1, 2016 and due 2035. That bond dropped 4.6%, starting at 90.08 of par at close on October 29, 2018 and declining to 85.94 on

November 2, 2018. Similarly, GE's perpetual preferred stock dropped 4.5% from $94.07 at close on October 29, 2018 to $89.88 on November 2, 2018.

348. The bond price declines, in particular, reflected the increased riskiness of lending to GE with its significantly reduced cash flow and resulting difficulty GE would face in borrowing additional funds, thus pushing the Company to rely more heavily on its credit lines.

349. On November 16, 2018, *The Wall Street Journal* commented on the decline in GE's credit rating. "Bond prices began their recent fall in late October when the company disclosed $22 billion in unexpected charges tied to its power unit, after reporting a $6 billion shortfall in insurance reserves in the first quarter. GE's bonds have been the most actively traded in the U.S. corporate-debt market over the past two weeks with more than $10 billion changing hands, according to MarketAxess."

350. The following chart demonstrates the dramatic decline in GE's bond price following GE's October 2018 disclosures:



351. Predictably, the goodwill write-down had a major impact on GE's balance sheet. At the end of the second quarter of 2018, GE's balance sheet included $342.8 billion in total

90

assets, $267.6 in total liabilities, and $71.8 billion in total equity. In the third quarter of 2018, after GE wrote off $22.0 billion of goodwill related to Power, GE saw a 31% reduction in equity in a single quarter, revealing that the Power segment had significantly reduced cash flow prospects and that Power segment's future was uncertain.

352.     Adding further uncertainty to the ability of the Power segment to rebound was the revelation that the turbine failures were impacting power plants around the world.

353.     In total, GE's share price at the end of 2018 represented a 74% decline and loss of $193 billion of shareholder wealth since 2016. During the same time period, the S&P 500 increased 33%:



*Source: Yahoo Finance, ChartIQ (accessed 3 May 2019, GE benchmarked against the S&P 500).*

### G.     <u>The $22 Billion Write-Down Reflected Not Changed Circumstances but Rather that New Leadership at GE Demanded Realistic Accounting Assumptions</u>

354.     The ultimate impairment was a total reversal from GE's Class Period conclusions that the Power Generation and Grid Solutions' reporting units' fair value exceeded carrying value or required only a *de minimis* impairment.

355. The disparity between the second and third quarter 2018 goodwill valuation and calculation is particularly striking, and compels the conclusion that GE's Class Period valuations lacked any reasonable basis. The second quarter 2018 and third quarter 2018 impairment analyses use the same data, yet arrive at opposite results. The second quarter 2018 interim impairment test considered the data as it existed "at June 30, 2018." The third quarter 2018 annual impairment test considered the data "as of July 1 of that year." But the outcome of the two tests could not be more different. GE announced that in second quarter of 2018 the Power Generation reporting unit's fair value was 10% over carrying value and Grid Solutions reporting unit's fair value was 9% over fair value. Then the third quarter results, examining data from the same time period, resulted in a $22 billion goodwill impairment due to reduced current and future earnings and cash flow projections.

356. GE's $22 billion impairment, following on the heels of its determination that fair value exceeded carrying value by 8%, reflected that GE did not have any reasonable basis in fact for its goodwill balance throughout the Class Period and that it failed to conduct a meaningful inquiry into the factors affecting goodwill valuation.

357. GE did not point to a particular transformative event that justified this dramatic change in assumptions that caused this impairment.

358. Instead, GE, under the new leadership of Larry Culp, explained this total reversal not by pointing to a major event but rather by the Power segment's purported continued deterioration from the significant overcapacity in the industry, lower market penetration, uncertain timing of deal closures due to deal financing, the complexities of working in emerging markets, project execution and our own underlying operational challenges, and increasing energy efficiency and renewable energy penetration.

359.   Continued deterioration does not cause a dramatic reversal in the fair value calculation, as occurred with GE's goodwill impairment.

360.   The goodwill impairment came to pass because of new leadership at GE who saw that the Company had not conducted a meaningful inquiry into factors affecting its goodwill valuation and/or the valuations lacked any reasonable basis and demanded change.

361.   In April 2018, GE's Board transformed, losing half of its membership and adding new members Larry Culp (renowned for successful company acquisitions), Leslie F. Seidman (former chair of FASB), and Thomas W. Horton (CFO who oversaw major airline merger).

362.   The new Board members' first close review of the Power segment's fair value occurred after late July 2018.  In conducting their formal review of the Power segment's fair value, the GE Audit Committee scrutinized the actual operating cash flows and future cash flow projections that management produced.  These seasoned board members recognized that the "good faith" estimates being presented by GE's then CEO Flannery and CFO Miller were unsupported.  Accordingly, just nine weeks after GE claimed that its Power segment's fair value exceeded carrying value by 9%, Defendants announced based on the same reporting timeframe, not only that fair value did not exceed carrying value, but also that a $23 billion impairment may be required (this figure was refined to $22 billion by the end of October 2018).

363.   After GE took the $22 billion write-down and Culp abruptly replaced Flannery as CEO, the Company later admitted that the predecessor regimes' accounting assumptions did not reflect reality.  For example, during the fourth quarter 2018 investor call on January 31, 2019, Culp admitted that the Company's prior revenue outlook did not reflect reality: "Embracing market reality means a more appropriate revenue outlook, one that is further grounded in the

reality of our $92 billion backlog rather than in the hope of new orders not yet won" and that the Company had not set "realistic commitments and returns" in prior years.

364.    Also, during the January 31, 2019 investor call, Culp admitted that stated GE was "late to embrace the realities of the secular and cyclical pressures in the business."

365.    These admissions were reiterated during the March 15, 2019 JP Morgan Aviation, Transportation, and Industrials conference, where Culp again stated that GE failed to utilize realistic assumptions and was "[l]ate to embrace market realities."

366.    GE's failure to apply realistic, GAAP-compliant assumptions to the goodwill calculation and valuation during the Class Period was false and misleading and in violation of GAAP.

**H.    GAAP Obligated GE to Conduct an Accurate Assessment of Goodwill Based on Reasonable Assumptions Which Required a Material Impairment in the Fourth Quarter of 2017 and First Quarter of 2018 and a $22 Billion Impairment in the Second Quarter of 2018**

367.    All of the factors discussed above demonstrate that GE's projected cash flows and fair value determinations in the fourth quarter of 2017, first quarter of 2018, and second quarter of 2018 required a goodwill impairment in the Power Generation and Grid Solutions reporting units.

368.    Indeed, by at least the second quarter of 2018, it is clear that the full $22 billion goodwill impairment was required.  The amount of that impairment can be quantified because as discussed above, paragraph 355, the second quarter and third quarter goodwill calculation relied on the same data set; accordingly, the ultimate goodwill impairment of $22 billion would have occurred in that same amount nine weeks earlier had GE applied realistic, GAAP-compliant assumptions.

369.    The absurdity of the Power Generation reporting unit's fair value swinging from 10% over carrying value in the second quarter to under carrying value and *all* of its goodwill being impaired lays bare the fraudulent nature of GE's Class Period accounting, including during the fourth quarter of 2017 and first quarter of 2018.

370.    It is clear from the facts discussed above in Section E (including the absence of Alstom synergies, market dislocation, and executional and operational challenges) and ultimate impairment that a material impairment should have been taken in the Power Generation and Grid Solutions reporting units in the fourth quarter of 2017 and clearly in the first quarter of 2018 after GE adjusted guidance.

371.    Notably, however, GE took numerous steps to actively conceal from investors the information necessary to identify the amount of the impairment that should have been taken in the fourth quarter of 2017 and first quarter of 2018.

372.    First, GE's accounting is intentionally opaque.  Indeed, analysts and the media have consistently noted GE's opaqueness with respect to its accounting practices, including for cash flow.

373.    For example, analysts noted "significant uncertainty" about the Alstom acquisition because GE did not disclose Alstom's balance sheet. Analysts lamented their inability to construct cash flow analyses that have "any credibility" due to GE concealing key information from investors. Others noted it was "unclear" how GE measured its cash flow in the fourth quarter of 2017. *The Wall Street Journal* noted that "analysts and investors have long regarded GE's accounting and some its holdings as a 'black box'" and that sentiment was echoed by RBC analysts, who stated with respect to GE's long-term service agreements that "this area of GE's balance sheet has historically been viewed as a 'black box' with little to no transparency."

*Fortune* magazine noted that GE was an "overly-secretive company" that "reveale[ed] . . . little about an arcane business where analysts need lots of data to assess." *The Wall Street Journal* further noted that "GE's accounting has long been a subject of scrutiny" and that, with respect to its contract asset accounting, "[t]he [reported] level of contract assets relies in part on GE's own estimates and assumptions about how much profit it will ultimately reap from those contracts, and analysts have said they have little visibility into those estimates."

374.   Second, GE intentionally obscures the discount rate used for its goodwill impairment test. In fact, GE did not disclose to investors the precise cash flow discount rate that it used for annual goodwill impairment testing of each reporting unit; did not provide any information about the discount rate used for interim impairment testing; and after the end of the Class Period, even changed the range of discount rates that it claimed to have used for the third quarter annual impairment test.

375.   GE provides a range of discount rates used for annual impairment testing for all of its reporting units. By concealing (1) where a particular reporting unit falls within the range and (2) whether GE has increased or decreased the discount rate applied to that reporting unit over time, investors and analysts cannot probe the goodwill calculation to determine whether it aligns with reality, as required by the accounting standards.

376.   GE did not provide any information regarding the discount rate used for interim impairment testing of the Power Conversion reporting unit in the fourth quarter of 2017 or of the Power Generation and Grid Solutions reporting units in the second quarter of 2018.

377.   Further, GE reported a 9.5% to 17% discount rate in the third quarter 2018 10-Q, but then in the 2018 10-K increased that range to 9.5% to 23.0% - a six percentage-point increase in the top end of the range.

378.     This discrepancy in reporting makes it impossible for investors to understand what discount rate was applied to the cash flow analysis and further conceals from investors how GE decided to impair goodwill.

379.     GE's opaque accounting for its goodwill is notorious.  Indeed, GE has a long history of accounting fraud, enabled in part by the opacity of GE's accounting. "[A]nalysts and investors have long regarded GE's accounting and some its holdings as a 'black box.'"

## I.     Post-Class Period Revelations

380.     After the close of the Class Period, the extent of GE's manipulation of long-term service agreements—a key revenue booster for the Power segment and, therefore, a critical metric in the goodwill impairment analysis—continued to trickle out.   One way that GE manipulated service contracts was by offering steep price reductions on equipment to entice customers with the hope of securing a high volume of service agreements, which had the effect of appearing to generate income but at the expense of maximizing profitability.

381.     On February 13, 2019, in an article entitled, "GE Power has a 92 Billion Backlog. For the New Boss, That's a Problem," The Wall Street Journal noted the opacity of GE's accounting, explaining that, "[t]he power backlog is large, but there is little information on what it contains partly because the details of commercial agreements with customers are kept private. The backlog includes both equipment orders and service contracts, some of which cover more than a decade."

382.     The article also described the sort of practices that led to false internal assumptions and delayed the impairment of Alstom goodwill.  For example, "It sold equipment upgrades to some customers by rolling them into existing service contracts. It also changed its profit assumptions for such agreements to record gains."

383.     The *Wall Street Journal* went on to report that in order to change this culture of "using aggressive accounting to dress up the business," under Culp's leadership, GE has changed its compensation practices so sales teams will focus on margins, rather than volume of sales at the expense of profitability.

384.     Additionally, as discussed further below, paragraph 402, after the Class Period ended, *The Wall Street Journal* confirmed that the GE Board was keenly attuned to Tusa's reporting on the Company because they acknowledged its accuracy and tried to stop any leaks to him. During the Class Period, Tusa expressed concern about the Power segment's goodwill, including noting in a February 26, 2018 report that "[p]ower goodwill, noted by rating agencies as a factor in their future analysis, is increasingly at risk, especially the $4.5B in Grid Solutions."

### J.   Additional Facts Evidencing Scienter Regarding GE's Failure to Materially Impair Goodwill by the End of Fourth Quarter 2017

#### 1)   There Was No Transformative Internal or Industry Event that Justifies the Magnitude of the Third-Quarter 2018 Impairment

385.     As discussed above, Section G, the absence of a transformative internal or industry event explaining the total reversal in current and future earnings and projections further demonstrates that Defendants were concealing their failure to apply realistic, GAAP-compliant accounting assumptions during the Class Period.

#### 2)   The Speed and Volume of the Goodwill Impairment Alongside Flannery's Removal as CEO and Divisional Reorganization Strongly Demonstrates Goodwill was Inflated at All Times During the Class Period

386.     The volume of the goodwill impairment, the fact that it occurred just nine weeks after GE's second quarter 2018 statement that goodwill needed to be only slightly impaired based on the same metrics, and the fact that the impairment occurred in one fell swoop immediately after new leadership joined the Company, supports an inference of scienter. In April 2018, GE's board shrank from 18 seats to 12 and three new members joined the board:

- *H. Lawrence Culp, Jr.* was the former CEO and President of Danaher Corporation where he transformed the company from a manufacturer into a leading science and technology firm. Culp was known for a disciplined capital allocation approach, growing market capitalization and revenue five-fold during his fourteen years at the head of Danaher.  His success there also included a series of strategic acquisitions and dispositions.  Some analysts particularly cheered Culp's nomination as "he hails from a well-run, highly respected company and would be well positioned to help Flannery with what's needed at GE."

- *Leslie F. Seidman*, former chair of FASB, a widely recognized accounting expert and recipient of numerous industry awards, former VP of Accounting Policy at JP Morgan, former auditor at EY, the founding Executive Director for Pace University's Center for Excellence in Financial Reporting and at the time of nomination a current director at Moody's Corporation and Chair of its Audit Committee as well as acting as a Public Governor of FINRA and chair of its Audit Committee.

- *Thomas W. Horton* was lauded for his strong financial skills and had previously served as CFO for American Airlines where he oversaw the restructuring of the company as well as its merger with US Airways. He was also the CFO at AT&T, helping strengthen its financial position and ultimate merger with SBC to become AT&T Inc., and was a Senior Advisor at Warburg Pincus LLC at the time of his nomination.

387. These new directors influenced the annual impairment process for GE and pushed back on the lack of meaningful inquiry that enabled future cash flow assumptions which could not be supported because of the dislocation in the gas power market and GE's internal problems with warranty issues surrounding their large turbines, as well as other execution issues.

388. Accordingly, on October 1, 2018, just months after these new members boasting impressive accounting and acquisition backgrounds joined the Board, GE announced that Culp would replace Flannery as the CEO and that the Company anticipated taking a major goodwill impairment in its Power segment.

389. Then, on October 30, GE announced that it would take a $22 billion impairment and that the Power segment would be wholly restructured to separate the poorly performing gas products and services from the Power segment's other assets (including Steam, Grid Solutions, Nuclear, and Power Conversion) and that the new division would report to new CEO Culp, rather than Defendant Stokes.

390.    GE's impairment charge was reported by *The Wall Street Journal* as the largest goodwill impairment in recent corporate history.  The last such significant impairment was over ten years earlier, in 2008.

391.    A massive goodwill impairment preceded by only *de minimis* prior impairments is indicative of at least severe recklessness, if not intentional fraud.  Indeed, the impairment immediately caught the eye of the United States government. GE announced on October 1, 2018 that it anticipated taking a goodwill impairment and by October 31, 2018, when it actually took the goodwill impairment, civil and criminal government investigations by the SEC and DOJ were underway.

392.    The historically significant goodwill impairment combined with the Board turnover, abrupt termination of the CEO – whose most important achievement launching him to the helm of GE had been the acquisition of Alstom – and reorganization of the Power segment further compounds the inference of at least severe recklessness.

### 3) Defendants, Particularly Flannery, Were Personally Motivated to Maintain Goodwill That Violated GAAP Because Jobs Were on the Line

393.    Defendants were motivated to conceal the need for a goodwill impairment because admitting the need for the impairment put their jobs at risk.

394.    Defendant Flannery was brought in as the CEO of General Electric in large part due to his role in the Alstom acquisition. The press release announcing his appointment noted the acquisition as a major accomplishment.

395.    Flannery was deeply knowledgeable about developments in the Power segment because of its importance to GE overall.  As a William Blair & Company research analyst wrote after Flannery's ouster, "[u]nder Flannery, GE Power would have been core."

396.    If Alstom failed, the Power segment failed, and so too did Flannery. Indeed, when the Company finally reckoned with the need for the total goodwill impairment, Flannery was fired. After Flannery's ouster, a report noted that the issues in the Power segment "carried a particular sting for Flannery" because his plan to turnaround GE depended on salvaging Power, as well as aviation and healthcare.

397.    Flannery's personal motivation was to hope for a turnaround, despite the clear facts to the contrary, in order to salvage his job and reputation.

398.    After five years at GE, Defendant Hauser left the Company shortly before the goodwill impairment cover-up was revealed. Hauser was GE's Vice President, Controller, and Chief Accounting Officer. She is the only signatory to GE's Form 10-Q for the first and second quarter of 2018, which contain the materially inflated goodwill numbers.

399.    On July 26, 2018, Hauser announced her intention to retire. She was replaced effective just a few weeks later on September 10, 2018.

400.    Then on October 1, 2018, after GE announced it anticipated needing to take a massive goodwill impairment, the Company installed a new CEO (Culp), new Chief Accounting Officer, and new General Counsel—replacing GE's homegrown leadership that had fraudulently concealed the structural issues within the Power segment. Outsider Culp took drastic, immediate steps to re-position Power.

401.    Finally, on July 31, 2019, Jamie Miller stepped down as CFO.

### 4)  The Board was Paying Close Attention to Tusa's Reports

402.    After the Class Period ended, *The Wall Street Journal* confirmed that the GE Board was keenly attuned to JP Morgan analyst Stephen Tusa's reporting on the Company, which accurately predicted the scope, severity, and systemic nature of issues in the Power

segment.   He "had an uncanny knack, time and again, for uncovering deep problems before they were public."

403.    Tusa was right about GE—and GE's Board, including Defendant Flannery, knew it.  "One former senior GE executive said" to *The Wall Street Journal* that "Mr. Tusa's reports were painful to read, but were thorough and largely correct. 'I tip my hat,' this executive said. 'At the end of the day, our problem is not Steve Tusa.'"

404.    Tusa's reports were so accurate that the Board believed he was relying on an insider.  According to *The Wall Street Journal*, "[t]he board and advisers would scrutinize Mr. Tusa's reports. *GE even launched a hunt for leakers, a board member questioned JP Morgan about the research and the bank conducted an internal review*, people familiar with the matter said . . . At GE, there has long been a suspicion that Mr. Tusa had a network of contacts inside the company that fed him information, according to former executives and people familiar with the board. The detailed knowledge of the company in his research notes was seen by some as being suspiciously accurate . . . *In looking for leaks, no one was above suspicion, even board members were commanded to keep their mouths shut*, the people said, and GE took extra steps to keep any developments under wraps."

405.    During the Class Period, Tusa was repeatedly out ahead of the Company in identifying the scope and severity of the HA turbine defect and its financial impact, including on long-term service agreements.

### 5) Non-Impairment Gave Defendants' Cover to Conceal the HA Turbine Problems and Consequent Financial Implications

406.    At the same time that Defendants were recording materially inflated goodwill and failing to timely impair it, they were covering up the major oxidation and vibration problems with the H-class gas turbine.

407.    The concealment of the HA turbine defect and its financial consequences from investors further supports an inference of scienter with respect to the goodwill calculations and valuations throughout the Class Period.

408.    Defendants were motivated to not timely impair the materially inflated goodwill because doing so would expose the problems in the Power segment, including that the H-class gas turbine had not proved to be the "crown jewel" and driver of the Power segment's future success that GE touted it to be. Revealing the problems with the H-class turbine would show that Power's financial model was fundamentally broken due to the combination of existing service contracts becoming unprofitable due to the costs of repairing and replacing the blades, lost future orders and service contracts, as demonstrated by GE's lost market share.

### 6) Defendants Conceal their Goodwill Fraud through Inappropriate Treatment of Service Agreements Under GAAP

409.    GE obfuscated many metrics related to service agreements, which made up a significant portion of the Power segment's revenue during the Class Period.  GE concealed from investors the assumptions and methodology that it used to determine expected profits over the life of service agreements, the timing of customer payments over the life of the contract, and the method for predicting utilization rates for turbines and other equipment.

410.    As GE noted in its 2017 Form 10-K, predicting the use of GE turbines and other equipment over the life of a contract is critically important to assessing expected revenues and profit margins from service contracts: "a significant estimate in determining expected revenues of a contract is estimating how customers will utilize their assets over the term of the agreement."  GE further stated that it "gain[s] insight into future utilization and cost trends . . . through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods."

411.    Through GE's Data Center in Atlanta, Georgia, GE had real-time access to customer utilization rates for gas turbines and other equipment under service contracts that were otherwise unknown to the public.  This allowed GE to carefully follow trends in utilization, making its use of outdated utilization data unjustifiable.

412.    GE also concealed from investors that it was underpricing service agreements in a last-ditch effort to retain customers. This issue was identified by Tusa in an April 6, 2018 analyst report, stating:

> In an effort to lock down the core of the future asset value story at GE Power, GE has been underpricing both transactional and renegotiated CSAs to drive retention. This is more of an issue for GE vs competitors, given a weak macro for the OE market, as customers begin to push back on price, the leader has more to lose, and this explains the significant decline in Power Services profits/margins as GE specific, something that's unlikely to recover quickly unless they walk away from lower margin contracts . . . which in the end impacts revenue and ultimately cash flow.

413.    Concealing that GE was engaged in aggressive short-term strategies to retain customers at the expense of steady and predictable long-term profits helped GE conceal the need to impair goodwill.

### 7) The Individual Defendants Were Well Aware of the Power Segment's Collapse

414.    The Individual Defendants understood the implications of the Power segment's devastating financial results and outlook and, consequently, its goodwill.

415.    For example, on October 20, 2017, Defendant Flannery described GE's financial results as "completely unacceptable," largely as a result of the Power segment's failure to achieve forecasts.

416.    Similarly, Defendant Bornstein said, "[m]ost recently Power emerged as a real challenge in terms of volume, profitability and cash flow," and that the Power segment's

performance "was sharply lower than we expected."   He admitted that "all in, it was a very disappointing quarter and outlook for 2017."

417.    Finally, in June 2017, analysts had been looking for GE to produce annual earnings per share of at least $2 in 2018. In a November update for shareholders, management forecasted a figure of just $1.00-$1.07, or little over half as much as had been predicted just a few months before.

**8)   Defendants Were Motivated to Maintain GE's Credit Rating**

418.    As discussed above, GE was wholly reliant on the Power segment for its success during the Class Period.  Impairing goodwill—and thereby revealing the problems in the Power segment—threatened GE's ability to maintain a sufficiently high credit rating.  Analysts noted this connection before the impairment.  Even in February 2018, JPM analysts noted that the status of the Power goodwill would be a factor in the credit rating agencies' future analysis.

419.    On September 20, 2018, after GE first announced the HA oxidation issue, Tusa of JP Morgan noted "[e]ven the rating agencies have said a lack of progress in power profit improvement or a major write down of contract assets could drive a downgrade."

420.    Then, on September 25, 2018, a Motley Fool analyst stated that "a recovery in the power segment is an integral part of GE's plan to reduce its net debt-to-earnings ratio *in line with what credit rating agencies typically expect* for investment-grade debt."

421.    Similarly, on September 27, 2018, RBS stated, "[i]n our view, the biggest impact of an Alstom write-down would be if it triggered a downgrade of GE's credit ratings."

422.    GE announced the potential goodwill impairment on October 1, 2018. That day, Deutsche Bank analysts stated that the impairment "could call the company's credit rating into question – which could necessitate another (larger-than-expected) dividend cut, and also sends a clear message about just how much value was destroyed via the Alstom acquisition."

423.    This analyst's prediction came to pass.  Immediately after the announcement of the potential goodwill impairment, GE's credit rating suffered.

424.    S&P's October 2, 2018 release announcing GE's downgrade from A to BBB+ just a day after GE announced that it anticipated a $23 billion impairment. S&P said in a release, "The latest news on power performance [announcing a potentially $23 billion goodwill impairment] has led us revise down our view of GE's aggregate competitive positioning, with solid performance in aviation and health care further overshadowed by weakness in the power segment." Also on October 2, 2018, Moody's placed GE under review for a credit downgrade. Moody's explained: "Among the range of issues that Moody's will consider is the impact on GE's earnings and cash flow prospects of the continuing deterioration in its Power business, which is likely to persist for some time." Then on October 31, 2018, after GE actually took the impairment, Moody's lowered GE's long-term debt credit rating from A2 to Baa1, just two notches above the non-investment grade cutoff. Just a few days later, on November 2, 2018, Fitch lowered GE's credit rating from A to BBB+, just three levels above junk grade. A few months later, in February 2019, Fitch changed the outlook from Stable to Negative.

425.    Credit ratings agencies look to cash flows to determine how likely a company will be able to pay interest and principal on debt. As the following chart showing one-year maturity interest rates by credit rating during the Class Period demonstrates, the reduction in GE's credit rating significantly impacts its cost of borrowing.  This is because lower credit ratings result in increased rates on debt and increased interest expense.



426.    Defendants were therefore incented to avoid any acknowledgment of reduced expected future cash flows, including a write-down of goodwill, because of the known negative impact that would have on its credit rating.

### 9)   Defendants Were Motivated to Maintain GE's Dividend

427.    Because cash flow and future demand are such central metrics in the goodwill impairment test, significantly impairing the Power segment's goodwill would reveal that GE had insufficient cash flow to pay out future dividends, and that the prospects for Power were weak.

428.    In January 2018, in a discussion of the work lying ahead for John Flannery, RBC acknowledged that "recent disclosures about the missteps of Power and free cash flow shortfalls have been unsettling, in our view."  Indeed, just two days after the impairment was announced, *The Wall Street Journal* explained, "[t]he concern, analysts say, comes from a $23 billion write-down in its biggest business—which makes power turbines—and a warning that cash flow is going to be softer than expected. Worries about cash flow have led investors to fear the conglomerate will need to cut its once-reliable dividend yet again."

429.    Analysts were quick to link the Power segment's troubled cash flow forecast with a likely dividend cut.  "The dividend payout is swallowing most or all of GE's projected free

cash flow, which has cratered due to its slumping power segment and trouble in its financial arm." Another analyst in the same article, Jack De Gan, Chief Investment Officer at Harbor Advisory, explained, "They're going to have to eliminate the dividend. They don't have the balance sheet to support it." When GE stopped inflating its cash flow forecasts, it was forced to reduce its dividend and cut the goodwill—both of which are direct expressions of cash flow. While GE referred to the goodwill write-down as a "non-cash" impairment, the goodwill write-down was in fact an acknowledgment of the reduction in GE's expected future cash flows. Specifically, the goodwill write-down resulted from reducing the fair value of sub-units within the Power segment as estimated using discounted cash flow analyses. When expected future cash flows are reduced, fair value correspondingly goes down.

430.    GE's 10-Q for third quarter 2018 announced the goodwill impairment and noted that various conditions had resulted in "downward revisions of our forecasts on current and future projected earnings *and cash flows*…"

431.    GE's dividend has historically been a major attraction to investors and the consistency of the dividend had made GE unique among its peers. In November 2017, and based on impairments in other GE business, GE cut its dividend almost in half. Cutting the dividend already had been a difficult decision leading to serious unrest in the investor community. The Company knew that even this 50% dividend cut could cause many long-time shareholders in the 125-year-old conglomerate to flee, making the Company extremely reluctant to cut its dividend any further. Indeed, the stock dropped 7% on the news that a dividend cut was going to occur – the stock's worst single-day decline since the recession.

432.    Defendants knew that nearly eliminating the dividend would cause a major backlash from investors.

433.    Beyond the actual payout of the dividend, the dividend also serves as a proxy for the financial health of a company.  "The absolute last thing that a company wants to do is to cut its dividend," says Bob Johnson, president and CEO of the American College of Financial Services in Bryn Mawr, Pennsylvania. "It is the strongest signal the company could possibly send that it is in financial trouble."  Accordingly, Defendants were motivated to maintain the goodwill number to maintain the appearance that the prior dividend reduction had been sufficient.

### 10) Defendants Were Motivated to Remain on the Dow Jones Industrial Average

434.    Taking the necessary goodwill impairment would have resulted in a major stock drop, which would significantly increase the likelihood of GE's removal from the Dow Jones index in which GE had been a continuous member since 1907 and claimed status from being its last original member.   Accordingly, Defendants were motivated to conceal the need for impairment in order to maintain General Electric's spot on the elite index.

435.    Indeed, GE was removed in June 2018 – and the S. & P. Dow Jones Indices which owns the Dow cited GE's sliding stock price as a contributing factor in its removal.

### 11) GE Has a Long History of Similar Accounting Concealment

436.    Over and over again, GE fails to monitor and ensure the accuracy and integrity of its accounting.

437.    In 1994, a GE trader was discovered to have exploited a computer flaw to generate false profits, forcing GE to take a $350 million charge when the misconduct was discovered. A *New York Times* investigation revealed that although this single trader accounted for over 25% of the division's income, executives never bothered to understand where the money was coming from or why this individual was so unusually profitable.

438.    In 2009, the SEC charged GE with accounting fraud, alleging non-compliant financial reporting practices between 2003 and 2009. The Company was alleged to have engaged in illegal accounting maneuvers in order to meet or exceed analyst expectations, including inflating revenue and earnings and dampening volatility in results. In a statement, SEC Enforcement Division Director Robert Khuzami said, "GE bent the accounting rules beyond the breaking point . . . Overly aggressive accounting can distort a company's true financial condition and mislead investors." The Company settled the charges for $50 million.

439.    In January 2018, the SEC announced an investigation into GE's accounting for GE Capital's long-term care insurance portfolio. This investigation came on the heels of GE announcing a $6.2 billion charge in fourth quarter 2017 and that it would spend $15 billion to boost reserves over a seven-year period. That investigation is still ongoing.

440.    As one analyst put it, "[a]t the end of the day GE evokes aggressive accounting."

441.    As another noted, "[a] series of broken promises, presentation 'errors' that later have to be corrected, a continuing tendency to micromange Wall Street expectations to orchestrate optical 'beats' and an unwillingness to do away with heavily engineered earnings adjustments have cost GE dearly in the credibility department."

### 12) KPMG's Audit Opinions Do Not Immunize Management's Unreasonable Estimates

442.    For over one hundred years, KPMG, LLP ("KPMG") has been GE's public accounting firm.

443.    In recent years, KPMG's work has come under intense scrutiny by the Public Company Accounting Oversight Board ("PCAOB") and the SEC. The PCAOB and/or SEC has found KPMG's audit standards to be deficient, including with respect to goodwill testing, in 2014, 2015, and 2016. KPMG admitted that even as of January 25, 2019, it had not sufficiently

addressed and remedied the failings outlined in the PCAOB reports and is currently in the process of completely revamping its audit procedures and training as a result of a settlement agreement with the SEC arising out of its failures in connection with audits concerning goodwill assessments.

444.    GE initially defended its decision to continue using KPMG despite the concerns raised by the PCAOB, including by claiming that the thorough oversight provided by the Board's Audit Committee would ensure KPMG's performed its audit work appropriately. Shareholders did not share GE's confidence. At the April 2018 annual meeting, 35% of shareholders voted to oust KPMG as auditor. By the end of 2018, prompted by the "severity and ongoing nature" of GE's accounting issues, the two most well-known proxy advisory firms (Institutional Shareholder Services and Glass Lewis & Co.) took the extremely rare action of advising GE investors to vote against KPMG at the spring 2019 meeting.

445.    As a result, the Audit Committee announced that KPMG would stay on as auditor for the 2019 audit, but opened a tender process to determine whether it should be replaced.  At least one advisor to union pension funds, Ctw Investment Group, has continued to urge GE to replace KPMG and has called the company to task for the "lack of urgency from the audit committee and from the board" noting "no credible plan [exists] to deliver a reliable audit in 2019 or future years."  At the 2019 Annual Meeting 11.9 % of shareholders voted against the retention of KPMG as GE's auditor.

## VI.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

446.    On December 4, 2017 (the first day of the Class Period), GE issued a press release on its website announcing that GE's "largest and most efficient gas turbine, the HA, is now available at more than 64 percent efficiency in combined cycle power plants, higher than any other competing technology today." GE further stated:

The HA is our most advanced gas turbine technology, and we've never stopped pushing the boundaries of what it can do," said Joe Mastrangelo, president and CEO, GE's Gas Power Systems. "With the ability to deliver 64 percent efficiency, GE is proud to achieve an industry first and offer customers *the most efficient gas technology available in the world today.*" According to GE Power's estimates, *an additional percentage point of efficiency in gas turbines can translate to millions in fuel savings for customers globally. . . . The new combustion system has already been successfully tested at full-load and full-speed* at GE's test stand in Greenville, South Carolina.

*The HA is a proven technology* – with 70+ orders to date – and is being deployed by customers worldwide. . . .

447.    The quoted statements in the foregoing paragraph regarding the efficiency of the H-class turbine, including its "successful" testing, and the "proven" nature of the H-class turbine technology were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects—eliminating the benefits of "efficiency" GE touted. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made because, among other things, (1) there were two instances of oxidation in 2015, one leading to a blade break; (2) in response to the 2015 incidents, GE conducted a root-cause analysis, worked on new protective coatings and altered a heat treatment process for the defective component; (3) when GE inspected turbines containing blades with the supposedly improved special coating, it found blades showed early stages of cracking after only 7,000 hours and observed cracking after 12,000 and 16,000 hours; (4) in mid-2017 and prior to this statement, GE sent a technical information letter to customers and worked with some HA unit customers to resolve the oxidation issue; (5) on September 24, 2018, it was revealed that GE had known of the oxidation issue for at least a year; and (6) throughout the Class Period, Defendants followed Tusa's commentary regarding

the turbine issues at GE. This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

448.    On December 27, 2017 in a statement to *Reuters*, GE denied there were any systemic or structural issues with the H-class turbines, assuring the public that "*every commercial HA site today is demonstrating exceptional performance levels for both output and efficiency*."

449.    The italicized statements in the foregoing paragraph regarding the efficiency of the H-class turbine and its "exceptional performance" were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects – eliminating the "exceptional" "output and efficiency" GE touted. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 447. This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

450.    On January 3, 2018, the journal *Power* published an article titled "Efficiency Improvements Mark Advances in Gas Turbines," quoting GE Gas Power Systems' Executive Product Manager for gas turbines, Guy DeLeonardo, who stated that "*the company also is innovating with advances in cooling and sealing, improved aerodynamics, and the use of materials and coatings designed for use in higher temperatures, including ceramic material composites.*"

451.    The italicized statements in the foregoing paragraph regarding GE's innovation and advances in materials and coatings for use at high temperatures were false and/or misleading and omitted material facts. The claim led investors to believe that GE's advanced technologies and materials allowed its H-class turbines to operate at higher temperatures when in fact that was blatantly false. The truth was that the blades defectively oxidized at high temperatures causing potential blade breakage such that the opposite was true make—its advances did not allow for effective and efficient operation at high temperatures. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 447. This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to write down $22 billion by the fourth quarter of 2017.

452.    On January 24, 2018, GE held a conference call with investors, during which Defendant Stokes stated that GE was "proud of the HA gas turbine technology" as "*[i]t is operating in line with performance guarantees.*" Defendant Stokes acknowledged "*some issues related to commissioning at certain sites,*" but that GE had "*readily addressed them*" and had "commenced working on supply chain and project organizations to address volume ramp issues

114

and things considered *normal learning curve process*." Defendant Stokes also stated that all of the 23 units installed were "*performing to specifications and guarantees*."

453.    The italicized statements in the foregoing paragraph regarding GE's H-class turbines "performing to specifications and guarantees," as well as his explanation that issues were "normal learning curve process" were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and performing as intended with world-class efficiency. In fact, the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the H-class units for fewer hours before testing for defects.  Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 447. This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

454.    During the same call on January 24, 2018, Defendant Stokes warned that total gas turbine sales would decrease in 2018 to 60-70 units, compared with 102 units in 2017. Yet, he omitted another significant reason, instead blaming the reduced sales exclusively on factors external to GE: "*the markets were softer than expected. Deals are taking longer to close and are very competitive. We are expecting the markets to be less than the [sic] 35 gigawatts in 2017 and we are preparing our restructuring plans for a market that could be as low as 30 gigawatts in 2018.*"

455.   The italicized statements in the foregoing paragraph regarding the reasons for the lower projected gas turbine sales were false and/or misleading and omitted material facts. When these statements were made, Defendants also knew that GE was triaging H-class blade inspections and repairs due to the oxidation issue, which was preventing its ability to ship new turbines because employee teams and machines were being deployed elsewhere. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 447. This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

456.   In its 2017 Form 10-K issued on February 23, 2018, GE reported that it had conducted an interim impairment test in the fourth quarter of 2017 and took only a *de minimis* impairment of $217 million for the Power Conversion unit – representing merely .86% of the total amount of goodwill at the end of that quarter and that there was $25.269 billion in goodwill attributable to its Power segment. GE reported a goodwill year-end balance for its Power segment of $25.3 billion.

457.   GE explained its process as follows:

Due to the impairment taken in the third quarter, we performed an interim impairment test of our Power Conversion reporting unit in the fourth quarter of 2017, which indicated that its carrying value was greater than its fair value. Therefore, we performed a step two analysis which resulted in the impairment of the remaining reporting unit goodwill. The primary factors contributing to the further decline in the fair value of the Power Conversion reporting unit in the fourth quarter were increased competition leading to loss and cancellation of orders in the renewables customer segment and further downturn in oil and gas. In

addition, Power Conversion reached an agreement to sell its low voltage motors business, which decreased the fair value of the remaining Power Conversion reporting unit. As a result, we recognized an additional non-cash impairment loss of $217 million during the fourth quarter. The total impairment loss of $1,164 million of the Power Conversion goodwill was recorded on the Statement of Earnings (Loss) to Other costs and expenses. After the impairment loss, there is no goodwill in our Power Conversion reporting unit.

In addition, we identified one reporting unit for which the fair value was not substantially in excess of its carrying value. The Grid Solutions reporting unit within our Power operating segment was formed as a result of the Alstom acquisition in November 2015. Since fair value equaled carrying value at the time of acquisition, this caused the fair value of this reporting unit not to be significantly in excess of its carrying value. In the current annual impairment test, the fair value of Grid Solutions continued to be not substantially in excess of carrying value. Therefore, we performed an interim impairment test in the fourth quarter of 2017 which resulted in the fair value being in excess of its carrying value by approximately 8%. While the goodwill of this reporting unit is not currently impaired, there could be an impairment in the future as a result of changes in certain assumptions. For example, the fair value could be adversely affected and result in an impairment of goodwill if expected synergies of the acquisition with Alstom are not realized or if the reporting unit was not able to execute on customer opportunities, the estimated cash flows are discounted at a higher risk-adjusted rate or market multiples decrease. The goodwill associated with our Grid Solutions reporting unit was $4,542 million, representing approximately 5% of our total goodwill at December 31, 2017.

458.    This fourth quarter 2017 goodwill valuation and calculation explanation were false and misleading and omitted material facts.

459.    By this date, Defendants were aware that Alstom would not produce any synergies, there was a market dislocation in the global gas power market and the defect on the HA turbine. Given these major problems, combined with overcapacity in the market and GE's other execution issues, application of a good-faith, GAAP compliant cash-flow projection that aligned with information in GE's possession would have significantly reduced the cash-flow projection, forcing GE to disclose that Power Generation and Grid Solutions' carrying value exceeded their fair value and forcing GE to take a material impairment in the Power segment goodwill in this quarter. Instead, GE concealed from investors that its cash-flow projections were

not made in good-faith or compliance with GAAP and that its resulting goodwill valuation was based on outdated assumptions.

460.    GE's explanation of the goodwill calculation purports to accurately determine fair value by stating that Grid Solutions' fair value exceeded its carrying value by 8% and Power Generation's fair value was significantly in excess of carrying value when in fact the fair value of each reporting unit was materially and artificially inflated by accounting assumptions that lacked any reasonable basis, in violation of GAAP.

461.    Additionally, GE's statement that Grid Solutions – the only Power segment reporting unit that was even modestly at risk of impairment according to GE's statement – represented only 5% of Power segment goodwill misleadingly suggested that 95% of the Power segment's goodwill was not at risk of impairment, when in fact the information in GE's possession indicated that it was.

462.    This statement also misleadingly suggested that there was a potential future risk that "expected synergies of the acquisition with Alstom are not realized." This statement claims to identify possible future events that would cause a goodwill impairment, when in fact certain of these events had already come to pass – the Alstom synergies were not being and would clearly not be realized at the levels claimed by GE.

463.    Additionally, GE misleadingly stated: "We derive our discount rates using a capital asset pricing model and analyzing published rates for industries relevant to our reporting units to estimate the cost of equity financing. *We use discount rates that are commensurate with the risks and uncertainty inherent in the respective businesses and in our internally developed forecasts.* Discount rates used in our reporting unit valuations ranged from 9.0% to 18.0%." At this time, GE did not use a discount rate commensurate with then-existing risks and uncertainty;

had it done so, it would have been forced to take the $22 billion impairment for the following

reasons 1) the Alstom deal did not and would not produce the expected synergies, resulting in

forecasted accretiveness of $.18-.20 per share, 2) by the end of 2017 the market for gas power

had collapsed, and 3) by the end of 2017, the expected operating cash flows for the Power

segment were depressed with no expectation of a recovery in the gas power market.

464.    On March 28, 2018, the magazine *Power* published an article titled "GE HA

Turbine Snags Another World Record for CCGT Efficiency," in which GE "noted that *the*

*Bouchain and Nishi-Nagoya world records highlight HA turbine contributions at the world's*

*most efficient power plants in both the 50 Hz and 60 Hz segments.*" Defendant Stokes further

stated in the article: "We're very proud to make history once again and to partner with Chubu

and Toshiba to bring GE's *industry-leading HA turbine* to Japan . . . *Our HA technology enables*

*the power plant of the future, delivering unprecedented levels of efficiency and reliability that*

*can help countries everywhere meet today's power demands and reach more aggressive*

*emissions goals.*"

465.    The italicized statements in the foregoing paragraph regarding the "unprecedented

levels of efficiency and "reliability" of the "industry-leading HA turbine" were false and/or

misleading and omitted material facts. These statements assured investors that GE's H-class

turbine technology and its commercial rollout were successful and without substantial problems,

when in fact the H-class turbines had systemic manufacturing defects that led to oxidation,

resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the

H-class units for fewer hours before testing for defects – eliminating the "efficiency" GE touted

and contradicting its assurances of "reliability." Defendants knew or recklessly disregarded that

these statements were false and/or misleading and omitted material facts when made for the

reasons set forth in paragraph 447. This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

466.    In the first quarter 2018 results filed on Form 10-Q on May 1, 2018, GE reported a goodwill balance for the Power segment of $25.9 billion.

467.    GE reported its process as follows:

In assessing the possibility that a reporting unit's fair value has been reduced below its carrying amount due to the occurrence of events or circumstances between annual impairment testing dates, we consider all available evidence, including (i) the results of our impairment testing from the most recent testing date (in particular, the magnitude of the excess of fair value over carrying value observed), (ii) downward revisions to internal forecasts or decreases in market multiples (and the magnitude thereof), if any, and (iii) declines in our market capitalization below our book value (and the magnitude and duration of those declines), if any. In the first quarter of 2018 we did not identify any reporting units that required an interim impairment test.
As of March 31, 2018, we believe goodwill is recoverable for all of our reporting units. However, the Power and Oil & Gas markets continue to be challenging and there can be no assurances that goodwill will not be impaired in future periods as a result of sustained declines in macroeconomic or business conditions affecting our reporting units.

468.    This first quarter 2018 goodwill valuation and calculation explanation were false and misleading and omitted material facts for the following reasons:

469.    By this date, Defendants were even more aware that Alstom would not produce any synergies, there was a market dislocation in the global gas power market and the defect on the HA turbine. Given these major problems, combined with overcapacity in the market and GE's other execution issues, application of a good-faith, GAAP compliant cash-flow projection that aligned with information in GE's possession would have significantly reduced the cash-flow

projection, forcing GE to disclose that Power Generation and Grid Solutions' carrying value exceeded their fair value and forcing GE to take a material impairment in the Power segment goodwill in this quarter. Instead, GE concealed from investors that its cash-flow projections lacked any reasonable basis, in violation of GAAP.

470.     Further, it is false, misleading, and omits material facts to say that no interim impairment testing was required in the first quarter of 2018, when in fact material changed circumstances required impairment testing. In the first quarter of 2018, GE revised downward its demand projections, which resulted in lower-than-forecasted equipment orders; as a result of this adjustment, GE warned that earnings per share would be on the low end of the guidance. This is precisely the sort of event that requires an interim goodwill impairment test and further demonstrates that Defendants did not conduct a meaningful inquiry into the Power goodwill valuation during the Class Period.

471.     Specifically, in the first quarter of 2018, GE's execution issues, fallout from the HA turbine defect, and the impact of increasing energy efficiency and renewable energy penetration were all revealed in orders, sales, and profit margins down steeply from the prior year. GE's prediction in the fourth quarter of 2017 that Power segment sales would grind to a near halt was realized.  Orders were down significantly compared to the same quarter in the prior year – indeed, GE did not receive *any* orders for H-class gas turbines in the first quarter of 2018:

| DRASTIC REDUCTION IN ORDERS compared to prior year | | | |
|---|---|---|---|
| | Q1 2017 | Q1 2018 | *% Decline* |
| **All gas turbine models** | 12 | 4 | *-66.67%* |
| **H-class gas turbines** | 2 | 0 | *-100.00%* |
| **AGPs** | 20 | 4 | *-80.00%* |

121

472.     Additionally, the drop in orders meant GE would not recognize profit from long-term service agreements that were cross-sold with new machine sales.

473.     This caused GE to lower total sales forecast for new plant orders from 35 GW to below 30 GW.  This news was accompanied by GE's reduction in earnings guidance stemming from Power's lack of profitability.

474.     As should have been expected by the Company in the fourth quarter of 2017, sales fell by 40-71% in the Power segment in first quarter 2018 compared to the prior year:

| DRASTIC REDUCTION IN SALES compared to prior year | | | |
|---|---|---|---|
| | Q1 2017 | Q1 2018 | *% Decline* |
| **All gas turbines** | 20 | 12 | *-40.00%* |
| **AGP** | 21 | 6 | *-71.43%* |

475.     The Power segment's profit margins similarly dropped by 30%, as should have been expected by the Company in the fourth quarter of 2017:

| DRASTIC REDUCTION IN PROFIT MARGIN compared to prior year | | |
|---|---|---|
| **Q1 2017** | **Q1 2018** | *% Decline* |
| 5.5% | 3.8% | *-30.9%* |

476.     Nonetheless, GE states in the first quarter 2018 10-Q that in determining whether to perform an interim impairment test it considers "downward revisions to internal forecasts or decreases in market multiples (and the magnitude thereof), if any." A meaningful inquiry into GE's downward revision of demand projections and orders should have triggered GE to conduct an interim impairment test; instead, its statement that goodwill was recoverable falsely and misleadingly expressed that GE was not required to do interim impairment testing.

477.    On June 26, 2018, GE held a conference call with analysts, during which Defendant Flannery stated that the Power segment "is *a fundamentally strong franchise with leading technology*, a valuable installed base, and expansive global research" with "approximately 7,000 gas turbines in our installed base and we have a 20- year plus track record that demonstrates *we can improve output, reliability, and performance of those assets when we service them*."

478.    The italicized statements in the foregoing paragraph regarding GE's "leading technology" in the Power segment and its ability to "improve output, reliability, and performance" when it "service[s]" Power assets was false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were reliable and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shut downs, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects – and thus the HA units were not "performing to specifications and guarantees" but rather subject to warranty claims. Further, GE's ability to "improve output, reliability, and performance" by "servic[ing]" its turbines was severely compromised by shortfalls in materials and labor to replace defective blades with Gen II blades. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 447. This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a

material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

479.    On July 27, 2018 filed the second quarter 2018 results on Form 10-Q, reporting a goodwill balance for the Power segment of $23.2 billion.

480.    GE reported its process as follows:

In assessing the possibility that a reporting unit's fair value has been reduced below its carrying amount due to the occurrence of events or circumstances between annual impairment testing dates, we consider all available evidence, including (i) the results of our impairment testing from the most recent testing date (in particular, the magnitude of the excess of fair value over carrying value observed), (ii) downward revisions to internal forecasts or decreases in market multiples (and the magnitude thereof), if any, and (iii) declines in our market capitalization (and the magnitude and duration of those declines), if any. As a result of this assessment, we performed an interim step-one impairment test at our Power Generation and Grid Solutions reporting units within our Power segment in the second quarter of 2018. The results of the analysis indicated that fair value was in excess of carrying value by approximately 10% for our Power Generation reporting unit and 9% at our Grid Solutions reporting unit. The goodwill associated with our Power Generation and Grid Solutions reporting units was $19,041 million and $4,586 million, respectively, representing approximately 23% and 6% of our total goodwill at June 30, 2018.

Also, in the second quarter of 2018, as a result of classifying a significant portion of Healthcare Equipment Finance's financing receivables as assets held for sale, we performed an interim step-one impairment test at our Industrial Finance reporting unit within our Capital segment. The results of the analysis indicated that fair value was in excess of carrying value by approximately 12%. While the goodwill of this reporting unit is not currently impaired, there could be an impairment in the future as a consequence of the disposition of these financing receivables classified as assets held for sale. The goodwill associated with our Industrial Finance reporting unit was $111 million at June 30, 2018.

As of June 30, 2018, we believe goodwill is recoverable for all of our reporting units. However, the Power and Oil & Gas markets continue to be challenging which could result in changes in our projected future earnings and net cash flows at these businesses as a result of sustained declines in macroeconomic or business conditions affecting our reporting units and there can be no assurances that goodwill will not be impaired in future periods. The planned sale of our Distributed Power business is not expected to materially affect the goodwill impairment test results for our Power Generation reporting unit noted above.

481.    By this date, Defendants were even more aware that Alstom would not produce any synergies, there was a market dislocation in the global gas power market and the defect on the HA turbine. The effects of these problems are revealed in plummeting orders, sales, profit margins, cash flow, and market share. Specifically:

482.    In the second quarter of 2018, equipment orders of Power's main products fell precipitously between 70% and 75% as compared to the same quarter in the prior year, as should have been expected by the Company in the fourth quarter of 2017:

| DRASTIC REDUCTION IN ORDERS compared to prior year | | | |
|---|---|---|---|
| | **Q2 2017** | **Q2 2018** | *% Decline* |
| **All gas turbine models** | 24 | 7 | *-70.83%* |
| **Aeroderivatives** | 12 | 3 | *-75.00%* |

483.    Once again, the reduction in orders meant GE would not generate future profits from long-term service agreements that were cross-sold with new machine sales.

484.    Additionally, sales dramatically declined by 66-70% in the second quarter of 2018 as compared with the same quarter in 2017, as should have been expected by the Company in the fourth quarter of 2017:

| DRASTIC REDUCTION IN SALES compared to prior year | | | |
|---|---|---|---|
| | **Q2 2017** | **Q2 2018** | *% Decline* |
| **All gas turbines** | 21 | 7 | *-66.67%* |
| **Aeroderivatives** | 17 | 5 | *-70.59%* |

485.    Correspondingly, the Power segment's profitability took a dramatic downward turn by 47% in the second quarter of 2018 as should have been expected by the fourth quarter of 2017:

| DRASTIC REDUCTION IN PROFIT MARGIN compared to prior year | | |
|---|---|---|
| Q2 2017 | Q2 2018 | *% Decline* |
| 10.6% | 5.6% | *-47.1%* |

486.    The reduction in profit margins also demonstrated that even if any cost synergies that were supposed to come from the Alstom acquisition had been realized, they were a drop in the bucket given the dramatic downturn in the Power segment's profitability.

487.    Given these major problems, combined with overcapacity in the market and GE's other execution issues, application of a good-faith, GAAP compliant cash-flow projection that aligned with information in GE's possession would have significantly reduced the cash-flow projection, forcing GE to disclose that Power Generation and Grid Solutions' carrying value exceeded their fair value and forcing GE to take a material impairment in the Power segment goodwill in this quarter. Instead, GE concealed from investors that its cash-flow projections lacked any reasonable basis, in violation of GAAP.

488.    GE's explanation of the goodwill calculation purports to accurately determine fair value by stating that Grid Solutions' fair value exceeded its carrying value by 9% and Power Generation's fair value exceeded its carrying value by 10% when in fact the fair value of each reporting unit was artificially inflated by accounting assumptions that were not made in good faith and in compliance with GAAP.

489.    This explanation also misleadingly suggested that there was a potential future risk of "sustained declines in macroeconomic or business conditions affecting our reporting units" that could lead to goodwill impairment, when in fact the Power segment was already in a sustained decline in both macroeconomic *and* business conditions affecting its reporting units.

490.    Further, the statement is false and misleading and omitted material facts because, as discussed above at paragraph 355, the second quarter 2018 and third quarter 2018 impairment analyses analyzed the same data, yet arrived at opposite results – finding in the second quarter of 2018 that the fair value of Power Generation exceeded the carrying value by approximately 10% and the fair value of Grid Solutions exceeded the carrying value by approximately 9% but in the third quarter of 2018 that carrying value exceeded fair value for both reporting units, resulting in a $21.9 billion impairment. GE could only have reached these completely different conclusion about the same data by dramatically changing its accounting assumptions, particularly projected future cash flow, demonstrating that the accounting assumptions used in the second quarter of 2018 lacked any reasonable basis by ignoring the information in GE's possession at the time regarding the macro environment and its company-specific issues.

491.    On September 12, 2018, GE issued a press release touting the selection of its "*industry leading HA gas turbine technology*" for a natural gas power plant in Ohio.  GE stated that its HA fleet of gas turbines had achieved "*more than 175,000 operating hours*" and had been recognized by industry third parties, specifically noting that "*Exelon's HA-powered Wolf Hollow II project was honored as Power Engineering's Best Gas-Fired Project in 2017.*"

492.    The italicized statements in the foregoing paragraphs regarding GE's "industry leading HA gas turbine technology" and the success of the Wolf Hollow project were false and/or misleading and omitted material facts. These statements assured investors that GE's H-

class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines—including specifically at the Wolf Hollow plant— had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 447.  This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

493.   On September 20, 2018, GE Gas Power Systems CEO Chuck Nugent minimized the oxidation issue in an interview with *Bloomberg*, claiming that "*the concerns were overblown,*" noting, "*the turbine's performance has been highly reliable,*" and adding "*I am confident this is not a significant issue from a customer perspective.*"

494.   The italicized statements in the foregoing paragraph regarding the magnitude of the issues stemming from the oxidation defect and the "reliab[ility]" of the H-class turbines were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shut downs, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted

material facts when made for the reasons set forth in paragraph 447, and because GE had attended an H-class turbine user meeting in September 2018 where it acknowledged the oxidation was a "fleet-wide issue." This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

495.   On September 20, 2018, GE told *Reuters* that the oxidation issue "was first discovered on turbine blades in a natural gas-fueled turbine operated by Exelon Corp. in Texas a few weeks ago." Defendant Stokes also told *Reuters* that "[t]he minor adjustments that we need to make do not make the HA any less of a record setting turbine—they are meeting—and in many cases exceeding—their performance goals at every customer site today."

496.   The statements in the foregoing paragraph that the oxidation issue was "discovered" "a few weeks ago," the reassurance that the only fixes required are "minor adjustments" and that the HA is meeting and exceeding performance goals at every site were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects – and thus the HA units were not meeting or exceeding "performance goals" and certainly were not doing so "at every customer site." Further, the statement that the oxidation issue was only discovered "a few weeks ago" was false and misleading because GE discovered the oxidation issue in 2015,

had been working on a fix ever since, and had arranged to inspect and replace blades for certain customers starting in 2017. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 447, and because GE had attended an H-class turbine user meeting in September 2018 where it acknowledged the oxidation was a "fleet-wide issue." This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

497.     On September 21, 2018, GE spokesman Chris Shigas stated: "A few weeks ago, there was an event at Exelon's Colorado Bend site that resulted from an issue with an H-class turbine component. We expect the same issue to impact other HA units. *We have identified the solution and have a plan in place, and we have been proactively working with customers on a case-by-case basis to address any impacted unit. We expect the Exelon unit to return to service soon.*"

498.     The italicized statements in the foregoing paragraph regarding GE's "solution" and "plan" to address defects on a "case-by-case" basis, and that the Exelon unit would return to service "soon" were false and/or misleading and omitted material facts. These statements grossly understated the magnitude of the problem, assuring investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in catastrophic turbine blade breaks and prolonged plant shutdowns (over two months

in the case of Exelon) to resolve the issues. Further, the statements reassured investors that the problem was solved and it had a fix, when in fact it would not be known for many months whether the oxidation issue was resolved or recurring.   Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 447, and because GE had attended an H-class turbine user meeting in September 2018 where it acknowledged the oxidation was a "fleet-wide issue" and users expressed concern whether the Gen II "fix" would work. This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

499.    On September 21, 2018, Defendant Stokes stated:

GE engineers and teams identified a fix and have been working proactively with our customers on a case-by-case basis to quickly return impacted units to service and mitigate any future issues … *In all industries and new technologies, developing and launching products at this scale and complexity involves fine-tuning and adjusting the technology . . .*

500.    The statements in the foregoing paragraph regarding GE's "fine-tuning" to "quickly" return units to service were false and/or misleading and omitted material facts. These statements grossly understated the magnitude of the problem, assuring investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in catastrophic turbine blade breaks and prolonged plant shutdowns (over two months in the case of Exelon) to resolve the issues. Further, the statements regarding identification of a "fix" reassured investors that the problem was solved and it had a

fix, when in fact it would not be known for many months whether the oxidation issue was resolved or recurring. Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 447, and because GE had attended an H-class turbine user meeting in September 2018 where it acknowledged the oxidation was a "fleet-wide issue" and users expressed concern whether the Gen II "fix" would work. This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

501.    On September 28, 2018, GE published an article by Chuck Nugent and Scott Strazik on the gas turbine issues via LinkedIn and as a press release, stating: "*The issue involves oxidation that could cause distress on 9FB and HA gas turbine Stage 1 Blades (S1B).*" Nugent and Strazik further stated that "*[w]e identified the solution and have a plan in place to implement it.*" "*As we move forward, we remain very confident in our technology and the future of gas . . . The HA is the world's largest and most efficient turbine. There's nothing like it in operation today. It's meeting – and in many cases exceeding – performance goals at every customer site today.*"

502.    The italicized statements in the foregoing paragraph that oxidation "*could*" impact HA gas turbine blades, GE's plan to solve the issue, and GE's reassurance that the HA is meeting and exceeding performance goals at every site were false and/or misleading and omitted material facts. These statements assured investors that GE's H-class turbine technology and its commercial rollout were successful and without substantial problems, when in fact the H-class

turbines had systemic manufacturing defects that led to oxidation of the blades, resulting in plant shutdowns, catastrophic turbine blade breaks, and plants being forced to run the HA units for fewer hours before testing for defects – and thus the HA units were not meeting or exceeding their performance goals, and certainly were not doing so at "*every customer site*." Further, the statements regarding GE having "identified the solution" reassured investors that the problem was solved and it had a fix, when in fact it would not be known for many months whether the oxidation issue was resolved or recurring.  Defendants knew or recklessly disregarded that these statements were false and/or misleading and omitted material facts when made for the reasons set forth in paragraph 447, and because GE had attended an H-class turbine user meeting in September 2018 where it acknowledged the oxidation was a "fleet-wide issue" and users expressed concern whether the Gen II "fix" would work. This statement also omitted the financial implications of the oxidation defect on sales and long-term service agreements, as well as the impact on cash flow for the goodwill analysis, which required dramatic revision to GE's assumptions in the goodwill analysis, contributing to the need to take a material impairment by the fourth quarter of 2017 and first quarter of 2018, and a $22 billion impairment by at least the second quarter of 2018.

## VII.   ITEM 303 OF SEC REGULATIONS S-K, 17 CFR. § 229.303

503.    Pursuant to Item 303 and the SEC's related interpretive guidance, an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues or income from continuing operations. Such disclosure is required by an issuer in the management's discussion and analysis section of annual and quarterly filings, such as Form 10-K and 10-Q filings for domestic issuers.

504.    In May 1989, the SEC issued an interpretive release on Item 303 which set forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

505. Throughout the Class Period, Item 303 required Defendants to disclose that:

a.   the oxidation and/or vibration defect in the H-class would lead to lower revenues and profits related to that product due to the unexpected costs of inspecting, repairing, and replacing turbine blades;

b.   the oxidation and/or vibration defect in the H-class would lead to lower revenues and profits related to that product due to lower sales of the product;

c.   revenues, profits, and cash flow were declining for the Power segment due to the oxidation and/or vibration defect;

d.   reduced cash flow would lead to a major goodwill impairment; and

e.   reduced cash flow would lead to a major dividend reduction.

## VIII.   CLASS ACTION ALLEGATIONS

506. Lead Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure

23(a) and 23(b) on their own behalf and on behalf of:

All persons and entities, their agents, successors in interest, assigns, heirs, executors, and administrators who purchased GE securities during the period between December 4, 2017 through and including December 6, 2018, and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

507. The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of members of the Class is unknown to Lead Plaintiff at

this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that

there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by General Electric or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

508.   Lead Plaintiff's claims are typical of the claims of the Class in that all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought is common to the Class.

509.   Numerous questions of law or fact arise from Defendants' conduct that is common to the Class, including but not limited to:

a.   whether the federal securities laws were violated by Defendants' acts during the Class Period, as alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and legal/regulatory compliance of GE;

c.   whether the price of GE securities was artificially inflated and/or maintained during the Class Period; and

d.   to what extent the members of the Class have sustained damages and the proper measure of damages.

510.   These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

511.   Lead Plaintiff will fairly and adequately represent the interests of the Class in that they have no conflict with any other members of the Class. Furthermore, Lead Plaintiff has retained competent counsel experienced in class action and other complex litigation.

512.   Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

513.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

514.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## IX.    LOSS CAUSATION AND ECONOMIC LOSS

515.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of GE securities and operated as a fraud or deceit on Class Period purchasers of GE securities by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed through a series of partial corrective disclosures and as the risks materialized, the price of GE securities declined significantly as the prior artificial inflation came out of the price of GE securities.

516.    As a result of their purchases of GE securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e. damages, under the federal securities laws.

517.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company, including that Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the problems with the H-class turbine and its launch and the need to impair the $22 billion of goodwill in the Power segment in light of dramatically declining profits, cash flow, and demand. When the truth about GE was revealed to the market through a series of partial corrective disclosures, the price

of GE securities fell significantly. This decline removed the inflation from the price of GE securities, causing real economic loss to investors who had purchased GE securities during the Class Period.

518.    In particular, with respect to the goodwill impairment, on October 1, 2018, the Company announced that Defendant Flannery was terminated, Larry Culp was named its new CEO, and that it anticipated taking a major goodwill impairment and would fall short of prior earnings and cash flow targets.

519.    In reaction to this news, analysts recognized the market's positive reaction to GE's decision to replace Flannery with Culp.  Deutsche Bank tied the positive market reaction specifically to the news about Larry Culp, remarking that "GE stock's positive reaction to today's news (+10% at the time of writing this) speaks volumes about Larry Culp's market perception – and we totally get it."

520.    UBS stated, "CEO Larry Culp likely to inspire confidence in turn-around potential." UBS then elaborated, "we believe that CEO Culp will, at a minimum, re-baseline the company, drive execution and make long-term decisions that benefit the company and shareholders."

521.    Tusa of JP Morgan wrote "I 'heart' Larry Culp."

522.    However, each of those analysts also cautioned that notwithstanding the favorable market reaction to Culp's ascent, the "press release signals the kitchen sink is coming."  Tusa, recognizing longer-term significance of the news, wrote: "The appointment of ex-DHR CEO and current lead director of GE's Board Larry Culp as the new CEO of GE was not out of the realm of potential outcomes and positive for future investor confidence, in our view though, the timing and format of this announcement is a negative surprise and supports our thesis…. we believe our

downside case has more merit."   In support of his conclusion, Tusa noted that there had been, within months, turnover of the CEO, General Counsel and Chief Accounting Officer.   He continued, "[a] change of this magnitude, at this point, with no real details and no conference call, is negative."   Tusa then predicted a "likely material dividend cut" would follow because of "how serious the situation is."

523.    Deutsche Bank likewise cautioned, "we know that a $23bn goodwill impairment could call the company's credit rating into question - which could necessitate another (larger-than-expected) dividend cut, and also sends a clear message about just how much value was destroyed via the Alstom acquisition."

524.    It was not until October 30, 2018, that GE explained the reasons underlying its $22 billion impairment or the consequence that GE also planned to cut its dividend to a penny and that the federal government had opened criminal and civil investigations into its impairment decisions.

525.     Between October 31 and November 2, 2018, GE's securities prices continued to fall on news that Moody's and Fitch had lowered GE's credit ratings.

526.    The economic loss, i.e. damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of GE securities and the subsequent decline in the value of the securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE - FRAUD ON THE MARKET DOCTRINE AND AFFILIATED UTE ALLEGATIONS

527.    Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

528.     In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for GE securities was an efficient market for the following reasons, among others:

    a.     GE securities met the requirements for listing, and was listed and actively traded, on the Nasdaq, a highly efficient, electronic stock market;

    b.     as a regulated issuer, GE filed periodic public reports with Nasdaq;

    c.     GE regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.     GE was followed by securities analysts employed by major brokerage firms, including JPMorgan, Wells Fargo Securities, LLC, and Compass Point Research & Trading LLC, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

## XI.    <u>NO SAFE HARBOR</u>

529.     The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Amended Complaint.

530.     Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements, GE's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

531.     Furthermore, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as GE's Forms 10-K and 10-Q issued throughout the Class Period.

532.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

533.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of GE who knew that the forward-looking statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XII.    CAUSES OF ACTION

### COUNT ONE
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

534.     Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

535.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

536.    Defendants:

a.      employed devices, schemes, and artifices to defraud;

b.      made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and

c.      engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

537.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GE securities. Lead Plaintiff and the Class would not have purchased GE securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

538.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of GE securities during the Class Period.

## COUNT TWO
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

539.    Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

540.    The Individual Defendants acted as controlling persons of GE within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers

and/or directors of GE, and their ownership of GE securities, and their culpable participation, as alleged above, the Individual Defendants had the power and authority to cause GE to engage in the wrongful conduct complained of herein.

541.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII.   JURY TRIAL DEMAND

542.   Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiff demands a trial by jury of all of the claims asserted in this Amended Complaint so triable.

## XIV.   PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.   This action may proceed as a class action, with Lead Plaintiff as the designated Class representative and Lead Plaintiff's counsel designated as Class Counsel;

B.   Lead Plaintiff and the members of the Class recover damages sustained by them, as provided by law, and that a judgment in favor of Lead Plaintiff and the Class be entered against the Defendants, jointly and severally, in an amount permitted pursuant to such law;

C.   Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conduct alleged herein;

D.   Lead Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.    Lead Plaintiff and members of the Class recover their reasonable costs and expenses of this suit, including attorneys' fees and expert fees; and

F.    Lead Plaintiff and members of the Class receive such other and further relief as may be just and proper.

Dated: August 30, 2019                      Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Laura H. Posner*
Joel P. Laitman (JL8177)
Laura H. Posner (4343158)
88 Pine Street, Fourteenth Floor
New York, NY 10005
Telephone: (212) 838-7797
jlaitman@cohenmilstein.com

Steven J. Toll (*pro hac vice*)
Julie Goldsmith Reiser (*pro hac vice*)
Molly J. Bowen (*pro hac vice pending*)
Eric S. Berelovich (EB7243)
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
mbowen@cohenmilstein.com
eberelovich@cohenmilstein.com

*Counsel for TRS and Lead Counsel for the Class*