**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GENERAL ELECTRIC SECURITIES LITIGATION | 19 Civ. 1013 (DLC) <br><br> <u>ORAL ARGUMENT REQUESTED</u> |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**</u>
<u>**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**</u>

LATHAM & WATKINS LLP
Miles N. Ruthberg
Blake T. Denton
885 Third Avenue
New York, New York 10022
(212) 906-1200

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700

William J. Trach (*pro hac vice*)
200 Clarendon Street
Boston, Massachusetts 02116
(617) 948-6000

Sarah A. Tomkowiak (*pro hac vice*)
555 Eleventh Street NW
Washington, D.C. 20004
(202) 637-2200

*Attorneys for Defendants*

September 27, 2019

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................3

    A.    GE and the Individual Defendants ...........................................................................3

    B.    GE's Goodwill Accounting and Reported Goodwill Balances................................4

    C.    GE Power's H-Class Turbine and the September 2018 Blade Failure .................10

    D.    Plaintiff's Putative Class Action..........................................................................12

ARGUMENT ...........................................................................................................................13

I.      THE SAC FAILS TO PLEAD A SECTION 10(B) CLAIM............................................13

    A.    Plaintiff Fails Adequately to Plead a False or Misleading Statement...................13

          1.    Defendants' Statements Regarding GE's Estimates and
               Calculations of Goodwill Were Not False or Misleading.........................14

          2.    Defendants' Statements Regarding H-Class Turbines Were Not
               False or Misleading...................................................................................21

    B.    Plaintiff Fails Adequately to Plead a Strong Inference of Scienter ......................28

          1.    Plaintiff Has Not Pled a Cognizable Motive...............................................28

          2.    Plaintiff Has Not Pled Recklessness ..........................................................30

    C.    Plaintiff Fails Adequately to Plead Loss Causation.............................................37

II.      THE SAC FAILS TO PLEAD A SECTION 20(A) CLAIM ...........................................40

CONCLUSION.........................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ...........................................................................................28

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...........................................................................................40

*Central States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
  543 F. App'x 72 (2d Cir. 2013) ..............................................................................38, 40

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
  679 F.3d 64 (2d Cir. 2012).....................................................................................17, 18

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd.*,
  2010 WL 309009 (S.D.N.Y. Jan. 22, 2010) ...........................................................16, 17

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd.*,
  655 F. Supp. 2d 262 (S.D.N.Y. 2009).........................................................................16

*Cortina v. Anavex Life Scis. Corp.*,
  2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ..........................................................33

*Dingee v. Wayfair Inc.*,
  2016 WL 3017401 (S.D.N.Y. May 24, 2016) ..........................................................13

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).....................................................................................................37

*ECA v. J.P. Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)....................................................................................28, 29

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)........................................................................................15

*Fila v. Pingtan Marine Enter. Ltd.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016).........................................................................39

*Fogel v. Wal-Mart de México SAB de CV*,
  2017 WL 751155 (S.D.N.Y. Feb. 27, 2017)................................................................13

*Gissin v. Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010).........................................................................19

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................................34, 35

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
  2013 WL 144041 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden*
  *v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013) .................................24

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018).......................................................................26

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
  2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ........................................................22

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)........................................................................14

*In re Barrick Gold Corp. Sec. Litig.*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018)........................................................................37

*In re Carter-Wallace Sec. Litig.*,
  220 F.3d 362 (2d Cir. 2000)......................................................................................35

*In re CRM Holdings, Ltd. Sec. Litig.*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2012) ..........................................................39

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008)........................................................................24

*In re Express Scripts Holding Co. Sec. Litig.*,
  2018 WL 2324065 (S.D.N.Y. May 22, 2018) ..........................................................18

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
  2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ..........................................................30

*In re GeoPharma, Inc. Sec. Litig.*,
  411 F. Supp. 2d 434 (S.D.N.Y. 2006)........................................................................32

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015)......................36

*In re Omega Healthcare Inv'rs, Inc. Sec. Litig.*,
  375 F. Supp. 3d 496 (S.D.N.Y. 2019)...................................................................29, 30

*In re Optionable Sec. Litig.*,
  577 F. Supp. 2d 681 (S.D.N.Y. 2008)........................................................................27

*In re Razorfish, Inc. Sec. Litig.*,
  2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001)...........................................................23

*In re Rockwell Med., Inc. Sec. Litig.*,
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ............................................33, 35, 36

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816
    F.3d 199 (2d Cir. 2016).................................................................................................1

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)..................................................31, 32

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
    2016 WL 2757760 (S.D.N.Y. May 11, 2016) ........................................................34

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ........................................................38

*Jones v. Perez*,
    550 F. App'x 24 (2d Cir. 2013) .............................................................................36

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)......................................................................28, 29, 30

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom. Central States, Se. &*
    *Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72
    (2d Cir. 2013)...........................................................................................................40

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..............................................................................37, 40

*Lucescu v. Zafirovski*,
    2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018)................................................ *passim*

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ..............................................................................38

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC*
    *Partners, Inc.*,
    2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016).......................................................19

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)....................................................................................29

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps.*
    *Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) ....................................26

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    135 S. Ct. 1318 (2015) ........................................................................................15, 26

*Pearlstein v. Blackberry Ltd.*,
    93 F. Supp. 3d 233 (S.D.N.Y. 2015) ..................................................................23, 24

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ....................................................... 31, 32, 35

*Police & Fire Ret. Sys. of Detroit v. La Quinta Holdings Inc.*,
    2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir. 2018) ................................................................................................................24

*Pollio v. MF Glob., Ltd.*,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009) .......................................................................22

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ......................................................................................13

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ........................................................................ 28, 29, 30

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    2019 WL 4094559 (S.D.N.Y. Aug. 29, 2019) .............................. 19, 20, 33, 36

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ......................................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...........................................................................................28, 36

*Trueblood v. Culp et al.*,
    No. 655552/2018 (July 3, 2019), Doc. #27 .......................................................19, 20

*Turner v. MagicJack VocalTec, Ltd.*,
    2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) .........................................................37, 39

*Waters v. Gen. Elec. Co.*,
    2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010), *aff'd*, 447 F. App'x 229 (2d Cir. 2011) ................................................................................................................38

*Williams v. Citibank, N.A.*,
    565 F. Supp. 2d 523 (S.D.N.Y. 2008) .......................................................................25

## STATUTES

15 U.S.C. § 78t ....................................................................................................................40

15 U.S.C. § 78u-4(b)...................................................................................................13, 28

## RULES

Fed. Rule Civ. P. 8........................................................................................................37

Fed. Rule Civ. P. 9(b) ........................................................................................13, 37, 40

Defendants General Electric Co. ("GE" or the "Company"), John L. Flannery, Jamie S. Miller, Jan R. Hauser, Russell Stokes, Chuck Nugent, Scott Strazik, and Joe Mastrangelo (the "Individual Defendants," and with GE, "Defendants") submit this memorandum of law in support of their motion to dismiss the Second Amended Complaint ("SAC") (Ex. 1, cited as "¶ _").[1]

## PRELIMINARY STATEMENT

The SAC suffers from the same pleading deficiencies as the Amended Complaint ("AC"). It again attempts unsuccessfully to portray adverse business developments—a write-down of the goodwill estimates for GE's Power segment, and technical challenges with the blades on GE's H-class turbines—as securities fraud. Despite Plaintiff having over two additional months to identify facts supporting its theories, the SAC cites no new confidential witnesses, internal documents, or other materials revealing any fraud. Plaintiff continues to rely on a single, low-level former employee ("FE") who does not claim any interaction with any Individual Defendant, much less direct knowledge of wrongdoing. Rather than particularized facts, the SAC merely adds 37 pages of supposition based on publicly available information and what amounts to attorney argument regarding the inferences that should be drawn from the AC's existing allegations. Such new "allegations" fall woefully short of pleading fraud with particularity. With no cogent theory of fraud and no well-pled facts supporting even an inference of fraud, the SAC should be dismissed.

*First*, Plaintiff again alleges without any particularity that the goodwill balances reported for GE's Power segment were overstated, and it newly alleges that disclosures regarding GE's impairment testing were false. But the SAC is devoid of any facts showing that Defendants did

---

[1]     Unless otherwise indicated, all internal citations and quotations are omitted, emphasis is added, and citations to "Ex. __" refer to exhibits attached to the Declaration of Blake T. Denton. The Court may consider documents or statements incorporated into the SAC by reference, SEC filings, and "information already in the public domain and facts known or reasonably available to the shareholders." *See, e.g.*, *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 539 n.13 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

not actually believe that these goodwill estimates (which are indisputably opinion statements) were accurate when made, or that any disclosure regarding GE's impairment testing was untrue. Instead, Plaintiff relies on incendiary rhetoric regarding the power market "burning down" in an effort to allege that GE's goodwill balances or impairment testing must have been fraudulent. Such unsubstantiated speculation cannot substitute for well-pled allegations showing that those balances were overstated at any time, or that GE's fully disclosed impairment testing was conducted fraudulently. The SAC's allegations amount, at most, to a hindsight disagreement with GE's accounting for goodwill—a quintessentially judgmental issue—which cannot sustain a fraud claim. As this Court recognized in *Lucescu v. Zafirovski*, 2018 WL 1773134, at *7 (S.D.N.Y. Apr. 11, 2018), pleading false goodwill opinion statements is "no small task," and Plaintiff fails here, just as plaintiffs did in *Lucescu*.

*Second*, Plaintiff claims Defendants misled investors about an oxidation issue that impacted a single blade component in GE's newly launched H-class turbine. But Plaintiff's own allegations—based on media and analyst reports—concede that GE was actively investigating the frequency and severity of the oxidation problem during the purported class period and, once the necessary investigation had been completed, GE disclosed the cause of the problem, the plan to fix it, and a reserve to cover the costs of the fixes. And, although the SAC's sole FE purports to have been "responsible for technical issues related to gas turbines and steam turbines," Plaintiff fails even to allege that he has knowledge of ***any*** issues impacting H-class turbines. There simply are no particularized facts to support Plaintiff's theory that GE concealed "systemic manufacturing defects" or had a duty to disclose its ongoing examination of the oxidation issue any earlier than it did—much less that the issue had any impact on GE's goodwill estimates.

*Third*, Plaintiff's claims fail for the independent reason that the SAC does not—and cannot—raise a strong inference that Defendants acted with scienter. Plaintiff alleges neither a

2

cognizable motive by any Defendant to engage in fraud nor a single fact establishing strong circumstantial evidence of conscious misbehavior or recklessness.  Instead, the SAC introduces illogical and/or ill-timed theories of fraud, which are refuted by Plaintiff's other allegations.  The SAC establishes **no** inference of scienter, much less a "strong" one.

*Finally*, Plaintiff fails to advance any viable theory of loss causation.  None of the supposed partial disclosures cited in the SAC revealed any alleged relevant "truth"; rather, they merely repeated previously known information or said nothing about the subject of the alleged fraud.  Most importantly, GE's stock price **increased** when GE first announced a potential goodwill impairment charge and when GE first disclosed the H-class turbine issue.

Despite numerous attempts, Plaintiff remains unable to plead a coherent theory of fraud or facts establishing a claim.  The SAC should now be dismissed with prejudice.

## BACKGROUND

### A.    GE and the Individual Defendants

GE is a global industrial company headquartered in Massachusetts, incorporated in New York, and traded on the New York Stock Exchange.  ¶¶ 16, 19, 29-30.  GE employs over 280,000 persons worldwide and offers a wide range of products and services.  ¶ 30; Ex. 48, 2018 10-K, at 4.  The SAC focuses on GE's Power segment.  ¶ 1.  The Individual Defendants are current or former executives of GE.[2]  ¶¶ 20-26.

---

[2]    Mr. Flannery served as Chief Executive Officer ("CEO") and Chairman of GE from August 2017 to October 2018.  ¶ 20.  Ms. Miller has served as GE's Chief Financial Officer since November 2017.  ¶ 21.  Ms. Hauser served as GE's Controller and Principal Accounting Officer during the purported class period, until retiring in September 2018.  ¶¶ 22, 399.  Mr. Stokes served as CEO and President of GE Power until October 2018, when he became CEO of GE Power Portfolio following Power's reorganization.  ¶ 23.  Mr. Mastrangelo served as CEO and President of GE's Gas Power Systems until January 2018.  ¶ 26.  Mr. Nugent became CEO and President of Gas Power Systems in March 2018, and, prior to that, served as Vice President of Manufacturing for GE Oil & Gas and Vice President of Supply Chain for GE Healthcare.  ¶ 24.  Mr. Strazik served as CEO of GE's Power Services, and then Gas Power, during the purported class period.  ¶ 25.

### B.        GE's Goodwill Accounting and Reported Goodwill Balances

Plaintiff's first theory of purported fraud relates to GE's disclosures regarding goodwill reported for its Power segment.  Under GAAP, in connection with certain corporate transactions, an acquiring company accounts for the value of certain assets it has gained as "goodwill," measured as the excess of the purchase price of the acquired company over the total value of its identifiable assets and liabilities.  ¶¶ 200, 204-05; Ex. 5, ASC 805-30-30-1.  Assets that are accounted for as goodwill can include going-concern value, as well as the synergies created by the combination of the two companies' assets.  ¶ 204.  Goodwill is evaluated by "reporting unit," *see* Ex. 4, ASC 350-20-35-41, and for a company like GE that has over 150 subsidiaries, a "reporting unit" can be a group of subsidiaries, *see* Ex. 48, 2018 10-K, at Ex. 21.  Once a company finalizes allocation of the purchase price one year after the acquisition, goodwill stemming from the transaction is apportioned among the goodwill balances of its relevant reporting units.  *See* Ex. 4, ASC 350-20-15-2, 350-20-20; Ex. 14, 2016 10-K, at 159-60.

GAAP requires that companies conduct annual impairment testing of goodwill balances at the reporting unit level.  Ex. 4, ASC 350-20-35-28.  In Step One of that testing, a company determines the fair value of the reporting unit and compares it to the unit's carrying value.  *Id.* 350-20-35-4; ¶ 212; Ex. 22, 2017 10-K, at 146.  ***Only*** if the fair value of a reporting unit is less than its carrying value does GAAP permit the company to proceed to Step Two, in which the company measures the amount of goodwill impairment loss, if any, by first determining the fair value of the reporting unit's identifiable assets and liabilities.  Ex. 4, ASC 350-20-35-6, 8, 14; ¶¶ 216-17; Ex. 22, 2017 10-K, at 146.  The excess, if any, of the fair value of the reporting unit as determined in Step One, over the fair value of its identifiable assets and liabilities calculated in Step Two, is the implied fair value of the remaining goodwill for the reporting unit.  Ex. 4, ASC 350-20-35-14, 16; ¶ 217; Ex. 22, 2017 10-K, at 146.  The goodwill recorded at the reporting unit level must then be

4

written down to this implied fair value, and the company takes a non-cash impairment loss in the amount of the difference between the two.  Ex. 4, ASC 350-20-35-11; ¶ 218; Ex. 22, 2017 10-K, at 146.

These are not mechanical calculations.  Under the relevant accounting standards, multiple techniques can be used to estimate the fair value of a reporting unit.  Ex. 4, ASC 350-20-35-22, 24; Ex. 6, ASC 820-10-35-24, 24A, 24B; ¶ 214; Ex. 22, 2017 10-K, at 146.  Thus, there can be multiple different results that would all be acceptable under GAAP.  Further, once a valuation technique has been selected, companies and auditors must still make numerous judgment calls and assumptions.  Ex. 6, ASC 820-10-35-24, 820-10-55-1, 2.  Because goodwill is a non-cash asset, and not a measure of how a company is performing at any particular time, short-term fluctuations in a company's profitability do not necessarily mean that the company's estimate of goodwill must be impaired.  Rather, a goodwill impairment is required—indeed permitted—only when there is a determination that (i) the carrying value of a reporting unit exceeds its fair value and (ii) the excess of the reporting unit's fair value over the fair value of its identifiable assets and liabilities is less than the recorded goodwill.  Ex. 4, ASC 350-20-35-6, 8, 11, 14, 16; ¶¶ 216-18.

Consistent with GAAP, GE conducts goodwill impairment testing annually (in the third quarter), as well as in interim periods if circumstances change that, in its judgment, could more likely than not reduce the fair value of a reporting unit below its carrying value.  *See* Ex. 4, ASC 350-20-35-28, 30; ¶ 210; Ex. 25, Q1 2018 10-Q, at 73.  To determine the fair values of reporting units in its Power segment in Step One, GE generally utilizes the market or income approach, or a combination of the two, relying in part on reasonable estimates of the present value of projected

cash flows.[3]  *See* Ex. 22, 2017 10-K, at 146.  In 2017 and 2018, GE's external auditor, KPMG LLP ("KPMG"), audited goodwill balances at year-end and reviewed them each quarter.  *Id.* at 119; Ex. 48, 2018 10-K, at 93.

Plaintiff's fraud allegations relate to the goodwill balance reported for the Company's Power segment for the fourth quarter of 2017 and the first two quarters of 2018.  A substantial portion of the goodwill recorded for Power Generation, a reporting unit within Power, and Grid Solutions, a reporting unit that later became part of Power, was initially booked in connection with GE's November 2, 2015 acquisition of the Thermal, Renewables, and Grid businesses of French power company Alstom S.A. ("Alstom") for approximately $10.1 billion.  ¶¶ 56-57; Ex. 12, 2015 10-K, at 159; Ex. 43, Q3 2018 10-Q, at 80.  GE recognized $17.3 billion in goodwill in connection with the Alstom transaction.  ¶ 208.  Of that, $12.9 billion was recorded for reporting units then in GE's Power segment.  *Id.*  Anticipated synergies included process improvements and optimization of manufacturing and service operations; margin benefits from revenue growth opportunities; sourcing opportunities; and elimination of certain expenses, including related to duplicative research and development.  Ex. 11, Dec. 3, 2015 Alstom Investor Meeting Tr., at 4-5.

In the second half of 2017—during which time Mr. Flannery was named GE's CEO, ¶ 20—GE recognized that the global power market had "a lot of disruption"; however, it was difficult to determine how long that disruption would last based on the available "range of forecasts [] of

---

[3]     The market approach uses prices and other information (such as "market multiples") generated by market transactions involving comparable assets, the selection of which "requires judgment, considering qualitative and quantitative factors specific to the measurement."  Ex. 6, ASC 820-10-55-3A, 3B.  "The income approach converts future amounts (for example, cash flows or income and expenses) to a single current (that is, discounted) amount," reflecting "current market expectations about those future amounts."  *Id.* 820-10-55-3F.  GAAP recognizes that "[a] fair value measurement using [the latter] technique[] is made under circumstances of uncertainty because the cash flows used are estimates rather than known amounts," and that in most cases, "both the amount and timing of the cash flows are uncertain."  *Id.* 820-10-55-7.

electricity generation coming from gas power over the next 10 years." Ex. 15, Q3 2017 Earnings Call Tr., at 15. Based on GE's annual goodwill impairment testing in the third quarter, and in light of "downturns in certain . . . customer segments" of Power Conversion that were likely "extended," GE disclosed a $947 million goodwill impairment for Power Conversion. Ex. 16, Q3 2017 10-Q, at 85. But, as GE informed investors, the fair value of Grid Solutions remained in excess of its carrying value, and the fair values of Power Generation and all other non-impaired reporting units were still "substantially" in excess of their carrying values. *See id*.

In the fourth quarter of 2017, given that the Company "expect[ed] the challenging power markets to continue and potentially be worse than [it] expected" in 2018, it prepared for the year's challenges by removing costs through a cut to its dividend and layoffs of approximately 12,000 Power employees. ¶¶ 280, 283; Ex. 20, Q4 2017 Earnings Call Tr., at 6. Additionally, GE performed interim goodwill impairment tests for three of its Power reporting units because of a concern that the units' fair values may have declined. Ex. 22, 2017 10-K, at 146. That testing led GE to disclose an additional impairment of $217 million for Power Conversion (leaving no goodwill remaining for that unit). *Id.*; ¶ 226. GE's Step One analysis for Grid Solutions revealed that its fair value remained in excess of its carrying value. ¶ 222; Ex. 22, 2017 10-K, at 146. And the Step One analysis for Power Generation revealed that although its fair value had decreased, it nonetheless remained substantially in excess of carrying value. ¶ 224; Ex. 22, 2017 10-K, at 146. As a result, GE did not, and was not permitted to, proceed to Step Two or take impairments related to the Grid Solutions or Power Generation units; accordingly, GE reported an audited Power goodwill balance of $25.269 billion. ¶ 227; Ex. 22, 2017 10-K, at 119, 145. However, in light of ongoing developments in the power market, GE warned investors of the risk of future impairment. *See, e.g.*, Ex. 22, 2017 10-K, at 106 (explaining that GE "recorded significant goodwill and other intangible assets on [its] balance sheet" as a result of "acquisitions such as the Alstom acquisition,"

and that "if [it is] not able to realize the value of these assets [it] may be required to incur charges relating to the[ir] impairment").  At the same time, GE continued to see long-term "opportunity" in Power:  in addition to aligning its costs to market realities, GE had a plan to address slow-moving inventory and project execution challenges, and gas turbine orders and shipments were up in the quarter compared to the prior year.  *See* Ex. 20, Q4 2017 Earnings Call Tr., at 10-12, 15-16.

In the first quarter of 2018, after considering the totality of the circumstances under ASC 350-20-35-30 and concluding that the fair values of its reporting units were more likely than not in excess of their carrying values, GE did not perform interim goodwill impairment testing, and it reported a Power goodwill balance of $25.886 billion, which was reviewed by KPMG.  *See* Ex. 25, Q1 2018 10-Q, at 72-73; ¶¶ 228-29.  As GE told investors, Power was "making good progress on execution."  Ex. 24, Q1 2018 Earnings Call Tr., at 3.  In fact, GE's industrial margin rate increased in the first quarter of 2018, in part due to cost-cutting at Power.  *Id.* at 3-4.  But the Company also warned that "there can be no assurances that goodwill will not be impaired in future periods as a result of sustained declines" in the power market.  Ex. 25, Q1 2018 10-Q, at 73.

In April 2018, shortly before GE filed its Form 10-Q for the first quarter of 2018, Larry Culp (former CEO of Danaher), Leslie F. Seidman (former Chairman of the Financial Accounting Standards Board), and Thomas W. Horton (former CEO of American Airlines), joined GE's Board. ¶¶ 228, 386.  Ms. Seidman and Mr. Horton also joined GE's Audit Committee, with Ms. Seidman replacing Mary Schapiro (former Chairman of the SEC) as its head.  Ex. 48, 2018 10-K, at 89.

In the second quarter of 2018, GE determined it needed to perform interim goodwill impairment testing for the Power Generation and Grid Solutions reporting units.  Ex. 28, Q2 2018 10-Q, at 81.  As the Company disclosed, after recalculating the units' fair values in Step One of the analysis, fair value of Power Generation was no longer "substantially" in excess of its carrying value, but instead was only in excess of its carrying value by approximately 10%.  *See id.*  GE

reported that the fair value of Grid Solutions exceeded its carrying value by 9%.  *Id.*; ¶ 232.  As in prior quarters, under GAAP, despite the market challenges and a decreasing spread between the fair value and carrying value of Power Generation, GE was not permitted to progress to Step Two or take goodwill impairments related to the two units, and it reported a Power goodwill balance of $23.186 billion, which was reviewed by KPMG.  Ex. 28, Q2 2018 10-Q, at 81.  GE warned that further "changes in [its] projected future earnings and net cash flows" potentially could lead to a goodwill impairment.  *Id.*  But GE continued to work through the "turnaround" of its Power segment, and believed the market showed signs it would eventually improve, citing to reports that electricity from gas would increase by 20% by 2050.  Ex. 26, June 26, 2018 Call Tr., at 16.

Ultimately, the power market further deteriorated in the second half of 2018, leading GE not only to lower its near-term guidance, but to further reduce its long-term power demand projections, resulting again in decreased forecasts of Power's future earnings and cash flows and changes to other assumptions underlying its valuation modeling.  *See* Ex. 43, Q3 2018 10-Q, at 80; Ex. 44, Q3 2018 Earnings Call Tr., at 4 (explaining that GE now believed that power market downturn would "persist longer and with deeper impact than [it] had initially expected").  On October 1, 2018, the Company announced that Mr. Culp, who had joined GE's Board in April 2018, would replace Mr. Flannery as CEO.  ¶ 329.  GE also announced that as a result of its third quarter goodwill impairment testing, it expected to take a non-cash impairment charge representing "substantially all" of Power's goodwill balance of approximately $23 billion.  *Id.*; Ex. 41, Oct. 1, 2018 Press Release, at 1.  Following the announcement, GE's stock price increased, closing on October 1 at $11.63, a 7.09% increase over the prior business day's price of $10.86.  *See* Ex. 7, GE Historical Stock Price.  On October 30, 2018, GE confirmed the earlier announced goodwill impairment charge, which it then estimated would be $21.973 billion.  *See* ¶ 330; Ex. 48, 2018 10-K, at 119 (reporting a finalized, audited charge of $22.042 billion on February 26, 2019).

### C.      GE Power's H-Class Turbine and the September 2018 Blade Failure

Plaintiff's other fraud theory focuses on GE Power's H-class gas turbine.  GE is the world's largest manufacturer and supplier of gas turbines—complex combustion engines that convert fuels to electrical energy—and related technology.  ¶¶ 36-37; Ex. 8, GER-3620M, at 3, 7; Ex. 9, 2014 10-K, at 32-33; Ex. 48, 2018 10-K, at 14.  The Company offers several different models of gas turbines, including the H-class turbine.  ¶ 1; Ex. 8, GER-3620M, at 46.  GE began taking orders for H-class turbines in 2014, *see* ¶ 41, and the first H-class turbine entered commercial service in June 2016, *see* Ex. 17, Dec. 4, 2017 Press Release, at 2.  The H-class turbine employs GE's most advanced technology, securing two world records for achieving the highest gross and net combined cycle efficiency rates.  *See* ¶¶ 43, 107; Ex. 29, Sept. 12, 2018 Press Release, at 2.

In gas turbines, hot air passes through rows of spinning blades, and the extreme temperature of that air can sometimes cause a form of corrosion in the blades called "oxidation."  ¶¶ 37, 79.  In 2015, before any H-class turbines entered service, two GE customers experienced oxidation in an older model of gas turbine (the 9FB), causing blade breakage in one unit.  ¶¶ 38, 77-78.  These issues were found at that time only in the 9FB, and not the H-class, which was not in operation yet.  *See id.*; Ex. 46, Jan. 25, 2019 *Reuters* Article, at 2.  Following these events, GE initiated a root-cause analysis to investigate the cause of the 9FB incidents.  ¶ 83.  Meanwhile, H-class units began to ship while GE's analysis of the 9FB blade issue was ongoing.  *See* ¶¶ 76-85; Ex. 46, Jan. 25, 2019 *Reuters* Article, at 2.  Plaintiff's cited documents concede that the first H-class units shipped "before it was determined that [the blade issue] was a component issue that impacted the 9FB fleet and the HA."  *See* ¶ 163; Ex. 46, Jan. 25, 2019 *Reuters* Article, at 2.

As a result of the root-cause analysis of the 2015 9FB incidents, GE worked to devise a solution for the 9FB fleet, first evaluating whether a special coating could protect affected blades from oxidation, *see* ¶ 83, and then developing a replacement component to resolve the risk of

oxidation, the "Generation (Gen) II" blade, *see* ¶ 87.  GE ultimately determined that there was a similar risk of oxidation in H-class turbine blades, *see* Ex. 46, Jan. 25, 2019 *Reuters* Article, at 2, and in 2017, GE developed a plan to upgrade all existing units with Gen II blades, *see* ¶¶ 86-87.

In early September 2018, an H-class turbine at the Colorado Bend site of GE customer Exelon experienced oxidation, causing one of its blades to break.  Ex. 35, Sept. 20, 2018 *Bloomberg* Article, at 2; Ex. 40, Sept. 28, 2018 Press Release, at 1.  This was the first H-class turbine that suffered blade breakage.  *See* Ex. 45, Dec. 7, 2018 *Reuters* Article, at 2.  As a precautionary measure, Exelon shut down a second turbine at that site, as well as two turbines at a different site, while GE addressed the issue.  Ex. 35, Sept. 20, 2018 *Bloomberg* Article, at 2.  Gen II upgrades that would have prevented the blade failure had been planned for Exelon, as well as for GE's other H-class units, but they had not yet been completed.  *See id.* at 1-2; Ex. 37, Sept. 24, 2018 Gabelli Report, at 1.

GE disclosed on September 19, 2018, that an H-class turbine had encountered an oxidation issue expected to impact other H-class units and that GE was working proactively with customers to implement a remedy, and it confirmed the Exelon shutdown the following day.  Ex. 30, Sept. 19, 2018 LinkedIn Post, at 5; Ex. 31, Sept. 19, 2018 Press Release, at 3; Ex. 32, Sept. 20, 2018 *Reuters* Article, at 1-2.  Just over one week later, two of the four Exelon units were up and running with new blades—ahead of schedule.  Ex. 40, Sept. 28, 2018 Press Release, at 1-2.  Exelon stated that it was "pleased with [GE]'s response" and that it had full confidence in the turbines, noting that with any new technology, "[y]ou have some growing pains, you have some startup challenges."  Ex. 35, Sept. 20, 2018 *Bloomberg* Article, at 2; *see also* Ex. 42, Oct. 8, 2018 *CCJ* Article, at 1 ("remind[ing]" readers that "the evolution of high-energy, highly engineered, cutting-edge power systems is rarely a smooth process").  At the time, analysts noted that "it [was] still

too early to quantify the financial impact" of the now more urgent repairs that would preempt the oxidation issue in other H-class units. *E.g.*, Ex. 39, Sept. 27, 2018 RBC Report, at 1.

On October 30, 2018, GE announced its third quarter 2018 results, including a $240 million charge for warranty and maintenance reserves to address the oxidation issue.[4]  ¶¶ 157, 186; Ex. 43, Q3 2018 10-Q, at 16.  To put that charge in perspective, in the third quarter of 2018, Power's revenues were $5.7 billion, GE's consolidated revenues were $29.6 billion, and the 82 H-class turbines ordered as of September 2018 each represented about $60 million in revenue, totaling $4.92 billion. *See* Ex. 43, Q3 2018 10-Q, at 9, 14; Ex. 38, Sept. 25, 2018 *Motley Fool* Article, at 2; Ex. 10, Mar. 31, 2015 *Bloomberg* Article, at 1.  GE also disclosed that it "expect[ed] to incur a similar incremental amount of cost over time related to the blades as [it] perform[ed] planned outages in [its] services contracts," which in the fourth quarter of 2018 represented "a very small" part of a $400 million charge resulting from "normal cost standard updates" to long-term service agreements.  Ex. 44, Q3 2018 Earnings Call Tr., at 5; Ex. 47, Q4 2018 Earnings Call Tr., at 8, 19.  GE continued replacing blades into early 2019, and in spite of the disclosed oxidation issue, GE received more H-class orders than anticipated in the beginning of that year. *See* Ex. 47, Q4 2018 Earnings Call Tr., at 19; Ex. 49, Q1 2019 Earnings Call Tr., at 14.

### D.      Plaintiff's Putative Class Action

Two putative class actions were filed and consolidated into the above-captioned case.  On June 21, 2019, Plaintiff filed the AC, which included a putative class period of December 4, 2017 to December 6, 2018 (the alleged "Class Period").  Defendants moved to dismiss the AC.  On August 30, 2019, rather than oppose that motion, Plaintiff elected to file the SAC.

---

[4]      Power also recognized charges of approximately $400 million "associated with an increase in issues on our existing projects driven by execution as well as partner and customer challenges," which were for expenses unrelated to the oxidation issue. *See* Ex. 43, Q3 2018 10-Q, at 16.

**ARGUMENT**

## I. THE SAC FAILS TO PLEAD A SECTION 10(B) CLAIM

To pursue a claim under Section 10(b), Plaintiff must plead facts showing, *inter alia*, (i) a material misrepresentation or omission, (ii) scienter, and (iii) loss causation.  *See Lucescu*, 2018 WL 1773134, at *6.  In addition to the requirement that Plaintiff must allege facts establishing a "plausible" claim, Plaintiff must also satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  *See Dingee v. Wayfair Inc.*, 2016 WL 3017401, at *3 (S.D.N.Y. May 24, 2016) (Cote, J.).  Under the PSLRA, Plaintiff must (i) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"; and (ii) "with respect to each [alleged] act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (scienter).  *See* 15 U.S.C. § 78u-4(b)(1)-(2).  Here, the SAC does not plead particularized facts that establish that any Defendant made any misstatement or omission of a material fact or acted with scienter, or that the alleged fraud caused any losses.

### A.    Plaintiff Fails Adequately to Plead a False or Misleading Statement

Plaintiff challenges the goodwill balances for GE's Power segment and descriptions of impairment testing reported in its 2017 Form 10-K and Q1 2018 and Q2 2018 Forms 10-Q, as well as a series of statements by Defendants regarding the technology, performance, and commercial potential of GE's H-class turbines.[5]  But Plaintiff "must do more" than contend a statement is false; it "must demonstrate with specificity why and how that is so."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  The SAC does not meet this basic requirement.

---

[5]    A table identifying the challenged statements, alleged speakers, and the reasons why each challenged statement is not actionable is attached as Exhibit 3.  *See Fogel v. Wal-Mart de México SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (accepting appendices that serve as "organizational tools").

As an initial matter, the SAC identifies only isolated statements with respect to several Individual Defendants, and only as to certain discrete topics. *See* Ex. 3, App'x. For example, the only alleged misstatements attributed to Mmes. Miller and Hauser are the goodwill balances and calculations reported in the Company's public filings, *see, e.g.*, ¶¶ 21-22; Plaintiff does not even attempt to attribute any misstatements to them regarding H-class turbines.[6] In effect, Plaintiff seeks to hold all of the Individual Defendants liable under the rejected theory that the allegedly false statements challenged in the SAC were "group-published" information and the result of their "collective actions." *See* ¶ 27. That is insufficient. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 637-41 (S.D.N.Y. 2017) ("[E]specially in light of the particularity requirements imposed on securities fraud pleadings . . . the group-pleading/group-published documents doctrine . . . is [] no longer viable."). And in any event, regardless of their maker, none of the alleged misstatements supports a claim for securities fraud.

       1.    <u>Defendants' Statements Regarding GE's Estimates and Calculations of Goodwill Were Not False or Misleading</u>

Plaintiff alleges that the goodwill balances reported for GE's Power segment during the Class Period and GE's description of its impairment testing were false and/or misleading because they were "not made in good faith" and "lacked any reasonable basis." *See, e.g.*, ¶¶ 456-60, 466-70, 479, 487-90. But—as this Court's recent decision in *Lucescu* instructs—Plaintiff's conclusory allegations fail to meet fundamental pleading standards. *See* 2018 WL 1773134.

---

[6]    Along the same lines, the SAC alleges that the only instances in which Messrs. Strazik or Mastrangelo made a supposed misstatement occurred in two press releases discussing the H-class turbine, and it never alleges that they made any statements regarding the Company's reported goodwill. *See* ¶¶ 446, 501. Likewise, the SAC alleges that Mr. Nugent made only two supposed misstatements, once in a press release and once in a news article, both of which again discussed only the H-class turbine, and had no bearing on the Company's goodwill. *See* ¶¶ 493, 501.

a.     *GE's Goodwill Estimates Are Inactionable Opinion Statements*

Estimates of goodwill "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).  As such, goodwill balances are quintessential opinion statements, for which Plaintiff must satisfy the pleading standards articulated in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015). *See Lucescu*, 2018 WL 1773134, at *7.  To avoid dismissal, a plaintiff arguing that an impairment charge was recorded improperly—like Plaintiff here—must "point to objective standard[s] such as market price that the plaintiff claims defendants should have but failed to use in determining the value of the company's assets."  *Id*.  Additionally, Plaintiff must plausibly allege with particularity facts showing that Defendants did not genuinely believe GE's goodwill balances were accurate at the time they were made.  *Id.* at *7, *11.  The SAC alleges no such facts.

*First*, although Plaintiff alleges that GE did not conduct an accurate assessment of goodwill, *see* ¶¶ 456-63, 466-76, 479-90, it does not "point to objective standard[s]" that GE "should have but failed to use in determining" the fair value of Power's assets.  *Lucescu*, 2018 WL 1773134, at *7.  Instead, Plaintiff provides a litany of publicly available information regarding "dislocation" and "severe overcapacity" in the power market that it claims "should have" lowered GE's projected cash flow and fair value estimates, as well as references to the "outwardly pessimistic" view of the power market held by two of GE's competitors, *e.g.*, ¶¶ 235-328, but not one of these general allegations represents an objective standard—like the market price of any of the relevant reporting units being valued—that GE failed to take into account, *see Fait*, 655 F.3d at 110; *see also* Ex. 4, ASC-350-20-35-22.  Moreover, Plaintiff fails to allege with particularity at what earlier point in time GE was required to take an impairment charge.  Plaintiff first claims that GE should have "material[ly]" impaired its goodwill balance in stages, in Q4 2017 and again in

15

Q1 2018, ¶ 235, but nowhere does Plaintiff allege that the GAAP-mandated analysis yielded such a result, or the size of the charge(s) it thinks GE should have taken. *See, e.g.*, *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd.*, 655 F. Supp. 2d 262, 269-70 (S.D.N.Y. 2009) (dismissing claim that "fail[ed] to allege at what point in time an impairment charge should have been taken and which specific losses known to the Company should have triggered [it]"); *see also City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd.*, 2010 WL 309009, at *4 (S.D.N.Y. Jan. 22, 2010) (allegation that $49 billion impairment should have been taken "no later than the beginning of the Class Period" "fail[s] to approximate the amount by which the Company should have written down its goodwill value," and when).

Plaintiff next speculates that "the full $22 billion impairment ***would have*** been taken ***at least*** by the second quarter of 2018" because, allegedly, GE's "second quarter 2018 and third quarter 2018 impairment analyses use[d] the same data, yet arrive[d] at opposite results." ¶¶ 235, 355. Plaintiff's argument is belied by the very statements upon which it relies. In its Q2 2018 filing, GE stated that "***[a]s of June 30, 2018***, we believe goodwill is recoverable for all of our reporting units." Ex. 28, at 81. By contrast, in its Q3 2018 filing, GE stated that "[w]e test goodwill for impairment annually in the third quarter of each year ***using data as of July 1 of that year***." Ex. 43, at 80. On their face, these two statements do not support Plaintiff's unsubstantiated theory that the same data was used to perform these two different calculations. In fact, GE's Q2 filing does not state that the interim impairment analysis relied on data "as of" ***any*** particular date. And even if the unspecified "data" used in GE's Q2 2018 and Q3 2018 analyses were the "same" (which is not what the filings say), use of the same data would not imply that GE made a false statement by taking an impairment in Q3 that was not taken in Q2. Fundamentally, because goodwill estimates are judgmental and based on long-term projections and forecasts that necessarily change over time, those judgments can and should change from one reporting period to another. And in any event,

16

Plaintiff fails to plead with the requisite particularity *which* data allegedly were the same.  *See* Ex. 22, 2017 10-K, at 146; Ex. 6, ASC 820-10-55-3, 7.[7]

Further, rather than alleging with particularity when GE should have reduced its long-term business projections for Power by any specific amount, Plaintiff relies on various short-term Power performance declines observed (and disclosed) by GE throughout the Class Period to support its allegation that GE should have reduced those projections earlier than it did.  ¶¶ 235-75, 456-63, 466-76, 479-90.  But as GE disclosed and Plaintiff admits, the downturn in the power market was "unprecedented in both scope and speed" and rapidly developing during the Class Period.  *See, e.g.*, Ex. 26, June 26, 2018 Call Tr., at 16 (noting that the Company continued to believe that the power market would improve); ¶¶ 5, 251, 257 (the power market was in "unprecedented" decline and "in the midst" of a dislocation in the fourth quarter of 2017); ¶¶ 459-62, 469-76, 481-89 (conceding that the power market still was "in the midst" of its downturn during the Class Period); *see also City of Sterling Heights*, 2010 WL 309009, at *4 ("[A]llegations of shifting market expectations . . . do not adequately allege that the Company was obligated to incur an impairment charge as to its goodwill value.").  Likewise, Plaintiff's sparse allegations that GE should have concluded earlier that "no synergies" would materialize from the Alstom acquisition based on a limited subset of purported synergies that "had not been realized" by year-end 2017 fare no better. ¶¶ 236-45; *see City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) ("downward trajectory" of company's market capitalization, "declining . . . revenues,"

---

[7]    Likewise, Plaintiff's speculative allegations regarding the different discount rates used in GE's reporting unit valuations from period to period, as reported in GE's Q3 2018 10-Q and 2018 10-K, are meritless.  ¶ 377.  Those discount rates are neither specific to the Power segment nor related to the same time periods.  *See* Ex. 43, Q3 2018 10-Q, at 80 ("Discount rates used in our reporting unit valuations ranged from 9.5% to 17.0%."); Ex. 48, 2018 10-K, at 118 ("Discount rates used in our annual reporting unit valuations ranged from 9.5% to 23.0%.").  And Plaintiff does not even attempt to allege that they affected GE's goodwill impairment result for Power.

"analysts' expectations regarding the [relevant] business environment," and "anticipation of economic slowdown" did not demonstrate defendants knew or should have known that impairment testing would reveal that goodwill was overvalued).

*Second*, Plaintiff fails entirely to plead any facts that would establish that any Defendant did not believe that GE's goodwill balances were accurate at the time they were made.  Plaintiff cites to no confidential witnesses, internal documents, or other information that speaks in any way to any Defendant's knowledge of GE's goodwill accounting.  Instead, Plaintiff speculates that, based on certain adverse market- or GE-specific trends and the size of the ultimate impairment charge, Defendants must not have evaluated goodwill throughout the Class Period in "good faith." ¶¶ 236-75, 459-62, 469-76, 481-89.  But that is not enough.  *Lucescu*, 2018 WL 1773134, at *12 ("Even if [Defendants] knew of facts that cut against the representations of . . . goodwill, that does not make the statements, which are statements of opinion, false or misleading."); *see also In re Express Scripts Holding Co. Sec. Litig.*, 2018 WL 2324065, at *8-9 (S.D.N.Y. May 22, 2018) ("[E]ven if plaintiff had plausibly plead[ed] facts to show that [the] accounting treatment should have been different, [it had] not allege[d] that Defendants 'did not believe' that the accounting treatment was appropriate during the Class Period; and therefore [did] not state[] a claim."). Indeed, Plaintiff is unable to contest that—in response to certain changed circumstances—GE conducted interim impairment testing during the Class Period and concluded in each instance that impairment was not permitted.[8]  *See* ¶¶ 224, 226, 232, 456.

---

[8]     The SAC also makes a half-hearted attempt to suggest that GE's goodwill impairment testing was impacted by supposed "manipulation of long-term service agreements," ¶¶ 380-84, 409-13, but it falls far short of alleging any facts that would plausibly support that theory. Plaintiff's remaining allegations rest upon the speculation of a former SEC Chairman regarding the size of GE's ultimate impairment charge, ¶¶ 10, 341, and an accounting expert's inability to "recall another situation" where goodwill exceeded the purchase price of a company, ¶ 59, which speak to neither GE's actual goodwill impairment testing, nor any Defendant's state of mind.

For these exact reasons, the New York Supreme Court recently rejected a shareholder lawsuit premised on GE's alleged failure to recognize sooner its October 2018 impairment charge. *See* Decision & Order at 11-12, *Trueblood v. Culp et al.*, No. 655552/2018 (July 3, 2019), Doc. #27. In dismissing nearly identical allegations to those in the SAC, the court held that the complaint did not "plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them," "failed to allege any specific instances where . . . Defendants acted in bad faith" or allegations "that could plausibly be read to infer bad faith," and failed to plead that the Board's alleged "delay in performing timely goodwill impairment tests, or in announcing a goodwill impairment charge related to GE Power was so egregious on its face that it could not have been the product of sound business judgment of the directors." *Id.* at 10-11.

The same is true here. The SAC pleads nothing more than a hindsight disagreement with the timing of the charge and GE's subjective accounting for goodwill, which is insufficient to plead fraud. *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, 2016 WL 5794774, at *11 (S.D.N.Y. Sept. 30, 2016) ("[N]othing more than disagreement with MDC's accounting judgments [regarding goodwill], [] cannot support a fraud claim.").

> b.      *GE's Goodwill Disclosures Did Not Violate GAAP or Item 303*

The SAC also fails to allege particularized facts showing that any statements about GE's GAAP-compliant goodwill testing and calculation, *see, e.g.*, ¶ 480, are actionable. *See Gissin v. Endres*, 739 F. Supp. 2d 488, 501 (S.D.N.Y. 2010). Plaintiff merely inserts long block quotes of GE's disclosures, summarizes accounting standards, and avers, in a conclusory fashion, that "GE concealed from investors that its cash-flow projections were not made in good-faith or compliance with GAAP." *E.g.*, ¶ 459. But, as Judge Furman recently held in another GE securities case, a mere recitation of accounting standards and a conclusion that Defendants "must have" violated them is insufficient. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 2019 WL 4094559, at *17

(S.D.N.Y. Aug. 29, 2019) (allegations that merely "recite[d] different accounting standards . . . or baldly assert[ed] that GE violated those standards, but ma[de] no effort to link the standards to any specific act, practice, statement, or lapse by GE" were "naked assertions of liability [that] do not allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").  Nor is it sufficient to allege that GE must not have performed its calculations in conformance with GAAP because GE ultimately recognized a large impairment charge.  *See Lucescu*, 2018 WL 1773134, at *11-12 (allegations that the "'same circumstances' that led to the September impairment existed in May" were "insufficient to state a claim that the assurances that [the company] complied with GAAP were false").[9]

Plaintiff further alleges that Item 303 required Defendants to disclose that "reduced cash flow" would have adverse effects such as "a major goodwill impairment."  ¶ 505.  But Plaintiff acknowledges GE's warnings leading up to and throughout the Class Period, in which GE told investors of the risks of a potential impairment charge, particularly if expected synergies from the Alstom acquisition did not materialize or market demand continued to decline.  *See supra* Section B.  While Plaintiff attempts to discount these warnings by claiming those risks already had materialized, *see* ¶¶ 459, 462, 469, 470-76, 481-89, this hindsight conclusion is not supported by facts.  Because "the 2017 Form 10-K warned of future impairments in the event the synergies from the Alstom acquisition were not realized," Plaintiff cannot "claim surprise at the October 2018 announcement."  *See, e.g.*, Decision & Order at 14, *Trueblood*, Doc. #27.[10]

---

[9]    Plaintiff's allegation that GE's truthful statement that Grid Solutions' goodwill totaled $4.5 billion, "representing 5% of our total goodwill at December 31, 2017" was somehow "misleading" demonstrates the paucity of its claims.  ¶ 461.  Plaintiff does not even attempt to allege that those numbers were false, and provides absolutely no support for its assertion that this statement "suggested that 95% of the Power segment's goodwill was not at risk of impairment."  *Id.*

[10]   *See also, e.g.*, Ex. 25, Q1 2018 10-Q, at 73 (warning that "the Power and Oil & Gas markets continue to be challenging and there can be no assurances that goodwill will not be impaired in

2.     <u>Defendants' Statements Regarding H-Class Turbines Were Not False or Misleading</u>

Plaintiff also fails to plead an actionable misstatement or omission by Defendants regarding GE's H-class turbines.  Defendants' statements of fact were true when made, they had no duty to disclose the developing oxidation issue (even though they did so shortly after the first and only incident of blade failure in an H-class turbine), and their corporate optimism, opinions, and forward-looking statements (which, prior to the Exelon blade failure, had nothing to do with oxidation) are all inactionable under well-settled law.

a.     *Defendants Made No False Statements Regarding the Quality, Operational Success, or Commercial Potential of H-Class Turbines*

Relying almost exclusively on thinly-sourced news articles and analyst speculation, Plaintiff alleges that Defendants' statements regarding the general quality, operational success, or commercial potential of the H-class turbine were false or misleading because, according to Plaintiff, the H-class turbine suffered from "systemic manufacturing defects" that led to oxidation in its blades, which "eliminat[ed] the benefits" of its efficiency.  *E.g.*, ¶¶ 447, 449, 453, 465, 478, 492, 494, 496, 498, 500, 502.  These allegations fail for multiple reasons.

*First*, Plaintiff fails to identify a single false statement of fact.  For example, Plaintiff points to GE's statement that the "[t]he new [H-class] combustion system ha[d] already been successfully tested at full-load and full-speed at GE's test stand in Greenville, South Carolina," ¶ 446, but nowhere alleges that such testing did not actually occur or that the results were unsuccessful. Likewise, Plaintiff points to statements that GE's HA fleet had achieved "more than 175,000

---

future periods as a result of sustained declines in macroeconomic or business conditions affecting our reporting units"); Ex. 28, Q2 2018 10-Q, at 81 (warning that "the Power and Oil & Gas markets continue to be challenging which could result in changes in our projected future earnings and net cash flows at these businesses").

operating hours" and that "Exelon's HA-powered Wolf Hollow II project was honored as Power Engineering's Best Gas-Fired Project in 2017," ¶ 491, but does not allege that the HA fleet did not achieve those operating hours or that the project did not receive that award.[11]  Accurate statements regarding the H-class turbine's accomplishments cannot serve as the basis for a fraud claim.  *See Pollio v. MF Glob., Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) ("[D]efendants may not be held liable . . . for accurate reports of past successes, even if present circumstances are less rosy.").

Indeed, the majority of the statements challenged by Plaintiff are not statements of fact at all, but expressions of corporate optimism that are inactionable because they are "too general to cause a reasonable investor to rely upon them."  *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) (Cote, J.) ("Simple expressions of puffery and corporate optimism do not violate securities laws.").  Plaintiff points to statements that GE Power was a "fundamentally strong franchise with leading technology" that had a track record demonstrating it could "improve output, reliability, and performance" of turbines when it serviced them, ¶ 477; that "HA technology enables the power plant of the future, delivering unprecedented levels of efficiency and reliability that can help countries everywhere meet today's power demands and reach more aggressive emissions goals," ¶ 464; and that there was "nothing like [the H-class turbine] in operation today," ¶ 501; *see also* ¶¶ 446, 448, 450, 452, 454, 491, 493, 497; Ex. 3, App'x.  But courts routinely conclude that substantively similar statements touting a product and operational successes are inactionable as a matter of law.  *See, e.g., Pearlstein v. Blackberry Ltd.*, 93 F. Supp. 3d 233, 240-41 (S.D.N.Y. 2015) (positive statements regarding outlook of rollout of

---

[11]     *See also*, *e.g.*, ¶ 450 (citing statement that "the [C]ompany also [wa]s innovating with advances in cooling and sealing, improved aerodynamics, and the use of materials and coatings designed for use in higher temperatures, including ceramic material composites," but failing to allege facts showing that GE was not innovating in those areas), ¶ 452 (citing statement that H-class technology was "operating in line with performance guarantees," but failing to identify what the performance guarantees were or how the technology failed to operate in line therewith).

new product constituted inactionable puffery); *In re Razorfish, Inc. Sec. Litig.*, 2001 WL 1111502, at *3 (S.D.N.Y. Sept. 21, 2001) (statements that company was "successfully executing our growth strategy" and "do[ing] an outstanding job" were "classic expressions of optimism [or] puffery of the kind that cannot possibly support a securities fraud claim").

*Second*, Plaintiff's allegations that Defendants' optimistic statements regarding the H-class turbine's quality or technology were misleading because they purportedly omitted material facts about "systemic" issues impacting the blade components likewise miss the mark. As an initial matter, nothing cited by Plaintiff actually supports its narrative that the H-class turbine's technology is fundamentally flawed or that the product was destined to fail—and, in fact, the allegations in the SAC show precisely the opposite. As Plaintiff concedes, GE proactively worked to identify a solution for the affected blade component in H-class turbines, *see, e.g.*, ¶¶ 87, 111, 122, 133-34, 143, and recorded $240 million (which constitutes less than 1% of GE's 2018 annual revenue) to increase associated warranty and maintenance reserves, *see* ¶¶ 157, 186; Ex. 44, Q3 2018 Earnings Call Tr., at 5, 10. And GE received more orders for H-class turbines than anticipated in the beginning of 2019, since the oxidation issue arose and was resolved. *See* Ex. 49, Q1 2019 Earnings Call Tr., at 14. Plaintiff relies on speculation about the risk that blade oxidation would harm GE Power's brand or market share,[12] *e.g.*, ¶ 127, and scattered complaints from unidentified customers allegedly impacted by the oxidation issue, *e.g.*, ¶¶ 110-12, rather than any facts showing internally-known blade defects significant enough to undermine the value of GE Power's turbine business.

---

[12]   Plaintiff's allegations that GE lost market share in 2017, resulting in significant financial losses beyond warranty or repair costs, do nothing to save its claims. *See* ¶¶ 169-76, 408. The only fact the SAC can muster is that GE received fewer turbine orders in 2018 than it did in 2017. *See* ¶ 171. Plaintiff makes no attempt, however, to allege with particularity that the alleged fewer orders resulted from the H-class turbine oxidation issue.

*Third*, Plaintiff fails to allege that Defendants had any duty to disclose a potential oxidation issue impacting the H-class turbine earlier than they did.  Plaintiff faults GE for disclosing the oxidation issue to its customers prior to informing the public, *e.g.*, ¶¶ 110-12, but the securities laws do not require continuous disclosure.  *See Police & Fire Ret. Sys. of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482, at *9 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir. 2018) ("A company is generally not obligated to disclose internal problems because the securities laws do not require management to bury the shareholders in internal details and because public disclosure of internal management and engineering problems falls outside the securities laws.").  And despite Plaintiff's characterization of GE's September 2018 customer meeting as "secret," the SAC acknowledges that members of the press attended and reported on it.  *See* ¶¶ 3, 110.

Plaintiff's allegations show (at most) that during the Class Period, GE was investigating oxidation affecting blade components in its gas turbines, while working closely with customers on possible fixes.  It is well-established that, "[t]aking the time necessary to get things right is both proper and lawful.  Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010); *see also In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013) (defendants "were entitled to devote a reasonable amount of time to investigation and remediation before disclosing an assessment of the [] situation any gloomier than that contained in [the] July and October 2011 disclosures"); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008) ("Defendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises.").

24

Indeed, Plaintiff cites to news articles describing blade oxidation impacting two 9FB turbines in 2015, *see, e.g.*, ¶¶ 120, 123, 163-66, 447, which "prompted GE to work on new protective coatings and alter a heat treatment process for the parts." *See, e.g.*, Ex. 46, Jan. 25, 2019 *Reuters* Article, at 2. Rather than support its claims that GE was aware of and concealed "catastrophic" blade issues impacting H-class turbines,[13] Plaintiff's own cited articles maintain that "after the blade [in the 9FB turbine] broke in 2015, GE did not know at first that the [oxidation] problem would also afflict its HA models," and that when GE became aware that H-class turbines may be similarly impacted, it was "working on [a] solution" before the unexpected September 2018 Exelon incident. *Id.*; Ex. 33, Sept. 20, 2018 *WSJ* Article, at 3; *cf. Williams v. Citibank, N.A.*, 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").

Following the Exelon incident, GE confirmed the turbine shutdowns, voluntarily disclosed to investors that a similar oxidation issue may impact other H-class turbines, and later publicly increased its reserves by approximately $240 million in response to the issue. *See* ¶¶ 120, 186; *supra* Section C; Ex. 32, Sept. 20, 2018 *Reuters* Article, at 1-2; Ex. 44, Q3 2018 Earnings Call Tr., at 5, 10. Plaintiff alleges no facts showing that GE knew earlier that H-class blade failures would

---

[13]    Plaintiff attempts to conflate the H-class oxidation issue with other routine operational challenges in an effort to make it appear more significant than it was. Plaintiff claims that in January 2017, GE Power issued a technical information letter ("TIL") to F-class customers in connection with the oxidation issue providing revised usage guidelines. ¶ 89. But the TIL that Plaintiff cites instead describes a "contamination" issue that was introduced into certain 7F and 9F units through repairs—one that has nothing to do with oxidation caused by "coating fail[ures]" or "insufficient cooling air circulat[ion]." *Compare* ¶¶ 79, 83, 87, *with* Ex. 13, TIL 2024, at 2. Plaintiff also references coverage of "vibration" and other issues in turbines operated by the Pakistani government, speculating that they "may be linked" to oxidation, *see, e.g.*, ¶ 94, but the sources upon which it relies do not support its conjecture. *See, e.g.*, Ex. 18, Dec. 27, 2017 *Reuters* Article, at 1, 3 ("no evidence" that H-class turbines had "fundamental design flaws").

occur before GE completed its planned replacements, or that an oxidation issue affecting a single component would otherwise pose any threat to the H-class turbine's overall success.

Tellingly, Plaintiff nowhere even attempts to allege that GE should have recorded charges for H-class turbine maintenance and upgrades earlier than it did, or that the reserves GE has are insufficient to address the issue.[14]  That further undermines any argument that Defendants were obligated to disclose the potential oxidation issue at any time, or—once voluntarily disclosed in connection with the Exelon shutdown—were required to express doubts they did not have about GE's ability to resolve the issue.  *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 577 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (company did not have a duty to disclose the implementation challenges it was confronting until those challenges had ripened).[15]

<blockquote>b.    *Defendants Made No False Statements Regarding GE's Response to the September 2018 Blade Failure*</blockquote>

Plaintiff also alleges that statements regarding GE's response to the September 2018 blade failure at Exelon were misleading because they falsely "reassured investors that the problem was solved and it had a fix."  *See, e.g.*, ¶¶ 494, 496, 498, 500, 502.  But Plaintiff again pleads no facts,

---

[14]    Plaintiff also misconstrues the charges taken in connection with Power's service agreements in an effort to make the oxidation issue seem more costly than it was.  Plaintiff now admits that the Q4 2018 $400 million charge was not solely the result of the oxidation issue, *compare* ¶ 186 (admitting that the $400 million charge was for "updates, including on service contracts related to the same oxidation issue"), *with* AC ¶ 180 (alleging GE incurred a $400 million charge on service contracts related solely to the oxidation issue), but continues to contend that a significant portion of the charge resulted from the oxidation issue.  ¶ 186.  Not true.  *E.g.*, Ex. 47, Q4 2018 Earnings Call Tr., at 19 (explaining that the blade repair work is "a very small issue in the quarter").

[15]    Several statements challenged in the SAC regarding H-class turbines are also inactionable as genuinely held opinions, *see Omnicare*, 135 S. Ct. at 1322, 1327, 1332; *see, e.g.*, ¶¶ 446, 493; *see also, e.g.*, ¶¶ 448, 452, 454, 464, 477, 491, 495, 501, or as forward-looking statements protected by the PSLRA, *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018); *see, e.g.*, ¶¶ 454, 477; *see also* Ex. 3, App'x.

apart from the speculation of analysts and anonymous customers referenced in news coverage, *see, e.g.*, ¶¶ 3, 110-11, to support its conclusory allegation that Defendants misspoke about the Company's response to the incident, concealed a bigger problem, or should have concluded that its Gen II blades would be ineffective. *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiffs' counsel."). GE itself disclosed that it would need to upgrade H-class turbines with Gen II blades, *see, e.g.*, Ex. 34, Sept. 20, 2018 J.P. Morgan Report, at 2, and (as discussed) Plaintiff has yet to explain why Defendants should have doubted the efficacy of those upgrades or concluded that the upgrades would make the turbines any less innovative, efficient, or reliable in the long term. And indeed, Defendants' statements regarding GE's "fix" for oxidation in the H-class turbine were indisputably true: Gen II blades do resolve the oxidation issue and were used to repair Exelon's turbines—in some cases, ahead of schedule. *See* Ex. 40, Sept. 28, 2018 Press Release, at 1-2; ¶¶ 86-89.

c.     *Disclosures Regarding H-Class Turbines Did Not Violate Item 303*

Finally, the SAC makes the conclusory allegation that Defendants violated Item 303 because they knew that the Company's H-class turbines represented a known risk and uncertainty to its financials. *See* ¶¶ 503-05. As Plaintiff acknowledges, the rules require disclosure only where the registrant has knowledge of a potential material impact on a company's financial results, to a reasonable degree of certainty. ¶¶ 503-04. And the SAC does not plead any particularized facts suggesting that any Defendant had such knowledge.[16] Moreover, GE warned of the risks and

---

[16]     Similarly, Plaintiff's transparent attempt to link its H-class turbine allegations to its goodwill claims is meritless. *See* ¶¶ 447, 449, 451, 453, 455, 465, 478, 492, 494, 496, 498, 500, 502. The two issues are plainly unrelated. Moreover, as described further above, Plaintiff does not allege with particularity that GE had a duty to disclose its reserves for the oxidation issue earlier than it did, let alone that any oxidation issue had an impact on GE's goodwill balance.

uncertainties Plaintiff claims were concealed.  *See, e.g.*, Ex. 14, 2016 10-K, at 122 ("there can be no assurance that we or our customers or other third parties will not experience operational process failures or other problems" that "could have a material adverse effect on our business").

### B.    Plaintiff Fails Adequately to Plead a Strong Inference of Scienter

The SAC also must be dismissed for the independent reason that Plaintiff still fails to establish a "strong inference" of scienter—*i.e.*, an "intent to deceive, manipulate, or defraud"—as to each Defendant and each alleged misstatement.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); 15 U.S.C. § 78u-4(b)(2).  To meet this standard, "it is not sufficient to set out facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent."  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110-11 (2d Cir. 2009) (emphasis in original).  Instead, to be "strong," the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  In this Circuit, a strong inference of scienter may be established by alleging facts showing either (i) defendants' "motive or opportunity to commit fraud," or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA v. J.P. Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  The SAC fails to plead either.

### 1.    Plaintiff Has Not Pled a Cognizable Motive

It is axiomatic that Plaintiff cannot establish scienter through motives "common to most corporate officers."  *ECA*, 553 F.3d at 198.  If such motives were sufficient, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).  Instead, Plaintiff must plead a "concrete and personal benefit" realized by each Defendant from any purported fraud.  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Plaintiff fails to do so.

Plaintiff does not even allege any stock sales by senior executives—an "ordinary" hallmark of securities fraud.  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

Plaintiff first points to a series of generic motives that are not actionable under established law: (i) Defendants' desire to maintain the appearance that GE, and/or its Power segment, were financially strong, ¶¶ 276-88, 406-08; (ii) GE's desire to avoid cutting its dividend further after a 50% reduction announced in November 2017, ¶¶ 427-33; (iii) GE's desire to remain in the Dow Jones Industrial Average, ¶¶ 434-35; and (iv) GE's desire to maintain its credit rating, ¶¶ 418-26. But "[a]ction taken to maintain the appearance of corporate profitability, or of the success of an investment . . . does not entail concrete benefits sufficient to demonstrate motive." *Lucescu*, 2018 WL 1773134, at *8; *see also ECA*, 553 F.3d at 200 (desire to maximize corporate profits "actually benefits the shareholders"); *S. Cherry St.*, 573 F.3d at 109 ("desire to maintain a high credit rating" is a goal "possessed by virtually all corporate insiders").

Plaintiff then suggests that certain Defendants concealed facts regarding "key" projects or otherwise delayed disclosures to avoid their own terminations.  *See, e.g.*, ¶¶ 393-401.  That again is insufficient.  *See, e.g., Kalnit*, 264 F.3d at 139 (plaintiffs "must do more than merely charge that executives aim to prolong the benefits of the positions they hold").  Perplexingly, the SAC still alleges that Mr. Flannery was motivated to delay recognizing a goodwill impairment that was otherwise not permitted under GAAP because it would confirm the failure of the Alstom acquisition.  ¶¶ 394-97.  But as Plaintiff admits, in November 2017—before the Class Period and only a few months after he became CEO—Mr. Flannery publicly stated that the Alstom deal was a "disappointment" and that if GE "c[ould] go back in a time machine today, [it] would pay a substantially lower price than [it] paid."  ¶¶ 236, 239.  It defies logic that Mr. Flannery would be motivated to "inflate" goodwill to preserve the perceived success of the Alstom acquisition ***after*** publicly stating that it was a disappointment. *See In re Omega Healthcare Inv'rs, Inc. Sec. Litig.*,

29

375 F. Supp. 3d 496, 512 n.10 (S.D.N.Y. 2019) ("Courts often refuse to infer scienter . . . when confronted with illogical allegations.").

### 2.    Plaintiff Has Not Pled Recklessness

Because Plaintiff fails to allege motive, it faces a "correspondingly greater" challenge of establishing a strong inference that Defendants recklessly engaged in securities fraud. *Kalnit*, 264 F.3d at 142. "Recklessness" is more than "merely a heightened form of negligence"; it is "conscious . . . *i.e.*, a state of mind approximating actual intent." *S. Cherry St.*, 573 F.3d at 109. Plaintiff fails to meet this high standard.

### a.    *Plaintiff's Conjecture Fails to Raise a Strong Inference of Scienter Regarding GE's Goodwill Estimates*

Plaintiff's theory that Defendants fraudulently overstated the goodwill reported for GE's Power segment rests entirely on rank speculation. The AC and SAC share the same lone FE, who says nothing about the Company's goodwill impairment testing, period. Without any first-hand information, Plaintiff relies on a laundry list of generalized, publicly available "facts," *e.g.*, ¶¶ 236-328, to try to allege that Defendants must have known or recklessly disregarded that GE had not "conduct[ed] an accurate assessment of goodwill impairment based on reasonable assumptions." SAC at V.H. But Plaintiff never describes any data or assumptions GE actually used in its goodwill testing, let alone how or why those assumptions were unreasonable. Plaintiff's allegations amount to post-hoc, insufficient "must have been fraud" claims. *See In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) (plaintiffs must show "specific instances in which Defendants received information . . . contrary to their public declarations").

Plaintiff's remaining circumstantial allegations likewise fail. *First*, Plaintiff alleges that the magnitude of the impairment charge ultimately taken by GE gives rise to a strong inference of scienter. *See* ¶¶ 386, 390. But allegations regarding the size of the charge, standing alone, do no

30

such thing.  *See, e.g.*, *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010) ("[T]he size of an alleged fraud[ulent write-down] alone does not create an inference of scienter . . . ."); *cf. Lucescu*, 2018 WL 1773134, at *3-4, *13 (no scienter where impairment charge constituted "the entire amount of the reported goodwill associated with two of [the company's] business segments").

*Second*, Plaintiff attempts to transform the "sudden" nature of the goodwill impairment charge into a scienter allegation.  *See, e.g.*, ¶¶ 7-8, 10, 386.  Plaintiff's theory is unavailing; as Plaintiff admits, *see, e.g.*, ¶¶ 467, 480, GE repeatedly told investors about its ongoing goodwill testing, GE could only write down goodwill if it failed the GAAP-mandated impairment test, GE took impairments and described which impairment tests had not yet yielded write-downs, and GE warned of risks of further goodwill impairments due to continued market developments and underperformance, rendering the eventual impairments anything but "sudden."  *See* Ex. 22, 2017 10-K, at 83-84, 106, 132, n.8; Ex. 25, Q1 2018 10-Q, at 73; Ex. 28, Q2 2018 10-Q, at 81.  Indeed, because of these developments, GE informed investors that the cushion between the challenged reporting units' fair values and carrying values had eroded and GE was conducting more frequent interim testing—which KPMG audited/reviewed.[17]  *See* Ex. 22, 2017 10-K, at 83-84, 117; Ex. 28, Q2 2018 10-Q, at 81.  These indisputable facts are inconsistent with Plaintiff's scienter theory.

*Third*, Plaintiff points to the timing of the departure of several Defendants from the Company, *e.g.*, ¶ 388.  Of course, executive resignations during turbulent business times, without facts linking them to alleged fraud (which Plaintiff has not pled here), do not suffice.  *See In re*

---

[17]    Although the SAC attempts to cast aspersions on KPMG's fitness to serve as GE's outside auditor, its allegations of regulatory scrutiny are not specific to KPMG's audits of GE.  *See* ¶¶ 442-45.  The SAC fails to allege how KPMG's review of ***GE's*** goodwill practices were deficient.

*UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012) ("forced resignations and terminations of key [] personnel" alone did not support strong inference of scienter).

*Fourth*, Plaintiff attempts in the SAC to construct a narrative under which three new Board members, including Mr. Culp, put an "end" to allegedly improper goodwill testing, leading to the impairment charge in October 2018. *See* ¶¶ 386-89. But that narrative is based on nothing but the timing of changes to GE's Board and Plaintiff's own speculation. To credit Plaintiff's allegations under the PSLRA's rigid pleading standards, Plaintiff must allege a witness, a document, or something else that actually supports a plausible inference that the new Board members uncovered—and put an end to—fraud. The SAC offers only unsupported conjecture.[18] *See Plumbers & Steamfitters*, 694 F. Supp. 2d at 297 ("securities fraud claims" cannot be based "on speculation and conclusory allegations"). The only facts described in the SAC are what GE painstakingly documented in its SEC filings: the cushion between the fair value and carrying value of certain reporting units eroded over time, GE disclosed that erosion and the risk of a future impairment, and then in the third quarter of 2018, fair value fell below carrying value, at which point the disclosed risk materialized.[19] All of the SAC's contentions about new Board members

---

[18]     Not only is Plaintiff's speculative theory entirely without factual support, it also makes no temporal sense. Plaintiff alleges that the new Board members exerted their "influence" during the third quarter of 2018, *see* ¶ 387, but as Plaintiff recognizes, these new Board members started in April 2018, ¶ 386, three months before GE issued its Q2 2018 Form 10-Q, ¶¶ 479-80. Plaintiff's theory that the new Board members influenced the Q3 2018 financial report, but somehow not the Q2 report, rests entirely on unfounded speculation and cannot support a finding of scienter. *See In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 n.83 (S.D.N.Y. 2006) (illogical allegations do not provide a basis for strong inference of scienter).

[19]     In an effort to plead fraud by rhetoric, Plaintiff takes Mr. Culp's January 31, 2019 statements about "market reality" out of context to suggest he believed that GE's past forecasts had no basis in fact. ¶ 363. In actuality, Mr. Culp merely stated that GE was "late to embrace the realities of the secular and cyclical pressures in the business," Ex. 47, Q4 2018 Earnings Call Tr., at 5, which does not support any inference of fraud. GE's competitors may have acknowledged that the power market was undergoing a period of unprecedented tumult, *see* ¶¶ 251-52, but no one knew the length or depth of the decline. In any event, the "law is clear that misguided optimism

and the new CEO uncovering goodwill improprieties are simply uncorroborated stories invented by Plaintiff's counsel that do not hang together.  Those do not substitute for well-pled facts.

*Last*, Plaintiff references a preexisting SEC inquiry into GE Power's revenue recognition practices, *see* ¶ 325, and suggests that an investigation into its goodwill impairment evidences scienter, *see* ¶ 391.  But the existence of an "investigation[] cannot bolster allegations of scienter that do not exist."  *See Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *8 (S.D.N.Y. Dec. 29, 2016); *see also Sjunde AP-Fonden*, 2019 WL 4094559, at *20 (dismissing securities fraud claims related to GE's revenue recognition practices for long-term service agreements).

      b.    *The Vague Allegations of One FE Fail to Raise a Strong Inference of Scienter Regarding GE's H-Class Turbines*

Plaintiff also fails to raise a strong inference of scienter with respect to GE's H-class turbines.  In fact, the SAC does not even allege that prior to the Exelon incident any Defendant actually knew about the extent of the blade oxidation issue in the H-class turbines before making any challenged statements.  Rather, Plaintiff asks the Court to accept its assumptions about what Defendants "would have" known.  *See, e.g.*, ¶ 91 ("Technical Information Letter ***would have*** gone all the way to the CEO"); ¶ 93 ("Power segment executives ***would have*** been apprised").  Without pleading what any Defendant actually knew (and when), Plaintiff cannot satisfy the PSLRA.

Like the AC, the SAC includes negligible allegations attributed to just one FE, who adds nothing to Plaintiff's scienter allegations.  As Defendants noted in their initial motion to dismiss, and as the SAC tellingly does not even attempt to refute, that sole FE is not alleged to have interacted with ***any*** Individual Defendant or to have had ***any*** personal, first-hand knowledge of specific reports or information in any Individual Defendant's possession.  As such, the allegations

---

is not a cause of action, and does not support an inference of fraud."  *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30, 2018).

attributed to the FE continue to fall well short of raising a strong inference of scienter.  *See Lucescu*, 2018 WL 1773134, at *12 (confidential witnesses' "lack of [direct] access" to defendant "underscores the paucity" of plaintiff's scienter allegations).  In general terms, the FE describes the process by which GE issues TILs regarding gas turbines to customers, and then provides an "opinion" that an unspecified "different" TIL sent in 2017 "would have gone all the way to the CEO [Mr. Flannery] because of the financial and reputational impact of the letter."  ¶¶ 90-91.  The low-level FE's "opinion simply is not enough to support a claim."  *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016).

Tellingly, the FE does not describe the contents of the alleged "different" TIL, identify any GE policies that would require any Individual Defendant (or anyone else) to review or approve that TIL, allege that the TIL was related to oxidation, or ***even claim to have seen it***.  The sole FE fails even to "opin[e]" on whether any of the Individual Defendants apart from Mr. Flannery "would have" seen the TIL, or even been aware of its existence.  *See* ¶ 91.  The SAC cites ***another*** TIL, ¶ 89, but it has nothing to do with Plaintiff's claims.  As Plaintiff implicitly acknowledges, the cited TIL exclusively discussed F-class turbine oxidation issues caused by contamination introduced during repairs.  *See* Ex. 13, TIL 2024, at 2.  And neither Plaintiff nor the FE explain how the alleged "different" TIL, which is still ***not*** before this Court in the SAC, contradicted anything said by Mr. Flannery, Mr. Stokes, or any other Defendant.  The SAC's only new "allegation" related to the FE is a supposition by Plaintiff (and not the FE) that the FE's "explanation of the TIL process" coupled with GE's efforts to help customers mitigate any equipment issues "demonstrates" that certain Individual Defendants "would have" been apprised of the H-class oxidation "by the first half of 2017."  ¶ 93.  The FE's allegations should be afforded no weight.  *See, e.g., Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011)

("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge [are] insufficient.").

Here, not only has Plaintiff failed to allege with particularity any facts that directly contradict the H-class turbine statements it challenges, *see supra* § I.A.2, it supplies no facts regarding contradictory information even available to any Defendant. *See Plumbers & Steamfitters*, 694 F. Supp. 2d at 299 (plaintiff "must specifically identify the reports or statements that are contradictory to the statements made," or "provide specific instances in which Defendants received information that was contrary to their public declarations"). Plaintiff submits, for example, that Defendants must have known of or recklessly disregarded "systemic manufacturing defects that led to oxidation" in GE Power's H-class turbines because, *inter alia*: (i) GE conducted a root-cause analysis of oxidation discovered in 2015 in a 9FB turbine; (ii) GE observed instances of cracking on 9FB turbine parts that had a special coating; (iii) GE issued a TIL to customers and worked with some H-class customers to implement upgrades to avoid oxidation in 2017; and (iv) "Defendants followed [analyst] Tusa's commentary regarding the turbine issues at GE." *See* ¶ 447. But none of those allegations establishes systemic manufacturing defects in the H-class turbines, much less systemic defects that any Defendant recklessly disregarded when making general statements regarding the H-class turbines' performance and commercial success.

As Plaintiff acknowledges, GE was assessing the scope of the blade oxidation issue and potential fixes throughout the Class Period. ¶¶ 86-87, 110. Contrary to Plaintiff's theory, while GE was doing so, Defendants did not have to abandon their optimism for the H-class turbine. *See, e.g.*, *In re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 41-42 (2d Cir. 2000) (no recklessness where early reports indicated a "potential problem," as the law does not require a corporation to "abandon its product on what, at the time, would have been speculation"); *In re Rockwell Med., Inc.*, 2018 WL 1725553, at *15 (no recklessness where company did not provide "overly gloomy" reports on

sales prospects because, even if company "took a more optimistic view" than outside analysts, the "law is clear that 'misguided optimism is not a cause of action, and does not support an inference of fraud'" (quoting *Jones v. Perez*, 550 F. App'x 24, 26 (2d Cir. 2013))).

c.    *The Non-Fraudulent Inference Is More Compelling*

When "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323.  Here, the most cogent and compelling inferences to be drawn from the SAC are non-fraudulent. Specifically, GE: (i) tested goodwill often and disclosed the erosion of the cushion between fair value and carrying value, and the related risk of a goodwill impairment, and then took an impairment charge when GAAP required it to do so; and (ii) investigated, worked to resolve, and ultimately chose to disclose blade oxidation issues in a new product, its H-class turbines, along with a solution it believed would fix these issues.  The "alternative inference—that Defendants did not realize" the scope and depth of the global power market decline or the start-up challenges associated with the H-class turbine "and then made disclosures and adjustments as they learned about the scale of the problem[s]—is more compelling than the inference of fraud." *Sjunde AP-Fonden*, 2019 WL 4094559, at *12; *see also, e.g.*, *Lucescu*, 2018 WL 1773134, at *13 ("[a]n expectation that Nortel's new management would be able to rebuild the company's fortunes does not constitute an intent to deceive or defraud investors" absent "plausible allegations of fraudulent intent or an extreme departure from the standards of ordinary care"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 298 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

### C.   Plaintiff Fails Adequately to Plead Loss Causation

The SAC also does not adequately allege loss causation, or a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."[20] *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). Plaintiff vaguely alleges that the "truth" concerning GE's alleged manipulation of goodwill and issues in GE's H-class turbines was "revealed" through a series of partial disclosures from September 20, 2018, through the day after the Class Period ends. ¶¶ 3, 9-10, 517; *see, e.g.*, ¶¶ 113, 120, 122, 133-34, 138, 144-54, 157, 333, 344-45, 515. But none of the obliquely referenced partial disclosures revealed any alleged relevant "truth"; rather, they merely repeated previously known information or disclosed nothing about the alleged fraud. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43, 347 (2005).

*First*, Plaintiff alleges that GE's $22 billion goodwill impairment charge and corresponding dividend cut on October 30, 2018, revealed fraud in GE's prior goodwill accounting, causing its stock price to drop from $11.16 to $10.18. ¶¶ 330-42. But Plaintiff concedes that GE announced **on October 1, 2018** that it intended "to impair up to $23 billion in goodwill," ¶¶ 9, 362, 424, after which GE's stock price **rose** from $10.86 to $11.63, a fact which is judicially noticeable. *See* Ex. 7, GE Historical Stock Price; *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 367 (S.D.N.Y. 2018). Plaintiff attempts now to explain away the price increase by implying that the market had a positive "reaction to the news about Larry Culp taking the helm." ¶ 329. But Plaintiff concedes that analysts cautioned on October 1, 2018, that "the kitchen sink [wa]s coming" and recognized the implications of the goodwill impairment, including a larger-than-expected dividend cut and downgrades to GE's credit ratings. ¶¶ 522-23. Plaintiff's concessions, along with GE's

---

[20]   Although the Second Circuit has not addressed whether loss causation must be pled with particularity under Rule 9(b), at least one Court has suggested that a heightened standard applies. *See Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *13 (S.D.N.Y. Feb. 3, 2014). In any event, Plaintiff fails even to meet the more lenient standard under Rule 8.

stock price increase, doom its loss causation theory. *See Waters v. Gen. Elec. Co.*, 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010) (granting motion to dismiss and observing that "[t]he Court c[ould not] find, and Plaintiffs ha[d] not cited, a single section 10b-5 case in which the plaintiff prevailed on a motion to dismiss when the stock price *increased* after an announcement revealing an alleged fraud" (emphasis in original)), *aff'd*, 447 F. App'x 229 (2d Cir. 2011).

Moreover, GE's confirmation of the impairment charge on October 30 was entirely consistent with its earlier disclosures, and revealed nothing new or fraudulent. Specifically, GE observed that the goodwill impairment resulted from, *inter alia*, a deteriorating outlook due to "the significant overcapacity in the industry, lower market penetration, uncertain timing of deal closures due to deal financing, and the complexities of working in emerging markets," as well as "market factors such as increasing energy efficiency and renewable energy penetration." ¶ 333 (quoting Ex. 43, Q3 2018 10-Q). Such cumulative disclosures that do not reveal any "relevant truth" cannot support loss causation. *See Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) (dismissing claim where alleged corrective disclosures "did not reveal any 'relevant truth' about the purported fraud"). Because the public knew that GE was poised to take an impairment of "substantially all" of Power's goodwill balance of approximately $23 billion on October 1 (which is actually more than the $22 billion impairment GE ultimately took), if anything, the October 30 announcement simply represented the materialization of a known, previously disclosed risk. It thus cannot support loss causation.[21] *See Central States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 77 (2d Cir. 2013).

---

[21]     Moreover, GE's additional disclosure on October 30, 2018, that the SEC and DOJ intended to investigate GE's goodwill accounting does not support loss causation. *See Janbay*, 2012 WL 1080306, at *15 ("The announcement of an SEC [] internal investigation is itself insufficient to plead loss causation."); *Meyer v. Greene*, 710 F.3d 1189, 1200-01 (11th Cir. 2013) (disclosure of investigation "is insufficient to constitute a corrective disclosure for purposes of § 10(b)").

*Second*, Plaintiff claims that media and analyst reports published on and after September 20, 2018, regarding the Exelon shutdown constituted partial corrective disclosures. *See* ¶¶ 120, 122, 124-25, 127-32, 136-38.  But these articles and reports did not correct any of Defendants' prior statements regarding the general performance of GE's H-class turbines (none of which had anything to do with oxidation, or the lack thereof), or otherwise reveal fraud.  The disclosures simply reported the undisputed facts that, starting in 2017, GE had begun investigating potential oxidation issues in its H-class turbines and developing a fix. *Id.*

Furthermore, GE first disclosed the existence of an oxidation issue in its H-class turbines through internet posts on September 19, 2018, as Plaintiff now admits. ¶ 119; *see also* Ex. 37, Sept. 24, 2018 Gabelli Report, at 1.  Despite Plaintiff's conclusory allegations that the September 19, 2018 disclosures "downplayed" the oxidation issue, those disclosures truthfully stated that oxidation "affects the lifespan of a single blade component" and that GE had "been working proactively with HA operators to address impacted turbines." ¶ 119.  Tellingly, GE's stock price again **increased** from $12.17 to $12.37 as of market close on September 19.  Ex. 7, GE Historical Stock Price.  Plaintiff speculates that further public coverage of the H-class oxidation issue caused declines in GE's stock price on September 20, 2018, *see* ¶ 132, but subsequent reports containing already-public information cannot establish loss causation.[22]  *See, e.g.*, *Turner*, 2014 WL 406917, at *13 (no loss causation where alleged corrective disclosures contained information that was already public); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *31 (S.D.N.Y. May 10, 2012) ("Investors cannot establish loss causation merely by relying on an after-the-fact negative characterization of already-public information.").

---

[22]  Plaintiff's reliance on negative analyst commentary, ¶¶ 127-30, reports of H-class turbine shutdowns, ¶ 138, and GE's announcements on its effort to find a solution, ¶ 134, is also misplaced. Not only did these reports fail to provide new information, they did not disclose that GE acted fraudulently. *See Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 498 (S.D.N.Y. 2016).

*Finally*, Plaintiff cites to three downgrades of GE's credit ratings, ¶¶ 343-49, 424, which courts routinely hold are merely negative assessments of public information that do not amount to corrective disclosures.  *E.g.*, *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 177 (S.D.N.Y. 2012) (finding credit downgrade was insufficient to establish loss causation), *aff'd sub nom. Central States*, 543 F. App'x 72; *see also Lentell*, 396 F.3d at 175 & n.4 (stock price drop following downgrade of stock did not amount to corrective disclosure because downgrade did not reveal to the market the falsity of the prior recommendations).

## II.    THE SAC FAILS TO PLEAD A SECTION 20(A) CLAIM

Because Plaintiff fails to state a claim under Section 10(b), its Section 20(a) claim must also be dismissed.  *See* 15 U.S.C. § 78t; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  Further, the SAC fails to allege any facts showing the requisite degree of control by each Defendant rising to the level of "culpable participation."  *See Lucescu*, 2018 WL 1773134, at *9.  For example, the SAC lacks any allegations that Messrs. Stokes, Nugent, Strazik, or Mastrangelo—all of whom served in management roles at subsidiaries of GE—exercised any purported control over GE, and they therefore cannot be held liable under Section 20(a) for any of its statements.  Likewise, apart from the conclusory allegation that Mmes. "Miller and Hauser would have been familiar with the H-class turbine issues by virtue of their involvement in GE finance and accounting matters," ¶ 27, the SAC provides no facts establishing their direct or indirect control of the H-class oxidation issue, much less any culpable participation.

**<u>CONCLUSION</u>**

The SAC, like the AC, states no claim under the stringent pleading requirements of Rule 9(b) and the PSLRA.  It should be dismissed with prejudice.

Dated: New York, New York
   September 27, 2019

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ Miles N. Ruthberg
   Miles N. Ruthberg
   Blake T. Denton
   885 Third Avenue
   New York, New York 10022
   (212) 906-1200
   miles.ruthberg@lw.com
   blake.denton@lw.com

   Sean M. Berkowitz (*pro hac vice*)
   330 North Wabash Avenue, Suite 2800
   Chicago, Illinois 60611
   (312) 876-7700
   sean.berkowitz@lw.com

   William J. Trach (*pro hac vice*)
   200 Clarendon Street
   Boston, Massachusetts 02116
   (617) 948-6000
   william.trach@lw.com

   Sarah A. Tomkowiak (*pro hac vice*)
   555 Eleventh Street NW
   Washington, D.C. 20004
   (202) 637-2200
   sarah.tomkowiak@lw.com

   *Attorneys for Defendants General Electric*
   *Company, John L. Flannery, Jamie S.*
   *Miller, Jan R. Hauser, Russell Stokes,*
   *Chuck Nugent, Scott Strazik, and*
   *Joe Mastrangelo*

41