**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GENERAL ELECTRIC SECURITIES LITIGATION | Case No.:        1:19-cv-1013 (DLC) |

**<u>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................ 4
    I.      Defendants Repeatedly Misrepresented the Efficiency and Reliability of the HA Turbine ..................................................................................... 4
    II.    Defendants Failed to Take the Necessary Goodwill Impairment, Instead Misrepresenting that the Power Segment Had Over $23 Billion in Goodwill .................................................................................................. 6

ARGUMENT ..................................................................................................................... 8
    I.      Defendants GE, Stokes, Nugent, Mastrangelo, Flannery, and Strazik Fraudulently Misled Investors about the HA Turbine ................................ 8
          A.     Defendants' False and Misleading Statements Regarding the HA Turbine ........................................................................................ 8
              1.     The Turbine Defect Statements Were Material to Investors ....... 11
              2.     The Challenged Statements Are Not Puffery............................... 12
              3.     Defendants' Purported "Investigation" of the Oxidation Issue Cannot Insulate Them from Liability ................................. 13
              4.     Defendants Concealed the Impact of the Oxidation Defect on the Company's Financials........................................................ 15
          B.     The Turbine Misstatements Were Made with Scienter........................... 16
              1.     Legal Standard for Scienter ........................................................ 16
               2.     Defendants Admit that they Knew of the HA Turbine Defect and Blade Breakage Risk ................................................. 17
              3.     GE's Effort to Conceal the Turbine Fraud Further Supports an Inference of Scienter ................................................ 18
          C.     Defendants' "Competing Inference" Is Not Compelling........................... 19
    II.    Defendants GE, Flannery, Miller, and Hauser's Fraudulent Goodwill Statements had No Reasonable Basis in Fact ................................................ 19
          A.     Defendants' Material Misrepresentations Regarding Goodwill ............... 19
               1.     Defendants' Goodwill Statements are False Statements of Opinion ................................................................................... 21
               2.     Defendants' Goodwill Statements Were Not in Compliance with GAAP........................................................... 24
               3.     Plaintiff Adequately Alleges the Date and Amount of the Impairment............................................................................ 25
               4.     Defendants' Purported "Warnings" Were Materially Misleading....................................................................... 26
          B.     Defendants Acted with Scienter........................................................... 27
               1.     The Magnitude of the Goodwill Fraud Supports A Strong Inference of Scienter ................................................................. 27
               2.     The Timing of the Impairment is Highly Suspicious.................... 28
               3.     The Civil and Criminal Government Investigations Support a Strong Inference of Scienter..................................................... 31

               4.       The Importance of the Power Segment to the Company's Turnaround and Financial Condition Supports a Strong Inference of Scienter ..................................................................... 31

               5.       Plaintiff Also Adequately Pleads Motive and Opportunity ......... 33

               6.       KPMG's Role Does Not Insulate Defendants ............................. 34

       C.     Defendants' "Competing Inferences" Do Not Defeat Scienter ................ 35

III.     Defendants' False and Misleading Statements Caused Plaintiff's Losses............ 36

IV.     Plaintiff Adequately Pled a Control Person Claim Under Section 20(a).............. 40

CONCLUSION.................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ...........................................................................................33

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ..........................................................................11

*In re Ambac Fin. Grp., Inc.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010).........................................................................28

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).........................................................................32

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..........................................................................................16

*In re Banco Bradesco SA Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017).........................................................................17

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).....................................................................................................12

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)....................................................................31, 39

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002).....................................................................................33, 34

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
No. 1:00-cv-2838, 2002 WL 34089163 (N.D. Ga. Aug. 20, 2002).............................29

*In re Chicago Bridge and Iron Co. N.V. Sec. Litig*,
No. 17 Civ. 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018)................19, 21

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)...........................................................................8

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*,
655 F. Supp. 2d 262 (S.D.N.Y. 2009).........................................................................25

*CLAL Fin. Batucha Inv. Mgmt., Ltd. v. Perrigo Co.*,
No. 09 Civ. 2255 (TPG), 2010 WL 4177103, 7 (S.D.N.Y. Oct. 7, 2010) .............21, 29

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) .......................................................................................13

*In re CRM Holdings, Ltd. Sec. Litig.*,
  No. 10 Civ. 975(RPP), 2012 WL 1646888 (S.D.N.Y. May 10, 2012)...................................37

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
  No. 1:17-cv-4576-GHW, 2019 WL 4600934 (S.D.N.Y. Sept. 23, 2019) ..............................40

*In re DRDGOLD Ltd. Sec. Litig.*,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007)........................................................................................39

*Dudley v. Haub*,
  No. 2:11-cv-05196 (WJM), 2013 WL 1845519 (D.N.J. Apr. 30, 2013) ...............................28

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)....................................................................................................................36

*Electrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017)........................................................................................12

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc.*,
  343 F.3d 189 (2d Cir. 2003).......................................................................................................37

*In re Express Scripts Holding Co. Sec. Litig.*,
  No. 16-cv-3338, 2018 WL 2324065 (S.D.N.Y. May 22, 2018) .............................................21

*In re Facebook, Inc. IPO Sec. and Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)........................................................................................26

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011).................................................................................................24, 25

*Fila v. Pingtan Marine Enter.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016)........................................................................................37

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  783 F.3d 395 (2d Cir. 2015).......................................................................................................36

*Fogel v. Wal-Mart de México SAB de CV*,
  No. 13-cv-2282, 2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) ..................................................4

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................................8, 28

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000).......................................................................................................11

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................................................31, 39

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) ...................................................................23

*Gruber v. Gilbertson*,
   No. 16-cv-9727, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ...............................14

*Hall v. Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008) ....................................................................30

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
   No. 18-CV-00299 (AJN), 2019 WL 4601644 (S.D.N.Y. Sept. 23, 2019) ..............27

*Ho v. Duoyuan Glob. Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012) ....................................................................30

*In re IMAX Sec. Litig.*,
   587 F. Supp. 2d 471 (S.D.N.Y. 2008) ....................................................................39

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014) .....................................................................12

*In re Inv. Tech Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) ....................................................................17

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) .................................................................................................8

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ...................................................................................33

*Kleinman v. Elan Corp., plc*,
   706 F.3d 145, 155 (2d Cir. 2013) ...........................................................................11

*Kuriskose v. Fed. Home Loan Mortg. Corp.*,
   897 F. Supp. 2d. 168 (S.D.N.Y. 2012) ...................................................................39

*Lucescu v. Zafirovski*,
   No. 09-cv-4691 (DLC), 2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018) ..................2, 20, 21, 24

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014) ......................................................................35

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008) ..................................................................................32

*Meyer v. Concordia Int'l Corp.*,
   16 Civ. 6467 (RMB), 2017 WL 4083603 (S.D.N.Y. July 28, 2017) ......................40

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014).................................................................................13, 27

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................27

*Monroe Cty. Emps. Ret. Sys. v. Southern Co.*,
No. 1:17-cv-00241, 2019 U.S. Dist. LEXIS 142630 (N.D. Ga. Aug. 22, 2019) ...................38

*In re Mylan N.V. Sec. Litig.*,
No. 16-cv-7926, 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)...........................11

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
988 F. Supp. 2d 406 (S.D.N.Y. 2013).....................................................................34

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...................................................................................33

*In re Nokia Oyj (Nokio Corp.) Sec. Litig.*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006)......................................................................9

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).............................................................................17, 18

*In re Novatel Wireless Sec. Litig.*,
830 F. Supp. 2d 996 (S.D. Cal. 2011)....................................................................13

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019).......................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*,
135 S. Ct. 1318 (2015)......................................................................................2, 19, 22

*Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*,
No. 3:17-cv-558, 2019 WL 4674839 (D. Conn. Sept. 25, 2019).......................9, 10

*In re Openwave Sys. Sec. Litig.*,
528 F. Supp. 2d 236 (S.D.N.Y. 2007).........................................................30, 33, 37

*In re Openwave*,
528 F. Supp. 3d at 253 ...........................................................................................38

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)......................................................................11

*In re Petrobras Sec. Litig.*,
862 F.3d 250 (2d Cir. 2017).....................................................................................39

*In re Pfizer Inc. Sec. Litig.*,
  No. 04 Civ. 9866(LTS)(HBP), 2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ....................8, 19

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015).........................................................................16, 28, 30

*Police & Fire Ret. Sys. of Detroit v. La Quinta Holdings Inc.*,
  No. 16-cv-3068, 2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017)............................................13

*Pozniak v. Imperial Chem. Indus. PLC*,
  No. 03 Civ. 2457(NRB), 2004 WL 2186546 (S.D.N.Y. Sept. 28, 2004) ...............................18

*In re RAIT Fin. Tr. Sec. Litig.*,
  No. 2:07-cv-03148-LDD, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)................................28

*In re Reserve Fund Sec. & Derivative Litig.*,
  732 F. Supp. 2d 310 (S.D.N.Y. 2010)...................................................................................31

*In re Reserve Fund Sec. & Derivative Litig.*,
  Nos. 09-md-2011, 2012 WL 4774834 (S.D.N.Y. Sept. 12, 2012) .........................................35

*Ret. Sys. v. CBS Corp.*,
  679 F.3d 64 (2d Cir. 2012).....................................................................................................20

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)........................................................................................8, 10, 27

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000).............................................................................................27, 28

*In re Sadia, S.A. Sec. Litig.*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009)....................................................................................30

*In re Salix Pharm., Ltd.*,
  No. 14-CV-8925 (KMW), 2016 WL 1623941 (S.D.N.Y. Apr. 22, 2016).............................23

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001).....................................................................................................19

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)....................................................................................29

*SEC v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. SEC*, 568 U.S.
  442 (2013)..............................................................................................................................10

*SEC v. Lek Sec. Corp.*,
  276 F. Supp. 3d 49 (S.D.N.Y. 2017)......................................................................................40

*SEC v. Shanahan*,
    4:07-CV-270(JCH), 2008 WL 5211978 (E.D. Mo. Dec. 12, 2008) .......................................18

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015)....................................................................................27

*In re Signet Jewelers Ltd. Sec. Litig.*,
    389 F. Supp. 3d 221 (S.D.N.Y. 2019)...........................................................................12, 13

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    No. 17-cv-8457, 2019 WL 4094559 (S.D.N.Y. Aug. 29, 2019).....................................24, 35

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)...............................................................................................13

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)............................................................................................15, 16

*In re Symbol Techs., Inc. Sec. Litig.*,
    No. 05-cv-3923, 2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013)..............................................12

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................................................37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................................17, 33

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016).................................................................................................20

*Trueblood v. Culp et al.*,
    No. 655552/2018 (N.Y. Sup. Ct. July 3, 2019) ....................................................................21

*Turner v. MagicJack VocalTec, Ltd.*,
    No. 13 Civ. 0449, 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) ..............................................37

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ..................................................................................39

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)...................................................................................26

*In re Vivendi Universal, S.A., Sec. Litig.*,
    634 F. Supp. 2d 352 (S.D.N.Y. 2004)...................................................................................38

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)...............................................................................9, 10, 36, 39

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003) ................................................................................29

*Wilson v. LSB Indus., Inc.*,
  No. 15-cv-7614, 2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) .................................................23

*In re Winstar Communications*,
  No. 01 CV 3014(GBD), 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ......................................32

*Zwick Partners, LP v. Quorum Healthy Corp.*,
  No. 3:16-cv-2475, 2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) ........................................23

S<small>TATUTES</small>

15 U.S.C. § 7241(a) ........................................................................................................................19

Securities Exchange Act of 1934 .............................................................................................15, 40

Sarbanes-Oxley Act of 2002 ..........................................................................................................19

Lead Plaintiff Teachers' Retirement System of Oklahoma ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion to dismiss the Second Amended Complaint ("Complaint") filed by Defendants General Electric Co. ("GE" or the "Company"), John L. Flannery, Jamie S. Miller, Jan R. Hauser, Russell Stokes, Chuck Nugent, Scott Strazik, and Joe Mastrangelo (together, "Defendants").[1]

## INTRODUCTION

This case arises from GE's concealment of a known, critical defect in its "crown jewel" gas turbine and its severely reckless accounting for the goodwill associated with its acquisition of Alstom. The former caused gas power plant shutdowns worldwide and compelled GE to offer customers and insurers costly extended warranties. The latter gave rise to an abrupt and massive $22 billion impairment, triggering civil and criminal investigations. Both events caused the prices of GE's securities to plummet, resulting in massive investor losses.

Throughout the Class Period (December 4, 2017 – December 6, 2018), Defendants repeatedly reassured GE's investors that *every* site using GE's HA gas turbines was meeting, and in many cases exceeding, performance guarantees. These statements were false and misleading: one was made just two days after GE's Board of Directors ("Board") called a special meeting to address the blade warranty issue, and others were made after the Company warned its customers that it needed to inspect their blades due to oxidation issues.

Likewise, GE's unprecedented and sudden write down of $22 billion in goodwill was not the result of any dramatic change in GE's financial condition. Indeed, in attempting to explain the

---

[1] Unless otherwise indicated, all internal citations and quotations are omitted and emphasis is added. Citations to "Br." refer to the memorandum of law in support of Defendants' motion to dismiss (ECF 90). Citations to "Def. Ex." refer to exhibits attached to the Declaration of Blake T. Denton filed with Defendants' Motion to Dismiss the Second Amended Complaint (ECF 89).

basis for the $22 billion impairment at the end of the Class Period, GE could only point to factors which existed *before* the Class Period even began. GE's maintenance of goodwill on its books was thus nothing more than an effort to conceal the significant impact of the severe and long-term downturn in the power industry and that execution issues had on GE's future cash flow. GE's goodwill accounting was so egregious that when the $22 billion impairment charge was ultimately taken, the Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") launched criminal and civil investigations, GE's credit rating fell to just above junk, and GE's stock price declined, reflecting a business in free fall.

Defendants argue that every challenged turbine statement – including those touting the HA turbine's "proven technology" and "efficiency" – was literally true. They are wrong. Not only do Defendants fail to contend with the context in which the challenged statements were made, but they ignore that they knew of the oxidation defect when the statements were made. Similarly, they argue that their turbine misrepresentations were immaterial puffery. But, that argument fails because the statements were known to be untrue, were measurable in many instances, and when Defendants spoke about the turbine, the securities laws required that they speak completely about its under-performance and limited life span, particularly given the importance of the turbines to the Company's bottom line.

Defendants further argue that their goodwill misstatements are nonactionable opinion statements. This is wrong. Under *Omnicare*, if, as here, the alleged misstatements rest on untrue supporting facts or contain material omissions regarding Defendants' inquiry, they are actionable. Indeed, rather than exculpate their statements, *Lucescu v. Zafirovski*, No. 09-cv-4691 (DLC), 2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018) ("*Lucescu*") demonstrates that Defendants' goodwill misstatements are actionable. In *Lucescu,* Nortel was forced to take a goodwill impairment due to

the unanticipated impact of the 2008 financial crisis on the company's business operations. Here the opposite is true. Defendants can point to no dramatic or unanticipated events leading into the third quarter that can remotely explain why the $22 billion impairment was justified based on historical data through July 1, 2018, when just weeks earlier no such impairment was necessary based on historical data considered through June 30, 2018. Moreover, despite previously warning investors that goodwill may have to be impaired if the Alstom acquisition was not synergistic, GE recklessly avoided interim impairment testing when, by the first quarter of 2018, that reality came to pass.

On scienter, Defendants focus on each of Plaintiff's allegations in isolation, rather than holistically, as required by law. When viewed properly, the facts, including the suddenness and unprecedented magnitude of the impairment, the known severe market dislocation in the power industry, the implicit acknowledgement that Alstom was non-accretive by the first quarter of 2018, the firing of the Company's CEO and resignations of other key executive officers (including the Company's Vice President/Controller/Principal Accounting Officer who signed the SEC filings), the civil and criminal investigations by the SEC and DOJ, and Defendants' motive to avoid a historic dividend cut and lower credit rating, satisfy the scienter pleading requirement.

Finally, Plaintiff sufficiently pleads loss causation by showing a causal relationship between its losses and the concealed information. Indeed, Defendants do not dispute that in response to disclosures of both the turbine issues and the goodwill impairment and its repercussions, GE's stock price dropped significantly on very heavy trading volume. The fact that GE's stock price did not fall on one of the dates associated with a partial disclosure of Defendants' goodwill fraud does not negate loss causation, because the news on that day was significantly mixed, including the very positive fact that Defendant Flannery was fired and would be replaced

by a well-liked and highly respected outsider, Larry Culp ("Culp"). Furthermore, teasing apart the precise impact of mixed news is an exercise for trial, not a motion to dismiss.

Accordingly, the Complaint adequately pleads a claim for securities fraud and the motion to dismiss should be denied.

## BACKGROUND

## I.    Defendants Repeatedly Misrepresented the Efficiency and Reliability of the HA Turbine

Throughout the Class Period, GE repeatedly falsely assured investors of the efficiency and reliability of the HA turbine, claiming the HA technology was "proven" and that every site and turbine was "meeting - and in many cases exceeding - their performance goals at every customer site today," "performing to specifications and guarantees," and "delivering unprecedented levels of efficiency and reliability." ¶¶ 105, 106, 107, 119. *See also* Ex. 1 (Turbine Fraud Timeline).[2] Unbeknownst to investors, these statements were false: Defendants knew that their "crown jewel" HA turbine suffered from a critical oxidation defect, and spent years developing and installing upgraded blades to try to fix the problem. ¶¶ 43, 83.

In 2015, Defendants learned that the HA turbine suffered from a serious oxidation defect that could cause total turbine blade failure. GE discovered premature oxidation in 9FB turbines, which contained similar components and shared the same heat treatment process as the HA. ¶¶ 76-78, 136. This issue forced GE to first develop a new coating for the blades to solve the issue and, when that did not work, to develop and manufacture entirely new "Gen II" replacement turbine

---

[2] Exhibits 1 (Turbine Fraud Timeline), 2 (Goodwill Fraud Timeline), and 3 (Loss Causation Chart) are demonstratives to aid the Court's review. *See Fogel v. Wal-Mart de México SAB de CV*, No. 13-cv-2282, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (accepting appendices that serve as "organizational tools").

blades. ¶¶ 82-86. In 2017, GE sent customers a formal Technical Information Letter ("TIL") warning of the issue and went into the field to inspect and replace blades. ¶¶ 88-96.

The public only began to learn of the design defect toward the end of the Class Period in September 2018, when a Texas power plant was forced to shut down for a month following the premature oxidation and break of an HA blade. ¶ 117-120. At a meeting attended by GE, dozens of HA turbine customers expressed their frustration with the "fleet-wide" defect and GE's inability to promptly remedy it. ¶¶ 110-112. The issue was so severe that it caused chaos for customers: blades failing after less than 10,000 operating hours, an unproved "fix", and power plant opening delays as customers waited for replacement parts. ¶¶ 111, 144-153, 494.

Mainstream media and analysts began reporting on the impact of the defect. From September 20-25, 2018, these reports revealed that the blade break had shut down four HA turbines in Texas, that GE had known about the oxidation problem for a year, and that the breaks occurred even earlier in the lifecycle of the turbines than previously anticipated. ¶¶ 120, 122, 124. Over the course of these four trading days, GE's stock price dropped from $12.86 to $11.27 per share on massive trading volume, ranging from approximately 90 million to 150 million shares. ¶¶ 132-140. On October 10, 2018, JP Morgan analyst Stephen Tusa disclosed that the HA problems affected customers across GE's fleet, causing disrupted shipments and forced shutdowns, and that GE's "fix" was not yet working. ¶ 145. Two days later, on October 12, 2018, investors learned that the oxidation defect affected 14 of the 51 installed 7HA turbines (27%) and as many as 70 of a different turbine model, the 9FB. ¶ 154. These revelations triggered further stock price declines from $13.28 on October 10, 2018 to $12.32 on October 12, 2018. ¶ 156. Finally, on December 7, 2018, *Reuters* revealed that 18 power plants "from Taiwan to France" with H-class turbines were shut down, and that GE had set aside $480 million to make repairs. ¶ 158. GE admitted it had

"identified the oxidation problem in 2015," ¶ 163, leaving unanswered why Defendants continued to tout the quality, efficiency, and reliability of the turbine to investors.

## II.   Defendants Failed to Take the Necessary Goodwill Impairment, Instead Misrepresenting that the Power Segment Had Over $23 Billion in Goodwill

GE's second critical initiative was the acquisition of French industrial manufacturer Alstom. GE bought Alstom for $10 billion, but recorded $17 billion in goodwill stemming from the acquisition – possibly the only acquisition in history where goodwill exceeded the purchase price by 170%. ¶¶ 57-59. GE justified a goodwill balance well in excess of the purchase price because of expected synergies, including "immediate benefits" for its current and expected customers. GE claimed that by 2018, Alstom would be accretive to earnings per share by $.15 to $.20. ¶¶ 60-61.

Recognizing how critical these Alstom synergies were to the Power segment's balance sheet, the Company warned investors in its 2017 Form 10-K that if Alstom was unable to generate the expected synergies, the Power segment's goodwill would need to be impaired. ¶ 457. In the fourth quarter of 2017, and certainly by the first quarter of 2018, Defendants knew that Alstom would not be synergistic in light of the power market dislocation and GE's own operational issues. Thus, in the first quarter of 2018, GE erased that risk warning from its SEC filings, a concession that the risk had come to pass. Nevertheless, the Company did not partially impair goodwill or even test for impairment as GAAP mandated in such changed circumstances. Had it done so, a minimum of approximately $3 billion should have been impaired from Grid Solutions.[3] Instead, GE repeatedly affirmed the Power segment's goodwill balance: $25.9 billion for the first quarter of 2018 and $23.2 billion for the second quarter of 2018. ¶¶ 456, 457, 466. Sixty days after

---

[3] Grid Solutions had $4.542 billion in goodwill in the first quarter of 2018 and $1.653 billion remained after the impairment. *See* ¶ 457; Def. Ex. 43 at 13.

affirming $23.2 billion in goodwill, GE suddenly reversed course, announcing a major goodwill impairment charge that was finalized at $22 billion on October 30. ¶¶ 330. The impairment erased GE's entire investment in Alstom and shocked investors with news of a DOJ criminal investigation into the impairment, an expanded SEC investigation, a restructuring of the Power segment to report to new CEO Culp, and that it was all but wiping out the Company's shareholder dividend. ¶¶ 330-337. On this news, GE's stock price dropped 8.78% on an exceptionally high trading volume of 225 million shares. ¶ 342. GE's stock and bond price continued falling as Moody's and then Fitch lowered GE's credit rating in response to the announcements and goodwill write-down. ¶¶ 343-49.

GE did not identify a major market or Company event that caused the dramatic and sudden impairment. Instead, GE pointed to factors evident to Defendants before the Class Period began:

- ***Challenging Power market and increasing energy efficiency and renewable energy penetration***: On November 13, 2017, Defendant Stokes acknowledged a market "dislocation" in the Power segment, stating that the "challenging macro environment" was "substantially worse than we forecast." ¶¶ 247, 249, 250. That same month, GE's key competitor Siemens said "the [power] market is burning to the ground" and reflected "a structural shift, a paradigm shift." ¶ 251. Competitor Mitsubishi noted that it expected the "situation to continue for two to three years." ¶ 252.

- ***Industry overcapacity***: By February 23, 2018, GE dropped its demand forecast to 40 gigawatts, nearly 50% less than the 78 gigawatts it forecast just three quarters earlier. ¶ 247.

- ***Uncertain deal closures and complexities of working in emerging markets***: On January 20, 2017, then-CEO Immelt reported the failure "to close a couple of big Power deals, including six or seven gas turbines." ¶ 289. Defendant Bornstein added that the Company lost sales in Bahrain, Iraq, and Libya because these were "really difficult" and "enormously difficult" locations for closing deals. *Id.* On July 21, 2017, Defendant Bornstein admitted delays in delivering at least three H-class turbines due to operational and execution issues. ¶ 293. And, again in October and November 2017, GE executives and Defendant Flannery explained that the Company failed to close deals because of "customer financing needs and geographic deal complexity" and "the complexity of doing some of those deals in some of the global markets." ¶¶ 289-291.

- ***GE's own underlying operational challenges***: By September 1, 2017, GE's Board knew that the Power segment had too much unsold inventory, which the Company recklessly

responded to by discounting prices to hit short-term revenue targets, causing long-term lower service fees. ¶ 323. In October and November 2017, Defendants Bornstein and Flannery acknowledged that GE had "exacerbated" the bad market situation "with some really poor execution," ¶¶ 249, 293-294, and on February 21, 2018, Defendant Miller emphasized that Power segment challenges were due to market factors and execution. ¶ 295. GE's operational issues included the HA turbine defect, vibration in Pakistan plants, and the 2015 Inland Empire turbine failure. ¶¶ 294-317.

Further, in December 2017, Defendant Stokes justified laying off 18% of the Power segment workforce based on the very reasons set forth above, which he expected to continue indefinitely: "overcapacity, lower utilization, fewer outages, an increase in steam plant retirements, and overall growth in renewables." ¶¶ 283-84, 286.

## ARGUMENT

**I.    Defendants GE, Stokes, Nugent, Mastrangelo, Flannery, and Strazik Fraudulently Misled Investors about the HA Turbine[4]**

A.    Defendants' False and Misleading Statements Regarding the HA Turbine

A qualifying misstatement or omission is any statement that "viewed as a whole, would have misled a reasonable investor." *Rombach v. Chang*, 355 F.3d 164, 178 n.11 (2d Cir. 2004). Defendants broadly claim, without any argument, that "Plaintiff fails to identify a single false statement of fact", and resort to a chart which just labels every turbine statement as "not false or

---

[4] Each of these defendants is liable for his or her own statements, whether orally or in writing. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-143 (2011); *In re Pfizer Inc. Sec. Litig.*, No. 04 Civ. 9866(LTS)(HBP), 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012). Additionally, all conference call participants are liable for the statements made during the call, whether they were the speaker or a participant who failed to correct the misstatement. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010) ("[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements"). *Janus* did not change the basic principle that officers can be liable for statements of other corporate insiders. *See In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548 at *4; *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).

misleading." Br. at 21-22; Def. Ex. 3. Defendants' sweeping argument fails because the challenged statements are either misleading when viewed as a whole or literally false.

For example, Defendants' claims about the HA turbines' performance, such as statements that the turbines were "meeting – and in many cases exceeding – performance goals at every customer site today" and "highly reliable" are false given Defendants' knowledge that the HA turbine had a serious defect that shortens the turbine blades' expected lifespan and forced power plants to shut down for premature inspection and replacement. ¶¶ 493, 501.[5]

Similarly, the few statements discussed in Defendants' brief – that the HA turbine was tested "at full-load and full-speed" and that the HA fleet rollout had achieved "more than 175,000 operating hours," (Br. at 21-22) – misleadingly communicated to investors that the turbines worked as promised, when as discussed above, they did not. *See Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*, No. 3:17-cv-558, 2019 WL 4674839, at *19 (D. Conn. Sept. 25, 2019) (company may give investors "accurate reports of past successes," but it "is still under a duty to disclose additional information in order to complete statements that would otherwise be 'misleading by omission.'") (quoting *In re Nokia Oyj (Nokio Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006)); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016)).

Defendants' statements following the September 2018 Exelon blade break are particularly striking. In September 2018, GE told *Reuters* that the oxidation problem was "first discovered on turbine blades in a natural gas-fueled turbine operated by Exelon Corp. in Texas a few weeks ago."

---

[5] *See also* ¶ 448 ("every commercial HA site today is demonstrating exceptional performance levels for both output and efficiency"); ¶ 446 ("proven technology"); ¶ 452 ("operating in line with performance guarantees" and all of the 23 units installed were "performing to specifications and guarantees"); ¶ 464 (HA technology is "delivering unprecedented levels of efficiency and reliability . . ."); ¶ 477 ("leading technology").

¶ 495. This is blatantly false. GE later admitted that it learned of the oxidation issue in 2015, and had been inspecting and replacing blades since 2017. ¶¶ 3, 120, 136, 177. Defendants also claimed that the problem was minor and had been solved,[6] which was false because, as analysts reported to the investing community, manufacturing and installing a new blade is not minor, customers were concerned about the lack of a solution due to insufficient replacement parts and no validated fix, and GE was forced at significant expense to extend its warranty coverage to address future issues with the turbine. ¶¶ 145, 183, 302. Defendants also misleadingly stated "oxidation . . . could cause distress on the 9FB and HA gas turbine," ¶ 501, suggesting a mere possibility, when it had already occurred. *Rombach*, 355 F.3d at 173 (defendants may not warn of a risk that has materialized).

Additionally, the claim that GE "communicated openly about launch challenges" in an article where they also stated that "every" site was demonstrating exceptional performance levels, ¶ 99, misleadingly communicated that GE had disclosed all of the HA's launch challenges – when in fact it concealed the oxidation defect. Finally, claims about GE's innovation in "use of materials and coatings designed for user in higher temperatures," ¶ 450, and that reduced sales were caused only by external factors like "softer" markets and "[d]eals . . . taking longer to close," ¶ 454, misleadingly omitted that the defect forced the Company to engineer and install new blades and contributed to GE's loss of market share.[7]

---

[6] ¶ 493 (concerns were "overblown" and this was "not a significant issue from a customer perspective"); ¶ 495 ("minor adjustments"); ¶ 497 ("We have identified the solution and have a plan in place"); ¶ 499 ("GE engineers and teams identified a fix" and new technology "involves fine-tuning and adjusting"); 501 ("We identified the solution and have a plan in place").

[7] *See also In re Vivendi*, 838 F.3d at 239-40; *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. SEC*, 568 U.S. 442 (2013) ("The law is well settled, however, that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud."); *Teva Pharm. Indus. Ltd.*, 2019 WL

1.     *The Turbine Defect Statements Were Material to Investors*

While Defendants do not explicitly challenge materiality, they argue that the Complaint fails to adequately show "that the H-class turbine's technology is fundamentally flawed or that the product was destined to fail." Br. at 23. This too is wrong.

"Materiality is 'a mixed question of law and fact and is rarely a basis for dismissal on the pleadings.'" *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 378 (S.D.N.Y. 2015). "A drop in stock price, if relevant, tends to establish materiality, *i.e.*, whether reasonable investors would consider the information 'to be significant or to have altered the total mix of information affecting their investment decisions.'" *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 155 (2d Cir. 2013) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 (2d Cir. 2000)); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 816 (N.D. Ill. 2017) (stock price drop after misstatements "confirms that those misstatements were material"). Here, the challenged statements were material to investors, as evidenced by the stock declines that occurred when the truth emerged. *See* ¶¶ 110-162. This is enough.

Further, while Plaintiff need not allege that the HA turbine was "destined to fail" to show materiality or falsity, GE's decision to offer an extended warranty, ¶ 166, to reserve $480 million, ¶ 158, and Culp's comment that the blade has a shorter life than guaranteed, ¶ 179, reflects that there was, in fact, a "fundamental flaw" in the turbines.

---

4674839, at *19 (defendants' statements regarding the reasons for their "profit increases and decreases" were misleading "half-truth[s]" because while they accurately identified some "factors . . . in their statements" that affected profits, "they neglected to include another significant factor"); *In re Mylan N.V. Sec. Litig.*, No. 16-cv-7926, 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018) (statements regarding company's income source were misleading for failure to disclose that the income "was *also* due to anticompetitive agreements").

Nor is materiality altered by Defendants' supposed resolution of the oxidation issue and receipt of turbine orders in 2019. Br. at 23, 27. First, this is a factual disagreement with Plaintiff's allegations that (1) as customers acknowledged, the "fix" was not yet validated, and (2) GE lost market share in 2019, demonstrating Company-specific issues affecting sales. ¶¶ 169-176. Second, even if the problem was ultimately resolved (at great cost to fix the issue and lower H-class sales), that does not matter. Materiality is measured by the "total mix of information made available" to investors at the time of the statement. *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988). That it could have been worse does not change that investors were misled at the time of the statements.

### 2. *The Challenged Statements Are Not Puffery*

Defendants next claim that "the majority" of the alleged misstatements are immaterial puffery. Br. at 22. Whether a statement is puffery is considered in "context" including whether it is "designed to distinguish the company to investors." *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229-230 (S.D.N.Y. 2019). Measurable statements are not puffery. *See In re Symbol Techs., Inc. Sec. Litig.*, No. 05-cv-3923, 2013 WL 6330665 at *7 (E.D.N.Y. Dec. 5, 2013). Even generic statements are actionable non-puffery when made repeatedly to quell investor concerns about existing issues. *Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017).[8]

The challenged statements are not puffery. It is actionable to represent that all 23 units installed are performing to specifications and guarantees, ¶ 453, while omitting that the Company is aware of a defect that significantly shortens the expected lifespan of the blades and could cause costly shutdowns or breaks. Similarly, Defendants' repeated assurances that the HA technology

---

[8] *See also In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834-35 (N.D. Cal. 2014) (statements that a product was "beneficial, safe and effective," represented "a new generation of surgery," and touting its "ease of use, precision, and dexterity" were non-puffery when defendants knew of multiple adverse reports).

was "proven," ¶ 446, that installed units were "operating in line with performance guarantees," ¶ 452, indeed that "*every* commercial HA site today" had "exceptional performance levels for both output and efficiency," ¶ 448, and their repeated downplaying of the seriousness and scope of the oxidation issue, ¶¶ 495, 497, 499, 501, are not puffery. These measurable statements solidified investors' false impression that the H-class performed as promised, reassured them after reports of H-class issues, and positively "distinguish[ed]" GE from its competitors. *In re Signet Jewelers*, 389 F. Supp. 3d at 229-230.

### 3.   *Defendants' Purported "Investigation" of the Oxidation Issue Cannot Insulate Them from Liability*

Finally, Defendants claim that they did not have "any duty to disclose a potential oxidation issue impacting the H-class turbine earlier than they did" because GE was entitled to "investigate for a reasonable time" while it "work[ed] closely with customers on possible fixes." Br. at 24. But a corporate investigation does not permit defendants to make false or misleading statements – once GE chose to speak about the HA turbines, it had "a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Indeed, the very authority upon which Defendants rely confirms that while a company is "entitled to investigate for a reasonable time," "[m]anagers cannot tell lies." *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010). That is what precisely what Defendants did.[9]

---

[9] Defendants cite inapposite cases stating that management need not "bury the shareholder in internal details[.]" Br. at 24 (quoting *Police & Fire Ret. Sys. of Detroit v. La Quinta Holdings Inc.*, No. 16-cv-3068, 2017 WL 4082482, at *9 (S.D.N.Y. Aug. 24, 2017)). Unlike here, the plaintiff in *La Quinta Holdings* failed to identify any affirmative statement that was misleading without further disclosures. *Id.* at *9. Plus, the relied-on quote originated in a Ninth Circuit case, *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991), which stated simply that "[t]he securities laws do not require management 'to bury the shareholders in an avalanche of *trivial* information.'" *Id.* at 516. In contrast, "[t]he facts rendering Defendants' statements false here . . . certainly were not 'trivial.'" *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1016 n.19 (S.D. Cal. 2011).

Moreover, Defendants' argument that they were merely engaged in a "reasonable" "investigat[ion]" ignores that they were aware of the oxidation issue at least *two years* before the first challenged statement and, before the Class Period even began, that GE had already performed its root-cause analysis, tried a replacement coating that failed, manufactured new Gen II blades, developed and disseminated a TIL regarding the oxidation issue in July/August 2017, and began inspecting and replacing blades in 2017. ¶¶ 3, 83, 87, 89, 136. Defendants thus cannot credibly contend that they were taking a "reasonable time" to "investigate" the problem they had known about and tried to address for *two years*. This argument is also inconsistent with Defendants' argument that their statements that the turbine issues had been addressed are literally true (*see* Br. at 21; Def. Ex. 43 at 2, 16) – either the investigation was ongoing (and thus that statement is false) or the investigation was complete (and so this argument that GE was taking reasonable time to investigate is false). While a company may investigate for a reasonable time, a "duty to disclose arises" once the investigation reveals material negative information – *e.g.*, after the root cause analysis identified the oxidation defect. *See Gruber v. Gilbertson*, No. 16-cv-9727, 2018 WL 1418188, at *10 (S.D.N.Y. Mar. 20, 2018).

Nor are Defendants immunized by their purported "voluntary" disclosure after the Exelon blade break and increase in reserves, Br. at 25,[10] given that the disclosure was prompted by a catastrophic blade break and that each of Defendants' subsequent disclosures downplayed the problem's scope. ¶ 143.[11] Defendants also note that Plaintiff did not allege that GE should have

---

[10] Defendants similarly point to their ultimate "disclos[ure] that [GE] would need to upgrade H-class turbines with Gen II blades" as somehow absolving them of liability. Br. at 27.

[11] Defendants claim that the Complaint fails to show GE knew that "H-class blade failures would occur before GE completed its planned replacements" or that the oxidation defect would "otherwise pose any threat to the H-class turbine's overall success." Br. at 25-26. This is nonsense. Plaintiff does not allege that Defendants concealed some clairvoyant prediction that the oxidation

recorded charges earlier or that the reserves it recorded were "insufficient." Br. at 24. The absence of such allegations is irrelevant. Defendants apparently believe that, so long as the costs associated with a major corporate problem have not yet been concretely calculated, corporations may mislead investors regarding the problem. The securities laws provide no such immunity.[12]

4.    *Defendants Concealed the Impact of the Oxidation Defect on the Company's Financials.*

Defendants barely contest Plaintiff's Item 303 claim. Their only arguments are that (1) the Complaint does not adequately allege Defendants knew the oxidation defect represented a known risk and uncertainty to its financials, and (2) that GE warned of the risks and uncertainties Plaintiff claims were concealed. Br. at 27-28. The Second Circuit has explained that disclosure under Item 303 "is necessary 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (quoting Exchange Act Release No. 6835 ("SEC Release")). A violation of Item 303, independent of any statement, "give[s] rise to liability under Section 10(b)" so long as the omitted information was material. *Id.* at 102. The SEC drafted Item 303 to be "intentionally general, reflecting the [SEC]'s view that a flexible approach elicits more meaningful disclosure and avoids boilerplate discussions[.]" SEC Release at *2.

---

defect would specifically cause a major wreck at one of the Exelon plants. Rather, Plaintiff alleges Defendants concealed the critical oxidation defect and vibration issues known to them – which they also knew *could* lead to catastrophic blade breaks, as occurred with the 9F in 2015. ¶ 77.

[12] Defendants claim the vibration issue and oxidation defect are unrelated, based on an article in which *they* said the HA turbine did not have "fundamental design flaws." But this article was published on December 27, 2017, nearly a year before Defendants began revealing the oxidation defect. *See* Def. Ex. 18.

Throughout the Class Period, Item 303 required Defendants to disclose that the manufacturing defect "presently known" to them was "reasonably likely" to have a material adverse effect on revenues and profits due to the unaccounted-for costs of inspecting, repairing, and replacing turbine blades, and lower sales of the product. ¶¶ 503-505; *see Stratte-McClure*, 776 F.3d at 101; *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) (inventory levels increasing over nine-month period was sufficient to constitute a trend under Item 303). As discussed below at pp. 16-19, Defendants certainly knew that a manufacturing defect requiring the complete replacement of a critical component of its flagship product (on which GE explicitly staked its financial success) would materially affect GE's financials. Defendants' second argument relies exclusively on the highly generic warning that GE's "customers or other third parties" may "experience operational process failures or other problems" that "could have a material adverse effect on our business." Br. at 27-28. Such "generic cautionary language" "unconnected to the company's financial position" "does not satisfy Item 303," particularly when, as here, the risk being warned of had already come to pass. *Stratte-McClure*, 776 F.3d at 105 (rejecting defendants' argument that they satisfied Item 303 "by disclosing the deterioration of the real estate, credit, and subprime mortgage markets, and its potential negatively to affect Morgan Stanley").

B.      The Turbine Misstatements Were Made with Scienter

1.      *Legal Standard for Scienter*

"Scienter may be inferred from (i) facts showing that a defendant had 'both motive and opportunity to commit the fraud,' or (ii) facts that constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 613 (S.D.N.Y. 2015) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007)). Scienter must be considered "holistically," with the court

determining "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as* any plausible opposing [non-culpable] inference." *Tellabs*, 551 U.S. at 324, 328 (emphasis in original). Under *Tellabs*, the inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences[.]'" *Id.* at 324. If the inference of scienter is equal to the non-culpable inference, the court should find that the plaintiff has adequately alleged scienter – in other words, on scienter, "the tie goes to the plaintiff." *In re Banco Bradesco SA Sec. Litig.*, 277 F. Supp. 3d 600, 666-67 (S.D.N.Y. 2017).

### 2. *Defendants Admit that they Knew of the HA Turbine Defect and Blade Breakage Risk*

Scienter may be inferred when defendants "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). *See also In re Inv. Tech Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 621 (S.D.N.Y. 2017) (knowledge or access to information showing public statements to be inaccurate "alone" is enough to satisfy scienter). There is no dispute that GE and each individual defendant alleged to have made a misstatement regarding the gas turbines – Stokes, Flannery, Nugent, Strazik, and Mastrangelo – knew facts or had access to information showing that their public statements about the turbines were false and misleading. ¶¶ 446, 448, 450, 452, 454, 464, 477, 491, 493, 495, 497, 499, 501.

In 2017, GE informed customers about the defective HA blades and that GE would need to inspect and replace them. ¶ 90. GE also admitted to *Reuters, Bloomberg* and the *WSJ* that, throughout the Class Period, they knew of the HA turbine defect. *See, e.g.*, ¶¶ 120, 122, 124.

17

Defendants still concede as much now. Br. at 34-35 (admitting the same). Indeed, the turbine defect was so material to the Company that GE's Board, including Defendant Flannery, convened a special and previously unscheduled meeting on September 26, 2018 to discuss the issue and how to handle it with customers. ¶ 141. These facts alone are more than sufficient to demonstrate Defendants' scienter.[13]

### 3. GE's Effort to Conceal the Turbine Fraud Further Supports an Inference of Scienter

Defendants' effort to conceal the turbine fraud further supports an inference of scienter. Concealment of facts demonstrating the falsity of a company's public statements supports scienter. *Pozniak v. Imperial Chem. Indus. PLC*, No. 03 Civ. 2457(NRB), 2004 WL 2186546, at *7-8 (S.D.N.Y. Sept. 28, 2004). *See also SEC v. Shanahan*, 4:07-CV-270(JCH), 2008 WL 5211978, at *5 (E.D. Mo. Dec. 12, 2008). Here, Defendants, including the GE Board, actively tried to prevent critical securities analyst Stephen Tusa of JP Morgan from disclosing the issues plaguing the HA turbine and its impact on GE's financial condition. ¶ 404. Tusa repeatedly exposed the falsity of Defendants' statements concerning the performance of H-class turbines including: the scope, severity, and systemic nature of the defect; that the defect cost GE long-term service agreements and market share; and that, because of these and other problems in the Power segment, GE made sweetheart deals to keep customers, at the expense of maintaining reasonable profit margins. *See* ¶¶ 127, 129, 144-153, 174, 275, 296, 297-300, 301, 384.

---

[13] These allegations are also corroborated by a former employee, who confirmed that the oxidation defect would result in a TIL informing customers of the problem that would be reviewed by executives, given its warranty implications. ¶ 91. Plaintiff's identification of his role at the Company and employment dates sufficiently support his knowledge. *See Novak*, 216 F. 3d at 314 (holding that where plaintiff's allegations are corroborated by, but do not rest exclusively on, a confidential source, allegations that "support the probability that a person in the position occupied by the source would possess the information alleged" are sufficient).

C.     Defendants' "Competing Inference" Is Not Compelling

Defendants contend that a non-fraudulent inference is more compelling because they disclosed issues about the H-class turbine "as they learned about the scale of the problem." Br. at 36. As set forth above, this argument fails because Defendants admitted in September 2018 that they had known of the issue and been working with customers for a year – before the Class Period even started – and belatedly admitted they had known of the issue even earlier, in 2015. ¶¶ 136, 163. The defense that GE "chose" to disclose the issue, Br. at 36, is unpersuasive given that they waited until a blade break risked the issue going public and their initial disclosures were incomplete, *see* ¶¶ 113, 119-140. Under these circumstances, it is far more plausible that Defendants acted fraudulently.

## II.    Defendants GE, Flannery, Miller, and Hauser's Fraudulent Goodwill Statements had No Reasonable Basis in Fact[14]

A.     Defendants' Material Misrepresentations Regarding Goodwill

Under the Supreme Court's decision in *Omnicare*, an opinion statement (such as a statement regarding goodwill) is false in three distinct scenarios: (1) the speaker did not hold the belief she professed, (2) the supporting facts she supplied were untrue, or (3) the stated opinion, though sincerely held and otherwise true as a matter of fact, omitted information whose omission made the stated opinion misleading to a reasonable investor. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*, 135 S. Ct. 1318, 1327, 1333 (2015). *See also In re Chicago Bridge and*

---

[14] Flannery, Miller, and Hauser are liable for the challenged goodwill balances, which are in the 2017 10-K, first quarter 2018 10-Q, and second quarter 2018 10-Q. The 2017 10-K was signed by Flannery, Miller, and Hauser; the first and second quarter 2018 10-Qs were signed by Hauser and reviewed and certified by Flannery and Miller in accordance with the Sarbanes-Oxley Act of 2002. *See* ¶¶ 21, 23, 22; 15 U.S.C. § 7241(a); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001) (corporate officer is liable for statements that they "review[ed]"); *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *4 & n.3 (defendant is liable for statements in SEC filings they signed).

*Iron Co. N.V. Sec. Litig*, No. 17 Civ. 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018). *Omnicare*'s recognition that an opinion statement is false even if not subjectively disbelieved "altered the standard" in the Second Circuit, which previously required that an opinion statement "was both objectively false *and* disbelieved by the defendant at the time it was expressed." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

Defendants argue that, under this Court's decision in *Lucescu*, their goodwill statements are not false or misleading. To the contrary, the logic of *Lucescu* demonstrates that Defendants' goodwill statements are actionable. *Lucescu* arose in the rapidly emerging global financial crisis in 2008. Just one month after Lehman Brothers declared bankruptcy, Nortel impaired its goodwill. 2018 WL 1773134, at *1-4. The Court concluded that on the "the very particular circumstances of this company and the economic climate of 2008," the allegations did not state a claim that Nortel's goodwill statements were false. *Id.* at *12. The Court also held that the defendants lacked fraudulent intent, noting that the factors causing the ultimate goodwill impairment "were substantially tied to the extraordinary market events that occurred in the Fall of 2008," right before the impairment, "and that had a profound impact on many companies, not just Nortel, and on the world's economy."[15] *Id.* at *13.

Here, the facts are exactly the opposite. When GE finally impaired its goodwill by $22 billion on October 30, 2018, it stated that the impairment was caused by downward cash-flow projections due to the "challenging" Power market, "overcapacity in the industry," "uncertain" deal closures, the "complexities of working in emerging markets," "increasing energy efficiency and renewable energy penetration," and GE's "own underlying operational challenges." ¶¶ 330,

---

[15] For the same reasons, Defendants' reliance on the financial crisis goodwill case *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012), *see* Br. at 17, is readily distinguished.

332, 333. But unlike in *Lucescu*, these issues did not suddenly arise right before the impairment – they all existed before the Class Period even began. *See* ¶¶ 247, 249, 250, 257, 283-84, 286, 289-91, 293-317, 323. Nevertheless, GE continued affirming its bloated goodwill number in the fourth quarter of 2017, first quarter of 2018, and second quarter of 2018, in order to avoid admitting that its critical acquisition of Alstom was a failure and the impact the write-down would have on the Company. ¶¶ 330, 456, 466, 479. Additionally, unlike in *Lucescu*, GE underperformed the NASDAQ Composite Index by 72.65% in 2017 and 52.58% in 2018. Thus, while Nortel's goodwill impairment occurred in the context of a global business catastrophe, GE was an outlier.

### 1. *Defendants' Goodwill Statements are False Statements of Opinion*

Here, the challenged goodwill statements are false because they contain untrue supporting facts and because Defendants omitted material information regarding their inquiry (*Omnicare*'s second and third scenarios).[16] When "identical factors that caused [defendant] to drastically writedown the value of the [asset] . . . were operative and evident to defendants at the time they issued" the challenged statements, the statements are false. *CLAL Fin. Batucha Inv. Mgmt., Ltd. v. Perrigo Co.*, No. 09 Civ. 2255 (TPG), 2010 WL 4177103, at *7 (S.D.N.Y. Oct. 7, 2010). *See also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (failure to write down goodwill "despite known delays, cost overruns, growing liability disputes" and defendant's "eventual execution of a quitclaim deed to relieve itself of liabilities" sufficiently allege material misstatements regarding goodwill).

---

[16] Plaintiff does not argue that Defendants did not hold the professed belief. This distinguishes this case from *Trueblood v. Culp et al.*, No. 655552/2018 (N.Y. Sup. Ct. July 3, 2019), Doc. #27 and *In re Express Scripts Holding Co. Sec. Litig.*, No. 16-cv-3338, 2018 WL 2324065, at *8-9 (S.D.N.Y. May 22, 2018), cited at Br. 18-19, which focused on whether defendants believed the goodwill statement when made. Additionally, *Trueblood* was a derivative suit considering demand futility, a different standard than at issue in the present case.

Here, the same factors causing impairment existed before the Class Period began and at the time of each challenged goodwill balance. *See supra* at pp. 7-8. Nonetheless, in violation of GAAP, Defendants presented goodwill balances based on projected future cash-flow and earnings – the key metric on which goodwill rests and the revision of which explained the impairment – that had no reasonable basis in fact as required by GAAP, and that did not "fairly align" with information in GE's possession regarding the market and its own operational issues.[17] *See* ¶ 213 (ASC 820-10-35-9 fair-value estimates must reflect current market realities based on the price a market participant would use); ¶ 215 (projected earnings and cash flows must have a reasonable basis); *Omnicare*, 135 S. Ct. at 1329. That failure is clear from the absence of any meaningful impairment during the Class Period, followed by the sudden $22 billion impairment just sixty days after the last challenged statement, with no intervening explanatory event or circumstance. That the second and third-quarter tests reached polar opposite results on nearly identical information demonstrates the falsity of the Class Period statements.[18] Because unreasonable cash-flow numbers infected the goodwill balance, each challenged goodwill balance is a false statement of opinion under *Omnicare*. The statements rested on untrue supporting facts – the cash-flow numbers. The statements omitted material information regarding Defendants' inquiry – that Defendants failed to

---

[17] Defendants argue that earlier impairment was not required because GE thought the market declines were short-term, citing a June 26, 2018 call where Defendant Flannery references the 2050 gas-power market and says "[i]t's going to be choppy in the next 1 to 2 years. . . we've got to keep a long-term perspective." Br. at 17; Def. Ex. 26 at 16. But this explanation came *after* two of the challenged goodwill statements and is inconsistent with the facts – GE impaired goodwill because the Class-Period financial outlook lacked any reasonable basis given the severity of the short-term dislocation relative to potential long-term relief.

[18] Defendants argue that the information considered in the second and third quarter impairment tests do not overlap. *See* Br. at 16. It is not clear what Defendants say the lag was but the second quarter 2018 goodwill balance is reported as of June 30, 2018 and the third quarter 2018 goodwill balance is reported based on data considered through July 1, 2018. ¶¶ 355, 480. Whether the lag was a day or even several weeks cannot justify such a reversal in outcome unless the challenged assumptions were so unrealistic as to lack any basis at all.

ensure that the goodwill number rested on a reasonable basis, that Defendants manipulated the long-term service agreement revenue, and the actual discount rate applied. *See* ¶¶ 374-378, 380-384.

This situation is similar to cases where courts found opinion statements to be false because, for example, reserve calculations relied on outdated information and the Company did not conduct a broad or intensive review; statements about future inventory and changes in wholesale buyer patterns omitted material facts about the speaker's inquiry into, or knowledge of, current inventory levels; the failure to test and timely impair did not "fairly align with the information" in defendants' possession at the time given declining financial performance, under-performance of a key asset, and deterioration in the overall industry; and cost and schedule estimates did not consider necessary engineering work. *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 779 (E.D. Va. 2015); *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1623941, at *11-12 n.10 (S.D.N.Y. Apr. 22, 2016); *Zwick Partners, LP v. Quorum Healthy Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at *5 (M.D. Tenn. Apr. 19, 2018); *Wilson v. LSB Indus., Inc.*, No. 15-cv-7614, 2017 WL 7052046 at *1-2 (S.D.N.Y. Mar. 2, 2017). GE's goodwill balance statements were similarly false because they failed to use reasonable, updated cash-flow numbers that reflected the known problems demanding impairment and instead, offered precise goodwill numbers that falsely bolstered investor's confidence in GE's goodwill calculations.[19]

This is not a case where Defendants simply omitted a fact that cut the other direction but did not fundamentally alter the goodwill valuation. GE was off by *$22 billion – wiping out GE's entire investment in Alstom.* ¶¶ 330-331. That was because, throughout the Class Period, Defendants failed to conduct a reasonable goodwill calculation that aligned with reality. By the

---

[19] Further, GE changed the discount rate it claims to have used in the goodwill test. ¶ 340.

Company's own admission, GE failed to set "realistic commitments and returns" and needed a new revenue outlook "grounded in the reality of our $92 billion backlog rather than in the hopes of new orders not yet won." ¶ 363.[20]

### 2.  *Defendants' Goodwill Statements Were Not in Compliance with GAAP*

Citing *Lucescu*, Defendants argue that Plaintiff fails to identify an objective standard, like market price, that defendant should have, but did not, use in conducting its goodwill impairment testing. Br. at 15 (citing *Lucescu*, 2018 WL 1773134, at *7). Defendants are wrong. Plaintiff does identify an objective standard that Defendants failed to use – GAAP – and, in particular, GAAP's requirement that a company measure fair value based on cash flow numbers that have a reasonable basis in fact. *See* ¶ 213 (ASC 820-10-35-9 required fair-value estimates to reflect current market realities based on the price a market participant would use); ¶ 215 (projected earnings and cash flows must have a reasonable basis). Here, GE egregiously failed to align the goodwill inputs (particularly that Alston could not be synergistic, as well as current and future cash-flow and earnings projections) with GAAP, and the realities of GE's business and the gas power market. ¶¶ 367-379, 385-417. Such concealment from investors is classic securities fraud.

Furthermore, identifying an objective metric (*e.g.* that GAAP required GE to impair Grid Solutions' goodwill by at least approximately $3 billion in the first quarter of 2018 because GE knew then that Alstom could no longer be synergistic) is one way, but not the only way, to prove that a goodwill calculation was fraudulent. The quoted language in *Lucescu* comes from *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). *Fait* did not hold that a plaintiff must point

---

[20] Plaintiff's allegations regarding Culp's admissions as well as its detailed allegations demonstrating that every one of the factors GE used to justify the third quarter 2018 impairment existed at the start of the Class Period distinguishes this case from *Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17-cv-8457, 2019 WL 4094559, at *17 (S.D.N.Y. Aug. 29, 2019).

to an objective standard; it simply explained that the challenged statements were opinions (not facts), by noting that fair value is an estimate, not an objective fact with objective metrics. *Id.* at 111-12. This background discussion did not create a new element of a goodwill fraud case.

                3.        *Plaintiff Adequately Alleges the Date and Amount of the Impairment*

Defendants perplexingly state that Plaintiff fails to identify at what point in time GE was required to take an impairment charge. Br. at 15-16. They are wrong – Plaintiff alleges that the goodwill balances announced on February 23, 2018 for the fourth quarter of 2017, on May 1, 2018 for the first quarter of 2018, and July 27, 2018 for the second quarter of 2018 were artificially inflated and GAAP required impairment. *See* ¶¶ 456, 466, 479. This case is thus distinguishable from *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 269-70 (S.D.N.Y. 2009), where the plaintiff failed to allege any point in time when an impairment should have been taken.

Defendants also claim that Plaintiff fails to sufficiently identify the size of the impairment that should have been taken. Br. at 15-16. Again, Defendants are wrong – a material impairment should have been taken in the fourth quarter of 2017, a material impairment (at a minimum of approximately $3 billion impairment in Grid Solutions) was required in the first quarter of 2018, and the full $22 billion by the second quarter of 2018. ¶¶ 367-379; 457; Def. Ex. 43 at 13. Plaintiff also explains that recognition in the first quarter of 2018 that Alstom was not synergistic and demand, sales, and revenue estimates had to be reduced were changed circumstances requiring GE to conduct interim impairment testing; GE's failure to do so violated GAAP and caused GE's goodwill balance to remain artificially inflated. ¶¶ 469-470. Finally, Plaintiff shows that there is no plausible way that a goodwill balance could go from $25 billion to a reduction of $22 billion in just nine weeks with no material or surprising negative event, unless the $22 billion impairment was required back in the second quarter of 2018. *See* ¶¶ 235-328, 368-370. On the facts of this

Case 1:19-cv-01013-DLC   Document 95   Filed 10/25/19   Page 36 of 51

case – a profound disconnect between the Class-Period goodwill balance and the truthful goodwill balance after cash-flow numbers were adjusted, the truthful goodwill balance coinciding with termination of the old CEO and elevation of a new CEO, the Company admitting that the true goodwill balance resulted from a downward revision of cash-flow numbers and the new CEO saying the Company's prior revenue outlook was not realistic, and the DOJ launching and SEC expanding an existing investigation into the goodwill accounting – it is clear that the Class Period goodwill balance statements were false and misleading, even absent a precise re-calculation of the Class Period goodwill.

4.    *Defendants' Purported "Warnings" Were Materially Misleading*

Risk warnings give rise to Section 10(b) liability when they falsely warn of a possibility that has already occurred. *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (collecting cases). Risk warnings are fact, not opinion; whether something "may" occur or already "had" occurred is a statement of present fact. *In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 986 F. Supp. 2d 487, 518 (S.D.N.Y. 2013).

The fourth quarter 2017 goodwill statement warned that "there could be an impairment in the future . . . if expected synergies of the acquisition with Alstom are not realized." ¶ 457. But this risk had already materialized before the Class Period even began. In 2016, GE's profits were 6-12% lower with Alstom included than without it, and in November 2017, Defendant Flannery admitted that the Alstom acquisition "in total has been a disappointment" and would be significantly less accretive than hoped for. ¶¶ 236, 239, 244. This "warning" is thus a misleading statement of fact. *See In re Facebook*, 986 F. Supp. at 518 (warnings of possible negative effects of mobile phone usage on revenues was misleading because negative impact already existed). Defendants' factually unsupported response that this is a "hindsight conclusion . . . not supported

by facts," Br. at 20, does not overcome Plaintiff's allegations of materialized risk misleadingly cast as a possible future event.[21]

Even assuming *arguendo* that these warnings are not independent misstatements, Defendants' cautionary language is no defense for a situation that already has occurred. *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). Defendants' knowledge that Alstom was not accretive by the first quarter of 2018 is not a "hindsight conclusion." Br. at 20. Rather, Defendants' contemporaneous knowledge of this fact is evidenced by the fact that in the first quarter of 2018 they purposefully excluded a warning about the need for an impairment in the event that Alstom was not accretive. ¶ 466. In any event, whether risk disclosures are a total defense is a "factual issue for trial." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 88 (S.D.N.Y. 2015).

## B.     Defendants Acted with Scienter

### 1.     *The Magnitude of the Goodwill Fraud Supports A Strong Inference of Scienter*

The magnitude of the goodwill fraud supports an inference of scienter. *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). "[C]ommon sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620,

---

[21] Item 303 also required Defendants to disclose that GE's reduced cash flow was reasonably likely to contribute to both a major goodwill impairment and dividend reduction. ¶ 505. Defendants argue that Plaintiff failed to allege an Item 303 violation because Defendants warned of a "challenging" market. Br. at 20-21 n.10. Defendants' warnings are insufficient because their highly generic disclosures did not sufficiently advise investors of the extraordinary downturn in the power market and its impact on cash flow and goodwill. *See Meyer*, 761 F.3d at 251; *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, No. 18-CV-00299 (AJN), 2019 WL 4601644, at *9 (S.D.N.Y. Sept. 23, 2019). Plus, the risk being warned of had already come to pass. *See* pp. 26-27; *Rombach*, 355 F.3d at 173.

636 (E.D. Va. 2000). *See also In re Salix*, 2016 WL 1629341, at *16 (finding scienter in part due to the "startling" magnitude of the fraud); *Plumbers & Pipefitters Nat'l Pension Fund*, 89 F. Supp. 3d at 619 ("the size of the purported fraud may also contribute to an inference of scienter" and large enough numbers "render less credible the defendants' arguments that they had no notice" of accounting improprieties).[22]

Defendants were inaccurate both directionally and by orders of magnitude – *$22 billion* – on the value of the Company's goodwill. They reported on July 27, 2018 a goodwill balance of $23.2 billion and that the Power Generation and Grid Solutions reporting units' carrying value exceeded fair value by 10% and 9%, respectively. ¶¶ 479-480. Yet, just weeks later GE took the largest corporate goodwill impairment since the financial crisis, and one of the largest write-downs ever. ¶¶ 330, 390. Such a reversal is strongly probative of knowledge or severe recklessness.

## 2. *The Timing of the Impairment is Highly Suspicious*

The sudden revelation of false accounting also supports an inference of scienter. *See Rothman,* 220 F.3d at 92 (sudden realization of the need to expense $73.8 million of royalty supported a finding of scienter); *Dudley v. Haub*, No. 2:11-cv-05196 (WJM), 2013 WL 1845519, at *12 (D.N.J. Apr. 30, 2013) (in finding that goodwill statements were false, noting that "[g]oodwill does not go from being unimpaired to fully impaired overnight").

The Company's sudden goodwill impairment is particularly suspicious here given that three quarters earlier the Company admitted knowledge of a severe market disruption resulting in

---

[22] *See also Freudenberg*, 712 F. Supp. 2d at 196 ("the magnitude of write-offs alleged to be the subject of the misstatements supports a strong inference of scienter"); *In re Ambac Fin. Grp., Inc.*, 693 F. Supp. 2d 241, 273 & n.38 (S.D.N.Y. 2010) (a "large enough" write-off will "support an inference of scienter"); *In re RAIT Fin. Tr. Sec. Litig.*, No. 2:07-cv-03148-LDD, 2008 WL 5378164, at *13 (E.D. Pa. Dec. 22, 2008) ("The sheer size of the impairment eventually taken . . . adds to the inference that [defendants] by imputation must have had some awareness that the problem was brewing.").

lower demand by more than 50%, ¶¶ 247, 249, laid off 18% of its workforce, ¶ 283, and recognized that Alstom was a disappointment, ¶ 236 – the factors they later claimed justified the impairment. It is also suspicious due to the identical nature of the information known by the Company between the second and third quarter impairment tests. *See supra* p. 3. When "identical factors" that force a company to make write-downs are "operative and evident to defendants" at the time of earlier public statements, such timing supports an inference of scienter. *See CLAL Fin.,* 2010 WL 4177103, at *7; *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, No. 1:00-cv-2838, 2002 WL 34089163, at *18 (N.D. Ga. Aug. 20, 2002) ("numerous allegations" indicate "that the need to write-down was so apparent to Defendants that a failure to take earlier write-downs amounts to fraud"); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1222 n.4 (N.D. Okla. 2003) ("Many of the factors which admittedly caused the write-downs were operative throughout the Class Period, but their impact were not properly reflected.").

Further, the impairment occurred at the same time as key executive firings and departures. Those are "highly unusual and suspicious facts" that "add to the overall pleading of circumstantial evidence of fraud." *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 381, 394 n. 176 (S.D.N.Y. 2007). On July 24, 2018, Defendant Hauser – Vice President and Controller and Principal Accounting Officer – announced her intention to resign after five years at GE. *See* ¶¶ 22, 398. Defendant Hauser signed each of the SEC filings containing the challenged goodwill balances, and, in highly suspicious timing, announced her resignation just three days before the second quarter 10-Q was filed and about eight weeks before the October 1 anticipated impairment announcement. *Id.* In another major move, on October 1 GE also announced that the Board had unanimously voted to fire then-CEO Flannery and replace him with Larry Culp and that the Power segment would be reorganized to now report to Culp (instead of Defendant Stokes). *See* ¶¶ 20,

329, 386-389. Then, Defendant Miller announced that she was stepping down less than two years after she became CFO (a fact that Defendants wholly ignore). ¶ 21. The timing of these major corporate departures around the goodwill impairment strongly supports an inference of scienter and provides the "link" between the executive departures and the fraud and knowledge thereof. *Cf. In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 251 (S.D.N.Y. 2007) (finding that general allegations of a single executive departure without more did not sufficiently link the resignation to the fraud or defendant's knowledge).[23]

Defendants argue that because new Board members joined before the second quarter 2018 10-Q was filed, Plaintiff's allegation that the leadership changes led to the belated goodwill impairment is not supported. Br. at 32 & n.18. They are wrong. The new Board members, including current CEO Culp, joined a giant, diverse company in April 2018, in the midst of multiple government investigations and in a month in which the Company announced a $1.5 billion reserve for a GE Capital mortgage business under investigation by DOJ. ¶¶ 190, 361. Plus, Defendants ignore that, unlike the second quarter results, the third quarter results arose from the mandatory annual impairment test. *See* Def. Ex. 43 at 80. That test would logically draw heightened scrutiny from new Board members, particularly because the Power segment had languished since the prior year.

Defendants also argue that the sudden nature of the goodwill impairment does not support an inference of scienter because GE told investors that it conducted goodwill testing and warned of risks of impairment. Br. at 31. But as discussed above, pp. 26-27, the risk disclosures were

---

[23] *See also Plumbers & Pipefitters Nat'l Pension Fund*, 89 F. Supp. 3d at 619; *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 523-24 (S.D.N.Y. 2009); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008).

misleading, warning of risks that had already materialized, and GE's nonexistent or *de minimis* Class Period impairments in the Power segment did not put investors on notice that an imminent impairment of $22 billion would occur despite the lack of any notable triggering event.

### 3.   *The Civil and Criminal Government Investigations Support a Strong Inference of Scienter*

Government investigations, both criminal and civil, are further evidence establishing a strong inference of scienter.[24] *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 167 (S.D.N.Y. 2008) (considering DOJ investigation); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 380 (considering SEC and Senate committee investigations). GE said it may take a major goodwill impairment on October 1, and by October 30, 2018, when it finalized the $22 billion impairment, the DOJ had already launched a criminal investigation. ¶¶ 329, 335. Concurrently, the SEC expanded its ongoing civil investigations into GE's accounting practices generally and the impairment specifically. ¶¶ 335. The government's immediate launch of these investigations, which are still ongoing over a year later, supports an inference of scienter.

### 4.   *The Importance of the Power Segment to the Company's Turnaround and Financial Condition Supports a Strong Inference of Scienter*

It is reasonable to conclude that Defendants "had intimate knowledge of those facts or should have known of them" when – as here – the concealed facts affected the Company's core operations and contradicted Defendants' public statements. *In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 323 (S.D.N.Y. 2010).

Like a company's key product, its key business line – the Power segment – is a core operation. As the Seventh Circuit noted, "it is exceedingly unlikely" that an executive defendant

---

[24] Although an investigation does not alone prove scienter, it should be considered in the Court's holistic analysis. *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013).

was "unaware of the problems of his [or her] company's two major products and merely repeating lies fed to him [or her] by other executives." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008). Although scienter cannot be inferred solely from Defendants' Board membership or executive position, "knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *In re Winstar Communications*, No. 01 CV 3014(GBD), 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006).

It "exceedingly unlikely" that Defendants Flannery, Miller, and Hauser were unaware of the need to materially impair goodwill. As signatories to and certifiers of the Company's SEC filings, they had a "duty to familiarize themselves" "with the facts relevant to the core operations of the company and the financial reporting of those operations," such as the issues in the Power segment, GE's main revenue source during the Class Period (including through hoped-for HA turbine sales). ¶¶ 35, 43; *see supra* at p. 19 n.14; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004). Also, Flannery was a key architect of the Alstom acquisition, which contributed $12.9 billion to the Power segment goodwill, and he regularly discussed the problems that justified the impairment, including that the Alstom acquisition would be less accretive than hoped for; GE had "exacerbated" a tough market with "some really poor execution"; that orders were down due to issues closing deals in global markets; and that GE had to take a dividend cut in November 2017 due to cash-flow issues. ¶¶ 47-55, 208, 236, 239, 244, 249, 250, 280, 291, 294. Similarly, Defendant Miller spoke about the Power segment's market and internal execution issues. ¶ 295. As reflected in these comments and by virtue of their positions and close access to Company financials Defendants Miller, Flannery, and Hauser are

knowledgeable of the pre-Class Period market dislocation and warnings that the power market was "burning to the ground" and undergoing a multi-year "paradigm shift"; GE's decision to lay off 18% of the Power segment's global workforce; and the fact that Alstom dragged GE's profits down. *See* ¶¶ 239, 244, 246-252, 283. These facts would have led Defendants Flannery, Miller, and Hauser to realize that the goodwill balances, which underwent no or *de minimis* impairments (and which was not even tested in first quarter of 2018), were false when issued, and further support an inference of scienter.

### 5.   *Plaintiff Also Adequately Pleads Motive and Opportunity*

In addition to recklessness, scienter can be established by demonstrating motive and opportunity. Defendants concede opportunity, but challenge motive. *See* Br. at 28-30. Motive allegations must be considered in the context of the entire complaint, and motive is demonstrated by allegations of a "specific benefit that would inure to the defendants."[25] *In re Openwave*, 528 F. Supp. 2d at 250 (quoting *Tellabs*, 127 S. Ct. at 2511); *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Allegations that defendants fraudulently preserved the appearance of financial health when "executives' careers and the very survival of the company were on the line" establish motive. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002). The fact that executives are forced out when the fraud is revealed confirms the fears and demonstrates something "more than the usual concern by executives to improve financial results." *Id.*

Here, Defendants faced colliding existential threats, including numerous government investigations, Alstom's failure, GE Capital's wind down, and the HA turbine defect, all of which

---

[25] *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) involved general allegations regarding executive compensation and insider trading, theories that are not advanced here, and so is distinguishable. Insider sales are not required to establish motive, as Defendants suggest, *see* Br. at 29. *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F. 3d 920, 944 (9th Cir. 2003) (lack of stock sales is not dispositive).

could have serious repercussions including significant credit downgrades or the loss of position on the Dow Jones. ¶¶ 32, 75-103, 110-118, 190-191, 207, 236, 239, 418-421, 431-435. Defendants were thus motivated not by typical executive goals, but rather because their "careers and the very survival of the company were on the line." *In re Cabletron Sys., Inc.*, 311 F.3d at 39. And, as in *Cabletron*, the feared negative consequences were borne out. GE's credit rating dropped along with the eventual goodwill impairment, GE was kicked off the Dow Jones, and Defendants Flannery, Miller, and Hauser were forced out or left. *See* ¶¶ 20-22, 398, 424.

Defendants argue that it is illogical for Defendant Flannery to fraudulently inflate goodwill to maintain the appearance of the Alstom acquisition after stating publicly that Alstom was a disappointment. Br. at 29. First, this ignores Defendant Flannery's other motivations – to maintain his own job and GE's credit rating, dividend, and position on the Dow Jones. Second, it is inconsistent with GE's argument about its risk warnings. If it is Defendants' position that Flannery's November 2017 statement that Alstom would generate lower earnings than hoped for and was a "disappointment" conveyed to the public that the Alstom acquisition was wholly unsuccessful, then why did GE warn of a potential, future risk of goodwill impairment *if* the Alstom acquisition synergies were not realized? *See* ¶¶ 236-245, 457; Br. at 17, 20. The inconsistency undermines Defendants' argument.

### 6.   *KPMG's Role Does Not Insulate Defendants*

KPMG's involvement in auditing GE's financial statement containing the fourth quarter goodwill balance cannot defeat an inference of scienter at this stage. Br. at 31 & n.17. (KPMG did not audit the first and second quarter 2018 10-Qs). Defendants have a "well defined obligation to ensure the accuracy of the information filed with the SEC" even where they have relied on independent accountants. *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013). This is particularly true given recent SEC findings that many of KPMG's

audits are inconsistent with GAAP and GAAS. ¶¶ 442-444. In any event, the affirmative defense of good faith reliance on an accountant's advice is a highly fact-specific inquiry (on which defendants bear the burden) which is suited for resolution at trial, not a motion to dismiss. *See, e.g. In re Reserve Fund Sec. & Derivative Litig.*, No. 09-md-2011, 2012 WL 4774834, at *2 (S.D.N.Y. Sept. 12, 2012).

C.     Defendants' "Competing Inferences" Do Not Defeat Scienter

As set forth above, when considered holistically, Plaintiff's allegations support a strong inference of scienter. Relying on *Sjunde AP-Fonden*, 2019 WL 4094559, Defendants propose a competing inference that they did not realize the severity of the global power market decline. Br. at 36. Defendants' reliance on *Sjunde AP-Fonden* is misplaced and this "competing inference" is inconsistent with the facts.

First, the *Sjunde AP-Fonden* quote refers to wholly different allegations regarding GE's long-term care insurance, and is therefore irrelevant. *Id.* at *11. Second, GE did not make appropriate "adjustments" along the way – GE did not even conduct interim impairment testing in the first quarter of 2018 and then abruptly impaired $22 billion, just nine weeks after concluding that the Power Generation and Grid Solutions' reporting units were 10% and 9% over fair value, relying on nearly identical historical data. ¶¶ 355, 470, 480. Also, Culp acknowledged that Class Period accounting was not realistic. ¶ 363. Defendants *failed* to adjust cash-flow numbers to reflect the Company and market realities, as required by circumstances at the start of the Class Period. *See supra* pp. 7-8. This case is therefore distinguished from *In re Magnum Hunter Res. Corp. Sec. Litig,* where the defendant took clear *public* remedial action by replacing its auditor and accounting firm and filing a 10-K. 26 F. Supp. 3d 278, 299 (S.D.N.Y. 2014). Plus, Defendants themselves acknowledged the market dislocation, as did GE's competitors. ¶¶ 246-252. Accordingly, Plaintiff's inference is "at least as likely" as Defendants' supposed non-culpable inference.

35

### III.     Defendants' False and Misleading Statements Caused Plaintiff's Losses

A plaintiff adequately pleads loss causation when allegations show a "sufficiently direct" relationship between plaintiff's loss and the information concealed by defendants. *In re Vivendi*, 838 F.3d at 263. Loss causation need only meet Rule 8's pleading requirements by "provid[ing] a defendant with some indication of the loss and the causal connection that the plaintiff has in mind[.]" *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,* 783 F.3d 395, 404 (2d Cir. 2015) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). "Whether the truth comes out by way of a corrective disclosure . . . or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *In re Vivendi*, 838 F.3d at 262. Plaintiff meets this standard.

The Complaint adequately alleges loss causation, including that GE's stock price dropped 12.36% over the course of several days in September as investors learned of the concealed oxidation defect.[26] ¶ 140. *See* Ex. 3 (Loss Causation Chart). On September 19, 2018, Defendant Stokes wrote a five-page LinkedIn post regarding numerous topics; on September 20, 2018, analysts and mainstream media expanded on the penultimate paragraph in that post. *WSJ, Bloomberg,* and *Reuters* described the shutdown of power plants due to "a flaw" with GE'S turbine blades as a "new threat," to the Company, which caused the stock price to drop. ¶¶ 120-132. On September 21, 2018, GE attempted to rebut concerns and contradicted Defendants' statements from the prior day regarding the defect's severity, causing the stock price to slide further. ¶¶ 133-135. On September 24, 2018, an analyst reported that GE's knowledge of the oxidation issue went back a year prior. ¶ 136. The stock price fell again, a 3.53% decline from the previous trading day.

---

[26] Defendants do not challenge and, therefore, concede loss causation from corrective information issued on October 10-12, October 30, and December 7, 2018. *See e.g.* ¶¶144-156, 155-156, 158-160, 162.

¶ 137. On September 25, 2018, the stock further declined after a *Reuters* report that a French power plant had to be shut down to replace H-class turbine blades. ¶ 138-139.

These allegations adequately demonstrate a "marked decline" in stock price due to a "curative disclosure" relating to the turbine defect – all that is required at this stage of the litigation. *In re Openwave*, 528 F. Supp. 2d at 253. Further inquiry into the cause of the decline alleged is "a matter for proof at trial." *Id*. (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).

Defendants argue, however, that September 20, 2018 did not disclose new, material information due to the prior day's reference to oxidation. Br. at 39. They are wrong. First, the information available on September 19 was limited, buried in the penultimate paragraph of a 5-page post, and incorrectly maintained that the turbines were meeting and exceeding their performance goals "at every customer site." ¶ 119. Stokes neither specified where or when the oxidation problem had been encountered nor the magnitude of the problem. Thus, the September 20 disclosures included new information that was negative and material; namely, that oxidation was expected to affect more of the 51 units shipped and GE had been working on a fix for months to a year, and the market reacted accordingly on that day. ¶¶ 120, 122, 124. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008) ("loss causation may be predicated upon brief, publicly-disclosed, third-party analyses of a company's financials, which contradict representations made by defendants").[27]

---

[27] Defendant's reliance on *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975(RPP), 2012 WL 1646888 (S.D.N.Y. May 10, 2012) is misplaced. There, the alleged risks were not concealed; they were disclosed in SEC filings years before plaintiff alleged the truth began to emerge. *Id*. at *30-31. *Fila v. Pingtan Marine Enter.*, 195 F. Supp. 3d 489, (S.D.N.Y. 2016) and *Turner v. MagicJack VocalTec, Ltd.*, No. 13 Civ. 0449, 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) also fail to support Defendants, as the disclosures were unrelated to misrepresentations.

Second, even if some of the facts were disclosed the prior day, the market may take longer than one day to fully respond in an efficient market, especially where technical information must be analyzed for investors. *See In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2004) (court declined to require a one-day event window and accepted a three-day event window for stock movement analysis).

Plaintiff also sufficiently alleges loss causation with respect to GE's fraudulent failure to impair goodwill. When Defendants ultimately revealed the true picture of the Power segment and GE's financial condition, the market reacted significantly. On October 30, 2018, GE announced that the $22 billion goodwill write-down had occurred; GE's purported justifications for this action; the consequence that the DOJ and SEC had begun criminal and civil investigations into its accounting practices; and that GE was cutting its dividend to a penny as a result. ¶¶ 330-333. This news caused the stock price to drop 8.78% from $11.16 on October 29, 2018 to $10.18 on October 30, on exceptionally high trading volume. ¶ 342. Plaintiff need not allege anything more. *See In re Openwave*, 528 F. Supp. 3d at 253.

Defendants contend that the October 1 stock price increase after announcement of the potential impairment undermines loss causation for the October 30 decline. Br. at 37. But Defendants ignore that GE introduced mixed news into the market on October 1 – the potential goodwill impairment was coupled with the announcement of Defendant Flannery's termination and Culp's elevation as the new CEO. ¶ 329. This information caused a very positive market reaction, with analysts exclaiming, "I 'heart' Larry Culp" and recognizing that "GE stock's positive reaction to today's news [ ] speaks volumes about Larry Culp's market perception – and we totally get it." ¶¶ 329, 518-521. It is not surprising that the stock price may not react negatively to mixed positive and negative news. *Monroe Cty. Emps. Ret. Sys. v. Southern Co.,* No. 1:17-cv-

00241, 2019 U.S. Dist. LEXIS 142630, at *35 n.11 (N.D. Ga. Aug. 22, 2019) (no statistically significant price when market presented with mixed news). S*ee also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 977-78 (N.D. Cal. 2009) (finding loss causation adequately pled despite stock price increase after issuance of financial restatements).[28]

Furthermore, the October 30 announcement revealed new information, including the impairment's precise amount and actual recording, which caused a resulting stock decline. That is sufficient to establish loss causation. *See, e.g.*, *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 575-76 (S.D.N.Y. 2007) (loss causation adequately pled when ultimate specification of precise impairment amount caused a stock decline). At this stage, the Court need not make a final determination regarding what losses occurred and what caused them. *Bristol Myers*, 586 F. Supp. 2d at 166. As long as the loss causation theory is "plausible," a complaint survives dismissal. *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 388 ("OPERS need only allege sufficient facts to support a plausible [loss causation] claim – not the most likely – at this stage."). It further disclosed the DOJ and SEC investigations, which are more than adequate to plead loss causation at this stage. *See, e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 388; *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 485 (S.D.N.Y. 2008). Finally, as a result of GE's actions, Moody's and Fitch downgraded its credit rating on October 31 and November 2, 2018, causing the stock price to tumble. ¶¶ 344-346.[29]

---

[28] Moreover, the Second Circuit has rejected the proposition that a plaintiff must demonstrate price movements in the "proper" direction even in support of market efficiency at the class certification stage. *In re Petrobras Sec. Litig.*, 862 F.3d 250, 277-78 (2d Cir. 2017).

[29] Defendants' assertion that news of credit ratings downgrades are not corrective disclosures is just wrong and not supported by the authority they cite. *See In re Vivendi*, 838 F.3d at 263 (announcements by credit rating agency of credit downgrades and potential future credit downgrades may constitute corrective disclosures); *cf. Kuriskose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d. 168, 177-78 (S.D.N.Y. 2012) (failure to plead loss causation because the disclosures did not relate to the underlying alleged fraud).

These allegations provide Defendants with sufficient information regarding the causal connection between the alleged misconduct and the harm suffered by the proposed Class.

## IV.     Plaintiff Adequately Pled a Control Person Claim Under Section 20(a)

To prevail on a claim under Section 20(a) of the Exchange Act, a plaintiff must only show: "(1) a primary violation by a controlled person and (2) direct or indirect control of the primary violator by the defendant." *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 63 (S.D.N.Y. 2017). Control allegations are broadly construed to fulfill their intention to "expand the scope of liability under the securities laws." *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, No. 1:17-cv-4576-GHW, 2019 WL 4600934, at *19 (S.D.N.Y. Sept. 23, 2019). To the extent culpable participation is required, it is satisfied by failure to correct misstatements of other defendants that the 20(a) defendant reviewed or was present for and failed to correct. *Meyer v. Concordia Int'l Corp.*, 16 Civ. 6467 (RMB), 2017 WL 4083603, at *9 (S.D.N.Y. July 28, 2017). Accordingly, Defendants Flannery and Miller are liable under 20(a) for misstatements made by other Defendants during conference calls in which they participated but failed to correct the misstatement. *See* ¶¶ 452, 454; Def. Ex. 20 at 3 (transcript showing call with Flannery, Miller, and Stokes); ¶ 477; Def. Ex. 26 at 2 (call with Flannery and Miller).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.

Dated: October 25, 2019                              Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Laura H. Posner*
Joel P. Laitman (JL8177)
Laura H. Posner (4343158)
88 Pine Street, Fourteenth Floor

New York, NY 10005
Telephone: (212) 838-7797
jlaitman@cohenmilstein.com
lposner@cohenmilstein.com

Steven J. Toll (*pro hac vice*)
Julie Goldsmith Reiser (*pro hac vice*)
Molly J. Bowen (*pro hac vice*)
Eric S. Berelovich (EB7243)
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
mbowen@cohenmilstein.com
eberelovich@cohenmilstein.com

*Counsel for TRS and Lead Counsel for the
Class*