```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X      19cv1013
                                         :      (DLC)
IN RE: GENERAL ELECTRIC SECURITIES       :
LITIGATION                               :      OPINION &
                                         :      ORDER
---------------------------------------- X
```

APPEARANCES:

For the plaintiffs:

Steven J. Toll
Julie Goldsmith Reiser
Molly J. Bowen
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

Joel P. Laitman
Laura H. Posner
Cohen Milstein Sellers & Toll PLLC
88 Pine Street, Fourteenth Floor
New York, NY 10005

For the defendants:

Miles N. Ruthberg
Blake T. Denton
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020

Sean M. Berkowitz
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611

William J. Trach
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116

Sarah A. Tomkowiak
Latham & Watkins LLP
555 Eleventh Street NW
Washington, D.C. 20004

DENISE COTE, District Judge:

In an Opinion of May 7, 2020, the Court granted the defendants' motion to dismiss.  In re Gen. Elec. Sec. Litig., No. 19CV1013 (DLC), 2020 WL 2306434 (S.D.N.Y. May 7, 2020) (the "May Opinion").  Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), courts are required to make findings as to the compliance of all parties and attorneys with Federal Rule of Civil Procedure 11(b) at the conclusion of private actions arising under the Securities Exchange Act of 1934.  15 U.S.C. § 78u-4(c)(1); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 579 F.3d 143, 152 (2d Cir. 2009) ("ATSI").  For the reasons stated below, this Opinion concludes that the plaintiffs and their attorneys are not subject to sanctions under Rule 11.

## Background

The allegations in this lawsuit are described in the May Opinion.  Familiarity with that Opinion is assumed, and only the facts necessary to the PSLRA sanctions inquiry are described here.  The plaintiffs' claims focused on two separate issues: GE's disclosure of oxidation problems affecting turbine blades and GE's reporting of its goodwill.

2

I.  The HA Turbine

In 1989, the General Electric Company ("GE") launched the 9F family of gas turbines.  In 2014, GE began to sell its next-generation HA turbine.  In 2015, GE learned of premature oxidation in two its 9F turbines, a process that can cause turbine blades to corrode and ultimately break, damaging other components along the turbine's exhaust path.  By 2017, GE knew that the oxidation issue affected its HA turbines as well.  It informed its customers of the issue and its solution to the problem.  Despite the oxidation issue, GE continued to make a number of statements over the course of 2018 praising the HA turbine.

In September 2018, a GE customer -- Exelon -- suffered a blade break in one of its HA turbines and shut down three other turbines as a precaution.  On September 19, Russell Stokes, then the President and CEO of GE Power (the division of GE that provides goods and services related to energy production), posted an article on LinkedIn that publicly disclosed the oxidation issue for the first time (the "LinkedIn Post").  He wrote,

> [W]e identified an issue that we expect to impact our HA units.  It involves an oxidation issue that affects the lifespan of a single blade component.  Obviously, this was a frustrating development, for us, as well as for our customers.  But we have identified a fix and have been working proactively with HA operators to address impacted turbines.  The minor adjustments that

3

> we need to make do not make the HA any less of a
> record setting turbine -- they are meeting -- and in
> many cases exceeding -- their performance goals at
> every customer site today.

On September 20, analysts and a number of mainstream publications, among them Reuters, reported on the disclosures made in the LinkedIn Post and the events at Exelon. Over the four trading days between September 20 and 25, GE's stock price fell 12.36%, from $12.86 per share to $11.27 per share.

II. Goodwill in GE's Power Segment

GE removed nearly $22 billion in Power Segment goodwill from its books in October 2018. The bulk of that goodwill impairment was attributed to goodwill that had been added to GE's balance sheet from its November 2015 acquisition of the French manufacturing company Alstom S.A. ("Alstom"). GE had acquired Alstom for $10 billion and had booked $17 billion of goodwill in connection with the transaction. The large amount of goodwill reflected GE's prediction that it would recognize significant synergies from the Alstom acquisition.

    A.   2017 Form 10-K

In its 2017 Form 10-K, filed February 23, 2018, GE indicated that its Power Segment had $25.3 billion in goodwill. GE included a description of its goodwill impairment-testing methodology. Based on the results of GE's goodwill impairment testing, it reported that "the fair values of each of the GE reporting units exceeded their carrying values except for our

4

Power Conversion reporting unit, within our Power operating segment." GE wrote down $947 million of Power Conversion goodwill in the third quarter and $217 million in the fourth quarter, reducing that unit's goodwill to zero.

The Form 10-K also disclosed that GE had conducted interim impairment testing of its Grid Solutions reporting unit and found that its fair value exceeded carrying value by approximately 8%. Therefore, GE found that the goodwill of Grid Solutions was not impaired. But GE disclosed concern about an impairment related to the Alstom acquisition. It explained that while the goodwill of Grid Solutions was not currently impaired,

> there could be an impairment in the future as a result of changes in certain assumptions. For example, the fair value could be adversely affected and result in <u>an impairment of goodwill if expected synergies of the acquisition with Alstom are not realized</u> or if the reporting unit was not able to execute on customer opportunities . . . .

(Emphasis supplied.) GE also noted that "[d]ue to the overall decline in the Power market," it had conducted "an interim-step one analysis" of the Power Generation reporting unit. That analysis "indicated that its fair value has declined since our last impairment test; however, was still significantly in excess of its carrying value."

B.    2018 Second-Quarter Form 10-Q

In its 2018 second-quarter Form 10-Q, filed July 27, 2018, GE reported a somewhat decreased Power Segment goodwill balance

5

of $23.2 billion. GE indicated that it had decided to perform interim impairment testing of its Power Generation and Grid Solutions reporting units. According to the 10-Q, "The results of the analysis indicated that fair value was in excess of carrying value by approximately 10% for our Power Generation reporting unit and 9% at our Grid Solutions reporting unit." GE again included the disclaimer that "there can be no assurances that goodwill will not be impaired in future periods."

C. 2018 Third-Quarter Form 10-Q

In its 2018 third-quarter Form 10-Q, filed October 30, 2018, GE wrote down $22.0 billion in goodwill. GE included much the same description of its impairment-testing methodology from its February 2018 10-K. GE's stock price dropped by 8.78% following the October 30 announcement, from $11.16 per share to $10.18.

III. Procedural History

On February 1, 2019, the original complaint in this action was filed. On April 25, the Teachers' Retirement System of Oklahoma was appointed as lead plaintiff. The lead plaintiff filed an amended complaint on June 21 ("FAC"). On August 30, the lead plaintiff filed the second amended complaint ("SAC") on behalf of itself and a purported class of all persons who purchased GE securities during the period between December 4,

6

2017 through and including December 6, 2018, and who were damaged thereby.

The 144-page SAC alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The SAC alleged that the defendants made misleading statements concerning: (1) the performance of GE's HA model gas turbine and (2) the goodwill attributable to GE's Power Segment. Named as defendants in the SAC were GE and seven GE officers and directors.

In their motion to dismiss the SAC, the defendants argued that the SAC failed to adequately plead that the defendants (1) made a material misrepresentation or omission (2) with scienter, (3) that caused the plaintiffs' losses. The May Opinion dismissed all of the claims in the SAC. On February 3, 2021, the Second Circuit affirmed that Opinion in a Summary Order. In re Gen. Elec. Sec. Litig., 844 F. App'x 385, 386 (2d Cir. 2021).

In an Order of February 25, this Court issued a schedule to govern the parties' briefing regarding the plaintiffs' compliance with Federal Rule of Civil Procedure 11(b). On March 19, the plaintiffs filed their opening submission addressed to the issue of sanctions, presented in the form of proposed findings of fact and conclusions of law. On March 19, the defendants moved for sanctions pursuant to Rule 11 against the

7

plaintiffs and their attorneys ("Rule 11 Motion"). That motion became fully submitted on April 16.

**Discussion**

"The PSLRA mandates that, at the end of any private securities action, the district court must 'include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b).'" Rombach v. Chang, 355 F.3d 164, 178 (2d Cir. 2004) (quoting 15 U.S.C. § 78u-4(c)(1)); see also ATSI, 579 F.3d at 152. "If the court makes a finding . . . that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint . . . the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(c)(2).

Federal Rule of Civil Procedure 11(b) provides that an attorney who presents a pleading to the court thereby

> certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . .
>
>> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Rule 11(b), Fed. R. Civ. P. Thus, under Rule 11, "an attorney has an affirmative duty to make 'reasonable

8

inquiry into the facts and the law.'" Perez v. Posse Comitatus, 373 F.3d 321, 324 (2d Cir. 2004) (quoting Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc., 498 U.S. 533, 542 (1991)). "Since the inquiry must be 'reasonable under the circumstances,' liability for Rule 11 violations requires only a showing of objective unreasonableness on the part of the attorney or client signing the papers." ATSI, 579 F.3d at 150 (citation omitted). An erroneous statement of fact in a pleading can give rise to the imposition of sanctions only when the particular allegation is "utterly lacking in support." Kiobel v. Millson, 592 F.3d 78, 81 (2d Cir. 2010) (citation omitted). Courts must "ensure that any sanctions decision is made with restraint," Storey v. Cello Holdings, LLC, 347 F.3d 370, 387 (2d Cir. 2003) (citation omitted), however, and "be[] careful not to rein in zealous advocacy." Kiobel, 592 F.3d at 83 (citation omitted).

In their Rule 11 Motion, the defendants claim that the plaintiffs are subject to sanctions for five misstatements in their pleadings. While the plaintiffs should not have included the first three of the five statements discussed below in their pleadings, none of the alleged deficiencies had a material impact on the viability of the plaintiffs' claims.

I.  The Disclosure Date Provided in the FAC

The defendants assert that the FAC's allegation that GE first disclosed its oxidation issue on September 20 had no factual basis. The SAC removed that allegation and instead acknowledges that GE first disclosed the oxidation issue on September 19, when the LinkedIn Article was published.[1]

The FAC's misstatement allowed the plaintiffs to advance a flawed loss causation theory in the FAC by claiming that disclosure of the oxidation issue "caused GE's stock price to fall on September 20," when GE's stock price had in fact increased after GE's initial disclosure on September 19. The plaintiffs do not deny knowledge of the September 19 disclosure, adequately explain its omission from the FAC, or deny that the omission assisted their theory of loss causation. The omission, therefore, did not reflect the best practice of law.

II. The SAC's Description of the Reuters Article

The defendants claim that the SAC fabricated a misrepresentation by GE through its unreasonable reading of a

---

[1] In arguing that the plaintiffs failed to plead loss causation, the defendants' motion to dismiss the FAC emphasized the FAC's error. The plaintiffs chose to amend the FAC rather than oppose the motion.

10

September 20, 2018 Reuters article ("Reuters Article").[2] The Reuters Article reads, in relevant part:

> General Electric Co. <GE.N> said on Thursday that four of its new flagship power turbines in the United States have been shut down due to an "oxidation issue" and warned it expects the problem to affect more of the 51 units it has shipped, sending shares lower.
>
> The giant machines form the beating heart of billion-dollar electricity plants around the world. Analysts consider GE's success with the new turbines, known as the HA class, critical to rescuing its power division from a steep decline in sales and profits.
>
> "The issue, if not quickly resolved, could hurt GE's turbine brand image and market share," Jim Corridore, an analyst at CFRA, said in a note, cutting his price target to $14 from $15.
>
> GE stock was down 3 percent at $12.49 on the New York Stock Exchange.
>
> <u>The problem was first discovered on turbine blades in a natural gas-fueled turbine operated by Exelon Corp <EXC.N> in Texas a few weeks ago</u>, GE told Reuters.
>
> The problem forced Exelon to shut down one turbine. Exelon said it shut down its three other units as a precaution.
>
> GE and Exelon said they expect the turbines to return to service soon. Neither company provided details about the oxidation or how it led to the shutdowns. . . .
>
> GE Power Chief Executive Officer Russell Stokes first mentioned the problem at the bottom of a post on its LinkedIn internet page on Wednesday, without identifying the plant or providing details. . . .

(Emphasis supplied.)

---

[2] The full text of the Reuters Article can be found at https://www.reuters.com/article/cbusiness-us-ge-power-idCAKCN1M01WX-OCABS.

The SAC alleged, based on the Reuters Article, that GE made a false statement and concealed its discovery of the oxidation issue roughly three years earlier. The SAC describes the Reuters Article as follows:

> On September 20, 2018, GE told Reuters that the oxidation issue "was first discovered on turbine blades in a natural gas-fueled turbine operated by Exelon Corp. in Texas a few weeks ago." . . . [T]he statement that the oxidation issue was only discovered "a few weeks ago" was false and misleading because GE discovered the oxidation issue in 2015, had been working on a fix ever since, and had arranged to inspect and replace blades for certain customers starting in 2017.

(Emphasis supplied.)

The May Opinion flatly rejected the plaintiffs' reading of the Reuters Article. It reasoned:

> Since this is not a statement issued by GE, but a press report about an interview, it is particularly important to read the statement at issue with care and in context. Read in that way, the reference to a "few weeks ago" refers to the discovery of the breakdown at Exelon. For instance, the lede of the article indicates that it is about the shutdown of turbines at the Exelon facility. In the key passage, GE explains that it first learned about the problem with the Exelon blades "a few weeks ago." In the sentences that follow, the focus continues to be on what had happened at Exelon and when the Exelon facility would return to operation. The reporter adds that neither GE nor Exelon provided details about the oxidation issue, further undermining the plaintiffs' effort to read the highlighted passage as a broader statement about the history of the oxidation issue generally.

May Opinion, 2020 WL 2306434, at *11.

The plaintiffs' reading of the Reuters Article can be described as aggressive at best. As discussed in the May Opinion, the plaintiffs should have exercised a greater degree of care. They should have either accurately described the Reuters Article or omitted any allegation that GE misrepresented the date of its discovery of the oxidation problem.

III. The SAC's Allegation that GE's 2018 Second- and Third-Quarter Goodwill Impairment Analyses Used the Same Data

The defendants argue that the SAC's assertions regarding the unreliability of the goodwill valuations in GE's second- and third-quarter 10Q filings in 2018 rested on erroneous descriptions of those filings. The defendants claim that the SAC falsely asserted that the impairment analyses in the two quarters were conducted on the same data, when there was no reasonable basis for that assertion.

The relevant section of GE's 2018 second-quarter 10-Q provides:

> "[W]e performed an interim step-one impairment test at our Power Generation and Grid Solutions reporting units within our Power segment in the second quarter of 2018. . . . The goodwill associated with our Power Generation and Grid Solutions reporting units was $19,401 million and $4,586 million, respectively, representing approximately 23% and 6% of our total goodwill at June 30, 2018. . . . As of June 30, 2018, we believe goodwill is recoverable for all of our reporting units."

(Emphasis supplied.) GE's 2018 third-quarter 10-Q states:

> "We test goodwill impairment annually in the third quarter of each year using data as of July 1 of that year."

(Emphasis Supplied.)

The SAC alleged:

> The disparity between the second and third quarter 2018 goodwill valuation and calculation is particularly striking, and compels the conclusion that GE's Class Period valuations lacked any reasonable basis. The second quarter 2018 and third quarter 2018 impairment analyses use the same data, yet arrive at opposite results. The second quarter 2018 interim impairment test considered the data as it existed "at June 30, 2018." The third quarter 2018 annual impairment test considered the data "as of July 1 of that year." But the outcome of the two tests could not be more different. GE announced that in second quarter of 2018 the Power Generation reporting unit's fair value was 10% over carrying value and Grid Solutions reporting unit's fair value was 9% over fair value. Then the third quarter results, examining data from the same time period, resulted in a $22 billion goodwill impairment due to reduced current and future earnings and cash flow projections.

(Emphasis supplied.)[3]

The plaintiffs read the "as of" language in GE's 2018 second-quarter filing to mean that the interim impairment test itself took place on June 30. A careful reading of

---

[3] The May Opinion did not directly engage with this allegation. It explained:

> [T]he SAC has failed to plead facts that would support a claim that the goodwill reported in the Class Period, which the plaintiffs acknowledge is a matter of opinion, was a false or misleading statement of opinion.

May Opinion, 2020 WL 2306434, at *14.

14

the filing does not support their conclusion.  A careful reader could only assert that GE performed an interim impairment test at some point in the second quarter.  The second-quarter filing does not provide the date of the interim impairment test.

IV. The Plaintiffs' Claim that GE Actively Tried to Prevent an Analyst from Disclosing the Oxidation Issue

The defendants complain of an argument made by the plaintiffs in their opposition to the defendants' motion to dismiss.  The plaintiffs argued, from a Wall Street Journal article ("WSJ Article"), that GE "actively tried to prevent" a JP Morgan analyst from disclosing the oxidation issue.[4]  The WSJ Article states:

> GE even launched a hunt for leakers . . . .  At GE, there has long been a suspicion that [the analyst] had a network of contacts inside the company that fed him information, according to former executives and people familiar with the board.  The detailed knowledge of the company in his research notes was seen by some as being suspiciously accurate. . . . In looking for leaks, no one was above suspicion, even board members were commanded to keep their mouths shut, . . . and GE took extra steps to keep any developments under wraps.[5]

---

[4] The May Opinion did not address this argument, which the plaintiffs advanced in a single sentence in their opposition to the defendants' motion to dismiss.

[5] The Wall Street Journal article can be found at https://www.wsj.com/articles/ges-nemesis-an-eerily-prescient-bear-11559905201.

15

The WSJ Article describes GE's hunt for an analyst's sources. It was not unreasonable for the plaintiffs to argue from that hunt that the defendants actively tried to prevent leaks and to control the flow of information to the public.

V. The Errors in the Plaintiffs' "Goodwill Fraud Timeline"

The defendants claim that the plaintiffs' "Goodwill Fraud Timeline" ("Timeline"), which was attached as an exhibit to the plaintiffs' opposition to the defendants' motion to dismiss, contains two false statements regarding GE's interim goodwill impairment testing and the warnings that GE included in its 2017 Form 10-K. In opposing the defendants' motion for sanctions, the plaintiffs claim that these two misstatements were "typographical," "good faith" errors.

The plaintiffs' errors in the timeline reflect a lack of care, but they do not rise to the level of a Rule 11 violation. They were confined to a single exhibit, and the May Opinion did not rely on the inaccurate information.

Viewed in the context of this litigation as a whole, the plaintiffs' five statements that are the subject of this Rule 11 inquiry were not material. The plaintiffs' lawsuit alleged that the defendants made misleading statements regarding two overarching subjects: (1) the oxidation issue that affected GE's HA turbine and (2) the impairment of the goodwill attributable to GE's Power Segment. Regarding the oxidation issue, the

16

plaintiffs alleged that the defendants made thirteen material misstatements and one material omission that they were obligated to disclose under Item 303.  Concerning the impairment of GE's goodwill, the plaintiffs argued that GE should have taken its goodwill impairment sooner and largely relied on the size of the write-down in an attempt to plead scienter.

Of the five misstatements in the plaintiffs' pleadings that the defendants challenge in their Rule 11 motion, only three were significant to any extent: the September 20, 2018 disclosure date in the FAC, the SAC's description of the Reuters Article, and the SAC's allegation that two of GE's impairment tests in 2018 came to different conclusions from the same dataset.  Those three misstatements, however, played a minor role in the plaintiffs' lawsuit.  The FAC's September 20 disclosure date was corrected in the SAC.  The SAC's description of the Reuters Article was misleading, but the statement that it described was just one of the fourteen misstatements or omissions regarding the oxidation issue that the SAC challenged, and only one of four alleged misstatements that required any detailed discussion in the May Opinion.  Finally, the SAC's allegation that two of GE's impairment tests used the same data served as a single example of an accounting irregularity, part of the "laundry list" of arguments in the SAC that challenged

17

the timing of GE's impairment write-down. May Opinion, 2020 WL 2306434, at *15.

In sum, the plaintiffs' errors played no material role in the outcome of this litigation. Accordingly, in an exercise of discretion, sanctions will not be imposed on the plaintiffs or their attorneys. These errors do not reflect the standards of practice to which plaintiffs' counsel no doubt wish to hold themselves.

## Conclusion

The defendants' March 19, 2021 motion for imposition of sanctions is denied.

Dated: New York, New York
June 30, 2021

_____
DENISE COTE
United States District Judge